UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CARLOS OSORIO,                         )
                    Plaintiff,        )
                                       )
                                       )
vs.                                    )  CA No. 06-10725-NMG
                                       )
                                       )
ONE WORLD TECHNOLOGIES, INC.,          )
et al,                                 )
                    Defendants.        )


BEFORE:  THE HONORABLE NATHANIEL M. GORTON


JURY TRIAL DAY 3


John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, MA 02210
Wednesday, February 24, 2010
10:10 a.m.


Cheryl Dahlstrom, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, MA 02210
Mechanical Steno - Transcript by Computer

APPEARANCES:

        BOIES, SCHILLER & FLEXNER LLP
        By:  George F. Carpinello, Esq., and
             Teresa A. Monroe, Esq.
        10 North Pearl Street
        Albany, New York 12207
        - and -
        SULLIVAN & SULLIVAN LLP
        By:  Richard J. Sullivan, Esq.
        40 Washington Street
        Wellesley, Massachusetts 02481
        On behalf of the Plaintiff.

        SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
        By:  Michael S. Appel, Esq., and
             William F. Benson, Esq.
        101 Merrimac Street
        Boston, Massachusetts 02114-4737
        On behalf of the Defendants.

INDEX

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEPHEN GASS | 4 | 12 | 65 | |
| DARRY ROBERT HOLT | 88 | | | |
| ROBERT BUGOS, by videotaped deposition | | | | 82 |
| JEFFREY DILS by videotaped deposition | | | | 82 |
| BRYAN WHIFFEN, by videotaped deposition | | | | 87 |
| THOMAS WAYNE HILL, by videotaped deposition | | | | 87 |

THE COURT:  Good morning, jurors.

THE JURY:  Good morning.

THE COURT:  We're ready to resume.

Dr. Gass will please retake the witness stand.

Good morning, Dr. Gass.  You're reminded that you remain under oath.  Please be seated.

THE WITNESS:  Thank you.

THE COURT:  Mr. Carpinello may continue with direct examination.

MR. CARPINELLO:  Thank you, your Honor.

CONTINUED DIRECT EXAMINATION

BY MR. CARPINELLO:

Q.   Dr. Gass, I'd like to pick up where we left off yesterday. Did you have an opinion as to whether SawStop would have substantially reduced Mr. Osorio's injuries on April 19, 2005.

A.   I do.

Q.   And what is the basis for your opinion, sir?

A.   The basis for my opinion is that we have observed the results of our saws and the SawStop technology in real-world accidents.  In over 600 accidents --

MR. APPEL:  Objection, your Honor.  This is exactly what you ruled on yesterday.

THE COURT:  Well, he can state generally the reasons for his opinion but not the details of all the material that he considered.

MR. CARPINELLO:  Without giving specific numbers --

THE COURT:  Ask another question.

BY MR. CARPINELLO:

Q.    Did you -- is one of the bases for your opinion cartridges you received back from customers, spent cartridges?

A.    That's not a primary basis, but it is part of what leads me to an understanding of what happens in these kinds of accidents.

Q.    And how does it do that?

A.    I'm able to look at the data.  The cartridge actually stores data, sort of like a black box in air airplane, and I can look at that data and see some of the circumstances of the accident.  For instance, how long had the motor been on?  What does the electrical signature of the hand coming into contact with the blade look like?  And from that I can determine was the hand approaching the blade quickly?  Was it coming in slowly?  And that gives some guidance as to what kind of injury there's likely to be, because, as we discussed yesterday, the faster the hand is coming in to the blade --

MR. APPEL:  Objection, your Honor.  Again, this is the details --

THE COURT:  No, he can answer that.  Objection is overruled.

Continue, Doctor.

A.    So as we discussed yesterday, the faster the hand is

coming into the blade, the deeper the likely injury will be, because it takes a certain amount of time to stop, and the further the hand travels in that time, i.e., the faster it's going, the deeper the cut will be.

So by looking at the cartridge, we can see how fast hands normally come into saw blades from real-world experience where this actually happens nearly on a daily basis.

Q.   And based on that do you have an opinion as to the typical speed at which a hand would approach the blade in an accident similar to Mr. Osorio's based upon -- on the basis of the material that you just described?

A.   Well, my opinion on that -- I do have an opinion.  And my opinion would be that it does not -- hands normally approach saw blades in accidents at speeds such that SawStop is effective to minimize the injury.

Q.   Okay.  And is there any other basis for your opinion, sir, as to whether SawStop would have substantially reduced Mr. Osorio's injury on April 19th?

A.   Yes, the actual real-world result that we see.  We get results.  As I described yesterday, we get -- ask customers to tell us what happened in their accidents.  And when we look at those as a whole and see what happens, in the vast majority of those cases the accidents are -- the result is a very minor injury.  And so this -- and many of them are slips, similar to Mr. Osorio's, and what we see is that in those cases, in the

vast majority of cases, it's a relatively minor injury.  And so I believe there's nothing here that would set this accident outside of that.

In addition, the nature of the way of the injury that he suffered, where it was over a long distance and appeared to be due to his hand moving through the blade, that type of an injury is almost impossible to have on a SawStop saw, because the first finger that would contact the blade -- the only way you could injure multiple fingers would be if all five fingers -- because of the injury to all five fingers on his hand -- if all five hit the blade exactly simultaneously and just happened to match the curve of the blade perfectly, then you could, in theory, have injury too all five.  That's extremely implausible.  In all likelihood one finger hits the blade first.  When that happened, that would trigger the brake. And at the normal approach speeds that we observed in real-world accidents, that results in an injury to that finger, but typically a relatively minor injury.

So Mr. Osorio's injury, where he had it to all five fingers, is almost impossible to conceive on a SawStop saw.

Q.   Do you have an opinion, sir, as to whether it is technically feasible to put SawStop on a tabletop saw such as the BTS 15?

A.   I do.

MR. APPEL:  I believe this was asked and asked

yesterday.

THE COURT:  Overruled.

Q.    What is the basis for that opinion?

A.    I've done, as I described yesterday, testing on benchtop saws, on different kinds of table saws and miter saws, which I described.  I think the testing is equally similar because the mechanics are exactly the same.  I've also designed and built and costed saws that are -- include SawStop technology.  We designed the whole thing, bought the pieces, figured out how to build it.  So I know how these saws go together.  I know what it takes to put this technology on to a saw because I've done it.  We've produced three different model saws, and I know that it can be done, not just on those, but it can also be done on smaller benchtop-style saws.

I also know that it's economically viable, because I've looked at the costs.  I'm intimately familiar with the costs of the components that go into the saw, what it takes to implement this technology.

Q.    And were you at a meeting, sir, of this Consumer Product Safety Commission in November 2009 at which Mr. Bugos --

MR. APPEL:  Objection, your Honor, 2009.

MR. CARPINELLO:  Can I finish the question, Judge?

THE COURT:  Yes.  But you did say 2009.

MR. CARPINELLO:  I did say 2009.

THE COURT:  All right.

BY MR. CARPINELLO:

Q.   -- at a meeting of the CPSC in 2009 in which Mr. Bugos made representations --

MR. APPEL:  Objection, your Honor.

MR. CARPINELLO:  I'm about -- this is an admission by Mr. Bugos at a matter directly related to Mr. Gass' testimony --

MR. APPEL:  Because he's going to do --

THE COURT:  I'll see counsel at sidebar.

(At sidebar on the record.)

MR. CARPINELLO:  Mr. Bugos made a statement to the Consumer Product Safety Commission in November 2009 that it would cost between 100 and 150 to install a flesh-detection technology on a benchtop saw.

Their position is it's not economically --

THE COURT:  Keep your voice down, please.

MR. CARPINELLO:  Their position is it's not economically feasible to do that, and Mr. Bugos made a representation on behalf of Ryobi to the Consumer Product Safety Commission that -- representing Ryobi that that's how much it would cost.

MR. APPEL:  Your Honor, this is 2009.  I have no idea if there's any truth to this at all.  I've never heard this before.  But it is so irrelevant.  A statement made five years after the manufacture date, I think it's just questionable, the

liability --

THE COURT:  I am going to sustain the objection.  We can maybe have a more thorough discussion of it at a break, but I'm not going to let you have that question now.

MR. CARPINELLO:  Okay.  Thank you, your Honor.

THE COURT:  Objection sustained.

(End of discussion at sidebar.)

BY MR. CARPINELLO:

Q.   Dr. Gass, does SawStop recommend to its users that they use the guard on the saw?

A.   We do.

Q.   And why is that?

A.   The guard -- the use of the guard will prevent certain accidents and we believe is the ideal or preferred way to operate the saw.

Q.   And do you have an opinion as to whether the use of the guard by Mr. Osorio on April 19, 2005 would have prevented his injury?

A.   Under the circumstances --

Q.   Do you have an opinion as to that?

A.   Sorry.  Yes, I do.

Q.   And what is the basis for that opinion?

A.   Listening to Mr. Osorio's testimony as to what happened and looking at the dynamics of the accident, because his hand came in from the front, it would have passed into the blade,

whether the guard was present or not.

So in this particular accident, the guard, I believe, would not have effected the accident.

Q.   And do you recommend users of your table saw use a fence?

A.   We do.

Q.   And do you have an opinion as to whether the use of the fence or the non-use of the fence -- the use of the fence by Mr. Osorio on April 19, 2005 would have prevented his injury? Do you have an opinion?

A.   I do.

Q.   And what is your opinion?

A.   I do not believe that the use of the fence in this particular case at the time the accident occurred would have prevented the accident.  It was so early in the sequence of cutting that the fence would not have played any role yet.

Q.   And why is that?

A.   The fence provides stability to the piece of wood as it's passing the blade.  And to -- and will -- it allows you to guide the piece in a straight line so it allows you to get a better cut.  But it also prevents the wood from twisting, which can cause the teeth at the back of the blade, which are coming out of the table, to grab the wood and kick it back to the user, which we talked about the riving knife can prevent, keep the wood from shifting sideways.  The fence also serves that purpose, it keeps the wood stable and in line as it passes

through the blade.  But because he was just beginning the cut and was just at the very sort of leaning edge, half inch in, whatever it was, the fence won't play a significant role at that point in stabilizing the piece of wood.

MR. CARPINELLO:  Thank you, Dr. Gass.

THE COURT:  Crass examination, Mr. Appel.

MR. APPEL:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. APPEL:

Q.   Good morning, Dr. Gass.

A.   Good morning.

Q.   Now, after you graduated law school in 1994 you practiced patent law in Portland, correct?

A.   That's correct.

Q.   And at some point in the late '90s you invented your technology, SawStop technology, correct?

A.   That's correct.

Q.   And you went into business with two of your partners at that time, your law partners?

A.   Well, really we went -- there were four of us, three -- only one was a law partner, but there were four of us, four patent attorneys from the law firm, two of them were associates, and two of us were partners --

Q.   I see.

A.   -- that started SawStop and did the original work to take

it to the trade show in August of 2000.  We did that while we were still working as patent attorneys.

After the trade show in September of 2000, two of us resigned, two partners resigned our patent practice, and started pursuing SawStop full time.  The third patent attorney came at the beginning of the year in 2001.

Q.   And in 2000, in October 2000, you and one of your partners, Mr. Fanning, went to South Carolina and met with Ryobi engineers and management, correct?

A.   That's correct.

Q.   And you showed yesterday a video of the demonstration that you did in Anderson, South Carolina, correct?

A.   A video of that demonstration was shown.  I wasn't aware it was actually taken at the time, or didn't remember it, but --

Q.   All right.  Now, at some point during the day when you met with them, you were taken to lunch with a salesman who was also present.  Do you remember that?

A.   Yes, I believe that was at that meeting.

Q.   And at that meeting he talked to you about the possibility -- the applicability of your technology to certain of Ryobi's products, correct?

A.   Well, I'm not sure what distinction you're trying to make when you say certain of their products.

Q.   Well, he talked to you about putting SawStop on certain

Craftsman contractor saws, did he not?

A.    I don't recall a conversation that was specific to putting it on those saws.  Most of the discussions were about what products that Ryobi made.  He was sort of, I think, trying to make the point that Ryobi was a leading table saw manufacturer and they had -- they made a lot of different saws.  So there was discussion about that.  There was -- he shared some of what's called TRIAD data, which is a company that, I guess, gets cash register receipt information from big box retailers like Home Depot, and he talked about sort of the sales, for instance, of job site saws, and he showed us data from that.

        So my sense of that was that it was related to kind of talking about the market for table saws and where they were in that market.

Q.    Well, you've seen the notes of that meeting that were taken by Mr. Fanning, correct?

A.    I have.

Q.    Yeah.  And those notes just refer to Craftsman saws, right?  They refer to saws -- there are three Craftsman saws, about 700.  Do you remember that?

A.    I remember there's something in the notes about the three Craftsman saws.  I think there was other things in the notes as well, but --

Q.    And you -- after that lunchtime you continued, I think, your discussions with Ryobi people that day?

A.    I -- you know, I don't remember what we did that afternoon.  I would think we would have, but I don't remember as I sit here exactly what the conclusion of those -- I remember the morning meeting and the demonstration, I do remember the lunch.

Q.    All right.

A.    I'm not sure what we did in the afternoon.

Q.    After that day you supplied a prototype to Ryobi for testing?

A.    I think we supplied the prototype in advance.  I think we had -- the saw came in a crate so it had to be shipped on a truck, and I think we shipped that saw to Ryobi in advance of the October meeting; and they, I think, put it together, it had to be assembled, you know, the pieces of the stand and stuff put together.  I believe they put that together for the meeting so it was ready when we got there for the meeting.  We then left that saw with them to do testing, I think, after that meeting.

Q.    And after that meeting you continued to have discussions with Ryobi about a licensing agreement, correct?

A.    We did.

Q.    Those discussions continued throughout 2001, correct?

A.    Yes, I think they did extend through 2001.

Q.    And -- Mr. Carpinello showed some letters going back and forth between you and Mr. Bugos, correct?

A.   Yes.

Q.   And you talked about almost reaching an agreement, you were in, actually, a hair's breath of reaching an agreement in January of 2002, correct?

A.   Well, I think we had reached an agreement in January 2002. There was, as we described yesterday, a minor, basically, typographical error that was not a point of any contention, it was just -- well, just a typographical error, basically, in the contract that Ryobi signed and sent to us.  So I think at that point we had an agreement, at least as to terms.  We did not have a binding contract because we didn't sign -- countersign, I guess, the agreement and send it back.

Q.   Now, I just want to bring the agreement back up on the screen.  This is -- actually, it's going to be pretty much the same language that you were shown yesterday.  It's trial Exhibit 4.

        (Pause.)

        MR. APPEL:  I can't really see that.

        It's the next one in.

        (Discussion off the record.)

Q.   And there was a timeline that you had agreed to, right?

A.   Yes.

Q.   And the language I want to draw your attention to is that the issue is whether the licensee shall notify SawStop and -- SD3, by the way, at that time, was your company, correct?

A.    It was.  Well, it was -- in essence, part of SawStop.

Q.    And so the agreement was that Ryobi was going to notify you and SD3 whether a licensee can develop a feasible product incorporating at least a part of the intellectual property licensed in this agreement within nine months after the effective date of this agreement.  Correct?

A.    Yes, it does say that.

Q.    And it says, "Licensee shall notify SawStop and SD3 whether the cost of any such product is feasible within 12 months after the effective date of this agreement."  Did I read that correctly?

A.    I believe you did, yes.

Q.    So you'll agree that the agreement is contingent on whether or not Ryobi can determine if it's feasible to actually put your technology on one of their products, correct?

A.    Well, the agreement is not contingent on that.  Their going forward and producing a product is contingent -- going forward with the agreement after that is contingent on that.

Q.    Fair enough, right.

        MR. APPEL:  And go back to the other -- we're still in trial Exhibit 4.

Q.    And you see --

        MR. APPEL:  No.

        (Discussion off the record.)

Q.    Yeah.  You see that one?

And that gives -- that actually gave Ryobi the right to terminate the agreement unilaterally.  They could walk away from it as long as they gave you 60-day notice, correct?

A.   Yes, that's correct.

Q.   And you would agree with me, sir, that what was contemplated was that if -- if feasible, Ryobi would start out -- again, if feasible, they would try to produce a contractor's saw, correct?

A.   Well, what was contemplated for the agreement was that they would convert the entire product line of table saws, my understanding of what was contemplated for what was going to happen.

Now, if I understand you to be asking what were they going to do first --

Q.   Yes, that's what I asked you, sir.

A.   I don't believe you did ask first, but if that's what you meant -- as I sit here, I can't say for sure whether they were -- whether they were thinking of doing that first.  It would make some sense for the same reasons it made sense for us.  So I -- you know, I would guess that to be true, but I don't have a specific recollection.

Q.   Well, you recall that I took your deposition in this case --

THE COURT:  No, don't put the video up on the screen of the deposition.

MR. APPEL:  Okay.  Can I -- would your Honor allow me to put the transcript up, your Honor?

THE COURT:  Well, are you going to ask him about specific passage?

MR. APPEL:  I am, and precisely this issue because he doesn't seem -- he doesn't really recall it.

I can also just show him the --

THE COURT:  Why don't you show him the transcript.

MR. CARPINELLO:  Could we have the --

MR. APPEL:  I'm sorry, let me just get the precise line and page.  20.  We're on page 24.

MR. CARPINELLO:  Of which transcript, please?

MR. APPEL:  Osorio Bidgood.

BY MR. APPEL:

Q.   And it says -- and I asked you:  "Right.  And, indeed, it was contemplated that the first units that might incorporate SawStop were going to be these larger contractor's saws that sold under the Craftsman unit, Craftsman label, correct?"

And your answer was:  "I -- I think that is right."

MR. CARPINELLO:  Objection, your Honor.  He didn't read the whole answer, he read one line.

MR. APPEL:  I do have --

THE COURT:  Wait.  Read the entire answer.

MR. APPEL:  I will, your Honor.

Q.   "I think that is right.  I do -- I do have some

recollection they were planning to start with contractor's saws.  I don't remember specifically it being the Craftsman, but -- I don't -- I don't know that they sold any other contracting saws at that time.  So I suspect that is probably correct."

A.   Yes, I think that's essentially what I said in answer to your question originally.

Q.   And you would also agree with me, sir, that Ryobi, as it went -- if, indeed it found that it was feasible to even go forward on a contractor's saw, that it was not contemplated that Ryobi would stop manufacturing all of the small benchtop saws that it was producing, correct?

A.   Well, I'm not sure what you mean by stop manufacturing.  Are you talking about at the time they made the contractor's saw would they cease manufacture of all others?  Or are you saying would they -- well, I'm just not sure I understand the question.

Q.   You weren't under the impression that Ryobi was going to stop manufacturing all the saws, all the different model saws they put out until each one of those saws could be adapted to incorporate SawStop technology.

A.   No, I was not under that impression.

Q.   And you know that the benchtop saws could have been produced for years before they were allowed to -- before they were able to get your technology onto one of those saws?

A.   Certainly, they were -- I don't recall any clause in the agreement that would have required them to convert their entire product line.

Q.   And you agree with me that what was contemplated in your agreement with Ryobi was that you would assist Ryobi with the electronics, in particular, correct?

A.   I recall that we were planning to assist them, I don't remember it being specifically for the electronics, but that wouldn't surprise me.

Q.   And you also do recall that in your discussions that it would take up to two years to determine even if it was feasible on a contractor's saw, correct?

A.   I don't think so.  I think the contract provided the nine months to determine if it was feasible on -- well, you know, on a saw, whether it was a contractor's saw or otherwise.

Q.   All right.  That it would take up to two -- it would take two years to get the contractor's saw to market if the feasibility had been determined?

A.   Yes, that's correct.

Q.   And so let's suppose we have the best of circumstances here.  If a contract was entered into in January of 2002, under the best of circumstances if Ryobi had determined that it was feasible to put it on a contractor's saw under this contract, they would have been required to put it out by January of 2004?

A.   Well, I'm not sure what you mean by the best of

circumstances.  The agreement provides a maximum time, but not a -- I don't know if you're trying to sort of imply that that's a best of circumstances.  It could have been -- it could be that it would take them three months to do it and they would be six months ahead of the schedule.

The agreement, if that's what you're referring to, provides -- I think it ended up being, what, nine months, 12 months, and 24 months for deciding it was technically feasible, economically feasible, and then to release it to the market.

Q.    Now, I want to just go back to the January 2002 time frame.

You do remember -- and I think you testified yesterday about some phone calls you had with Mr. Bugos at around the time you were trying to consummate the agreement, correct?

A.    Yes.

Q.    And in particular, you recalled a conversation that -- in which Mr. Bugos talked about having just gone through an acquisition of another company, correct?

A.    I do recall that.

Q.    And that was one of the reasons that he had given to you as to why there was some delay in getting back to you, correct?

A.    That is correct.

Q.    And do you recall that that company was Homelite?

A.    Yes, I believe that's correct.

Q.    And Homelite is a manufacturer of also power tools, chain

saws, and lawn and garden equipment?  You know that?

A.    Yes, I think that's correct.

Q.    Now, the prototype that you put together and displayed for Ryobi back in the 2000 time period -- and by the way, that prototype is the same prototype you showed to other manufacturers in the 2000 time period, correct?

A.    Well, it wasn't the same physical prototype.  We had three substantially identical prototypes that we produced for the trade show, those saws we then sent individually to manufacturers to test, and one of those units was the one that we provided to Ryobi.

Q.    And you would agree with me that that prototype was very unsophisticated system at that time?

A.    Well, I don't know that I would agree it was very unsophisticated.

Q.    Well, it certainly had a lot of development work that needed to be done on it before it could be a mass produced product, correct?

A.    Yes, that prototype was not designed to be a mass-produced product.  It was designed to demonstrate the viability of the technology and how it worked.

Q.    And it needed work with respect to the speed in which the braking could be accomplished, correct?

A.    That actually wasn't one of the major things that I think needed to be done.  The speed, even at that time, although we

did subsequently improve it, the speed at that time in the majority of cases, at least, was sufficient to minimize injury in most accidents.  There were certain blade configurations that took longer with the plastic break pawl to stop.  So in certain limited accident scenarios it would result in, you know, more injury than we could -- than we would like to see.  And we were able to improve that, so we did.  But for the vast majority of accidents, even that original prototype, the braking time was sufficient to minimize the injury.

Q.   Sometimes the braking time was as fast as five milliseconds and other times it was as high as ten milliseconds, correct?

A.   Actually, I think sometimes it would have been probably up to 30 milliseconds, but what came into play at that point is -- I think I described yesterday that two things happen.  First, the blade stops, and then the angular momentum, the braking torque, causes the blade to retract below the table.  When the brake is able to stop the blade very quickly, the stopping of the blade is what prevents the injury.  When it takes longer to stop the blade, then the retraction actually starts to come into play, in to minimize the injury.

So in the case of the blades that took longer to stop, actually, the retraction still was effective to minimize the injury in most accidents.  Where it wouldn't --

Q.   Sir, you're going way beyond what I asked you.  I just

asked you a simple question as to whether or not some of your tests showed that you had five milliseconds and some tests showed ten milliseconds.

A.   Well, I think --

Q.   Would you please just answer my question?

A.   I'm sorry, I'm going to have to answer the question in a way I think is accurate and honest.

Q.   Well --

A.   I think --

Q.   When your attorney -- when Mr. Carpinello has a chance to inquire, he may do so.  But I'm asking you just a simple question, and I think you've answered that question.

MR. CARPINELLO:  Has he withdrawn the question, your Honor?

THE COURT:  No, I think the answer will stand, it's not withdrawn.

Go on.

BY MR. APPEL:

Q.   Dr. Gass, in addition to the braking issue, again, there was this variability in braking, but there was another issue with respect to your prototype and that was its performance with wet wood, correct?

A.   Well, when you say there was an issue, the system was not perfect with regard to distinguishing wet wood from humans, if that's what you're referring to.

Q.   Yes, it is.  And the issue there is whether the system could differentiate between a piece of wet wood or pressure treated wood and a human hand, right?

A.   Well, the issue is with regard to how wet the wood can be, really whether it was just wet wood, because wood can be anything from sort of zero moisture to, you know -- well, it goes as a percentage of the weight is how you measure it, but it can -- it's kind of a continuum.  So you could have wood that is so wet that it sprays water as you're cutting it in a mist, and so the question was how -- what percentage moisture content or how much water could the wood have whether, pressure-treated or otherwise, and the system still have the ability to not activate, thinking that was human.

Q.   Right.  And is it fair to say that the concern there was that if a piece of wood that was wet or pressure-treated was attempted to be cut by an operator while using SawStop that it would falsely trigger, in other words, it would recognize it as a human hand, it might recognize it as a human hand, trigger the SawStop technology unnecessarily, correct?

A.   Long question, but I think that's correct.

Q.   And in that case, what would happen is that the cartridge underneath -- the brake pawl underneath the table would jam into the blade, correct?

A.   Yes, that's correct.

Q.   And stop the blade, correct?

A.    Yes, that's correct.

Q.    And that would require the replacement of a cartridge, correct?

A.    It would.

Q.    And that alone costs $70, correct?

A.    The retail cost for our cartridges is $70, $69.

Q.    And the blades that many carpenters use are carbide-tipped blades?

A.    The vast majority of blades are carbide-tipped, yes.

Q.    And many of those are quite expensive, correct?

A.    Well, the vast majority would not be, but there are certainly many examples of very expensive blades.

Q.    So it could be anywhere between $50 and $150 for a blade, depending on how sophisticated the blade was?

A.    Well, actually the blades will go anywhere from -- carbide tipped blades that are commonly used will go anywhere from 10 to 150 would be near the upper limit.  But the blades that would be used cutting that kind of lumber are likely to be construction blades, which are the -- at the lower end.  I don't know if that's significant, but --

Q.    Well, you just talked about the lumber, the kind of lumber that you're talking about, that's very -- that's building -- are you talking about building supply lumber?

A.    Well, green lumber in general.

Q.    All right.  And that -- by the way, green lumber is very

different than the kind of lumber that's used in the shops where your SawStop is located, correct?

A.   No, that wouldn't be correct.

Q.   You think that most cabinet shops are cutting green lumber?

A.   No, but you asked where our saw stops are located, and they are located in shops that do use green lumber.

Q.   The vast majority of work that's done inside an industrial cabinet shop is with very dry lumber, things like furniture making, doors, windows, fixtures, like that, correct?  That is not done with green lumber?

A.   Yes, so for those saws that are located in those locations, yes, that would be true.

Q.   Now, just back to the blade, the carbide-tipped blade, when there is a false trigger, not only would the operator be required to buy a new cartridge, he would then have to purchase a new blade, because your pawl gets jumped up right into the blade, correct?

A.   As I described yesterday and somewhat on the blades, so in the scenario I described with this kind of lumber where you're typically using the lower-cost blade, then, yes, the person would normally replace the blade under those circumstances.

Q.   And you were concerned about this whole issue with respect to your prototype's performance with wet or pressure-treated wood, correct?

A.   Yes, we certainly wanted it to be as close to perfect as possible.

Q.   Again, at some point in time after you were not able to consummate a licensing agreement, you decided to build your own saws, correct?

A.   Yes, that's correct.

Q.   And at some point in 2002 you hired a firm called Visualize, correct?

A.   I believe that was -- we did hire a firm Visualize.  Yeah, it would have been 2002.

Q.   And in July of 2002 you actually entered into a contract with them.  Do you recall that?

A.   I do.

Q.   And do you recall the terms of the contract that you entered into with Visualize?

A.   Well, generally we were trying to describe the features of a saw that we wanted them to design.  We wanted a cabinet saw, we wanted certain sort of performance characteristics.

     One of the issues that they were to work on was -- as I assume you're getting to the issue of -- better distinguishing wet wood from -- well, when we were using hot dogs as held by a human.

Q.   In effect, you wanted Visualize to build your saw for you, correct?

A.   Well, we wanted them to design the saw for us.

MR. APPEL:  May I approach, your Honor?

THE COURT:  Yes.

BY MR. APPEL:

Q.   And is it fair to say that what I'm going to show you is the contract terms and conditions that you entered into with Visualize?

A.   Without examining it I don't know for sure.

Q.   Sure.

(Pause.)

A.   I'm going to have to spend a little more time to say for sure.  If there's something specific you want to refer me to.

Q.   I just want to refer you, sir, to the fact that your signature is right here, right?  Accepted by Steve Gass.  It refers to this proposal.  And here are the contract -- the cabinet saw specifications.  You recall that, don't you?

A.   I do recall having specifications that were generally along these lines.

Q.   All right.  And so let me direct your attention to some of those specifications.

MR. APPEL:  Just a moment, your Honor --

THE COURT:  Is this contract in evidence?

MR. APPEL:  No.  I'm just showing it as --

THE COURT:  All right.

BY MR. APPEL:

Q.   So you see at the very top there, these are the contract

saw specifications.  This is July 19, 2002.  And could you just get the top of that, the first thing is that the mechanical configuration was to be modeled on a Delta unisaw, correct?

A.   That's correct.

Q.   And a Delta uni is a large cabinet saw, correct?

A.   It is a cabinet saw.

Q.   And the -- another one of the mechanical configurations is that it must meet UL and ANSI requirements and standards.  Do you see that?

A.   I do.

Q.   And the reason for that is because UL and ANSI requirements and standards embody good safety engineering principles; isn't that correct?

A.   I actually don't believe that to be true.

Q.   But, yet, you wanted it to be up to those specifications?

A.   Well, ANSI and UL standards embody certain requirements that it saved us specifying, for instance, that the saw having a guard.  So when we were drawing this up, we were trying to sort of -- it's in some ways a shorthand for saying some of the things the saw has to have.  I don't believe that UL sets good safety standard for saws, but they do set what is the norm and many of the details, for instance, that the arbor flange has to be a certain diameter relative to the saw blade diameter, you have to have a fence that's secured, you have to have a guard.  There are a whole variety of things that are specified in the

standards, that, rather than having to spell out here, we were able to just put this in as a shorthand.  It's basically saying you have to build what is a normal saw that would meet the various requirements that are out there, including --

Q.   Those are safety requirements, sir, ANSI and UL are safety requirements, are they not?

A.   Probably the focus is generally towards safety, but they specify many mechanical details.  And that's what we were primarily asking them for.

Now, many of those relate to safety, so, yes, the fact that it specifies you have to have a guard is related to safety.

Q.   And --

(Discussion off the record.)

Q.   If you look at where it says, "Reaction System" --

(Discussion off the record.)

Q.   You see where it says you wanted them to build a saw that stopped within five milliseconds, correct?

A.   Yes, that's correct.

Q.   And that it must not damage the saw upon braking or retraction.

A.   I'm sure that's true -- oh, there it is, right there.

Q.   It's the third bullet point.

A.   Yes.

Q.   And now let's go down to the section where it says,

"Guards."

A.   Yes.

Q.   Again, you see that you wanted a blade guard complying with UL and ANSI requirements and standards, correct?

A.   Yes, that's true.

Q.   And you also wanted a riving knife on it, correct?

A.   Yes, that's true.

Q.   And that wasn't addressed by the UL standards, so you wanted a riving knife that would conform to EU standards, correct?

A.   Yes, that's correct.

Q.   And that's because riving knifes were not required by UL standards in 2002?

A.   Well, the reason we had both of these things was -- or the reason we added the riving knife was we felt it was an important safety requirement and something we wanted on our saw and was not, you're correct, not required by UL.

Q.   And you were actually on an ad hoc working group along with Mr. Peot and Mr. Domeny working on revising the standards, the UL standards, at that time, sir, were you not?

A.   I was.

Q.   So you were part of the UL standard -- I mean part of working on revising the standards, because you wanted it to be improved, correct?

A.   Yes, that's correct.

(Discussion off the record.)

Q.    Now, if you look at costs, sir, you were wanting to have Visualize manufacture, actually manufacture and packaged costs should not exceed $1,300 FOB Taiwan in quantities of 2,000 per year.  That included a certain guarding and fencing, correct?

A.    Well, you started by saying we wanted Visualize to make.

Q.    That requires the T-Glide fence?

A.    That does includes the T-Glide-style fence.  You started by saying we wanted Visualize to manufacturer.  That is not correct.  Visualize is an engineering development firm that has some electrical engineers and mechanical engineers and they design products on a contract basis.  They don't have any manufacturing facility.  But this whole contract was a -- the reason we had all these specifications was it was a performance-based contract.  So we were saying this is what you want, and if you do this, we'll pay you this much.  And if you don't -- aren't able to make a saw that meets these specifications, then don't get paid.

So we were trying to be very thorough in spelling out exactly what the requirements were going to be for them to be successful, because they contacted us and said they could do this, and as I described yesterday, the three of us that were running SawStop didn't really have any product development experience.  We didn't -- had never designed production saws, didn't really know very much about that process.  And so we

were hoping to get that assistance from Visualize.

So where you see the price here at the bottom, that's a constraint on their design, that in order to be successful, this has to be a product that we can go to a manufacturer in Taiwan and get quoted and the manufacturer will quote it at, you know, this or less.

Q.   And that's what you wanted to do.  You wanted to sell a cabinet saw for $1,300, correct?

A.   No, we wanted to buy -- to pay 1,300 or less for a cabinet saw.

Q.   From a manufacturer in China?

A.   In Taiwan.

Q.   And then sell it?

A.   And then sell it, yes.

Q.   And ultimately, you wound up eventually doing that, correct?  Well, actually, you went your own way and you contacted a manufacturer yourself in Taiwan, correct?

A.   Well, I'm not sure I understand the question when you say your own way, relative to what?

Q.   Well, you decided after Visualize couldn't design the product for you -- and indeed, they didn't, they were not able to perform under this contract, correct?

A.   That's correct.

Q.   And you actually had to sue them, correct?

A.   That's correct.

Q.    And you sued them in federal court in Oregon, correct?

A.    That's correct.

Q.    And that was done sometime in October of 2003?

A.    I don't know when -- you know, I would think it probably would have settled with them returning the bulk of our money in October of 2003.  The suit probably would have been filed early in 2003, I think.

Q.    Well, you eventually -- so after that chapter ended with respect to Visualize and you -- you actually went forward with your other design engineers to put something together, correct?

A.    Well, we did -- actually, when we went forward, we ended up doing all of -- I think all of the mechanical design ourselves for the saw.  We hired electrical engineer consultants to help us with the electronics design.  As I described yesterday, I have -- had, especially at the time, a relatively limited electronics experience and was not capable of doing electronics at the level of sophistication required for a production model.

Q.    And eventually after this development work was done you started selling your saws in 2004, correct?

A.    That's correct.

Q.    And since that time you've made a number of changes in your cabinet saws, correct?

A.    Yes, we've made a variety of different changes.

Q.    And in late 2007 you started using a new microprocessor

that had a much higher processing capacity?

A.    Yes.  I'm not sure of the date, but we did at one point change to a different microprocessor.

Q.    But even today you still cannot always cut pressure-treated wood with your saw, with your SawStop cabinet saw or your SawStop contractor's saw, correct?

A.    Yes, that's correct.

Q.    And you actually recommend in your manual that -- and I think you testified to this yesterday -- that an operator go into bypass mode when he's trying to cut with pressure-treated wood -- with pressure-treated wood?

A.    With very wet pressure-treated wood that would be true.

Q.    And one of the things you want an operator to do -- you have some fancy diagnostics, I think, attached to your saw, correct?

A.    Well, there is -- there are a variety of self-tests built primarily into the cartridge because that's -- the brake cartridge, that's where the microprocessor, the brains, if you will, of the thing reside.

Q.    And so what you want an operator to do when they have pressure-treated wood is to actually place the wood up against the blade and let the diagnostics determine whether or not it has a moisture content which is in excess of what the system will allow a cutting operation to proceed with?

A.    No, that would not be a reliable way to determine that.

Q.   How -- what would be a reliable way?

A.   So the system, in order to determine if there's some piece of wood, or often it's some material that you don't know whether it's conductive or not and you want to determine that, you can place the saw into bypass.  When it's in bypass, the brake won't activate but the detection is still active.  So you cut the piece of wood that's in question, and at the end of the cut a red light will start to flash on the front if it would have detected contact, it would have fired the brake if it weren't in bypass.

So the correct way to determine whether a particular type of wood, if you have a stack of lumber, you would cut two or three pieces of it to see whether you got a red light or not in bypass.  If you did, then you would cut the rest of it in bypass; if not, you could cut it in normal mode.

Putting the wood up against the side of the blade will trigger a red light, but it's a very different system and it's not meant to determine whether or not you could have cut that piece.  It's actually meant to determine whether somebody is touching the blade at the time that they try and turn on the saw.

So it's a far more sensitive system, probably five or ten times more sensitive to moisture in wood than what it takes to cause an activation.

Q.   Fair enough.

And when you put it in bypass mode -- again, that means that your whole technology is not operating, correct?

A.    Yes.

Well, I should clarify.  It means that the system will not save your finger if you run your hand into the blade.

Q.    So, for instance, a small contractor who's doing decks that require pressure-treated wood will very frequently not be able to use any of the safety features of your system, correct?

A.    I don't believe that's true.

Q.    And on what basis don't you believe it's true, sir?

A.    Well, in my experience, most pressure-treated wood does not create a problem.  It is relatively unusual for pressure-treated wood to be wet enough to cause the system to either shut down, as we described yesterday.  The first line of defense when you're cutting, in a sense, defense against activation with pressure-treated wood is the overload system I described yesterday, where if you're cutting along and the saw sees something it thinks is close to a human but not quite, it will shut the saw off and try and warn you that this might be something you need to cut in bypass.

Q.    I see.  So when a carpenter picks up a piece of pressure-treated wood and starts feeding it through your saw, at some point, if there's too much moisture in it, the saw will just shut down.

A.    That's one possibility, yes.

Q.   And you'll agree with me that often a piece of wood has --
the moisture content could vary across the whole length of the
board, so that say you're cutting a piece of two-by-ten or
two-by-eight and it's ten feet long, that there might be less
moisture in the first two feet of the board than there is in
the middle two feet of the board, correct?

A.   Yeah, that's possible.

Q.   So often, you know, you may start a cut under your
scenario and the operator's putting in some pressure-treated
wood, and then midway through the cut it just -- it stops, your
machine stops?

A.   Yes, so if the wood you're operating with is on the margin
of what you could -- was too wet to cut, then you might have
that, as you describe.

     If the wood is, you know, what I consider more normal
moisture levels, then you wouldn't have that scenario.

Q.   Now, you finally did, again, market your saw, your cabinet
saw, that is, in late 2004, correct?

A.   Well, we sold the first ones in -- well, I guess we sold
the production pilot run prototypes I talked about in sort of
April, May 2004.  The first sort of commercial sales, if you
will, that were not test units that we followed up on closely
went out in August of 2004.  And then really what I would
consider normal production started in November of 2004.

Q.   And those saws weigh almost 700 pounds?

A.    That would be pretty close.

(Discussion off the record.)

Q.    And that is -- what I'm showing you, that's the owner's manual for your cabinet saw, correct?

A.    Yes, it appears to be the cover.

Q.    And that saw, again, weighed about 700 pounds, used, of course, in cabinet shops, correct?

A.    Cabinet shops would be one of the places where it would be used.

Q.    Certainly it's not a transportable saw, correct?

A.    It's not easily transported at 700 pounds.

Q.    And it -- it sells or it certainly sold at that time for somewhere in excess of $3,500, correct?

A.    No.  Actually, the first ones we sold, I believe, for $2,195 was, I think, the initial price.  We had -- the fence was separate, and so I think you could buy the basic saw without the fence for $2,195 and then the fence -- we had two different fence models, small and large ones, that were $250 and $350.

Q.    And then you had to have it delivered, correct?

A.    Yes, in most cases people had to have it shipped to their location.

Q.    The total price after you put all the extras, your fence, your rails -- in other words, you sold your product without -- giving the consumer choices as to what kind of fence to put on

your saw, correct?

A.   We did, yes.  Many of our saws were going in to replace perfectly good saws that people had a fence on already, and so we felt like it was -- that they were -- since they were throwing away the existing one, they could use their existing fence, they would prefer in some cases to use their own fence rather than purchase ours.  So we offered that option.

Q.   And the price with everything included approached certainly $3,000, sir, if not more?

A.   Well, it -- so the other thing, when I said the base model, there are different motor configurations.  There's a three horsepower, five horsepower -- well, initially there wasn't seven-and-a-half.  So those motors -- if you bought a bigger motor it cost more.  But the base -- the one we sold the most of was the three horsepower that sold for -- I think it was $2,200, but I couldn't swear, it might be plus or minus a hundred dollars.

The fence then would have -- I think was 250 to 350, say 300 on average, so that puts you at 2,500.  The shipping on average would be, oh, maybe 300.  So that probably gets you to $2,800.  So in 2004, you would have been just shy probably of $3,000 for the typical saw.

Q.   And early on you also had wanted to manufacture and sell a contractor's saw, correct?

A.   Well, I'm not sure what you mean by early on.

Q.   Well, when was it that you thought that you might want to also sell a contractor's saw, the saw that you have right next to you in the courtroom?

A.   Well, it's -- the question is not -- doesn't quite fit the facts.

We started out, actually, with a contractor -- we had done the prototypes on a contractor's saw, so the sample we sent around for the manufacturers to look at was a contractor's saw.

The first saw we originally thought we would make that we started working on was going to be a contractor's saw, and then we decided that we -- it was better to make a cabinet saw first for sort of marketing reasons, and so we changed from the contractor's saw to a cabinet saw design.  Then after the cabinet saw came out -- well, actually as the cabinet saw was coming out, we were working on the design of this contractor's saw as well.

Q.   So you were working on a design of the contractor's saw in 2004, correct?

A.   Actually, I think we probably started on the design in -- in late 2003, I think.

Q.   But that didn't come onto the market until June 2008, correct?

A.   You know, was it 2008 or 2007?  I can't say for sure.

Q.   Well, good enough, either one, 2007 or 2008.  I believe it

was 2008, sir.

A.    Okay, it's possible.

Q.    And that saw, the saw that we have in the courtroom, that's your smaller saw.  That weighs almost 300 pounds, correct?

A.    I think it's a little less with the base fence, maybe 280, but in that neighborhood.

Q.    Well, I guess it depends, because the saw that you have in the courtroom -- and would you mind just wheeling that out for the jury?

THE COURT:  Yes, he may.

Q.    You can just put it in front of the witness stand.

MR. APPEL:  Would that be okay, your Honor?

THE COURT:  Yes.

MR. APPEL:  I'm not going to ask him to demonstrate on it.

A.    Do you want it in any particular orientation?

Q.    Yes, please, just so that the jury can see it in the front.  That's great, the jury can see the front of the saw.

A.    Right here?

Q.    Yes, thank you.

And there's a motor there that also comes with it, you don't have to attach it, but, of course, what you're showing the jury now is not the complete product, correct?

A.    No, it doesn't have all the attachments as we described

yesterday.

Q.   Right.  So not only does the motor have to be attached, but it also needs rails on both sides and extra cast iron tables, correct?

A.   No, actually the tables that come with the base model extend to -- what we call wings that come with the base model are sheet metal.

Q.

             (Discussion off the record.)

             THE COURT:  You can return to the witness stand.

             Thank you, Dr. Gass.

BY MR. APPEL:

Q.   And on the screen now is the owner's manual that comes with that contractor's saw, correct?

A.   Yes, it appears to be.

Q.   And that's how it looks like.  That's how it's equipped and sold, correct?

A.   Yes, that includes the standard components, the complete fence and both extension wings.

Q.   And so that saw is sold, actually, with three different options.  You can buy it with rails that are 58-and-a-half inches wide, correct?

             Let's say 30-inch rails, okay?

A.   Yes, that's what's pictured here on the front is the base model, which allows you to cut 30 inches to the right of the

blade.

Q.    And the cost of that saw is $1,600, correct?

A.    Yes.

Q.    And if you buy it with 36-inch rails, it goes up to $1,800, correct?

A.    In that neighborhood.  I couldn't say specifically.

Q.    And if you buy it with 52-inch rails, it goes up to, what, $2,000?

A.    I don't think there's that much difference.  I think there's about a hundred dollars difference between the 36 and 52, but I'm -- I couldn't give you a specific number.

Q.    You'll agree with me that there's no -- this saw is very different than the BTS 15, correct?

A.    Yes, it's designed for a different primary use.

Q.    And you do not dispute that the BTS 15, the small benchtop saw which has just a plastic body and lightweight metal, that is a transportable saw, correct?

A.    I think it would meet that description, yes.

Q.    And you know that that weighs about 58 pounds, correct?

A.    That would -- I don't know that specifically, but it sounds about right.

Q.    Now, you know that those kinds of saws, like the BTS 15, make up the large majority of the table saw market, correct?

A.    Well, certainly the -- what I would call benchtop saws make up the large majority.  The BTS 15 is one sort of example

that -- gosh, might even be at the upper end of that --
probably not -- the middle of that market, I guess.

Q.   To this day you have not designed and developed a benchtop
saw, correct?

A.   We have not produced one.  We have done designs.

Q.   Well, let's go into that, sir.

What you did was back in 2000 you put a brake pawl on
top of a very small Delta saw, correct?

A.   For testing purposes, yes, that's correct.

Q.   That's what you did.  And I think you've described --

A.   It was probably 2001, I think, rather than 2000.

Q.   All right.  And you did two tests, right?

A.   Yes, with that Delta saw.

Q.   Again, that was not a real prototype, that's just putting
your brake pawl on the Delta saw, correct, to see, you know, if
it could stop the blade, correct?

A.   I guess I would disagree with that.  I would say that
that's -- it's a prototype, the purpose of the prototype was to
evaluate the effect of braking on the saw and to evaluate it in
the context of a lightweight saw of what happens given the
angular momentum, the spinning blade you have in there, what
happens to that saw when the brake is applied.

Q.   You didn't design a benchtop saw, sir, you just took
somebody else's benchtop saw and put your brake pawl on top of
it, right?

A.   If you're limiting it to that particular saw, I didn't design that saw, but that's not what I was referring to when I said we designed a benchtop saw.

Q.   You have never designed a benchtop saw, have you, sir? And you have testified to that at least a half dozen times?

A.   Actually, we have done designs on a benchtop saw.

Q.   Can you show the jury any benchtop saw that you designed, sir?

A.   I don't have any designs with me.  We have provided some drawings in the past that are confidential drawings.

Q.   You have shown me a CAD drawing, correct?

A.   That is a design, yes.

Q.   Sir, that's just a rendering that you had GeeTech do, correct?

A.   No, that's a 3D CAD model of a saw design.

Q.   Did you ever build that saw?

A.   We did not.

Q.   So that's not a prototype that you actually have designed, correct, sir, or developed?

A.   Well, those are two different questions.  We have designed such a saw.  It was not something that we decided to put into production.

Q.   Those drawings don't have any detailed mechanical specifications to them, correct?

A.   Well, they do have many detailed design specifications.

I'm not sure I follow your --

Q.    Those are just drawings, sir, that you -- you showed me three drawings.  You haven't designed anything with respect to those drawings, correct?

A.    Well, drawings -- when you design something, that's what you do, is make drawings.

Q.    Have you -- but you did not build a prototype, correct?

A.    We did not build a prototype based on those.

Q.    And the only other testing you've done is testing of miter saws and hand-held circular saws, correct?

A.    No, I wouldn't say that's correct.

Q.    What other testing have you done, sir?

A.    Well, the testing -- all of the testing that we've done related to our current saws and most particularly, most tellingly the results that we've seen in the field of how a saw works --

Q.    Sir, I'm talking about benchtop saws.  The only testing you've done on benchtop saws are the two tests that you did back in 2001 on that Delta saw that you put your brake pawl on, correct?

A.    Well, it's going to be a semantical question.  I think all of the testing we've done of SawStop technology on different machines, including miter saws, including our production models and prototypes that led up to that, is all relevant to how you would implement this technology on a benchtop saw.

Q.   You say it's all relevant, but, sir, you did not -- again, you did not actually test a benchtop saw.  You tested other saws.  You didn't do any further testing of a bench top saw since that testing in 2001; isn't that correct?

A.   If you want to say on a, you know, a full, physical benchtop table saw -- well, even that's not correct, because we did do detection and isolation testing on those kinds of saws on actual benchtop table saws.  Now, most of that was in the same time frame -- no, some of it was in 2003 as well.  So there would have been other testing as well.

MR. APPEL:  Could I have the --

(Discussion off the record.)

MR. APPEL:  May I approach the witness, your Honor?

THE COURT:  Yes.

(Discussion off the record.)

BY MR. APPEL:

Q.   Now, I asked you, again, under oath, sir -- and this was back in September of 2008 --

A.   Can I see the place you're referring to?

Q.   Let me show you --

MR. CARPINELLO:  Could I have the page, please?

MR. APPEL:  It's page 39, line 23.

BY MR. APPEL:

Q.   And I asked you, "Subsequent to that testing on that Delta saw do you recall any other testing you've conducted over the

years on benchtop table saws?"

And your answer was:  "I can't think of any offhand."

A.   Can I read the rest of the answer?

Q.   Yes.

A.   "And especially if you're limiting it to benchtop table saws.  And the reason I make that distinction is that much of the work we did, for instance, with miter saws, is equally applicable to benchtop table saws, and we did a lot more testing in that they use the same type of motor and same type of direct drive.  So the testing we did on those types of machines is informative as to what would happen in a benchtop table saw."

And I think elsewhere in this deposition I --

Q.   Sir --

A.   Excuse me, can I finish my answer?  You're implying that I was misrepresenting something.

The testing that we did, I think, I referred to you the other testing that I mentioned here today with the electrical isolation testing, that that came up.  I may not have thought of that at that point, just like today it wasn't the first thing that occurred to me, but you're talking about something that happened, you know, nine or ten years ago.  And so, you know, pieces occur over time.  And I think we did discuss that in that same deposition.

Q.   All right, sir.  You want to continue to take this

position.

MR. APPEL:  Can I get Landrum?

Q.    This is a deposition, sir --

(Discussion off the record.)

MR. CARPINELLO:  Can I get a copy?  I don't think we were provided --

MR. APPEL:  I'm sorry, I don't have a copy.

BY MR. APPEL:

Q.    This is a deposition that was taken of you, again under oath, in a case pending in another jurisdiction.  This deposition actually took place a little bit over a month ago. And again, you were asked?  "You haven't done any specific testing since 2002 devoted to assessing putting the SawStop technology on a portable benchtop saw?

"A.  Well, that depends on what you mean by that, because we have not done -- I think the testing, like what you saw in that video" -- and the video was of those saws jumping up and down --

A.    I would dispute --

MR. CARPINELLO:  Objection to the characterization.

THE COURT:  Sustained.

BY MR. APPEL:

Q.    -- "where it was attached to the benchtop saw and we are trying to brake to see what would happen, that testing I think was all done prior, and I don't think that I've done any

testing on a benchtop saw specifically."

Did I read that correctly?

A.    You did, but this is -- you have to see that it was referring to since 2002.  The other testing -- actually, I guess I -- and I'd have to read more in context here to know whether this was in reference to just the mechanical side.  It seems to being focused on the braking.  So if the question is related to the braking side of it, we have not done any testing specifically on benchtop table saws since 2002.

The electronic-related, isolation-related testing some of that, I believe, was done in 2003, probably not much later than that.  So --

Q.    What you did was you tested miter saws and hand-held circular saws, correct?

A.    We also did tests on miter saws and hand-held circular saws, yes.

Q.    And you would agree with me that your Chinese -- you have Taiwanese -- a Taiwanese company that manufacturers your product for you?

A.    There are actually three different Taiwanese companies that manufacture our products for us now.

Q.    And you have stated you -- they would like to actually manufacture a small benchtop saw for you, correct?

A.    Yes, each of them have expressed an interest in manufacturing such saws for us.

Q.    But you haven't -- you haven't done that, sir?

A.    We have not pursued that, no.

Q.    And that's because you haven't overcome the mechanical problems associated with putting your technology in a benchtop saw, correct?

A.    No, that's not why.

Q.    You say it's all economic reasons, right?

A.    No, I didn't say economic, I said business related and marketing related to the size of our company as a start-up and not feeling like we were capable of dealing with companies the size of Home Depot.  That is just not a business we feel like we can take the risk to undertake at this point.

Q.    Now, you agree that consumers will compare products based on many different factors, correct?

A.    Yes, I would agree with that.

Q.    People are going to assess whether they're going to buy a saw based on what needs they have, correct?

A.    That would be one of the factors.

Q.    What kind of projects they need to accomplish with the saw, correct?

A.    Yes, I think that would be one of the factors.

Q.    How many features they want on the saw, how many bells and whistles, correct?

A.    Yes.

Q.    And, of course, cost is also going to be a factor for any

consumer, correct?

A.   Yes, I believe so.

Q.   And as a matter of fact, when you built your saw, you were concerned that the users wouldn't buy your saw just because it was safe?

A.   I don't think I would characterize it that way.  I think we actually thought people would buy our saw because it was safe.

Now, we also felt like we wanted to make a quality saw, so if that's what you're referring to, then, yes, that was -- that was certainly a consideration.

(Discussion off the record.)

Q.   You prepared a report in this case, did you not?

A.   I believe I did, yes.

THE COURT:  Are you about to question him about his report?

MR. APPEL:  Yes.

THE COURT:  It doesn't need to be on the screen then at this point.

MR. APPEL:  Okay.

I will show him his report, your Honor.

BY MR. APPEL:

Q.   And I'm reading from paragraph 46 of your report.  And let me start here.  This is the -- the context is that you went to Taichung in October of 2002, and you met with some

manufacturers, correct?

A.   Yes, that's correct.

Q.   And it says, for example, We designed our saw to include a riving knife to minimize kickback, a more functional blade guard, a bigger table, and stronger bearings.  We included features like this -- like these because we thought woodworkers would not buy our saw simply because it was safer.  It had to be a quality machine.

Did I read that correctly?

A.   You did.

Q.   Is it fair to say that your position here is that whatever additional cost it would add to a benchtop table saws that consumers should have to pay it so that it could get your -- so that it could have SawStop technology on the market?

A.   Well, it would be my position that it's not reasonable to sell a saw without this kind of technology.  And so that would increase the cost of particularly the lowest cost saws, and that those saws are so unreasonably dangerous that I don't think they should be on the market.

Q.   So every saw sold has to have your technology on it.  Isn't that what you're saying, sir?

A.   No, I'm saying every saw sold should have some type of technology to protect the user in the event of contact with the blade or dangerous proximity to it.  Just like I think every car should have seat belts.

Q.    You're a patent lawyer, sir, correct?

A.    That's what I did for a living, yes.

Q.    And you have at least 35 to 40 patents on your invention, correct?

A.    That's correct.

Q.    And it's your opinion that there is no other flesh-detection technology that would be outside the scope of your patents, correct?

A.    That is my hope that that is true.

Q.    So, in effect, there is no flesh-detection technology, in your opinion, that would be outside the scope; and, therefore, all flesh-detection technology would have to be in your interest, correct, sir?  You are the one who would be getting royalties on every single saw made?

A.    Well, it's not me personally, to begin with, it's the SawStop company, which I'm one of the owners.

     But it's the -- this technology, the SawStop technology, is the only technology I'm aware of which actually accomplishes this result.

     I understand that the Power Tool Institute through their joint venture has developed an alternative technology.  I don't know enough about that technology to say whether it's -- would be -- would require a license or not.  I hope that it does.  I suspect that they put a great deal of efforts into trying to avoid having to license us, otherwise I suspect they

would have involved us in that process.

Q.   And is it fair to say, again, that if a saw couldn't be sold without your technology, it shouldn't be sold?

A.   No, that's not what I said.  I said if a saw can't be sold with technology to protect the user, then I don't think it should be sold.

Q.   Flesh-detection technology?

A.   Well --

Q.   You mean the flesh-detection technology?

A.   With technology to protect the user in the event of contact or dangerous proximity to the blade.

Q.   Would you agree with me that you -- with respect to your technology you never did a formal hazard analysis?

A.   I would say we never did a formal hazard analysis, but I will also say that throughout the development process, analyzing what could have happened, what could go wrong, and trying to address those in advance, sort of pervaded my life because this whole -- the future of this technology depended on our ability to build a saw that would work reliably and protect users.  And if the technology failed to work when we put it out there, it would die.  And I felt a significant responsibility for the technology, having invented it, to get it out there. And if I screwed it up and it died because no one else was showing much interest in bringing it to market, that would have been my responsibility.  And -- so it was -- not to mention of

course the liability that we would have been exposed to.  That was something that, you know, I ate and breathed and slept every day for years trying to anticipate what could go wrong.

So to say we didn't do a formal one is, I think, misleading in that we did do extensive failure analysis.

Q.   Right.  You went through a thought process.  Again, as you just stated, one of your own concerns was product liability suits, correct?

A.   That was a -- it would have been an issue.  I don't know that I would say that was one of my primary concerns.

Q.   Because you wouldn't want to find yourself here as a defendant in court either, would you?

A.   I wouldn't want to find my products maiming my customers.

Q.   Now, with respect to the hazard analysis, you are aware of the standard of safety engineering principles, correct?

A.   I have come to be familiar with them.  I was not at the time we designed the saw.

Q.   When did you come to be familiar with them?

A.   Over the last couple of years.

Q.   Now that you are familiar with them, you do understand that the first line of defense with any table saw would be to provide proper guarding, correct?

A.   If you can provide perfect guarding, then that would be the ideal solution.

Q.   Well, you provide a guard with your saw, correct?

A.   Yes, we do.

Q.   And you got in front of the jury yesterday and you extolled the virtues of that guard in comparison to that guard on the BTS 15, did you not?

A.   Yes, I did.

Q.   And actually, in your manual, you warn users repeatedly to use your blade guard, correct?

A.   I'm sure we do, yes.

Q.   And you also warn them to use the fence, correct?

A.   I don't -- I think that's probably true.  I don't remember that warning specifically.

Q.   Well, let me show you that, sir.

     This is your contractor's saw manual.

A.   Okay.

Q.   I refer you to page 7.

     Do you see that?  And it says you must --

     MR. APPEL:  Can I have this on the screen, your Honor?

     THE COURT:  Yes.

     MR. APPEL:  Could you put that on the screen?

BY MR. APPEL:

Q.   All right.  You see number 21.  It says, "You must install a rip fence before using this saw.  Attempting to use the saw without the rip fence could result in serious injury."  Do you see that?

A.   I do.

Q.   Then number 22 says, "Always maintain control over the material being cut.  Never cut any material freehand."  Correct?

A.   It does.

Q.   And go to the next page.

You also have warnings on the saw itself, not just in this manual, correct?

A.   There are warnings associated with the saw, yes.

Q.   And you have a warning label which says use the blade guard, correct?  Number 2?

A.   Yes, number 2 says that.

Q.   And you have another warning, number 3, which says keep hands out of the line of the saw blade, correct?

A.   Yes.

Q.   And you have a warning, number 6, do not perform any operation freehand.  Correct?

A.   We do.

MR. APPEL:  Go to page 47.

Q.   And there's a section about using your saw, correct?

A.   There is.

Q.   And right in the middle it says, "Warning, a rip fence must always be used when making rip cuts.  Never perform a ripping operation freehand or serious injury may result."  Correct?

A.   That's correct.

Q.   Now, you were not able to come to an agreement with respect to licensing with Ryobi in 2002, correct?

A.   Well, actually I think we did come to an agreement.  It fell through.

Q.   Died on the vine, so to speak.

A.   Well --

Q.   You couldn't get Mr. Bugos to return your phone calls, correct, to finally sign off on the last little bits of that agreement, correct?

A.   As I described yesterday, Mr. Bugos did not ever return a resigned agreement with the typographical changes.

Q.   And then in 2003 you filed a petition with the Consumer Product Safety Commission, did you not?

A.   I, along with several hundred other people, did, yes.

Q.   You wrote that petition, correct?

A.   I participated in writing it.  I did not write it individually.

Q.   You had some of your partners write it?

A.   My -- partners not technically correct, but, yes, the other people that I worked with at SawStop, all of us participated in writing it.

Q.   And you were asking the federal government through the Consumer Product Safety Commission to make your technology mandatory on all table saws, were you not?

A.   No, that's not technically correct.

Q.    Well, you were -- okay.  So you wanted them to issue a requirement that all saws designed for cutting wood with a diameter of less than 12 inches have a flesh-detection technology, correct?

A.    I don't believe that language is exactly correct.  I think -- but in substance we asked for a performance requirement that all saws should have some type of system to prevent injury in the event that a user -- prevent or limit injury in the event a user contacted the blade.  The only such system I know of to date is ours.  But there may well be others that meet the functional requirement, and that's what we were asking for, not that they require SawStop in particular.

Q.    And, of course, you would benefit substantially if that was made a requirement, correct?

A.    Well, actually it's somewhat of an open question, because there are two ways that it could play out if that happens.  One is that the industry decides to license the technology, and if that happens, then, yes, we would certainly benefit from that. I would like to see that happen.

        The other way it could play out that I personally see as equally likely is the industry stays banded together and decides to challenge our patents and we're a small company with very limited resources and could essentially overwhelm us with patent litigation and may well put us out of business.  So it could well end SawStop as an independent entity.

Q.   In 2004 you met with Attorney Sullivan here?

A.   I -- he flew out to visit SawStop and see the technology, but I don't know if it was 2004 or not.  It was -- it would have been several years ago.

Q.   And he came out with this gentleman back here, Mr. Holt?

A.   He did.

Q.   And you have actually spoken with Mr. Holt on several occasions, have you not?

A.   I have.

Q.   And you've spoken with him about this case and other cases, have you not?

A.   Certainly.

Q.   And you're not charging a fee here today for the plaintiff's lawyers, are you?

A.   I am not.

Q.   And is it fair to say you have an interest in this litigation?

A.   Yes, I think that's fair to say that I have -- I'm very interested in how it comes out.  I believe the manufacturers have made a rather despicable choice to continue to produce saws that injure their customers, and I would like to see that changed.

Q.   You have more than that kind of an interest, though, you have a financial benefit in mind, too, don't you?

A.   I don't directly benefit from it.  As I described before,

there are sort of two ways -- sort of just like CPSC, if this litigation and other litigation were to go forward and cause the manufacturers to feel like they had to change, there are two ways that could play out.  One is they come to us and license the technology.  In that event, yes, we benefit.  And the other, I think equally likely possibility, is that the manufacturers decide to simply go forward without a license and we're faced with, you know, years and years of patent infringement litigation and potential bankruptcy.

Q.   But it's your sense and your opinion that your patents cover the scope of all flesh-detection technology, correct?

A.   No, I don't have an opinion on that.

Q.   Isn't that what you just said?

A.   No, I said I hope it does.

Q.   Ah, okay.

MR. APPEL:  I have no further questions for you.

THE COURT:  Any redirect?

MR. CARPINELLO:  Yes, Judge.

REDIRECT EXAMINATION

BY MR. CARPINELLO:

Q.   Dr. Gass, Mr. Appel asked you about a petition submitted to the Consumer Product Safety Commission in 2003.  Do you recall that question?

A.   I do.

Q.   And did the Consumer Product Safety Commission investigate

SawStop in response to the petition?

A.   They did.

Q.   And did they issue a report?

A.   They did.

Q.   And what was the conclusion of the report?

A.   The conclusion --

MR. APPEL:  Objection, your Honor.

MR. CARPINELLO:  Your Honor, he opened the door.

THE COURT:  What is the question, again, Mr. Carpinello?

MR. CARPINELLO:  I asked whether the CPSC had issued a report?  And the report is a public document.

He asked in his cross if a petition was filed in 2003 to the Consumer Product Safety Commission.

THE COURT:  I understand.  The objection is sustained. That did not open up this line of inquiry.

BY MR. CARPINELLO:

Q.   Did the Power Tool Institute oppose the petition?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.   Did Ryobi oppose the petition?

A.   They did.

Q.   Did Mr. Bugos appear before the Consumer Product Safety Commission in November of 2009 and oppose the petition?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.   Is Ryobi a member of the Power Tool Institute?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.   Mr. Appel showed you a copy of a manual that accompanies your saw that has the warning that the rip fence should always be on the saw.  You believe that, do you not?

A.   I do.

Q.   And why is it important to have the fence on the saw?

A.   Well, the fence does -- is useful in terms of cutting it, and stabilizes the material while you're cutting.  It allows you to do a better job cutting than if you were to try and freehand, because it guides the material and allows you to cut on a straight and parallel line.  But it makes it safer to cut.

Q.   And its primary purpose it to prevent a kickback?

A.   It relates to preventing kickback.  I don't think I would describe it as the primary purpose.  The primary purpose is to guide the wood, but guiding the wood does tend to reduce the chance of kickback.

Q.   And it's your opinion that it would not have -- the absence of the fence in this case would not have made any difference?

A.    No, given the circumstances of the accident where he hadn't actually gotten far enough in where a fence would have come into play, I don't think it would have made any difference.

Q.    Mr. Appel asked you about standard risk analysis, engineering principles of risk analysis and hazard mitigation. Do you recall that?

A.    I do.

Q.    And he asked you a question whether the first line of defense is a guard.  Do you recall that?

A.    I do.

Q.    And do you know what the -- are you familiar with the ANSI standards of risk analysis?

A.    Only at the most general level.  I know there's this hierarchy of four things, and the first one is to design out the hazard.

Q.    So the first line of defense actually is, if you can, to design out the hazard, correct?

A.    Yes.

Q.    And is that possible on a table saw?

A.    No.

Q.    So the next line would be to see if you could guard against the hazard; is that correct?

A.    I believe so, yes.

Q.    And what do the standards say if the guard either fails of

its purpose because it prevents -- it cannot prevent the injury in all cases, or if by virtue of its design it makes use of the machine either cumbersome or difficult in such a way that it encourages users not to use the guard?

MR. APPEL:  Objection, your Honor.

THE COURT:  Were you through the question?

MR. CARPINELLO:  I was through the question.

THE COURT:  Okay.  Ground for the objection?

MR. APPEL:  I don't believe that that's what the standards say.

THE COURT:  Well, he can say that.  The objection is overruled.

A.   So I believe the next thing, if the guard can't provide sufficient protection, the next -- without sort of commenting on the specifics -- the next thing would be to apply some type of an engineering solution, like SawStop, to, therefore, minimize and prevent the hazard.

MR. CARPINELLO:  Can you put 7.3.7 --

Judge, I'd like to show the witness the ANSI standards of risk analysis which Mr. Appel asked Dr. Gass about.  I'd like -- I forget the exhibit number.

(Discussion off the record.)

MR. APPEL:  Your Honor, before this goes up, may I be heard?

THE COURT:  Yes.

(At sidebar on the record.)

THE COURT:  Mr. Appel.

MR. APPEL:  Your Honor, this document is not a standard, and the body of the document itself says so.  It says this document is not an American national standard and material contained herein is not normative in nature.

THE COURT:  So what is the document?

MR. CARPINELLO:  The document --

THE COURT:  Keep your voice down, please.

MR. CARPINELLO:  The document is a document created by the National Standards Institute to guide manufacturers to do, as it says on its front, risk assessments and risk analysis.

Mr. Appel asked Mr. Gass about his understanding of the principles of risk analysis.  And this lays out -- the American National Standards Institute has laid out the principles of risk analysis.  Specifically as it relates -- there's a provision here that relates to guards that fail their essential purpose.

And he asked him on direct -- on cross what his understanding of standard risk analysis was, and I want to pursue that and show him the actual principles of standard risk analysis.

MR. APPEL:  Your Honor, he's entitled to testify about it, but the document should not be shown to the jury and it should not come into evidence.  He can testify to anything he

wants.

THE COURT:  I'm going to allow you to question him, but don't put this in front of the jury.

In fact, if at some stage you want to refresh his memory, you can put it in front of him and then take it away and ask him if it refreshes his memory about what the rules are.  But I don't want it put in front of the jury to or to come in as evidence.

(End of discussion at sidebar.)

MR. CARPINELLO:  May I appropriate, your Honor?

THE COURT:  Yes.

BY MR. CARPINELLO:

Q.   Dr. Gass, have you seen the ANSI national standards risk analysis --

MR. APPEL:  Your Honor, objection.

THE COURT:  That's not what was said at sidebar.

MR. CARPINELLO:  Well --

THE COURT:  You have to ask him a question, and if he needs his memory refreshed, then you can put it in front of him.

MR. CARPINELLO:  Let me return to the podium, your Honor.

BY MR. CARPINELLO:

Q.   Are you familiar, Dr. Gass, with the ANSI, American National Standards Institute, risk assessment and risk

reduction guide?

A.    In a general sense, yes.

Q.    And do you recall 7.3.7 of the guide?

A.    I do not by number.

MR. CARPINELLO:  May I refresh his recollection, your Honor?

THE COURT:  Yes.

BY MR. CARPINELLO:

Q.    I ask you to just review 7.3.7 to refresh your recollection.

(Pause.)

A.    Okay.

Q.    Does that refresh your recollection, sir?

A.    It does.

Q.    And what is your understanding of what is required by 7.3.7 of the ANSI national standards?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.    Based upon your knowledge of the ANSI standard 7.3.7, to comply with the ANSI standards --

MR. APPEL:  Objection.

THE COURT:  He hasn't asked the question yet.

BY MR. CARPINELLO:

Q.    Is it enough for -- in your opinion is it enough for table

saw manufacturers to provide a table saw, power table saw, with a guard, simply a guard and fence and the other components contained on the BTS 15?

A.    No, I do not believe it is.

Q.    And what is the basis for your opinion?

A.    Well, there are several bases.  One is, it's not effective, and that is what the standards talk about.  One of the things you have to consider when you do a risk assessment, when you look at what can happen, is if you're going to provide a guard and you want to offer that as the solution, you have to consider what people are going to do with that guard.  Will it work?  Will it be effective?  Will people take it off?  What's the incentive for people to not use it?  And that's, for the reasons we talked about yesterday, with our guard, sort of the ease of installation, the low profile, we try to minimize all those things, the incentives that people would have to remove the guard and not use it.

The guard that's used on the BTS 15 doesn't comply with those because it wasn't designed to be easily removed and installed.  It didn't take into consideration the difficulty or the incentive that would create for a user who might want to take advantage of that but end up not doing so because the guard was so poorly designed.

Q.    Now, Mr. Appel asked you whether safety sells and whether you had a concern as to whether safety sells.  Do you recall

that question?

A.   I don't recall him phrasing it exactly that way but --

Q.   Well, do you recall him questioning whether you had concern about whether your saw would sell simply because it had the SawStop technology or simply because it was safer?  Do you recall that line of questioning?

A.   I do, yes.

Q.   Is it your view that a responsible manufacturer should not add safety components to a product simply because it may not enhance the sellability of the product?

MR. APPEL:  Objection, your Honor.

THE COURT:  Overruled.  He can express his opinion on that.

A.   I believe it's the duty of a power tool manufacturer, manufacturer really of any product, but let's talk about table saws in particular.  I believe it's the duty of the manufacturer to provide a safe product or as safe as it reasonably can be made.

When the manufacturer is the one who knows the most about what happens in the field, what the real results with these saws are, how devastating the accidents are, how many of these accidents occur.

An individual buying it, maybe they can buy a cheaper one that wouldn't be safe, but at some point the manufacturer has to say, I know more, I know that's not a responsible choice

to offer that dirt cheap but dangerous product, that shouldn't be on the market.  I think that is a manufacturer's duty and obligation to their customers, to take into account what are the real dangers associated with this and what are -- what are the statistics?  You know, how many accidents occur?  How often do they occur?  How much damage occurs?  What's the cost of those accidents to people that suffer them, and make those bound?  Because no one else can, the individual doesn't have that knowledge, a customer doesn't know, they don't know what the risk is, only a manufacturer is in the position to make an informed choice, and I think it's their duty to make that choice responsibly.

Q.   Now, Mr. Appel asked you a series of questions about whether or not SawStop intended to introduce a benchtop saw similar to the BTS 15 in size and weight and why it hadn't. I'd like you, Dr. Gass, to explain to the jury succinctly why SawStop has not yet made that saw.

A.   I'll try and be succinct.

As I described, it's really business reasons.  We are a start-up company, especially early on -- we have more resources now -- but we're still small in the power tool world, and it just is not practical for us to try and field a product in that category where the volumes are so high and the businesses that you have to deal with are so large.  Just from a business standpoint is not a reasonable choice for us, and

that's why we chose not to.

Q.    With regard to pressure-treated wood or wet wood, if the wood is sufficiently wet such that it would trip the mechanism, there's a device for the user to turn off the trip mechanism, is there not?

A.    Yes, that is the bypass system that I described.

Q.    And in that mode the saw would work like any other table saw, correct?

A.    Yes, it would be equally dangerous.

Q.    I'm sorry?

A.    Yes, it would be equally dangerous to any other table saw at that point.

Q.    Now, based upon the testimony you heard from Mr. Osorio would any of the wood that Mr. Osorio was working on in his job or specifically on April 19th lead to a false trip or a shutting off of the safety of the saw?

A.    No, it would not.

Q.    And why is that?

A.    Because that wood was dry flooring material, and that would be non-conductive.  And so it would not have any impact on the detection technology.

Q.    And you -- SawStop came out with its first saw when, please, Dr. Gass?

A.    Well, as I said, the very first ones went to customers on a limited sort of test basis in April, May of 2004.  They went

to customers -- a few of them went to customers unrestricted in August of 2004, and then regular production started in November of 2004.

Q.   And SawStop was able to meet that timetable despite a six-month delay with Visualize, caused by your dispute with Visualize?

A.   Yes, we were able to meet it.  The Visualize thing didn't take a whole six months to realize they weren't going to do the job, so really about halfway through it we started working on our own.  So it really wasn't that much of a delay.

Q.   And do you have an opinion, sir, as to whether Ryobi, if it had wanted to, could have put a saw on the market similar in size to the BTS 15 by January 2005 when Mr. Osorio's saw was purchased using a flesh-detection technology?

A.   Yes, I believe they certainly could have.

Q.   Mr. Appel asked you whether you believed that the UL standards were adequate safety standards.  Do you recall that questioning?

A.   I recall some questioning along those lines.

Q.   When he had the Visualize contract on the screen and he pointed out that the SawStop Visualize contract said it must meet UL standards, and he asked you whether -- he said -- I believe he said to you UL standards are safety standards, are they not?  Do you recall that question?

A.   I think he said something along those lines, yes.

Q.   And you responded they were not adequate safety standards?

A.   Yes.

Q.   And why do you have that opinion?

A.   Well, as a member of the UL committee -- I became a member after we received the award from the Consumer Product Safety Commission.  Chairman Ann Brown recommended that I join the UL committee, sort of recommended to UL that they ask me to join, and so I joined the committee and was -- have been, effectively, a minority member, you might say, of the committee, and participated in the standards development.

And what you see in the standards development process is that the standards are not developed to protect the public. The standards are developed to protect the manufacturers. There is no underwriting or overriding guidance as to -- as a member of the committee what you're supposed to design the standards for.  You're not supposed to say, like, Well, we want to balance economic costs and benefits of some change and improve guarding or whatever.  All you're supposed to do -- and I specifically asked this because I was confused, I said, Isn't there some standards, and I was told by UL, You're supposed to vote in your best interest.  So each member of the committee votes in their best interest.  It's just the majority rules.

Well, the majority of the committee is the power tool -- representatives of the power tool manufacturers, because no one else has enough interest in these standards,

they're kind of boring other than to power tool manufacturers. So what's written into the standards is written by the power tool manufacturers themselves. It's a completely perfect example of the fox guarding the henhouse. They write the standards and then they come to court and try to use them as a shield to protect themselves and say we met the standards. They met the standards that they chose and they wrote.

Q. Now, the committee that you're on, is Mr. Peot of Ryobi on the committee?

A. Yes.

Q. And is Mr. Domeny, formally of Bosch, on that committee?

A. He is.

Q. Did there come a time when the committee was asked to render an opinion as to the feasibility of SawStop?

A. Well, the committee -- I made a proposal, the same proposal I made to the Consumer Product Safety Commission, to the UL committee to incorporate a requirement that table saws include some type of technology to protect the user. That -- the committee then looked at that proposal and dismissed it.

Q. And did Mr. Peot vote against it?

A. There actually -- it didn't even reach the point of a vote.

Q. Did Mr. Peot speak against it?

A. I don't recall.

Q. Did Mr. Domeny speak against it?

A.   I don't recall.

Q.   The committee reached the conclusion they would not pursue the SawStop technology; is that correct?

A.   Yes.

Q.   Now, Mr. Appel asked you about the fact that Ryobi manufactured Craftsman saws and asked you whether the Craftsman saws were a topic of discussion at your visits in October, November of 2000.  Do you recall that questioning?

A.   I think it was October, but, yes.

Q.   And at any time in your negotiations with Mr. Bugos from October of 2000 to the point in time when he stopped returning your phone calls did he ever tell you that Ryobi only intended to use this technology on Craftsman saws?

A.   No, that was never said.  Minor point.  He didn't ever stop returning calls, I always got ahold of him, he just always told me the same story.

Q.   Okay.  But the phone calls aside, did he ever suggest to you, ever tell you that Ryobi was entering into this arrangement or intended to enter into this arrangement and intended to only put it on certain Craftsman saws?

A.   No, that was never said or suggested.

        MR. CARPINELLO:  No further questions.

        THE COURT:  Any further recross?

        MR. APPEL:  Nothing further.

        THE COURT:  Dr. Gass, thank you.  You may step down.

We're going to take a short recess, jurors.  We're out of sync for our normal time but we've been at it for a couple of hours.  We're going to take a shortened recess and then end up with probably a later lunch break but then proceed as usual.

Ten minutes.

(Jury left the courtroom.)

THE COURT:  Be seated, counsel.

Now, what do we have next?

MR. CARPINELLO:  Next, your Honor, is Mr. Bugos via videotape.

THE COURT:  And that's the hour and a half, roughly --

MR. CARPINELLO:  Well, all four of them together.

THE COURT:  I understand.  Well, we'll see how far we get.  We probably won't finish that tape before the lunch break, but we're going to take probably a late lunch break today and a little bit shortened one.  So we'll be in recess for ten minutes.

THE CLERK:  All rise.

(Recess taken.)

(The jury entered the room at 12:25 p.m.)

THE COURT:  Good afternoon, jurors.  We're ready to resume.  The plaintiff will call his next witness.

MR. CARPINELLO:  Robert Bugos, your Honor, by videotape of his deposition.

THE COURT:  Yes.

(Videotaped deposition of Robert Bugos played for the jury.)

THE COURT:  Yes, Mr. Carpinello.

MR. CARPINELLO:  Yes.  We'd now like to play Mr. Dils'.  And with regard to Mr. Dils', there's a -- I think there's a ten-minute sequence.  The defendants have designated their own sequence which we -- by agreement, should be counted on their time.  And if we could have the audiovisual people stop at the end of our sequence, and then we can advise as to the commencement of the defendants' sequence.

THE COURT:  That's fine.

MR. CARPINELLO:  I think it's about -- altogether, about 20 minutes, is that correct?  Is that acceptable, your Honor?

THE COURT:  Yes.

(Videotaped deposition of Jeffrey Dils played for the jury.)

MR. BENSON:  Now it's our designation, your Honor.

THE COURT:  All right.

(Videotaped deposition continued to be played for the jury.)

THE COURT:  Is that the end of the playing of the tape?

MR. BENSON:  No.

THE COURT:  Sorry.

(Videotaped deposition continued to be played for the jury.)

THE COURT:  Jurors, we are now going to take a lunch break.  It's late.  And I'm going to ask you to take a little

bit shorter break and be back at quarter of 2, 45 minutes from now.  And we'll have an afternoon session.  I'll see you back here at quarter past 2.

(The jury left the room at 1:27 p.m.)

THE COURT:  All right.  Be seated, counsel.  Now, how many more of the -- we have two more?

MR. CARPINELLO:  We have two more excerpts.

THE COURT:  I would just suggest, for the clarity of the jury, that when we start in the middle of a deposition, it might be nice to say who it is that's being deposed, what his position is with the company, when it was.  Of course, the date is on the screen.  That sort of preliminary would help the understanding of --

MR. CARPINELLO:  I certainly --

THE COURT:  -- who is being deposed.

MR. CARPINELLO:  I will certainly do that, Judge.  I didn't know we would be allowed to.

THE COURT:  After those two depositions -- which will take what, about an hour, you think?

MR. CARPINELLO:  About 22 minutes.

THE COURT:  Then who is the next plaintiff's witness?

MR. CARPINELLO:  Mr. Holt.

THE COURT:  And his direct?

MR. CARPINELLO:  Will be at least an hour.

THE COURT:  Okay.  So we won't get beyond -- the cross

will be approximately how long?

MR. APPEL:  Forty-five minutes or so, your Honor.

THE COURT:  So we won't get beyond Mr. Holt this afternoon.

MR. CARPINELLO:  Your Honor, I think Mr. Appel asked that we take Mr. Peot out of order tomorrow morning.  Is that correct, Michael?

MR. APPEL:  I don't know if I have a preference at this point.  I have to speak to him and see what his commitments are, your Honor, but it would be -- if he's going to come in tonight, I would like you to take him tomorrow.

MR. CARPINELLO:  I will certainly take him morning.

THE COURT:  We'll finish Mr. Holt tomorrow morning and then we'll take Mr. Peot.

MR. CARPINELLO:  That's perfectly fine for us, your Honor.

THE COURT:  There have been some motions filed, but not responses from the defendants, with respect to some of these other designations.  Have you been able to work out any of the matters, Mr. Appel?

MR. APPEL:  I'll let Mr. Benson argue that.

MR. BENSON:  No, we have not.  I thought we were going to -- it was filed -- for the deposition designations, it was filed this morning.  We did not file the -- a response to the other motion.  We can address that orally, your Honor, the Bob

Holt issue.

THE COURT:  Which one is it that you have not --

MR. BENSON:  There was a motion concerning some exhibits that they want to introduce through Mr. Holt that they filed last night.  We haven't filed a written response.  One of them deals with the ANSI standards, which you addressed earlier today with Doctor Gass.

THE COURT:  And the other one was the tests of the --

MR. BENSON:  We have no objection to them showing the tests as demonstrative, your Honor.  We just don't think they should come in as evidence.

THE COURT:  Any problem with that?

MR. CARPINELLO:  My problem is, Judge, we think they are admissible, and we've agreed to have Mr. Domeny's tests be admitted as exhibits to go to the jury.  I see no basis to object to Mr. Holt's tests.  The exact same thing, the results of his tests and the videotape of his tests.  They want to send theirs to the jury.  I think ours should also go to the jury.

THE COURT:  What do you mean the videotape?  Are we going to watch another videotape?

MR. CARPINELLO:  No.  It's a very short demonstration of what Mr. Holt did in his test.  I think that all four clips last about 40 seconds.  Mr. Holt is going to narrate what -- he videotaped every single one of his tests.

THE COURT:  There is no objection to that?

MR. APPEL:  Your Honor, this is my issue with all of this.  I don't think the -- what experts show to the jury, I think, are demonstratives.  I don't think -- I mean, I -- I don't think that's evidence, and that's simply --

THE COURT:  Expert reports are definitely not evidence.

MR. APPEL:  Correct.  I mean, my position is the same with respect to a demonstrative, like a short video clip.  I have no objection whatsoever to Mr. Carpinello laying the foundation for what they are and then showing them to the jury.  And the same thing goes with my expert.  I don't really even care if they're actually admitted as evidence or not.

THE COURT:  Then the same treatment will be used.  We won't have either one of them admitted as exhibits, but they can both be shown to the jury as chalks.

MR. CARPINELLO:  If I may say, Judge, please, if I may say, until now, that's exactly what we had proposed, and Mr. --

THE COURT:  All right.  No time for that.

MR. CARPINELLO:  Okay.

THE COURT:  But we will now resolve that issue in that direction.  Now, if there are other issues, we'll deal with them as we go along.

MR. CARPINELLO:  Thank you, your Honor.

THE COURT:  We're in recess, then, until 2:15.

(Luncheon recess taken at 1:32 p.m.)

(The jury entered the room at 2:18 p.m.)

THE COURT:  Good afternoon, jurors.  We're ready to resume.  The plaintiff will call his next witness.

MR. CARPINELLO:  If I may have just a moment, your Honor?

THE COURT:  Yes.

MR. CARPINELLO:  Our next witness via videotape, your Honor, is Bryan Whiffen, who is senior vice president of bench-top and stationary equipment for One World Technologies.

THE COURT:  All right.

(Videotaped deposition of Bryan Whiffen played for the jury.)

THE COURT:  Is that the completion, Mr. Carpinello?

MR. CARPINELLO:  Yes, I believe it is, your Honor. And now Thomas Wayne Hill by videotape, who is the project safety manager for Ryobi.

(Videotaped deposition of Thomas Wayne Hill played for the jury.)

THE COURT:  That's the conclusion of the playing of the deposition, Mr. Carpinello?

MR. CARPINELLO:  Yes, it is, your Honor.

THE COURT:  Okay.

MR. APPEL:  Your Honor, if I may, just to inform the Court, Mr. Hill will be testifying in the defendants' case in chief.

THE COURT:  All right.  Mr. Carpinello.

MR. CARPINELLO:  May I call Robert Holt, your Honor?

THE COURT:  Yes.

DARRY ROBERT HOLT, Sworn

THE CLERK:  You may be seated.  Please state your name for the record, spelling your last.

THE WITNESS:  Full name is Darry Robert Holt, H-o-l-t. I go by Robert, Bob.

DIRECT EXAMINATION BY MR. CARPINELLO:

Q.   Where do you reside, Mr. Holt?

A.   In York, Maine.

Q.   Could you tell the jury about your educational background?

A.   Sure.  I went to Purdue.  I graduated in 1963 with a bachelor of science in mechanical engineering.  I went to night law school at Suffolk University and got a J.D. in 1969.

Q.   Can you tell the jury what a mechanical engineer is trained to do?

A.   Mechanical engineer is trained basically in how machines work, basics of math, physics and the engineering science is applied to all kinds of machines.

Q.   Does that include machines such as table saws?

A.   Sure.

Q.   Can you describe to the jury your occupational history, please, sir?

A.   When I got out of Purdue, I went to work for W.R. Grace. I stayed there about nine years, three years in production and

maintenance supervision and about six years in a central engineering group which basically designed processes for expanding existing product lines and bringing products down from research.

I then had a couple of -- well, after that I practiced law for about six months. And then I took two short-term jobs just to get back into engineering.

But in 1974, I believe it was, I went to work for a consulting engineering firm called Teledyne Engineering Services. And at that job, what my job was, to evaluate the safety design of various products and processes and structures after there had been some incident of personal injury or property damage, utilizing physics and math and the sciences, as well as methodologies for hazard identification, hazard control and risk assessment reduction. And, basically, I've been doing the same thing for the last 36 years. I've been doing it at my own firm, first with a partner and later by myself, since 1981.

Q.   You mentioned physics and math. I assume you've taken courses in physics and math?

A.   Oh, sure.

Q.   In addition to your engineering courses?

A.   Well, it's all part of the engineering curriculum.

Q.   Does your consulting work include evaluating accidents?

A.   Well, more evaluating -- looking into accidents and then

evaluating the equipment that's involved in the accidents relative to the accident circumstances and then evaluating the safety design of that equipment relative to those circumstances by applying -- utilizing whatever yardsticks there might be available for that kind of product, standards, treatises, that sort of thing.

Q.   And your consulting work and examining products that are involved in accidents, does that work include from time to time being asked by attorneys for either the plaintiff or the defendant to evaluate the case for them?

A.   Not the case, to evaluate the equipment relative to the accident circumstances and to advise them as to perhaps whether there was a problem with this equipment, yes.

Q.   And you've been retained by plaintiffs' law firms?

A.   Sure.

Q.   And you've been retained by defendants' law firms?

A.   Yes.

Q.   Have you been asked to evaluate products in cases where you advise the plaintiff or his or her attorney that the product was adequately manufactured?

A.   Adequately designed or adequately -- in an adequate condition of maintenance or -- but, yes, many times.

Q.   So there are occasions when you've told the plaintiff or his or her attorney that their theory of the case was not a valid one, and you would not provide testimony to support that

theory?

A.    Well, I think there really -- I'm sure there's some of those, too.  But, typically, it's, you know, tell us what you think of the machine and then -- they have no theories themselves, and I'm asked to evaluate the equipment and advise them as to the adequacy of the safety design and then they do what they want to with that.

Q.    Mr. Holt, did there come a time when you were asked to evaluate the adequacy of the safety design of table saws manufactured for sale in this country?

A.    Yes.

Q.    When was that?

A.    First -- first time -- although I had seen table saws and investigated table saw incidents in the past and evaluated certain aspects of the design of table saws in the past, but this particular project started in 2004.  And it was prompted basically by an accident at that time, coupled with the innovative technology that Doctor Gass had come up with.  And I was asked to look into that to see if it was viable and was applicable to table saw -- hazard control of table saws.

Q.    In what year did you begin your review of table saws?

A.    2004.

Q.    Approximately -- from then to today, approximately how many hours have you spent investigating the adequacy of safety design on table saws?

A.   I think it's about up to a man-year or 2,000 hours by now.

Q.   How many different table saws have you examined and analyzed?

A.   Individual table saws, probably order of magnitude of 40, different manufacturers, some that were involved in incidents, some which were exemplars, some which were new on the market that I was comparing to some that had been involved in incidents.

Q.   Did your review include the Ryobi BTS 15, which is the subject matter of this litigation?

A.   Yes.

Q.   How many times have you examined the BTS 15?

A.   Other than here in court, three times, three occasions.

Q.   Did you examine both the BTS 15 generally and the specific saw on which Mr. Osorio was injured?

A.   Yes.

Q.   Now, as part of your evaluation of the adequacy of the safety of design of table saws, tell me specifically what you did.

A.   Well, it began with an inspection of the saw that was involved in the accident in 2003 which prompted this long-term project.  The first step was to go out and visit with Doctor Gass in July, I believe it was, of 2004, to see what the technology was firsthand and to see if it was -- it appeared to be viable.

I then was -- obtained one of Doctor Gass' prototypes, which I tested in 2005, preliminary testing.  Since that time, I've obtained a -- a production model saw -- actually, a couple of them -- and I've tested production model saws for -- in a couple ways, one for the effectiveness of the SawStop technology in stopping in a suitable time to prevent severe injury and another set of tests which was designed to determine if there was any validity or -- to the Power Tool Industry's stated objection to SawStop that it had false trips.

And that involved testing a cabinet model saw on pressure-treated lumber to see what the percentage of false trips was and then to evaluate, also, what percentage of lumber that might be cut on a saw was pressure-treated lumber and, also, to determine what portion of that pressure-treated lumber might be used on a table saw as opposed to a miter saw, which is typically what's used for pressure-treated to cut to length.

Q.   Did you also perform tests on the reaction time and braking time of the SawStop table saw?

A.   Yes.  That was the first set of tests, but I did more than just tests.  I've done calculations to determine -- to bound the velocities of a hand in certain situations, whether it be a kickback, a slip, a trip type of accident.

I've read data which was provided to me from the Consumer Product Safety Commission on the number of accidents annually that occur on table saws.

I reviewed similar data from Doctor Gass relative to his experience in the field, all of that relative to how many accidents are occurring.

I've searched for standards and treatises which might be applicable to the standard -- to a table saw, not just the product-specific standard of UL 987 but the building blocks that go up into the general principles of safety design.

Q.   Does that include the ANSI risk reduction standards that we've heard mentioned by Mr. Hill in his deposition and earlier today in Doctor Gass' testimony?

A.   It does, yes.

Q.   Did you review any litigation-related documents?

A.   I reviewed all of the documents that were provided to me. I think I saw all of them.  But there were -- all of the minutes of the meetings from the Power Tool Industry, various subcommittees for the -- really, going back to 2000 -- or 1999, to date -- maybe not to date but to, I think, 2009.

I've reviewed all of the internal documents that were -- effort that various -- of the power tool manufacturers -- the table saw manufacturers had for programs to evaluate the SawStop.

I've evaluated the data that -- the test data that was generated by -- I guess it was a power tooling -- Power Tool Industry people who were evaluating the SawStop saw as compared to the saw which they finally come up with, a similar

flesh-detection technology based on the same technique that Doctor Gass uses, which is capacitive sensing, in other words, contact sensing.  You have to contact the point of the blade before anything happened.

Q.    You reviewed PTI documents that describe -- and describe the configuration and the working of that contact-sensing prototype, that J.V. contact-sensing prototype?

A.    I'm not sure all of what you mean.  I've seen the documents and minutes, the D2M design to manufacture documents.

Q.    Who is D2M?

A.    D2M was a company that was hired by the Power Tool Industry with oversight by -- oversight by various manufacturers' representatives within the Power Tool Industry to devise or come up with a design for a flesh-detection sensing unit and a reaction unit which would both sense a person's presence at the blade and then deal with the blade, remove the hazard, the blade hazard, from the operator.

Originally, they were working with a proximity sensing, which means I'm coming close.  You'd better do something.  And then, lastly, they can -- I contacted it.  Now I do something. That's the state of it, which is the same state of Doctor Gass' and has been the same state that Doctor Gass had since 1999.

Q.    Did you review Ryobi documents which describe the workings of this Power Tool Industry joint venture?

A.    Yes.

Q.    Did you review Mr. Domeny's testimony about the tests that he had conducted on the -- both the SawStop machine and on the joint venture's own contact-sensing prototype?

A.    Yes.  I also saw the videos.

Q.    And based upon that work, do you have an opinion, sir, as to the adequacy of the safety design of the BTS 15?

A.    I do.

Q.    What is your opinion, sir?

A.    It's inadequate.

Q.    Why is it inadequate?

A.    Well, there's a hazard which is uncontrolled adequately in accordance with good engineering safety design practice, which is the hierarchy of control of hazards and risk reduction -- risk assessment, risk reduction methods.

Q.    I want to stop you right there.

A.    Sure.

Q.    And I want to ask you to describe for the jury what you mean by the "hierarchy of standards" as best you can in layperson's terms.

A.    Sure.  First step in the evaluation of any equipment from a safety design standpoint is to say, What hazards have you got?  This one is a no-brainer, at least relative to the blade. You touch the blade.  You're injured.

Now we have to control that hazard.  How can we control that hazard?  The first step in the hierarchy would be to

eliminate it.  We can't eliminate that blade because we want to cut things.

So the next step in the hierarchy -- this is a priority of control.  Elimination, safeguard and warning, that priority, because elimination is much more effective than the last one, which would be warnings.  So we can't eliminate this hazard.

The next step is to safeguard it.  Safeguards would include guards, barriers, accessory devices, the fence, the miter gauge.  But it also would include devices which might sense the presence of the operator and remove the hazard from the operator because, in working with the hazard, what we really want to do is evaluate the risk.  And the risk is a combination -- it's a product of both how often an incident might occur and how bad the injury might be.

So you might have something that occurs all the time, and you get no significant injury and the risk is low.  But by the same token, you might get something that doesn't happen very often, but when it does, the injury is catastrophic.

And so the trick is to deal with both the probability and the severity both, and you can deal with them separately to try to reduce the risk.

Q.    Taking it down from designing it out of the product to safeguarding, does standard risk reduction methodology require you to evaluate whether the safeguarding that you propose would somehow interfere with the use of the product or be of such a

design that it would encourage users not to evade -- not to use or to try to evade the safeguard?

A.    Yes.  When you evaluate what you've done by controlling the hazard, then you have to go back and say, okay, I've put these things in the machine to safeguard the hazard.  And you have to ask yourself, have they done the job?  Well, part of asking yourself have they or will they do the job is to say, well, will they do the job if they're in place?  And will they do the job if they're not in place?  And is there some opportunity or reason for them not to be in place, which is what counsel has just said.  Why might someone defeat a guard?  And in this instance, there's numerous reasons, as you've heard already.

Q.    And what are those reasons?

A.    Well, the guard, No. 1, is cumbersome.  It gets in the way.  You want to make a measurement, you have to raise it.  It falls down on your hand sometimes.

The guard, there's visibility problems with it.

The guard is basically attached to the back of the machine.  It has a big lever arm between where it's mounted and the front of the guard so you can move it and it bends quite easily.  It can get damaged.  It can get damaged in use, and it can get damaged in transport.  As a matter of fact, this guard is damaged.

The other objections -- I'm trying to think of them right

now.

Q.    Well --

A.    Basically --

Q.    Would there be occasion where the user would have to take the guard off?

A.    Oh, of course, yes.  There are some cuts which are nonthrough cuts where you're cutting, but you're not going all the way through the boards.  For those, you can't get it past the back of the guard because the splitter, that metal piece in the back, you'd bump into it so you couldn't complete the cut. Any time you make a nonthrough cut, you have to remove the guard.

And then when you remove it, if you want to make another cut for which you can use the guard, you have to go through the procedure of remounting it and realigning it, and that can be difficult, especially when you have numerous fasteners to do so.  Some people just say, well, I'm just going to leave it aside, and that's what the culture is out there right now.

Q.    In fact, have you reviewed documents which report survey results which show the frequency of nonuse of guards in people using -- the users of table saws such as the Ryobi?

A.    Yes.

Q.    What would those survey shows?

A.    Surveys show that it's a -- 80 to 90 percent of the people don't use the guard.

Q.   What is the implication of that from a safety design perspective, going back again to your hierarchy of standards?

A.   The significance of it is, is that you provided a control, that because it is not used for either legitimate or illegitimate reasons but is not used, it is not controlling the hazard.  So you have to ask yourself, what else can I do?  So you have an iterative process.  You provide controls and then you evaluate those controls.  Then you say, is it enough?  If not, you've got to go back to the beginning and say let's do something else.

Let's design something else.  We try that.  Implement it.  Does that do the job?  Is the risk reduced to a residual level that's acceptable?  Yes, no.

You keep going around the loop until you arrive at something, features which do reduce the risk to an acceptable level.  They have controls on the machine that accomplish that task.

Q.   And with regard to table saws in particular, is there such a control that will accomplish that task so as to adequately -- to reduce the risk to an acceptable level under standards such as the ANSI standards?

A.   Yes.

Q.   What is that?

A.   SawStop or something similar.  Perhaps what they've developed in the J.V. across the last ten years.

Q.   I take it the first step or one of the essential steps of going through that process is for the designer or the producer of the product to actually find out if the safeguard, as provided, is actually being used, correct?

MR. APPEL:  Objection, your Honor.  That's leading.

THE COURT:  Sustained.

Q.   Describe for me, if you will, the importance of the producer of the product finding out whether its safeguard is actually being used.

A.   Well, the importance is that they've provided a control, and they should evaluate the effectiveness of that control out in the field by -- not only out in the field but in-house, too, before it even goes out the door.  But out in the field, to make sure that in those circumstances where they feel that they have provided an effective control to go out and talk to the folks and say, hey, is it working or not?  Do you use it?

And it's important because that is the control they provided; and without it, you have no control, which means that you have a high risk in the use of the table saw.

Q.   Now, you're not suggesting that they go out and interview all millions of users of table saws, correct?

A.   No.

Q.   How -- tell the jury how -- what's an adequate way of going out into the field and determining, for example, the frequency of guard use.

A.    Well, you could have surveys of supply houses, and you could have field engineers or field people go out in their normal sales and talk to the salespeople and to the carpenters and other people who come in to buy saws and ask them, if they had a saw in the past, did they like it?  Do you use a guard? Why not?  That sort of thing.

Q.    Do you know whether Ryobi did that in 2009?

        MR. APPEL:  Objection, your Honor.

        THE COURT:  Sustained.

Q.    You've read the depositions of the Ryobi witnesses here, Mr. Hill's deposition, Mr. Whiffen?

A.    Yes.

Q.    Mr. Peot?

A.    Yes.

Q.    Up until the time Mr. Osorio was injured on the saw, did Ryobi ever go out in the field and do the surveys that you described?

        MR. APPEL:  Objection.

        THE COURT:  Sustained.

Q.    You heard Mr. Hill testify just a moment ago about FMEA? Do you recall his testimony that he used FMEA?

A.    He said FEMA.  He switched the M and E, but, yes, I'm familiar.

Q.    You know what he's talking about?

A.    Yes.

Q.    What is it?

A.    Failure Mode and Effects Analysis, where you postulate a failure, and you say what -- the failure of this power cord. You say, if this power cord fails, what happens?  What happens to the microphone?  It goes dead.  How can you fix it?  Well, you want to attach that more solidly.

So it's basically going through and determining, component by component, and saying what if?  What if this?  What if that? And determining what the effect is.

Q.    Is it a risk reduction analysis?

A.    No.

Q.    Why not?

A.    Because the next step is to -- what they're determining here is what the hazards are.  That's a hazard analysis.  Once you do a hazard analysis, then you get into controlling the hazard and then into the risk reduction to evaluate whether or not the controls you've put in to control the hazard are effective or not.

Q.    Now, you've already testified about the inadequacy of the risk analysis as it applies to SawStop, the absence of SawStop?

A.    I'm sorry.  I missed the question.

Q.    Let me rephrase the question.  It wasn't worth listening to.

Other than the issue of the absence of SawStop, are there any other bases for your opinion that the BTS 15 is not -- that

the safety design of the BTS 15 is inadequate?

A.   Yes.

Q.   Can you describe or show the jury the other ways in which it is inadequate?

MR. APPEL:  Objection, your Honor.

THE COURT:  Grounds?

MR. APPEL:  There's no relevance to it because there's no causal link.

THE COURT:  Overruled.

A.   Yes.

Q.   Can --

A.   As a lead-in, though, first, before I go down to the saw, relative to risk, you recall I said you work on both sides, the frequency of it, the probability of an incident and the severity of injury?  Well, the probability of an incident is one of the things that affects the probability of an incident, contact with the blade, is the quality of the saw, the saw components, and how well it's made and how effective the components are in doing their job and preventing an incident where you might make contact with the blade.

MR. CARPINELLO:  May he come down, Judge, and illustrate to the jury --

THE COURT:  Yes, he may.

MR. CARPINELLO:  -- the inadequacy of the design?

May I proceed, your Honor?

THE COURT:  Yes.

Q.   Mr. Holt.

A.   This is the subject saw.  This is an exemplar.  Let's start with the subject one.  As you can see, it's bent, the out-feed table is bent, so you can see that this guard would be ineffective in controlling it because it would be mounted in such a fashion that you really couldn't use it.

Having said that, I'll move to this guard -- to this table saw.  The fence, which is provided to allow you to make parallel cuts to the blade, you can see that you can inadvertently put it in a nonparallel manner.  I don't know whether you can see that or not.  But that's not going to work.  But the fence is cockeyed to the blade and that could be done inadvertently.

The consequence of that would be that when you run a board through you're running it into a taper, and it might be wide enough -- narrow enough to get through this, but by the time you get back there, it sticks and your hand slips, just like Mr. Osorio's hand slipped.  So saws, more expensive saws, even some middle-priced saws, the fence is a lot better than this.

The other thing is, is that the guard is mounted in the back.  You have a large lever arm here which causes it to wobble.  That can easily deform if you strike it, or if you're transporting it, you may not notice that it's deformed and you might do the same thing.  If this is over there and you get to

this point, then you bump into the splitter again, and the same thing happens.  Your hand will go right into the blade.

Another item here is that some guards will mount -- rather than here, they're mounted right behind the blade, and they'll rise and fall with the blade.  And you'll notice, when the blade is up, this gap is very small between the splitter and the blade so that if you are making a rip cut, that it won't rotate into the back of the blade, which is important because the blade is rotating this way.  If it catches the back teeth, it's going to be thrown up and back toward the operator, in some cases impaling the operator or causing the operator to make some inadvertent motion and, again, get wrapped up into -- in the blade.

When the -- excuse me.  When the blade doesn't rise -- when the guard does not rise and fall with the blade, then that gap here is larger so that you can get rotation more easily into the blade.  And so the probability of a kickback accident is much higher.

Q.    Let me stop you there and ask you, the saw that Doctor Gass illustrated today, the SawStop saw, does that have the rise-and-fall feature that you're referring to?

A.    Yes.

Q.    Okay.  And if I can, you mentioned the fence on the exemplar.  Can you also speak to the fence on the actual saw?

A.    Sure.  This fence won't attach.  It's sprung.  I haven't

figured out why but it bounces up.  It won't tuck.  So it's -- at least until I diagnose what's the matter with it, it's not usable.

Another problem with table saws of this type, small type, is that in the warnings they say "don't get within the danger zone."  Well, what's the danger zone?  If you're holding a workpiece, you're there already.  You're already under the guard.  You have only about five inches here.  You contrast that to the SawStop.  It's got, like, I think, 13 inches so that you have room to, like in a cross-cut, hold it down to move it in.  But on this one, your hand is already perilously close to the blade so that any inadvertent motion could cause contact with the blade.

Q.   Could you illustrate that with the wood in the configuration that Mr. Osorio was using it on the day of the accident?

A.    (Indicating).  He's doing hardwood flooring.  By definition, a hardwood floor, they cut out most of the knots and try to make this clear wood, and they're all short pieces and relatively narrow pieces.  So if he has to trim a board, he has -- by necessity, he has to be close to the blade.

Another problem with some of the lower-priced saws is that the throat plate, this insert here, can deflect.  Also, it can snag the workpiece on the back, and that can also cause you to -- if you jam into that like that as you're feeding it, then

your hand can slip into the blade.

The better throat plates have adjustments on them so that you can raise and lower it and make this flush or maybe a tiny bit lower than the table.  I believe Doctor Gass' SawStop saw has that feature.

Q.    Would the saw have to be the price of Doctor Gass' saw to correct the discrepancies that you described?

A.    Oh, no.  Most of these things, you make the footprint a little bigger, so it might cost you a little more plastic.  You redesign this so that it goes behind the blade instead of behind the saw.

Q.    As --

A.    Pardon?  I missed your question.

Q.    Are you aware whether there are saws on the market that, in fact, have the rise-and-fall feature in that price range?

A.    The DeWalt, I think, costs about $500, the one that Mr. Osorio was talking about, and that has a rise-and-fall feature.

Q.    Are you aware of Ryobi saws now on the market that have that?

A.    I don't remember as I sit here -- stand here.  There used to be.  There were some back in 1989, 1990.  Mr. Peot who's coming in, I guess --

MR. APPEL:  Your Honor, objection.

THE COURT:  Beyond the scope.  The objection is sustained.

Q.   Any other features of the saw that you want to point out to the jury that make it inadequately designed for safety purposes?

A.   No.  It's just -- the point is that the quality of these things -- all of these things could result in an accident by themselves.  But if you had something else to control the hazard so that when you did contact the blade you had a minor injury.  Then these -- you don't have to deal with solving these problems.  So you don't solve those problems.  You just solve the other problem, which is to put on the flesh-detection and the removal of the hazard from the operator, like in SawStop.

          MR. CARPINELLO:  May he return to the jury box?

          THE COURT:  Yes.  You mean the witness stand?

          MR. CARPINELLO:  The witness stand.

Q.   Do you have an opinion, Mr. Holt, as to whether the absence of that guard on the table saw that Mr. Osorio used on April 19, 2005, was a causative factor in his injury?

A.   I do.

Q.   What is your opinion?

A.   That was the guard?  It was not a causative factor.

Q.   Why is that?  Can you explain that to the jury?

A.   I'd have to go back down.  When he's holding the board, his hand is already under the guard.  I think Doctor Gass showed that yesterday, that if he slips, he's already under the

guard.  So -- and the guard is made to rise with the workpiece. When you put the workpiece up, the guard rises up over the workpiece.  Well, your hand is going to ride -- the guard is going to ride up over your hand and give you access to the blade.

So the guard provides absolutely no protection in a slip accident where it's a frontal approach to the blade because that's where the wood approaches -- the way the wood approaches the blade.

Q.    You did issue a report at one time where you said that you were unsure as to whether the presence of the guard would have been a causative factor?

A.    Yes.

Q.    Why did you render that opinion at that time?

A.    Because I wasn't exactly sure how Mr. Osorio's hand came into the blade -- into the guard because, if it comes in at a slide, more -- it could come in directly frontal or it can come in directly from the side or somewhere in between, and I didn't know where that would have been.  It wasn't clear to me at that time.  It didn't become clear to me really until I saw him demonstrate it in the courtroom.

Q.    Now having seen a demonstration, you're firmly of the opinion that it would not have made a difference?

A.    Yes, that's correct.

Q.    Do you have an opinion, sir, as to whether the absence of

the fence on that saw the day of Mr. Osorio's injury was a causative factor in his injury?

A.    I do.

Q.    What is your opinion, sir?

A.    It was not.

Q.    What is the basis for that opinion?

A.    Because the fence is designed to keep the workpiece parallel as it passes the blade.  He wasn't anywhere near past the blade yet.  It was at the very beginning, and there's no hazard -- at the very beginning, the teeth of the saw blade are actually going down into the table.  If anything, they're holding it down on the table as opposed to kicking it up and back.

          MR. CARPINELLO:  Your Honor, I'm now going to proceed --

          THE COURT:  This is a good place.  We're going to stop for the day.

          Thank you, Mr. Holt.  You may step down.

          Jurors, we've gone on a little bit today to try to make up for the lost hour.

          We will be in recess until tomorrow.  Tomorrow will be a regular day.  However, we are going to break a little early. We're going to break at a little bit after 3 tomorrow rather than at 3:30 to accommodate somebody's necessary plans.

          So, again, I caution you not to talk about the case.

You know the reasons why.  It's not that what goes on here is a secret.  It isn't.  But only you are going to hear all of the evidence, and you will decide the case based on all of that evidence and on closing arguments and my instructions on the law.  So please don't talk about the case with anybody, fellow juror members or family members.

I hope we'll be promptly starting tomorrow at 9 and so that we can get in a full day's work by 3 or a few minutes after 3.

So have a pleasant evening.  I'll see you tomorrow morning at 9 a.m.  Please, again, leave those notebooks in the jury room.

(The jury left the room at 3:39 p.m.)

THE COURT:  About how much longer on direct for Mr. Holt?

MR. CARPINELLO:  I would say approximately a half an hour, Judge.

THE COURT:  And cross-examination?

MR. APPEL:  Could be an hour, an hour and a half, your Honor.

THE COURT:  Okay.  And then after Mr. Holt, who will we have for the plaintiff?

MR. CARPINELLO:  We will have Mr. Mehler, Kelly Mehler.  I'm sorry, your Honor.  We will have David Peot.  And his testimony, for my examination, will be probably at least an

hour.

THE COURT:  All right.  And his cross?

MR. APPEL:  I would say about 45 minutes or so, your Honor.

THE COURT:  Okay.  Then after Mr. Peot?

MR. CARPINELLO:  We will then use Mr. Mehler, Kelly Mehler.

THE COURT:  And he will be testifying?

MR. CARPINELLO:  I would say about a half an hour.

THE COURT:  Okay.  And his cross?

MR. APPEL:  I would say also about a half an hour, your Honor.

THE COURT:  And if we get that far, after Mr. Mehler?

MR. CARPINELLO:  And then we do want to do some more videos, but that's the subject, again, of dispute between the parties.  I've submitted -- I'm sorry to burden the Court with this, but I've submitted our intended excerpts and their objections to those.  And we actually have a point, counterpoint on every single excerpt and a copy of the excerpt.

I'm not certain that I will use all of them, your Honor, but at this point I don't know which ones I will use or which ones I will not use.  It's fair to say that I probably will not use all of them, but, unfortunately, we -- I don't know that as I stand here.

MR. BENSON:  Just one point.  I don't think your

excerpts are actually attached to the motion you filed.  I think only the chart was.

MR. CARPINELLO:  The chart was or was not?

MR. BENSON:  The chart was but the actual testimony was not.

MR. CARPINELLO:  I apologize.  We'll correct that right now, Judge, and attach the excerpts.

THE COURT:  You need to do that and obviously provide a copy to counsel.

MR. CARPINELLO:  Of course.

THE COURT:  I presume counsel knows about what it is, but it must be provided to the Court.

MR. CARPINELLO:  That was inadvertent.  It was clearly intended that they would be attached, Judge.

THE COURT:  Make sure you get that to Mr. Nicewicz immediately.

Something else?

MR. BENSON:  No.  We did file an opposition, your Honor, so I think as long as you have the excerpts, you should be able to make a ruling on them.

THE COURT:  Anything else?

MR. CARPINELLO:  Yes.  We had proposed the 1006 summary, your Honor.  That's been opposed, I believe, by the defendants.  And we've submitted it to the Court for the Court's review.  We have not yet.

Should we make a formal motion?  This is a summary of the medical records and an attachment of a chart of all the medical bills and a sum total of all the medical bills, all of which, of course, have been provided in discovery to the defendants.

THE COURT:  Mr. Appel?

MR. APPEL:  Your Honor, I have -- we're preparing a brief on this, but I expect I will make an objection to one part of it, and that is, that the summary is prepared by the lawyers.  That's impermissible, I think, under that rule.  If it's a medical summary, that should be prepared by a witness, a medical expert, not to be prepared by the lawyers giving their version of what happened with respect to the medical chronology.  I will flush that out a little bit more in a very brief memorandum.

THE COURT:  It had better be brief because if it gets to the point where I have to use jury time to resolve these issues, time will be charged to the losing party.

MR. CARPINELLO:  I understand that, your Honor.

THE COURT:  We're in recess until 9 a.m. tomorrow.  We will be concluding tomorrow because one of the jurors has an engagement that needs to have him out of here by a few minutes after 3:00.

(Whereupon, at 3:43 p.m. the trial recessed.)

C E R T I F I C A T E


        We certify that the foregoing is a correct transcript

of the record of proceedings in the above-entitled matter to

the best of our skills and ability.


/s/Debra M. Joyce            02/24/2010

Debra M. Joyce, RMR, CRR         Dated

Official Court Reporter




/s/Cheryl Dahlstrom          02/24/2010

Cheryl Dahlstrom, RMR, CRR       Dated

Official Court Reporter