6-1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CARLOS OSORIO,                          )
                    Plaintiff,          )
                                        )
                                        )
vs.                                     )  CA No. 06-10725-NMG
                                        )
                                        )
ONE WORLD TECHNOLOGIES, INC.,           )
et al,                                  )
                    Defendants.         )


BEFORE:   THE HONORABLE NATHANIEL M. GORTON


DAY SIX OF JURY TRIAL


John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, MA 02210
Monday, March 1, 2010
9:15 a.m.


Cheryl Dahlstrom, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, MA 02210
Mechanical Steno - Transcript by Computer

6-2

APPEARANCES:

        BOIES, SCHILLER & FLEXNER LLP
        By:  George F. Carpinello, Esq., and
             Teresa A. Monroe, Esq.
        10 North Pearl Street
        Albany, New York 12207
        - and -
        SULLIVAN & SULLIVAN LLP
        By:  Richard J. Sullivan, Esq.
        40 Washington Street
        Wellesley, Massachusetts 02481
        On behalf of the Plaintiff.

        SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
        By:  Michael S. Appel, Esq., and
             William F. Benson, Esq.
        101 Merrimac Street
        Boston, Massachusetts 02114-4737
        On behalf of the Defendants.

6-3

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

PETER DOMENY

  by Mr. Appel        4

  by Mr. Carpinello          125

* * * * *

E X H I B I T S

| No. | Description | In Evd/For ID |
|---|---|---|
| A | Demonstrative shown by Domeny............ | 18 |
| B | Demonstrative chart shown by Domeny...... | 29 |
| C | Photo of Bosch 4000 model .............. | 94 |
| D | Photograph of damage to Bosch 400 after . test | 96 |
| E | Video clip............................ | 114 |
| 39 | SawStop safety evaluation performed by .. Bosch, 2001 | 133 |

P R O C E E D I N G S

THE COURT:  Good morning, jurors.  Welcome back.  I hope you had a nice weekend.  May I ask if you have been able to abide by my instructions about not talking about this case with anyone?  May I have a show of hands?  Thank you.  That's a unanimous showing of hands and I appreciate that.

We're ready to resume now, and the defendant will call its next witness.  Mr. Appel.

MR. APPEL:  Thank you, your Honor.  The defendant calls Mr. Peter Domeny.

PETER DOMENY, Sworn

THE CLERK:  You may be seated.  Please state your name for the record, spelling your last.

THE WITNESS:  Peter Domeny, D-o-m-e-n-y.

DIRECT EXAMINATION BY MR. APPEL:

Q.   Mr. Domeny, where do you live?

A.   I live in Georgia, Peachtree City, which is about a half-hour ride from Atlanta.

Q.   Are you currently employed?

A.   Not full-time.  I retired in 2008, end of 2008.  And I am working as a consultant part-time for Bosch Corporation, and I'm also consulting for number of other clients, power tool manufacturers.

Q.   Had you been working for Bosch Corporation, prior to your retirement, as an employee?

A.    Yes, I was.

Q.    What was your position?

A.    My position before I retired was a director of product safety.

Q.    Mr. Domeny, would you tell the jury where you're from and where you got your education and what that education was?

A.    Okay.  I was born in Czechoslovakia and I got my education there.  I went to the University of Komenski and got a degree which is equivalent to a master's degree, in physics, in experimental physics.  I received that degree in 1968.

Then I came to United States, the Chicago area, and I have attended Illinois Institute of Technology for one year, the Graduate School of Physics.  I have left that school in 1969.

And I started my employment with a company called Skil Corporation, S-k-i-l, mostly known for manufacturing portable circular saws.  I been with that company up to my retirement, which was end of 2008.  However, the company has changed names a number of times.  In 1979, it has been sold to the Emerson Electric Company.  And then in 1992, it became a part of joint venture between Emerson Corporation and Bosch of Germany.  They created a company called SB, like SB, or Skil-Bosch Power Tool Company.  Then in 1996 the Bosch has purchased the second half of that corporation because it was a 50/50 joint venture.  They have purchased the second half, and as of 1996, I been employee

of Bosch Power Tool Corporation in North America.

Q.   Could you describe the progression of your job responsibilities at Skil and then Bosch?

A.   Sure.  When I was hired in 1969, I was hired as a solid-state engineer.  In those days, the Skil Corporation was the inventor of a speed control switch that required electronic component known as silicon control rectifier, and I was hired in order to produce that solid state device.

Then that production was sold and moved to Europe, and I was moved to the research department, so I became a power tool research engineer.

In 1974, I have moved to the test lab, and I was working there for a couple of years as a test engineer.

In 1976, I became a safety liaison engineer.  I was doing various project related to the safety of power tools such as chain kickback, circular saw kickback projects, and I was assisting the organization in evaluating claims, where a claim has been made that a tool has been involved in an accident, and it was my job to find out the causes of the accident.

In 1977, I moved back to the research department.

And in 1981, I became the principal safety engineer. And as of that time, from 1981 up to 2008, I been essentially the principal or the leading safety engineer in our organization, responsible for the whole product line:  circular saws, grinders, routers.  Whatever the company was making, it

was my job to review the design of those components and the design of the tool as a whole.

When the Emerson and Bosch created a joint venture, I also became responsible for the review of Bosch power tools that had been mostly designed in Germany, and I have numerous trips to Europe where I was discussing the design issues with the German designers or the designers in Switzerland.  And later on, I also have an opportunity to work with our manufacturing facilities in China and Taiwan, where I visited the facilities to review the processes, how, for example, the table saw is manufactured and how some of the components have been designed there.  Some components have been designed in Chicago.  So that was my job throughout the '80s and '90s and up to my retirement.

Q.   Were you involved with issues relating to standards and hazard analysis as part of your job as safety director?

A.   Yes, I was, sir.

Q.   Could you describe a little bit what that was about?

A.   As a safety engineer, I have to assure that the product is meeting the safety norms or the standards that are applicable to that particular product category.  So there are standards such as -- back in '80s and '90s, it was the Underwriters Laboratory Standard No. 45 that was applicable to portable hand-held tools.  And there was a standard called UL 987 that was applicable to bench-top or stationary tools.

So these were the primary standards that I been concerned with, but I'm also familiar with standards in Canada because our products are sold in entire North America in the same execution as in United States.  So I had to be familiar with the Canadian standards because, for most part, the Canadian standards and the UL standards are very similar but not identical.

Of course, I also had to be familiar with the standards in Europe, what's called the EN norm or EN standards, "EN" for European Norms.  And because the products had been designed there, we had to make sure that certain aspects that are different between the EN requirement and the UL requirements, that those differences be harmonized and the product is going to be acceptable in United States and Canada.

Q.   As part of your job, did you investigate accidents and perform accident reconstructions?

A.   Yes, sir.

Q.   What did that consist of just very generally?

A.   The product safety cycle is integral in evaluating the accidents, finding out the root cause of the accident and then bringing that information to the design team and working with the design team to try to address whatever in a design, whatever in the product, how can the product be changed to minimize or eliminate this kind of accidents.  Then the next iteration of the product is put on the market, and, again, you

observe how the accidents are happening, trying to see what is a particular pattern of accident.  Again, you bring that information back to the design team.

So it's an integral part overseeing the design cycle as well as investigating the accidents.  Then you can bring the two issues together, and you can do the best job in designing the safe power tools.  And that was one of my tasks, not just to assure that a product meets the standard requirements, but what can we do in a design cycle to improve the safety of the tool.

Q.    Were you and are you still a member of any professional organizations?

A.    Yes, I am.

Q.    Which ones?

A.    I'm a member of American Society of Safety Engineers, American Society for Testing Materials.  I'm also on the various committees that are either associated with the ANSI, American National Standards Institute.  I'm on a standard technical panel of the Underwriters Laboratories.  I am on various harmonization committees.  There is a committee that is trying to harmonize and minimize the differences between the Canadian standard and the UL standard.  That committee is called Binational Working Committee.

I am also on committees dealing with harmonization of the North American standards with the world standards, and that

6-10

is happening under the umbrella of institution called IEC, or International Electrotechnical Commission.  The IEC is an organization that sponsors variety of standards for various products, among them power tools.  So there is an IEC standard called 60745.  And I'm on a committee that is trying to harmonize the requirements between the UL 745 and the IEC 60745 standards.  I'm also on a committee that is trying to harmonize the standards between the UL 987 and the IEC 61029 standard which is applicable to the fixed or stationary power tools.

I'm a member of variety of committees in the Power Tool Institute.  I'm a chairman of the product liability committee, product safety committee.  I'm also the chairman of -- in Power Tool Institute, chairman of circular saw subcommittee.  And circular saws in this subcommittee, it is not just hand-held circular saw but table saws, radial saws, miter saws.  They are all part of that -- or within the scope of that subcommittee.  And I'm sure I missed some other ones.

Q.   Mr. Domeny, with respect to these various committees, in particular the ANSI committees, are these committees that you volunteer for?  Were you invited to be a part of these committees?

A.   Some of them I been invited.  For some of them I have volunteered.  For some of them I have been appointed.  For example, I'm on the ANSI B7.1 committee and also on the ANSI B11 committee.  The ANSI B7.1 is a committee that is overseeing

the standard for safe handling and guarding of abrasive wheels. So that would be for grinders.  The B11 committee has a series of standards that deals with machinery guarding.

For both of these committees, I have been appointed by the Power Tool Institute.  As a representative of the Power Tool Institute, I'm a member of those committees and bring the information from the ANSI to the Power Tool Institute and vice versa, whatever the Power Tool Institute will have information providing to the ANSI committees, so I am the liaison between those two institutions.  So for that I been appointed.

Q.   Mr. Domeny, did I retain you to consult on this case for -- on behalf of Ryobi?

A.   Yes, you did.

Q.   Approximately when did I do that?

A.   About -- within the last six months or so.

Q.   Are you still consulting for Bosch?

A.   Yes, I am.

Q.   Now, I want to turn to table saws, sir.  Could you just describe very, very briefly for the jury kind of the history of table saws in this country?

A.   Well, for this country -- or for any other place, for a matter of fact -- the table saws have migrated from lumberyards where they have been used, this large machine with three-foot diameter saw blades.  They been cutting the timber into a standard dimension of lumber.

6-12

So from that first application -- they may have been driven back in old days by the steam machines.

Then they migrated into shops like for cabinetmakers and people who make furnitures.

Then they migrated to contractors, carpenters, who used the table saw for living, and they are using the table saw to do variety of tasks, preparing for installation of that woodworking project at the location, but they do the work back in a shop.  So original contractor saws and cabinet saws have been in that location.

And then later on, probably in '70s and in early '80s, the table saws have migrated to the job site, so it was no longer acceptable to do the work in a shop and then bring the end product to the job site.  They brought the table saw to the job site, and they have done the work on the site.

So that's how the transportable and small bench-top table saws have evolved and they became -- they have tremendously grown in their popularity from probably early '80s to the present time.

Q.   With respect to bench-tops, what did -- do you have any experience as to -- strike that.

You were already working for Skil in the early 1970s, correct?

A.   Yes.

Q.   What was one of the principal products that you were

working on?

A.    Well, the company Skil is known for Skilsaw, which is a generic name for portable hand-held circular saw.  That is the No. 1 product.  That's how the company was built.  They invented a portable Skilsaw in 1924, and out of that product the company grew and added on additional tools, drills, grinders, routers, sanders, jig saws, reciprocating saws, all kinds of saws.

Q.    Prior to the introduction of these bench-top saws in, I think you said, the late '70s or early '80s, do you have any information or did you collect any data with respect to how carpenters use their Skilsaws on the job to perform the kinds of tasks that could be done with a table saw?

A.    Yes, I have done that.  As a test engineer, it was my job to evaluate the products, mostly circular saws, how would they function on a job site.  And as you heard me to say earlier, if there was an accident involving a Skilsaw, it was my job -- they ask me to evaluate the product that -- what happened.  Why did this accident happen?  Did something break, you know, a tool?  Or is there another cause for an injury?  So I've been involved in circular saws as of 1974, and it became my full-time job as of 1981.

Q.    Did you see any misuse of circular saws as a replacement for what would have been a table saw on the job?

A.    Yes, quite often, sir.  In the days when there was no

transportable table saw, quite often it happened that people had a need to do a task that can be done only on a table saw. And what they have done is took a portable, hand-held circular saw, and they just plunge the blade through a plywood, through a sheet of plywood. Then they use screws to fasten the footplate of the circular saw. Put a sheet of plywood. And then they turn the whole assembly upside down, and all what you had is a saw blade put in the middle of the 4-by-8 sheet of plywood.

Now the people would take the piece of wood and they would just freehand, and they would just cut it, a product. Or they would lay a straight edge next to the saw blade and use that as a guide to advance the wood against the saw blade. But this assembly, you could not have an immediate access to the switch. You could not adjust easily the depths of the cut, how much blade was protruding through.

So these kinds of accidents had been happening quite often, and I had to investigate, back in the days when there was no small bench-top tools, why certain accidents happen with a portable saw, but they happen in a table saw application.

Q.    Were there even people who tried to purchase some metallic tables and then rig them up as kind of ad hoc or jury-rigged table saws?

MR. CARPINELLO:  Leading question, your Honor.

THE COURT:  Sustained.

Q.   Did you come across situations in which people used other fixtures to convert into table saws?

A.   Well, yes.  This need for a table saw application was apparent to number of manufacturers, so there were people who been selling after-market accessories.  There been small tables that had been used to attach a router to it, and now the device became a router shaper.

So along the same lines, the people who are doing that kind of after-market tables, they were manufacturing them. They saw the need for a table saw application, and they actually designed small metallic tables on four legs where you could actually attach the portable circular saw to the bottom of it and then use it as a table saw.  This has been an after-market accessory, very popular in '70s.

MR. APPEL:  Can we show a photo, your Honor?  Your Honor, I have a photo of that kind of a device.

THE COURT:  Yes.

MR. CARPINELLO:  Your Honor, objection.  My understanding that, unless there was an exhibit, it was not to be shown to the jury, demonstratives.

THE COURT:  Demonstratives, by definition, are showed to the jury, but they're not marked as exhibits.  They're not sent to the jury.

MR. CARPINELLO:  My understanding was that, if it had not been marked as an exhibit, we could not show it to the

jury.  Am I incorrect about that?

THE COURT:  Not if it's a demonstrative.  Have you seen this video?

MR. CARPINELLO:  I don't believe I have.

MR. BENSON:  We gave it to you this morning.

MR. APPEL:  It's not a video, your Honor.  It's a series of photos.

THE COURT:  I'm sorry.

MR. CARPINELLO:  It's my understanding, then, we can show demonstratives to the jury even if they're not exhibits?

THE COURT:  If it is a demonstrative and announced to the Court that it is, then it can be shown.

MR. CARPINELLO:  All right.  Thank you, your Honor. Yes.

MR. APPEL:  I'd like to show that demonstrative to the jury, your Honor.

THE COURT:  It may be shown.

Q.   Mr. Domeny, can you describe what is shown in these photos?

A.   Yes, I can.  In upper left-hand corner, you can see the side view of a portable circular saw that has been attached to the bottom of the table.  As you can see, there is a string that is wrapped around the switch of the handle, that white string that is just tied a knot on it.  That's how they activated the switch.  In order to turn it on or off, the

people would have to just plug or unplug the cord.

As you can see, the system doesn't have any real capabilities for attaching the guard. The guard of the portable circular saw is protruding above the table. There is no miter gauge or rip fence visible on this picture.

May I see the rest of the pictures, please? In the middle, on the right-hand side, that is a view from the back end. You can see the power cord. Under the power cord, there is that rope that ties the switch on. And you can see how that product had to be operated under this situation. That is a typical example.

There have been other manufacturers. This is not a Hirsh table, the company called Hirsh, H-i-r-s (sic). That was the company mostly known for manufacturing these kind of after-market devices.

Q. Was this -- these photos taken in the course of investigating an accident?

A. Yes, sir.

Q. Was it your opinion that these kinds of practices were hazardous and dangerous to users?

A. Yeah. That is my opinion. These kind of practices have been extremely hazardous. Here there's at least some attempt to hold the power tool in a fixed manner, but quite often, the practice that I described earlier, where they just plunged it through a sheet of plywood, that was much more a frequent

occurrence.

THE COURT:  For the record, this will be marked Exhibit A for identification.

MR. APPEL:  Thank you, your Honor.

(Exhibit A marked for identification.)

Q.    Mr. Domeny, does -- did Bosch manufacture table saws while you were employed for them?

A.    Yes.  The first time it was still under the name of Skil, and that was in second half of '80s.  Prior to that project, the Skil Corporation was manufacturing only hand-held portable tools.  In second half of '80s, it was the first attempt of the Skil Corporation to manufacture a transportable tool and a first of such tool was a small bench-top table saw.

But that -- it actually used a motor similar to one that you have seen, but it was attached to a carriage where the operator could crank the blade elevation up and down.  The operator could change the angular orientation of the saw blade. It was provided with a fence.  It was provided with a miter gauge and a guarding system that would shield the top or the portion of the blade that was protruding through the table top. So that was our first table saw that we have manufactured. That lasted only for a couple of years.

And then the next project was bringing a table saw that was manufactured by the company in Taiwan, bringing it into United States after certain redesign efforts and sell it

6-19

as a Skil Model No. 3400.  And I believe that product went on market in 1991 or 1992.

Q.    Did Bosch continue to manufacture bench-tops?

A.    Yes, they have.

Q.    What was the product that Bosch was marketing in the last years that you were product safety director?

A.    In mid-'90s or second half of the '90s, the Bosch undertook a project or a design effort that was aimed to produce a professional-grade bench-top table saw.  It would still be a transportable table saw.  It would be something that a person can actually pick up, lift and carry to the back of the truck or from the truck to the location where they were working.  It was a professional grade meaning that the life expectancy of the components, mostly the motor and gears, was -- I believe the target was 400 hours of operation.  And that product was introduced to the market in late '90s, 1999.

And then in 2006, 2007, they have introduced the next version or next iteration of this product, as Model No. 4100. It was a 4000.  4100 was the next model, which, as far as the footprint, the size of the base of the unit and the size of the table saw, was identical to the previous model 4000.  But the guarding system that was attached, the guarding system that was shielding the saw blade and the spreader assembly that you probably heard about, the spreader, was redesigned and replaced by the riving knife/spreader combination.  Essentially, it's

the same unit except for the differences that I just gave you.

Q.   Did Bosch make any contractor saws or cabinet saws?

A.   Yes.  I just need to add one more statement -- correction to the previous statement.  We also manufactured the Model 4000 for a European market, so it was essentially the same product as Model 4000, but for the European execution, where the table dimensions had to be changed to comply with the European Norms. So those were the products that we made.

Q.   Did it make any contractor or cabinet saws?

A.   No.

Q.   What is the main risk to users while operating a table saw?

A.   The table saw, as a category, has essentially three different families of risk.  Because it's an electrical tool, obviously, there is a risk of electrocution.  Because there is a high-speed saw blade that is cutting through the material, there is a possibility and the likelihood of objects being thrown by the high-speed blade.  Sometimes it's a broken tooth. Sometimes it's a knot from the wood that was cut through.  So you have the hazard and the risk of being stricken or hit by the flying object.

         But the dominant risk, where most of the accidents are happening, is the inadvertent contact with the saw blade that results in lacerations and sometimes in amputation of the fingers.

So we're going to, obviously, set aside all of the electrical hazards.  But the hazards of the flying objects and the hazard of the inadvertent contact and the lacerations, they are correlated to some degree, and probably we should be addressing that.

Q.    What is the process that you, as a safety engineer, go through in order to deal and address those risks?

A.    Well, you start, as you indicated, with the risk assessment, with the risk analysis.  The risk analysis is a process where you identify all the hazards that are present in a tool.  So there's a hazard of electric shock.  We set aside.

The hazard created by spinning saw blade, and that spinning saw blade can though these particles or it can cut you.  So you have identified the hazard.  The first task as a designer you have is you have to ask the question:  Can I eliminate the hazard?  Of course, if I would eliminate the spinning high-speed saw blade, I wouldn't have a useful tool. I would not have a table saw.  So the hazard cannot be eliminated.  That is the answer to your first inquiry.

In order of hierarchy, in order of priorities, your next task is you have to see whether the hazard, how it can be guarded.  How can you provide elements or engineering controls, whether it's guarding through some barriers or through some other control.  How can you control this hazard and prevent the undesirable outcome, either prevent the flying object from

hitting you or you touching the saw blade. So that is the guarding eliminate of your risk assessment and overall hazard evaluation.

After you have identified the hazard and you have thought about all possible ways of guarding it and guarding for all applications, not just guarding for a particular set of circumstances because you don't know how the product is going to be used. The table saw is very versatile, and it can be used with all kinds of cutters and for variety of projects. So you have to think about all possible ways how the hazard can cause a damage or harm to the operator. So you have to provide guarding for all of those particular applications, not just for one or two issues.

After you have done all that, you have to then provide a warning. You have to instruct the user that under these conditions you should do this and you should not do that. You have to provide the full set of warnings and instruction. So those are the three essential step: hazard identification; hazard removal or elimination. If you cannot remove it, eliminate it, then you guard it; and then you provide instructions and warnings.

Q.   Is knowledge of accident patterns useful information in determining how to guard and establishing which engineering controls to use on a product?

A.   Not that it's useful. It's absolutely essential because

if you don't know how the product is going to be used, how can you provide a proper engineering control?  And you have to study -- if the product is brand new, if anything -- like a table saw, if nothing like that was ever made, then you are in a predictive mode.  You're trying to theorize how certain accidents can happen.

After a century of using table saws, there is a pretty good body of knowledge that how accidents are mostly happening. Obviously, the knowledge that is applicable to the lumberyards and big mills, that is not transferable to bench-top product. The knowledge from cabinet shops, some of that knowledge is transferable.  Some of it is not because in a cabinet shop the user has a different behavior, has a different set of materials.  So you have to know the intended purpose of the product, how the product is going to be used on that job site, and you have to provide the engineering controls for the intended application that you design the product for.

And knowing how the accidents are happening, which I described earlier -- that you study the accident, you bring that information to the designers, and then you try to minimize the hazard -- that is an integral part of the process.  So knowing accidents, accident patterns, is essential in this process.

Q.    Generally, what kinds of specific information is important with orientation of the hand or speeds?

6-24

A.    Well, you have to know -- you have to look at all the accidents that have taken place, and you have to look for commonalities in these accidents.  And I have done that with the table saws and came to the conclusion, and it's generally accepted, that the contact with the spinning saw blade, talking about that particular hazard, happens under a variety of circumstances, but they can be classified into three families.

A contact that happens in the process of feeding, so as you're feeding the workpiece into the saw blade, you are not aware of the proximity of your fingers to the blade and sometimes you feed the finger into the saw blade.  So this would be feed type of accidents.

Some other accidents -- and they are relatively slow-approach velocities.  On the other end of the spectrum, are accidents that have been created by kickback.  These are accidents that typically happen on the rear portion of the saw blade where the operator is either reaching.  As he is completing the cut, he reaches to the back side of the table and picks the piece of wood and tries to pull it through to finish the cut because he doesn't want to feed the piece of wood into the saw blade.  It's too close.  So you reach on the back side and you're trying to pull it through.  As you pull it through, you may misalign the line of the cut with the plane of the saw blade.  You bind it and there is a kickback.  And the kickback will draw the hand into the back end of the blade,

typically to the top of the blade crown because when a kickback happens the piece of wood is elevated, and your hand would be striking typically the top of the saw blade.  These are high-velocity approaches.

Majority of the accidents happen in the slip or reach-over situation where, for whatever reason, you may have a kickback but your hand is not on the far side of the saw blade but it's front of the saw blade.  The material is binding, and there is going to be kickback that pushes the material against you.  You are trying to hold it down and keep pushing forward. Your hand slips on the material, and as it slips, it inadvertently goes into the saw blade.  So those would be slip type of accidents.

You can finish the cut, and you may be reaching for a piece of the material that was cut off.  But as you reach, you are not -- you are looking at the wood, but your thumb may hit the saw blade.  These are the reach-over accidents.  Or you can be cutting and you want to reach for -- you're pushing like this and the push stick is over there, and you put it in a wrong location and you want to reach for it.  As you reach for it, your fingers strike the saw blade.  Those are the reach-over accidents.  This family of accidents happen in approach velocities typically between 20 to 60 inches per second.

So it's important to realize how the accidents are

6-26

happening and how fast the hand was approaching the saw blade because that velocity, in combination for how long the hand is in contact with the spinning saw blade, those two factors will determine the depths of the cut, how deep your injury is going to be, because if you're moving ten inches per second and you have a contact for one second, you can theoretically have a ten-inch-long cut.  If your contact with the spinning saw blade is reduced to one-tenth of a second, your depth of injury is only one inch instead of ten inches.  So it's important to know the timing and the speed.

Q.   We're going to get into that in a little bit more detail.  But for now, I just wanted to go back to the principles of hazard analysis.  Those are some of the things, I think you just said, that you would have to learn in the process of doing a hazard analysis, correct?

A.   Correct.

Q.   Are there different models for doing hazard analysis?

A.   Yes.

Q.   What models do you use?

A.   Well, there are hazard analysis technique that are described in the IEC standards.  There are hazard analysis technique that are described by ANSI B11 technical papers.  There are other forms of hazard analysis that one can utilize.  There have been various papers written on it.  And, also, the form of failure mode and -- FMEA -- effect analysis.

So this kind of techniques allow you to look at your system, and in a failure mode analysis, you are asking, well, if something goes wrong, something breaks in this particular component, what's the affect of it.  What's the consequence?  So you're looking at it little bit from the other point of view, but it's a form of a risk analysis.

Failure mode effect analysis are quite often utilized to reduce the hazard.  We identify the hazard, and we looking how can we redesign it.  If you redesign it one way or the other way, we have to look at other potential failures and what the outcome is going to be.  So it's an integral part of risk analysis.  There are many models that are used by various people.

Q.    When you were safety director for Bosch, did you conduct a formal hazard analysis for every tool that went on the market?

A.    No, sir.

Q.    What was the general practice especially with respect to a consumer tool like a table saw or circular saw?

A.    Well, the general practice is that if you have a product that has been well-established in the marketplace, and you already know all the accident patterns, what happens, you don't need to go through this theoretical process of identifying hazard.  You already know that a hazard of the saw blade is there.  How are we going to guard it?  You know that.

Now you are more involved in a process that is called

a risk reduction component of the evaluation.  You come to a particular point.  You identify the hazard.  You know the magnitude of the injury.  You know the frequency.  So you know your risk.  And now we asking is this risk acceptable or not.  And if it's unacceptable to you, then you go through the process of trying to redesign the components that are generally involved in the accident.  You trying to reduce by design the possibility for those accidents to happen, and that is called a risk reduction process.

So you don't have to do a formal risk analysis from the very beginning if it's a mature product that has been on the market for number of years.  If it's a brand-new widget that you never made, then, of course, a full risk assessment is prudent.

Q.   Now, you talked about the use of accident data to understand the risks involved, in particular the blade contact risks involved, in using a bench-top table saw, correct?

A.   Yes.

MR. APPEL:  Your Honor, at this time I'd like to show to the jury another just for demonstration -- we can mark it as B.  This, I believe, has been shown -- as a matter of fact, I think it's agreed to.

THE COURT:  You said "B" as in boy?

MR. APPEL:  Yes.

THE COURT:  Yes.  It will be marked for identification

6-29

as Exhibit B as a demonstrative.

(Exhibit No. B received into evidence.)

MR. APPEL:  Yes.  Would you please show it.

Q.   Would you explain to the jury what that is?

A.   Well, this is a document that has been prepared in conjunction with Bosch's evaluation of the SawStop prototype unit.  And in order to make a full risk assessment of the SawStop table saw and compare the overall risk of that prototype to a traditional table saw, we have to know how the accidents are happening.  And this bar chart describes those three particular categories that I have mentioned earlier.

And based upon the data that Bosch had at this time -- and I believe it's 2001 time frame -- when we looked at the table saw accidents, then we determined that feed type of the accidents are counting for approximately 10 percent of all accidents.

Q.   When you say "feed," again, for the jury, what do you mean by a "feed" accident, and at what speeds are the hands typically moving into the blade?

A.   During the feed, the hand is moving between one inch to ten inch, maybe twelve, thirteen inch, in, generally, that speed range.

Q.   You mean per second?

A.   Per second, yes.  That's how many inches per second.  So ten inches per second, if I demonstrate, that would be -- ten

inch would be 1,000; you're moving, 1,000.  So then you cover ten inches of travel in one second -- in one second.

The slip-type accidents are --

Q.    Just, again, you're saying 10 percent of the accidents happen --

A.    10 percent happen in that approach velocity.

Slip-type, reach-over accident, they are anyplace from 20 to 60 inches per second.  60 inches are five feet.  So my span is six feet.  Five feet would be here.  So you would cover this distance.  1,000, you're moving like that.  You're reaching for something.  I covered five feet but in one second.  As you can see, this is not an extraordinary speed.  Human is actually capable of moving their hand under the force of their muscle -- we have measured it with high-speed camera -- up to 100 inches per second.  That would be 100 inches per second.

Then you have a kickback type of accident.  These are rare but one has to design and one has to account for the -- they are rare in the high-speed end.  The kickback accidents are not rare because they are actually counting for 41 percent of all the accident.  But the high-velocity approaches are rare, but you have to be aware of them and you have to design your safety system to accommodate when the hand that has reached behind the saw blade and grabbed the wood, and now the wood is brought out toward you.  If the material snags your fingers or your fingers are lodged in a geometric -- some kind

6-31

of a cutout, because not all of the pieces of lumber are nice and smooth, then your hand can travel very high.  Typically, there is a slippage between the velocity of the wood and your hand, so your hand is not going to be moving with the velocity of the wood kicking back.

So those accidents, the approach velocity during the kickback, can vary depending on how much slippage there is between your hand and a piece of wood that is being kicked back.  And I think I should explain how fast -- what are the potentials for kickback velocities.

Q.   Yes.  And I would like you to do that, but I have a question for you before that.

A.   Sure.

Q.   The question is:  Is it important, as a safety designer, to take into account the high end of the spectrum or the worst case?

A.   Yes, it is.  Obviously, you are not designing for once-in-a-blue-moon situations because you cannot account for those.  But if you have a knowledge that, even if it happens infrequently but it happens periodically, then the standards and also the good engineering practice would require you to design your safety systems for the worse condition and for a worst possible outcome.

Again, I'm not talking about something that would be way outside of the typical distribution of all the

possibilities.  So you cannot design for those way-out, outrageous situations.  But something that has been known and repeated, even if it's on the high end of the spectrum, you should be designing for it.

Q.   So as a safety engineer, you don't look at just one particular accident; you look at the whole range from the less severe to the most severe?

A.   Yes, sir.

Q.   Now, I want to get back to kickback.  Perhaps you can draw for the jury the physics and the dynamics of what happens in a kickback accident?

A.   I can certainly do that, yes.

Q.   Could you get a piece of paper and some pens and maybe you can display it on the Elmo.

Mr. Domeny, if it will be easier, you can do the drawing at the witness stand, and then we can put it onto the Elmo, whatever you prefer.

A.   I prefer to do it here.

THE COURT:  Mr. Domeny, we're going to have to hear you over here, so if you can kind of turn this way it would help or perhaps even get on the other side.

A.   So what I am attempting to do is -- it doesn't work too well with these pens.  I'm trying to draw a circle representing a saw blade.  That circle has a center here, and I'm going to draw a line.  You guys can see there, I see.  I'm going to draw

a line here that represents a platform upon which either a circular saw is advanced over the wood or wood is advanced over the stationary tabletop. So the diagram that I'm going to be drawing, I'm going to start with a portable circular saw diagram if that is okay.

Q.    Yes.

A.    So I'm going to label this as a circ. saw diameter. So if this is a saw blade and we say that the direction of the blade rotation is clockwise like that --

Q.    Perhaps if you could just -- if you can rotate that for the jury a bit. That's better, yes.

A.    That is -- I can actually stand this way, right? You don't mind? Then under this condition, if the saw blade is rotating in that direction, then at the bottom -- of course, the blade would be rotating this way. And with a portable circular saw that you take to the piece of wood, the cutting is happening on an upstroke as the saw blade is coming through the material. So this would be the front, so I will assign this side as the front of the machine. And, obviously, this will be the back of the machine.

        And under this table, which is a guide plate for part of the circular saw, I will draw in the long wood that has been cut, and it's represented by these red bar.

        THE COURT: Mr. Domeny, remember that we all have to hear you. So as you're drawing, I would appreciate it if you'd

then turn around and then testify.

THE WITNESS:  I will pay attention to that.  Sorry.

THE COURT:  Thank you.

A.    Now, the kickback happens as the interaction between the rotating blade and the wood that that blade is cutting.  So let's analyze two interesting points.  Let's say that the binding is happening at the front of the machine, and how is that different from the binding that happens at the back end of the machine.  The kickback is governed by the physical principle of action and reaction.  As we know from elementary physics, every action has equal but opposite direction reaction, okay.

So if I am -- in this case, in a portable circular saw, you have to understand that it is the wood that is stationary and the saw blade that is moving.  The saw blade in this instance, the whole machine is moving from back to forth.  It means the circular saw is moving in that direction as indicated by that arrow.

If the binding occurs at the front, what will happen is that the material is trying to pinch the saw blade.  The saw blade reacts to it, and the reaction is the kickback.  So the action from the blade on the wood can be illustrated by this arrow, which in technical terms is called a vector, a force vector.  And the reaction is equal in magnitude but opposite in direction.  So that would be the kickback vector.

And in this particular case, that real force can be illustrated by a force that is pulling down and pushing back. So in this case the saw is trying to -- the portable circular saw is --what is it doing, is trying to just push back because these forces are absorbed by the footplate.  The back end of it, the saw blade acts -- if the binding happens at the back end, the blade is acting on the wood illustrated by that arrow. The kickback is equal but opposite.  And in this situation, the kickback is going to have a horizontal component illustrated by that arrow and a vertical component illustrated by this arrow.

So a binding that happens with a portable circular saw in the back end of the machine is the more risky, more hazardous, because the saw blade is now pushed up.  The force of the kickback is pushing the saw blade up and back towards the operator.

The very same principles that are applicable for portable circular saw also apply to the table saw.  And in order to make this a table saw diagram, all what I have to do is just turn it upside down.  And now I call this diagram a table saw kickback.  The front of the machine is still going to be the front, so this is still the front here.  This is still the back.  And as you're feeding the material in, into the saw blade, the cutting starts at the front end of it where the saw blade is going down through the material.  Then it disappears below the tabletop, and it comes up at the back end of it.

So what happens when there is a binding at the front portion of the saw blade, in this instance, we have to recognize that the saw -- the table saw is not going to move because it's stationary. It's heavy, big mass. But it is the wood that is going to be pushed by these forces.

So in this particular case, the kickback, rather than being illustrated by this diagram, now the kickback is illustrated by this vector. So in this situation, the kickback is going to be pulling the piece of the material down, down into the tabletop. So it's pushing it down into the top of the tabletop. But this portion of that real force is pushing the material back towards the operator. So this would be the force that the operator has to deal with if the binding happens at the front of the machine.

If the piece of wood goes all the way through the saw blade and the binding happens at the back end, because in a table saw situation it's reversed between what is stationary and what is moving, this vector will represent the kickback. And in that particular case, these are real forces. Those forces will -- can be analyzed as a vertical component trying to lift the piece of the wood up and as a horizontal component pushing the piece of wood back.

So if the binding happens at the back end of it, typically -- this pencil will represent the material. The material is lifted up by the saw blade teeth. The saw blade

teeth are rotating that direction.  So the material is lifted up and then pushed back by that real component of the force.

And if the material gets all the way to the top of the saw blade, now it can be really propelled at the high velocity because now you don't have only the binding on the side of the saw blade, the friction that is driving the material into the operator, back towards the front of the machine, but now you can have the teeth that can dig into the bottom of the material, and now the material can accelerate and travel at much higher velocity.

So this is the engineering analysis and recognizing the magnitude of these forces and the velocities by which this system is operating and what is the potential -- how fast the wood can be moving, recognizing the forces, the speed and the direction is going to help you to analyze the accident.

Q.   Now, in the context of the table saw like the BTS 15 --

A.   May I return?

Q.   Yes, please.  With respect to the use of a product like the BTS 15, what are the main causes of the phenomenon of kickback that you've described?

A.   Well, it is not just for BTS 15.  For any table saw.  But if we talking about the bench-top table saws, they are slightly in a different environment than a cabinet source.  The main causes of a kickback would be the misalignment of the piece of the wood with the plane of the -- with the direction of the

cutting.

So if the saw blade is in this particular plane -- and you should be feeding the wood in in line with the plane of the saw blade.  But if you going to be feeding the wood in crooked, if you are misguiding the piece of wood, that creates a binding, and the front and the back and those forces that I have illustrated, both at the front and the back, are going to be present.  And generally the outcome is that a saw is going to propel that piece of wood back to the operator.  So misalignment of the piece of wood with respect to the line of the cut is a principal cause of the kickback.

Q.   In terms of actual operation of the saw, how does that happen?

A.   Most of it happens in a cut called a rip cut.  Rip cuts are long cuts where the material would be engaged around the saw blade both at the front and the back.  So it happens most often in a ripping operation.  But that does not mean that only in a ripping operation you can have a kickback.  You can be doing a cross-cut utilizing a miter gauge.  And you can be only inch or two inches into the cut, and if your miter gauge moves or your wood shifts with respect to the miter gauge and you cause a binding, you going to get a kickback just as well.

Q.   Are there particular ways that people can cut which will be more prone to cause this kind of binding?

A.   Well, the operator in use, the misalignment, is most

dangerous when operator is trying to freehand, when they are not using any guiding devices, because one of the engineering controls that have been designed into the machine is the fence and the miter gauge. They are workpiece guiding devices. And their job is to assure that your workpiece is moving parallel with the plane of the saw blade, that there is no misalignment that leads to those kickback forces. So miter gauge and a fence is your primary kickback control devices that are helping you to minimize the binding in use by the feeding process.

Then you also have a device at the back end of the saw blade, which is that black piece behind the saw blade referred to as a splitter or a spreader. And that device is there for two possible situation. One would be that even if the operator is doing everything right, the material, as it's being cut through, can generate stresses of their own where the wood will close the curve that has been cut by the saw blade.

So in this case, you need some kind of a control because it's not in the hands of the operator to prevent that. And that's why the splitter or the spreader is essential in order to minimize the closure of the curve upon the back side of the saw blade because if that curve closes on the back side, that pinching that I have illustrated with that red dot on the back end of the saw blade can create enough binding and the resulting kickback forces.

The spreader is there, also, to minimize the

probability of you misguiding the piece of the wood that you're feeding. So as you're feeding it through and if you would be drifting away from the fence, if your material is going to move away, that spreader that fits into that curve will keep it and will reduce the likelihood of that piece of wood being misaligned or drift away from the plane of the saw blade. So it also helps you to reduce the probability of the kickback that is caused by the effect known as steering, that when you're trying to steer, as you're pushing the piece of wood usually at the very end, the wood can be steered in this fashion where the back side of the saw blade will pick up or will hit the material that has been steered over those steers that are coming up. So that creates a kickback. So the spreader will reduce the likelihood of that.

And, finally, the last engineering control that is on the machine to reduce the magnitude of the kickback is the device called a kickback pawls or kickback pawls -- that's p-a-w-l-s -- pawls. I pronounce it funny. But pawls. They are like a one-way clutch. They allow -- they are like a half-moon-shape device with teeth that are in contact with the top surface of the wood. And they are spring-loaded such that if you're pushing forward --

Q.    Mr. Domeny, if I can just interrupt you for a second. You can actually go up, with the Judge's permission, just to show the jury again what these components are.

6-41

THE WITNESS:  May I?

THE COURT:  Where do you want him to go?

MR. APPEL:  Just up to this saw over here, your Honor.

THE COURT:  He may do so.  But she he needs to, the court reporter will have to move.

THE WITNESS:  It's going to be very short.

A.    The pawls are this device here, this half-moon-shape device, that are on both sides of the splitter.  And they have teeth.  So if you're pushing the material forward, they move up, but as you're trying to move back, these tooth are into the wood and they are not allowing you -- the wood to be pushed back by the saw blade.  That's one way it allows the wood to be moved forward, but it does not allow you to be pushed back by the saw blade.  Of course, the same thing is happening on this side because this is the kickback pawl on the other side of the splitter as well.

Q.    Now, are there any -- sorry.

A.    Yes.

Q.    Are there any other engineering controls on the table saw that are used to reduce the risk of accidents?

A.    Of course, the hood guard, yes, the guarding element.  And a hood guard is important for -- it's a barrier guard that is enveloping or covering both sides on the top of the saw blade, and it reduces the likelihood of access or incidental contact with the spinning saw blade.  It is also a very important

6-42

element to use the thrown-object hazard of the saw blade.

If the tooth of the blade breaks off -- and I don't mean the whole tooth but the tip of it -- those hard, carbide pieces of metal that are braced or sometimes welded to the blade, those can break off.  They have known to break off.  If you're cutting through the material and the material has a nail in it and you're not aware, you can strike the nail.  You can sometimes even have a piece of small pebble in the lumber.  And when you cut through these hard metals, the carbide tooth can break off and it can hit you.  And I have investigated number of accidents where people lost an eye because the carbide has thrown into their face.

You can also have a situation where, on the back end, there may be a knot in the wood.  At the front, the blade is pushing that knot, and it cuts through the knot because you cannot avoid -- you cannot cut always clear of the knots even if you try.  You should be lining up your cuts that you are avoiding the knots, but sometimes it's unavoidable.  Sometimes the knots will become loose.

So on the front end, as the blade is pushing down, the knot is being pushed into the tabletop, so the knot is not going to move.  But on the back end, as the saw blade is rising up, than that knot can be knocked out from that wood, and it can fly in your face.  And depending --

THE WITNESS:  May I, your Honor, go again?

THE COURT:  Yes, you may.

A.   If I'm cutting like this and a knot is being kicked up here, it's going to travel as a tangent to the circle of the saw blade, so it's going to miss you.  But if you do your adjustment of the saw blade and you set it to the right height, now the saw blade is coming in this direction.  You can see that the pieces of carbide are right there on line to your face.  The knot that is ejected by the saw blade is right in line with your face.

So the hood guard that is covering the saw blade will prevent that.  It will absolutely prevent that.  It's not just reduce the likelihood.  If the knot is kicked up, if the tooth breaks, this baffle or the top surface of the hood guard is going to prevent those particles from striking you.

Q.   Mr. Domeny, I just want to get back to kickback for a moment.  Have you studied kickback?  And when did you start studying it?

A.   Well, I have studied kickback on number of machines, and it started in 1974.  In 1974, our company was making chainsaws, and my first project as a test engineer was to evaluate the chainsaw kickback, which is very hazardous event.  It leads to number of very disabling injuries.  And I have constructed a fixture that eventually was used by Consumer Product Safety Commission to evaluate the kickback potential and to measure whether the circular -- whether the chainsaws have acceptable

or unacceptable level of the kickback.  So that was a project that I done in middle of the '70s.

Then in later part, in 1975, 1976, I was involved with investigating a circular saw kickback.  Again, I have constructed a fixture where I was able to duplicate the circular saw, portable circular saw kickback.  And that project was eventually handed off to the University of Missouri.  The Power Tool Institute, as the organization, has hired the University of Missouri to complete that project, and I was visiting with Professor Carlson and evaluating the progress of that project at the university between 1977 and 1981 when the project was concluded.

And then, of course, I evaluated the kickback in a table saw situation ever since we started to manufacture table saws.  But most intensively I have evaluated the kickback in conjunction with the SawStop prototype evaluation.  We have actually, in those days, used a high-speed video, and we documented how the kickback is progressing with the video clips back in year 2001.

Q.    You talked about the kickback dynamics.  What are the velocities that are induced in a kickback accident?

A.    Well, just talking about table saws, right?

Q.    Yes, just talking about table saws.

A.    A typical ten-inch diameter saw blade rotates anyplace from upper 3,000 to mid-4,000 revolutions per minute.  That

6-45

translates to the tip velocity of about 2,000 to 2,500 inches per second. So, potentially, those objects, like that piece of knot that is thrown by the saw blade because it's so small and because it can be hooked in by the saw blade, that object can propel and move at potentially very high velocity, 2,000 inches per second.

A piece of the wood that is on the top of the table there, tabletop of that saw, if it is just being propelled back as a result of side-loading and the blade being bound by the material that is closing on both sides, then there is going to be a substantial difference between the velocity of the blade and the velocity of that piece of wood. There is going to be a certain slippage. The wood is not going to go at the velocity of the blade.

We have, however, measured the pieces of wood of that size and even bigger, moving at velocities up to 300 inches per second. So that is something that has been documented. We know that smaller pieces can travel faster, but the larger pieces that are driven by the friction and side-loading between the material and the spinning saw blade, those pieces of material are going to be moving from -- anyplace from 100 inches to up to 300 inches per second.

Q.  Have you made estimates of how fast the hand can be moving in a kickback accident?

A.  Yes, I have.

6-46

Q.   What were those estimates, and what are they based on?
A.   Well, the estimates are based upon the laws of the
physics, and they are also based upon some measurements, but
mostly estimations just how fast the piece of wood is moving
and how good of a coupling or how much slippage is going to
occur between your hand and a piece of the wood.

        And it very much depends on what I call the profile of
the kickback.  As the piece of wood is being kicked back, the
kickback can have various characteristics.  It can happen such
that the blade grabs the piece of wood, and immediately it is
propelled with a high velocity.  So it starts out with a very
high acceleration.  Under that particular circumstance, the
hand is going to slip a lot with respect to the moving wood
because it's unable to go with the wood instantaneously.

        But there are many kickbacks that happen that the
binding is building up.  The wood is progressively being pushed
by the saw blade and accelerated -- the acceleration doesn't go
-- the velocity doesn't go immediately high, but it starts with
the lower velocity and accelerates up.  Under those conditions,
if the kickback profile is of that nature, then your hand is
capable of going with the piece of the wood.

        And now, it just depends on how much friction, how
much coupling you have between the wood and your fingers.  So
sometimes it's going to slip.  It's going to go only with half
the speed.  Sometimes, if you're maybe wearing a glove and

6-47

there is a sliver that grabs your glove, then your hand is going to be moving very fast.  If there is a -- if you're cutting -- let's say you're building shelves, and you cut number of dado grooves into this piece of board, so there are three-quarter-inch-wide grooves, half-inch deep, and you may be feeding one of these.  You have a board that you prepared with these slots in it, and you want to create two opposite halves of the shelf.  So you do it in one piece of wood, and then you cut it into the half.

If you have that situation and your finger happens to be in one of those depressions, then, again, it's going to go with a very high velocity because there is not going to be any slippage.  So how fast the hand is moving, it depends very much on the circumstance, what kind of a coupling or friction or coupling or geometric detail coupling you have between the finger and the piece of wood that is being kicked back.

Q.    Have you made rough estimates as to the speeds that we're talking about in these range of circumstances?

A.    Yes, I have.

Q.    What are they?

A.    In my opinion, what is reasonable, again, not designing for one of those once-in-a-blue-moon situation of extreme high velocities.  But it's reasonable to expect that under a reasonably expected condition, the hand can be moving between 100 to 140 inches.  120 inches is a reasonable number to assume

for a kickback-approach velocity.

Q.    Mr. Domeny, I'm going to change gears here and ask you some questions about standards.

A.    Okay.

Q.    Now, you talked before about UL 987.

A.    Yes.

Q.    What has been your involvement with UL 987?

A.    Well, early on in '80s and '90s, my involvement was to assure compliance with that standard.  Then as of 1999 and 2000 and through the early parts of 2000, I have been extensively involved in writing a draft proposal for the revision of that standard.  So my involvement has a broad spectrum.

Q.    Now, you've also been involved in other standards both in the formulation of them or the revision of them?

A.    I've been involved in harmonization of circular saw standards, and that I have done through '90s, late '90s, when we harmonized the UL circular saw standard between the UL, or American requirements, North American requirements, and European requirements.

We have harmonized because in Europe they had the requirement for a riving knife.  In United States they did not.  And we have meshed those two standards, so I've been very much involved in evaluating the standards.  I have spent weeks in Europe studying the riving knives, how they are used on various machines.  And based upon that knowledge, I have written many

proposals for portable circular saw, harmonization of the standards, and most recently and as of 2001, I been involved in writing proposals for table saw standards.

Q.   Now, is UL 987 a general standard or a tool-specific standard?

A.   987 is tool-specific standard.

Q.   What kind of tools does it apply to?

A.   To fixed or stationary power tools, electric-driven power tools.  It applies to any one of these table saws that we have in this courtroom.  It does not apply to large industrial table saws that you would find in industrial setting, in lumberyards. I think the upper-end limitation is by the power, that how much power the system or the model can have in these machines.  And I think it 3,700, 500 watt, is the limitation on the size and the power of these table saws.  Larger table saws do not belong to the 987 standard.  They are governed by what is known as ANSI 01.1 standard.

Q.   Is there a hierarchy of engineering values or principles in the world of standards?

A.   Yes, there is.

Q.   Maybe if you could just draw for the jury what that hierarchy would look like?

A.   The hierarchy is -- of the standard is divided into generally three classes.  You want me to draw it in?

Q.   Yeah.

A.    It's rather simple representation of -- by a pyramid.  At the base of the pyramid you have basic guidelines, so you have basic guidelines.

Q.    When you say "basic guidelines" -- if I refer to basic safety engineering principles --

A.    That would be, yes.

In the ISO world, International Standards Organization, hierarchy, they call this an A-level standard. Above this, you have, based upon an ISO standard, a B-level standard, and at the top of the pyramid is a C-level standard.

The B-level standard are typically technical papers that apply to categories of machines.  They don't apply to everything, all the mechanical world.  They are already somewhat narrower.

And at the top of the pyramid is a tool-specific standard.  The tool-specific standard gives you actually detailed information of how the good engineering practices and safety guidelines are to be executed because a basic safety guideline can tell you that the machinery should be so designed as to prevent accidental contact with the hazard.

Well, that is such a general language that very few people know how to interpret it.  How do you interpret it if you're dealing with the table saws.  How do you interpret it when you're dealing with the punch press because it could be equally applied?

That's why you need a tool-specific standard, that it will capture and it will incorporate all the basic safety guidelines but in a particular way that is done, so in a case of tools, should be designed as to prevent an access to the hazardous moving part.  The tool-specific standard will tell you, well, in a case of table saw, you shall use a hood guard. And the UL 987 standard tells you that a complete guarding system for a table saw shall incorporate a hood guard, a splitter and an anti-kickback block, those three items that I have shown you there.  So that is a tool-specific standard where it tells you how that basic language should be applied.

This principle that a tool-specific standard overrides and gives you specific details is not captured only in the ISO standard.  It's also captured in OSHA requirements.  The OSHA has a series of standards for machinery guarding, and I believe it's 1910.5C, or something like that, standard that tells you that if you have a tool-specific standard, the general basic guidelines are overridden or not to be used by the OSHA inspector.  The OSHA inspector is bound to use a tool-specific standard when he goes on a job site, not a basic guideline.  So that's the hierarchy of the standard and their application.

Q.   Just to fill in the blank there, what's on the B level?

A.   On the B level would be technical papers, and narrower would be -- standards that are narrow to some categories.  So instead of being applied to machines in the chemical industry,

you would be dealing with mechanical machines in the industrial setting.  A hazard analysis paper, technical report of hazard risk assessment, would be a B-level requirement.  It is not a C-level requirement for sure.

And it's not a standard.  These are guidelines to be used by the people who are applying it to every standard.  When you have a particular tool-specific standard, then you have to use a tool-specific standard.  Only in the case when there is no tool-specific standard, only then you are free to use the B-level or A-level standard.

Q.   Now, with respect to the tool-specific standard, UL 987, what does UL 987 require with respect to table saws?

A.   It has a number of requirements as far as the design of the table insert, as far as you have to have a fence.  You have to have a guarding system.  I believe I described what is a complete guarding system in the language of the UL 987.  What does UL consider a complete guarding for a table saw.

Of course, they have various other requirements, but what is interesting for us and germane to us is the requirement that you have to have a fence.  You have to have a miter gauge.  And you have to have a complete guard for a saw blade.

Q.   And have these requirements been the consensus among safety professionals and at UL and ANSI for quite some time?

A.   Yes.

Q.   And do all -- in order for all manufacturers to comply

with the standard, I take it they have to have those same elements?

A.    Of course.  In order to get a certification, they have to have the elements present.

Q.    Just in terms of the guarding, why was it felt that that particular kind of guarding system, the kind of guarding system on the BTS 15 -- why was it felt among safety professionals and UL that that particular guarding system should be required?

A.    It stems from the basic risk assessment and following the hierarchy, the pyramid of the standards.  If you do a risk assessment, you recognize that you have a hazard of the spinning saw blade while the general requirements for any hazardous moving object is that that moving object be guarded if it cannot be eliminated.  It has to be guarded.

Actually, that general principle tells you that the guarding elements cannot be removed without the aid of the tool.  You have to have a wrench.  You have to have a screwdriver or some kind of a tool in order to remove the guarding elements.

The exception is, to that rule, that if a guarding is for the piece of the machinery that is constantly being put on and off, then you may -- you don't have to but you may use devices such as a wing nut or a knob that you can fasten with the finger.  But, of course, you can also use a nuts and bolts that require wrench tool to fasten.

6-54

So the philosophy that stems from the risk assessment is that one needs to guard the hazard of the moving -- the moving hazardous object.  And the philosophy back in -- throughout the '40s '50s '60s, '70s, up to the year 2000 or so, has been that a total guarding, that every element of that moving hazardous component be fully guarded.  They did not allow an access -- or they did not allow a design that you could actually reach and touch some portion of that moving object.

That was the philosophy of fully guarding because it was felt that in order to eliminate or reduce the likelihood of accidents, you need to fully protect -- you need to provide a barrier between an operator and a hazard for all possible access points.  And it was also felt that the -- all the engineering controls should be present.  It should not be up to the user which control -- which engineering guarding system are they going to use.  So the operator wouldn't have to speculate, well, in this instance should I use a hood guard or should I not use the hood guard and use only the kickback post.  Maybe I don't need a kickback post.  I just need the spreader.  So those decisions were not up to the user.  The standard told you that they have to be combined, and all of them have to be present for the cutting that that guarding system can be used on.

Q.    And on the BTS 15, is that reflected in that guard design?

A.    Yes.    That is exactly in compliance with the sense of the UL requirements.

Q.    Now, did you have an opportunity to review the design of the BTS 15?

A.    Yes, I did.

Q.    Did you also review the warnings and other product literature?

A.    I have.

Q.    What were your conclusions from your design review of that saw, the BTS 15?

A.    My conclusions, when I done the design review of this machine, is that every engineering control that stems from the risk assessment has been applied and used on the BTS 15.    There wasn't a -- any particular hazard that was not addressed by an engineering control by some form of the guarding system.

As far as the review of the instruction manual, because now that you understand that you have this hazard, you have this particular guarding, how you are protecting the user from that hazard.    Now you have to look in that context, understanding the design, now you have to look into the warning.    Have the warnings been properly applied, and have the hazards been properly communicated to the user.

And I did review the manual and I did review the warnings that are on the top of the guard, on the front of the machine, and I find them to be fully in compliance with the

standard, and I also find them to be a communication method that is reasonable to tell the user what kind of hazards they may run into.

Q.   Do you have an opinion, to a reasonable degree of engineering certainty, as to whether the BTS 15, as manufactured by Ryobi and with respect to the subject saw that was involved in this particular case, whether it was safe for its intended purposes?

A.   I do have such opinion, yes.

Q.   What is that?

A.   In my opinion, the BTS 15 is reasonably safe.  There is no design defect.  I definitely, on the subject saw, haven't seen any manufacturing defect.  I already told you that I believe the warnings are not defective.  They are adequate to communicate the hazard.  So those are the elements that one would be looking at when one is looking for a set of potential defect or is there something wrong in the saw.  So, in my opinion, the BTS 15 is reasonably safe for the intended purpose for which it was designed.

Q.   Do you have an opinion as to whether or not the BTS 15 was unreasonably dangerous or defective in design?

A.   I do have such opinion, and, no, it is not unreasonably dangerous.  Just the opposite, as I told you, it is reasonably safe in design manufacturing and application of warnings.

Q.   Now, have you been involved in the revision of standards

for table saws?

A.    Yes, I have.

Q.    Would you describe the evolution as to how that came about?

A.    Yes, I can.  The evolution of revisions really started in 1998.  The main impulse for that -- or the kick-off to start thinking about revising the standard came from the Consumer Product Safety Commission that has approached the Underwriters Laboratories and also the Power Tool Institute, as organization that represents the manufacturers, and they have communicated to these two institutions that the accidents with table saws are -- they are not happy with it.  It's unacceptable.  What can be done with the design of the machines, talking to the PTI, and what can be done with the standards requirement, talking to the UL, what can be done to lessen the frequency of the table saw accidents?

So there was a follow-up meeting in 1999, and the first request from the UL to the CPSC was, well, CPSC, can you give us some data because you are telling us that there are accidents happening with the table saw.  We would like to see some quantitative evaluation because neither one of the companies sees the global picture, what's happening across the nation.  And CPSC give us this composite view of how the accidents are happening.

So that data from CPSC, which was in the form of

what's called an epidemiological report where there was some in-depth investigation of, I believe, 80-some accidents were further reviewed, and some information was provided of these accidents are happening.  That was the first information that we, as an industry, have received on this global picture how the table saw accidents are happening.

What the PTI was doing in the meantime is they were looking at their own accidents, and they were discussing, well, how could we address some of these injuries and what's happening.  And it was clear from the primary data -- each organization, each manufacturer had their own data, but that kind of a data is not shared between the manufacturers.  It's very much a proprietary data.

But we -- each one of the manufacturers recognized that a frequent parameter that is associated with an accident is the lack of the guard not being there, or the guard was not present when the accident happened.  So what can we, as the organization of manufacturers, do to improve this?  So one of the first things we have done is -- the answer to that question was, well, the engineering controls are what the hazard analysis tells us.  The design is what the UL permits us to design, what the UL requirements are.  How can we assure that the guards are going to be used with degree of frequency.

So the first instinct was to create an educational video.  So we just did not just brush the issue off.  We said,

well, we're going to design these how-to-do videos, not just for table saws, but we also done the project for other tool categories.  But we did create an educational videos that was given free to institutions such as schools so when the young students are instructed on -- in a woodworking classes, they would be viewing this how to use the table saw safety video.

These safety videos been available on the website of the Power Tool Institute.  They were free to download.  And they were given in a form of VHS tapes to schools, to carpentry -- this -- where the young carpenters go to learn their trades, to those kinds of institutions.  So that was the first approach.

Then, as a result of reviewing the data from CPSC, the Underwriters Laboratories has decided to create an ad hoc committee to address that issue.  And the first meeting of this ad hoc committee took place in RTP, which is Research Triangle Park, in North Carolina.  That's where one of the UL offices is located.  And that meeting was focused on improving the safety of the table saws.

Caroleene Paul from Consumer Product Safety Commission was present.  Number of approval engineers from the Underwriters Laboratories were present.  There were a number of manufacturing representative present.  I was present there. Representative from Makita, Black & Decker; Emerson Electric was present; Mr. Gass was present there.  So there were

probably dozen-plus people present in that meeting.

Q.   I just want to go back for a minute.  But what was the data that you obtained -- well, did you obtain just data from the Consumer Product Safety Commission, or was there another source of the data?

A.   Data source prior to that meeting was, of course, each company representative knew about the accident history they had in the file, but it wasn't shared information.  The only other shared information was a survey done by the woodworking magazine where accidents had been analyzed and some kind of a review of those accidents was available.  I don't remember much details about that, but I know that kind of information was available.

Q.   Was the data that you had available to you, and presumably available to other manufacturers, was that useful in -- as you went through the guarding revision process?

A.   Of course, yeah, yes.

Q.   In what respect?

A.   Well, in the respect, I think I have described earlier, that you have to know how the accidents are happening.  You have to see whether there are patterns and what can you change in the design in order to reduce the likelihood for these accidents.

Q.   So you met in 2001.  And then -- could you briefly describe for the jury what the process was that UL and these

6-61

other safety experts went through in order to begin the process and actually complete the process of revising the standards?

A.   Well, the process was that each of the invited member, because this was by invitation from UL, has expressed their position and their suggestions of what should be done in order to improve the safety of the table saw.

The representative from Ryobi was Mr. Dave Peot.  He was there.  So him and myself and I believe Mr. Rodriguez from Makita were the primary spokespeople who been advocating the change in the standards, that we needed to convince the Underwriters Laboratories that in order to permit us -- in order to reduce the likelihood of the accidents, they have to give us permission to change the standard.  It is -- because by this time there was evidence in our hands that the users are not using the guarding system despite our best efforts to design the guarding system for the hazard reduction, that there is a general notion that these guarding systems are not used with the frequency as would be appropriate, okay.

But in order to -- and we inquired.  Each one of us had a particular information that why is the guarding system rejected.  Somebody was complaining that I cannot see what I am doing.  The guarding system is in the way when I'm making narrow cuts.  The guarding system, I cannot measure the distance from the blade to the fence because the guard on some machines would fall back.  Somebody would have to hold it up.

6-62

In one -- they had -- when they have to remove it because there are situations where a guard has to be removed for nonthrough cuts, it take too long to install it back.

So everyone had their little corner of complaints.  So these kind of changes have been talked about in that first meeting, that what will we have to do.  We would -- for example, the Black & Decker representative was assigned that what kind of work helpers could be mandated to be supplied with the tool rather than just describe them in a manual.  Would it be prudent to supply certain work helpers to minimize the frequency of accident?  That was his assignment from the meeting.

My assignment that came from the meeting was -- along with Mr. Rodriguez.  We have volunteered and it was assigned to us that we should make proposals for revisions in the standard, which I have done along with Mr. Rodriguez.  My assignment was also to revise the questionnaire that the Consumer Product Safety Commission was using in their epidemiologic reports because when we looked at the data that CPSC has given us, and what kind of information that they provided, that information was very -- it was not full with useful information.  They gave you what was the gender of the person issued, how old he was, whether it was finger cut.  But there were many detailed informations that was missing.

And when I looked at the questionnaire, I suggested to

Caroleene Paul that this questionnaire doesn't even try to illicit the information from the person who is contacted by the CPSC, so she -- could you help us to rewrite it, and I did. And I supplied the rewritten questionnaire to Caroleene Paul. And that was my work that I have done.

Q.   Caroleene Paul being the representative of the Consumer Product Safety Commission?

A.   Correct.

THE COURT:  All right.  We're going to take the morning recess at this stage.  You may step down for the time being, Mr. Domeny.  We'll be in recess for 15 minutes, jurors.

(The jury left the room at 11:05 a.m.)

THE COURT:  Be seated for a moment, counsel. Approximately how much longer on direct?

MR. APPEL:  Your Honor, it could go another couple of hours.  Mr. Domeny is thorough.

THE COURT:  All right.  And any plans -- any outlook on the prospects for cross?

MR. CARPINELLO:  At least an hour, probably more like an hour and a half.

THE COURT:  All right.  We'll be in recess then for 15 minutes.

(Recess taken at 11:06 a.m.)

(After recess, start at 11:25 a.m.)

THE COURT:  Good morning, jurors.  We're ready to

resume.  Mr. Domeny would retake the witness stand, please.

Mr. Domeny, you're reminded that you remain under oath.  Please be seated.

Mr. Appel, you may continue with direct examination.

MR. APPEL:  Thank you, your Honor.

BY MR. APPEL:

Q.  Mr. Domeny, we were talking about the revisions to UL 987 that began taking place starting in 2001.  Was there a major change in guarding philosophy that needed to happen in order to make that change?

A.  Yes.

Q.  And would you describe that?  Because you described what the dominant philosophy was under the prior standard, so how did that change?  How did that philosophy change?

A.  The driving philosophy was embraced to take into the greater consideration the user behavior and acceptance or rejection of a safety device.  And it became apparent that irrespective of the engineering revisions and whether you're going to make changes in the given configuration, there is inertia of justifiable or not justifiable belief that these guards are difficult to deal with.  As certain carpenters would reject them without even trying them because of the inertia and because of the thinking that existed in that fraternity or in that group of carpenters.

So it became apparent that we have to even if some

changes are going to lead to systems that are not going to totally cover the hazard point but they are going to improve the visibility and the user friendliness of the device, that that may go a long way towards acceptance of that device.

So the philosophy changed from total guarding to provide systems that people would be or carpenters would be more meaning to use even if to some degree you have to sacrifice the coverage and the protection. Because overall, if you're considering all circumstances, even if you don't have a total coverage but because the system is going to be more likely staying in place, the total end effect is going to be a safer outcome.

Q. And this process, which began in 2001, was there a consensus that was reached at some point?

A. There was a consensus that was reached eventually in 2004, but not at all in 2001. It was a long process to reach that consensus.

Q. And incidentally, Dr. Gass was part of this process?

A. Yes, he was.

Q. And did he present his own technology, SawStop technology, to UL?

A. He did.

Q. And was he seeking to make it a requirement?

A. Yes, he did.

Q. And what was the consensus of the members of the UL

committee with respect to that?

A.    To my knowledge, the UL committee has not accepted the SawStop device as it was unproven in 2001, 2002 time frame, and they also had a reservation of mandating and writing standards that would be written around a patented technology that are no known alternatives.

Q.    Eventually there were standards that were published?

A.    Yes, in 2005 the revised standard was published.

Q.    And again, that's -- this saw that we're -- the subject of this litigation were not subject to those revised standards, correct?

A.    That's correct.  The standards were published in 2005 and this machine was made in 2004.  Even more importantly, it was designed prior to 2004, and it is at the time of introduction when the UL makes review if the product comply with the standards, so that would go back to early parts of 2000 when the determination was made and the standard that was used to make a determination for compliance was the sixth edition of the standard was the 1999 revision, and this product, the BTS 15, complied with those requirements.

Q.    Now, when did you first learn of SawStop?

A.    In August of 2000.

Q.    And how did you learn about it?

A.    I learned about it from the marketing people who have attended the woodworking show in Atlanta in August of 2000.

When they came back to the office, they came to my office and -- Hey, guess what I saw at Atlanta? I saw a table saw that is capable of distinguishing human contact and it reacts in such a fast way that the injury or the cuts to the hot dog is minimal. That was roughly the line -- I'm not quoting, but the essence of the conversation.

Q.   At some point did you actually see the SawStop device demonstrated?

A.   Yes, I have.

Q.   When was that?

A.   That would be in November of the year 2000 when Mr. Gass was invited to Cleveland, Ohio, where the offices of PTI is. They reside in Cleveland, Ohio. And the PTI has organized a meeting at the Sheraton Hotel right at the airport, and that's where Mr. Gass came in with his prototype, and various members of the Power Tool Institute were present to see his demonstration.

Q.   And what was your impression of it when you saw the prototype?

A.   My personal impression was favorable. I said that is a new way of looking at the improvement of power tool safety, table saw safety, and it seems to work fine. But the illustrations or the demonstrations were not covering all potential uses or all known accidents, or at least I knew how the accidents are happening. So I had some reservations, and I

have ask later on Dr. Gass whether we could receive a prototype for evaluation, and he indicated that he's willing to give us a prototype, and it -- I think it happened in May or April of 2001 when we received the prototype for our evaluation.

Q.    So Dr. Gass came to Chicago and met with you and others at Bosch in the spring and then after that you got the prototype for evaluation?

A.    I believe that's the sequence, that there was a brief meeting and then we received the prototype, and that was in our possession for two, three weeks; and we also received a box full of braking pawls.  We received a cartridge that could be built -- you could always recondition and put the cartridge back in the operative position.  But the braking pawl that is jammed into the blade, that is a throw-away item, at least in that execution as he had it in the year 2001.  So we received a number of pawls, a number of fuse wires, and one prototype and one cartridge, maybe two cartridges, I'm not sure.

Q.    And did you do some testing at Bosch with respect to that prototype?

A.    Yes, I have.

Q.    Can you describe the kind of testing and your methodology?

A.    The methodology was really similar to my approach when I evaluated portable circular kickback.  We have constructed a fixture that was capable of reproducing some events, like kickback, and we have conducted a test under the various

conditions and we have used a high-speed video camera to document how the test progress and we have extracted information from this high-speed video images that told us how fast the hot dog was approaching, because that video is capable of being calibrated and you can actually make measurements on a screen from point to point.  You can assign, you can calibrate the screen so the computer knows exactly what is the distance between those two points, and then it can measure any other distance.  And it, of course, knows the timing because every frame is so many milliseconds apart.  I believe we were shooting at 2,000 frames per second back in those days, in 2001.  So every frame was half a millisecond from frame to frame was the time interval.

And based upon knowing the time elements and knowing the distances we were able to extract motions we were able to extract velocities and how far something moved, how long did it take for the blade to stop after the contact was made, and information like that was derived from these tests.

Q.   Before we get into some of the specific test results, what was your general concern about SawStop technology?

A.   Well, they fall into the various categories, the concerns: Whether it's durable, how it's going to work in an environment, but what I was focusing at that particular time was, Well, how is the mitigation going to work out under the various circumstances that I know that how accidents are happening?

Because it was patently recognized, and Mr. Gass also says, that this is not a system that prevents accident.

So this was -- all the standards in every prior hazard analysis and engineering control was devised -- was a focus on preventing the accident.  This is not an accident-prevention device.  It mitigates the magnitude of the injury.

So my concern was that, Well, what is the mitigation at approach velocities and under the various blade configurations and under various other situation, what is the actual mitigation going to be?  Because I knew that accidents do not happen in a manner as it was illustrated where the hot dog is fed into the saw blade.  That happens only ten percent of the time.  Then Dr. Gass illustrated approach where he moved the hot dog faster, but not fast enough to replicate the approach velocities during the reaching or during the slipping.

So my curiosity was, Well, what kind of a mitigation do I -- will I get at those higher velocities of approach?

Q.   And could you summarize your test results?

A.   The test results where broken down into what is the stopping time from what we recognize at that time as a first contact, what we've seen on the screen when the hot dog makes the contact with the saw blade, to the point where the saw blade stops.  And then we also measured the depth of the injury, how deep is the injury on the hot dog?  But that injury measurement is somewhat not precise enough, because the hot

6-71

dogs have various shapes, sometimes they are more round, sometimes they are a little bit squarish. Under some high-velocity approaches the hot dog flexes away. It is a hot dog, the blade goes into it, it flexes away, and the total injury or total penetration of the finger into the blade is not faithfully replicated by the hot dog because it is more flexible than the hand.

So the -- what I'm trying to say, that injury measurement while we took it from the hot dog, is not something that you can absolutely rely on. It's much more informative from the engineering perspective is to measure the approach velocity and the timing events that how long is the object in contact with the hazardous moving part? Because once you know that information, it's a very straightforward engineering calculation, that if the object is moving inches per second and it's in contact with the blade for one second, the example that I give you earlier, then I can really easily establish that the depth of injury is one inch.

So the timing and the velocity are the key elements that you need to obtain from these measurements.

Q.    Can you for the jury just represent this in terms of a formula?

A.    It's a basic formula that we know from high school physics that velocity is the distance over the time. So if in particular point in time I'm at this location and I move to

6-72

that location and these two points are two feet apart and I cover them in two seconds to get from here to there, then the average velocity between those points is the distance over the time. Two feet over two seconds means the velocity is one foot per second.

So that is the formula that is used. The velocity was D over T, and that formula can be used to predict the depth of injury. You just take the D out and say, Well, I'm interested to learn how far the hot dog is traveling into the saw blade over this time. So, therefore, the D equals V, velocity, times the time, and that multiplication of velocity and a time is going to give you the depths of the injury.

Q. Now, what were you measuring? What was the -- were you measuring stop times?

A. Well, we were measuring stop times, but we have learned also that stop time does not reflect the total injury.

In a saw velocity when the approach of the hand to the saw blade, finger to the saw blade, is slow, the system is capable of stopping very fast, okay? And in that case, the finger is advancing so slow that the system stops and as a result of that deceleration of the decelerating saw blade there is a physical force from the phenomenon known as conservation of angular momentum, that force of decelerating saw blade we are drive the saw blade down below the tabletop.

So I can stop the saw blade and the saw blade will

then move down below the tabletop.

So here the injury is generated only during the time it is rotating, the blade is rotating.

However, at the higher velocity approach, if you're going 40, 50 inches per second, you can stop the saw blade but the hot dog is still approaching, and even though the saw blade is standing still, as it is going down, it is tearing through the tissue, as the hot dog is going through the saw blade. So the finger is like this, the hot dog. I stop the rotation but now it is dropping, and as though teeth are dropping and disappearing below the tabletop they are still cutting the hot dog.

In some instances the total injury is the sum of the injury generated during the stopping time plus the injury generated during the dropping time while the blade is in contact with the hot dog.

But knowing the total time is important.

Q.   Now, with respect to the testing you did in 2001, could you, again, express to the jury what your general concerns were based on that testing? What were some of the tests? Give the jury an example.

A.   Well, my primary concern was that a plastic pawl has shown a great variability or it was not consistent for various blades that might be used on a tabletop. There are teeth, saw teeth design that have what's called an aggressive hook angle; that

is, each individual tooth of the saw blade, how aggressively it is hooking into the material.  Aggressive hook angle gives you really fast cutting, and that kind of a tooth, if it's engaged in a plastic, it's going to stop very fast because it aggressively cuts into the plastic.

If you have a teeth that are blunt and they don't have that aggressive hook angle, the stopping time is going to be longer.

If you have a saw blade that has 140 teeth, so it's what's called like a paneling blade where you would be using cut to a plywood, something that doesn't chip up the surface, very small teeth, you have 180 of them.  That kind of a blade, it took three times longer to stop than the aggressive hook angle blade.

So in a prototype -- remember we're talking 2001, we're not talking the production unit that is front of us here.

In 2001 the stopping time that we have measured was approximately six milliseconds will be on the fast time, and up to 18 millisecond for these teeth that are small and blunt.

So that is a predicable variation that gives concern so the safety engineer, because, depending on what type of blade is being installed, I cannot promise to the user that the injury is going to be this or that under that condition.  It depends what kind of a blade he is using at the time.

So that was a concern, number one, the variability in

predicting the injury.

The other concern was whether the product, if the system is incorporated into the transportable tool, whether it is durable to withstand the dust, the vibration, and environmental conditions that this product is going to be used, because this transportable BTS 15 is not going to be sitting in a shop.  It may be on the back of the truck of the contractor in Minnesota when it's minus 30, or it may be in a trunk or enclosure in Arizona where the temperature inside enclosure is 180 degree Fahrenheit.  We did not just know how the system is going to work, and is it going to last?  Those electronic components, are they going to last under these extreme variations or various environmental condition, not just temperature, humidity, dust, vibration, and bouncing in the back of the truck.  So those were kind of concerns that we had.

Q.   Well, I want to just go back to the concerns you had about the stop times.

A.   Okay.

Q.   Did you say that depending on the blade or the aggressiveness of the blade there would be a variability in how fast the SawStop device was able to stop?

A.   Correct.

Q.   And did you test the device under different approach speeds?

A.   Yes, we have.

Q.   And could you predict, based on that testing, the severity of the injury, knowing the stop time and the approach speed?

A.   Yes.  Based upon that formula that I gave you, yes, we could do that.

Q.   Could you give the jury an example of why that was of concern to you?

A.   Well, for example, if you are using a regular tooth, like you see on this exemplar, and the stopping time of the prototype in those days was six milliseconds and you're approaching with a 12-inch approach velocity, then the degree of injury is going to be minor.  So you have 12 times .006 milliseconds, and you can calculate what that injury would be. I believe it's like a little bit more than a 16th of an inch or something in that ballpark.  More than 16th of an inch but less than 1/8 of an inch.

Another end of the spectrum would be that while I'm using a paneling blade and I have done the cutting and I reach behind it and now the piece of plywood is yanked by the kickback forces and my hand is approaching at 100 inches per second and the paneling blade, if it's engaged by the plastic pawl, is not going to stop until 18 milliseconds instead of six.  So now we have a 100-inch approach velocity multiplied by .018, so the depths of the injury is 1.8 inches.  So considerably more than a fraction of the inch.  And of course, you have some kind of a happy medium, it's going to be between

those two numbers.

Q.    So what is the significance of those numbers in terms of the injury?

A.    The significance is that, as we understood the system at that time, traumatic amputations are still likely.

Q.    Would the orientation of the hand as it approached the blade, even with a SawStop device on it, would that affect the severity of the injury under different approach speeds?

A.    Very much.  May I illustrate?

Q.    Yes.

THE COURT:  Yes.

(Pause.)

A.    Probably on this model will be the easiest.

So if the orientation of the hand, if I'm holding the piece of wood this way and my hand slips in under the of 60-inch or 50-inch approach velocity, I can have a regular tooth, I expect a small injury.  But if I have a fine tooth, the stopping time is going to be greater, the stopping time is going to be greater, it's going to be in excess of -- I don't know what the number is, half an inch, something in that ballpark.

So if I'm going to -- based upon the calculation, if I know that half an inch is going to be the depth of the injury, if I'm approaching the blade in this fashion, half an inch means I'm going to cut my pinky off and I'm going to lacerate a

portion of the ring finger.

Another way, if my hand is going to be kicked up and lands in this fashion, and I'm landing half-an-inch velocity means all of the fingers are gone.

So you have to consider the orientation of the hand, because in this fashion you just lose one finger but if you approach the same velocity in that fashion, you lose all fingers.

Q.   So -- you may resume the stand.

So were these the concerns you had about SawStop?  And I'll get to some others, but with respect to this particular concern, you had -- this was important to you in the time frame of 2001, 2002?

A.   Yes, sir.

Q.   Did, after that time, you conduct any additional tests to evaluate SawStop technology with respect to just this aspect of things?  The performance with respect to its ability to mitigate an accident?

A.   Yes.  In the context of evaluating the SawStop after the PTI joint venture has been formed, where some manufacturers pooled their resources and they created the JV group, and in evaluating the technology we have been benchmarking the performance of the systems that the JV was working on and how does it compare to the benchmark, which was the SawStop, which came out with a production model in 2004.  So I believe the

6-79

first benchmarking that we have done was in sometime in 2005. And then we have repeated that in 2007, as well as late 2008.

Q.   Now, we should be clear to the jury, what you're evaluating now, correct me if I'm wrong, you're actually doing evaluation of Dr. Gass' production saw, the saw that he's been manufacturing, the cabinet saw then the contractor's saw?

A.   After 2004.  2005, seven and eight it was a production version.  In 2005 and seven it was the cabinet saw.  And then in 2008 it was this contractor's saw that we've been evaluating.

Q.   And is it fair to say that that -- these saws performed of better than the prototype did?

A.   That's correct.  The production model has replaced the all-in-one pawl -- I'm sorry, the plastic pawl with the aluminum pawl.

So the design of the tooth is of no longer such a great variable as it has been in 2004.

So once you jam in this aluminum pawl into the saw blade, there are going to be variances, depending on the tooth design, but nothing of the magnitude like we experienced in 2001.

Q.   Based on the testing you continued to do during -- after 2005, though, did you continue to have concerns about the ability of SawStop to perform with respect to mitigation of the severity of an injury?

6-80

A.    Yes, I have concerns and we have found out a number of occasions that -- I have to explain here that -- the original constants dealt with a stopping time, but now what we discovered in a subsequent evaluation that that doesn't tell you the total story, that you have to know what is known or what we in the industry who evaluate and look at this kind of a system we call a sensing time.

So the system is -- it has a sensor that is trying to sense the presence of the human contact.  That information is an electronic signal, and that signal has to be processed by a signal processor contained in the machine.  And depending on what kind of a signal processor you have, I don't mean the -- whether you have model A signal processor or B, but what kind of an algorithms or how you write and get the computer to recognize the human contact.  That takes time.  And in the presence of information other -- other signals on the -- that are -- that the end thing or the saw blade is receiving, sometimes the computer cannot recognize is this a contact with the person or is this a wet wood or is this something else?

So the sensing time in a current configuration is the biggest variable that we are concerned with.  Under certain conditions it will not recognize the contact.  It means that you can have an event where the hot dog can be cut completely through, and everything on the system worked just fine.  Or it's going to trigger so late in the cutting process that the

6-81

hot dog is practically cut through before the system triggers

and actually fires and brings the saw blade to a stop.

Q.    Now, could we show the jury a couple of videos in which

this is illustrated, this problem?

A.    Yes, I have -- I gave you all the videos.

(Discussion off the record.)

BY MR. APPEL:

Q.    Before we begin this, could you describe what's going on

here?

(Discussion off the record.)

A.    What we have here is it's my hand, I'm the one who is

holding the hot dog.  You can see that the hot dog is squeezed

between thumb and the index finger and then between the index

finger and the middle finger I have it braced around a nail

that is driven into that piece of wood, and that is for me just

an anchor so my hand doesn't slide into the saw blade.  So I'm

using that nail to drive the hot dog sitting on top of the wood

forward into the saw blade.  That's why you see the nail.  But

the hot dog is embraced in my hand.

Proceed.

MR. APPEL:  You can proceed.

Q.    Okay.  So --

A.    So, in this instance, you can see that the hot dog was

totally cut through.  There is -- there was no triggering of

the system.  The system did not recognize my body being

represented by that hot dog.  It did not recognize the connection, and the system was done -- the test was done in the very same manner as Dr. Gass many times illustrates holding the hot dog and pushing it into the saw blade.

Q.    Do you recall anything about the approach velocity that you were using in this test?

A.    I believe the approach velocity here was 22 inches per second.

Q.    Which is -- is that -- in terms of the range of approach velocities, how would you describe that?

A.    That would be on the low end of the speed velocity.

        (Discussion off the record.)

A.    Again, same technique, but now what happens under this condition -- these were shots taken within hour of each other, or maybe even less -- and if you play out the video, you're going to see that the system cuts through.  And just as it comes to the very end of cutting through the hot dog, it is at that time that the system finally recognizes that there is contact with the human body, and then the system is triggered.

        (Discussion off the record.)

Q.    So, again, what did that show?

A.    That shows the variability in the sensing time.  The decision that the electronic brain of the system is looking at the signal that's coming from the sensor.  The blade is the sensor and that signal that is imposed on a saw blade is

monitored by a particular algorithm that is looking for a signature of what would be a contact is a hand.  I don't know to what degree it was explained.  There are a number of algorithms running side by side that are looking at that signal.

I know that Dr. Gass has testified that one of the parameters that he is looking for is in the drop in the voltage that is imposed on a saw blade.  If it drops below certain level, it's going to trigger.  He is also looking at the rate, how fast the voltage is dropping.  And he has at least four different ways of looking at that signal, because he is searching for what is the true signature of the contact with the saw blade?

Because it is -- I believe it has been said that this is a capacity of sensor that is the same like the old-fashioned touch lamps that you can just touch it and the system, the light comes on.  Well, that is not all what's happening in these electronic package.  The system and the signal is much more complicated.  You have to look at various ways -- you cannot just rely on the drop of the voltage that you will achieve by touching a lamp.  You have to be much more accurate in order to predict is this a person touching the blade or is this a wet wood touching the blade or some kind of other media?

So you have to look at it in the various ways and process that signal.  And under certain conditions that signal

processing determination takes longer or shorter time, depending on how the signal comes in.  That's the variable.

Q.    So did you also review Dr. Gass' manual?

A.    I have.

MR. APPEL:  And can we put that up on the screen?

Q.    Now, this is the manual for -- I believe it's a contractor saw.  It's actually the manual for that saw that's in the courtroom.

A.    Yes.

(Discussion off the record.)

Q.    So I wonder if we could read that to the jury.

This is in Dr. Gass' manual, and it appears that he acknowledges that -- some of your findings, that is, that you can get severe injury, correct?

A.    I believe so, that's what is there.

Q.    If I could read it, it says, "It's important to understand that SawStop saws do not prevent injuries, they work to minimize the severity of injuries.  In fact, an injury must occur before the SawStop safety system reacts.  The severity of the injury will depend on the speed at which a person contacts a spinning blade.  You may incur a serious injury on a SawStop saw, and if you decide to use the saw in bypass mode, the safety system will be disabled and will not activate in the event you contact a spinning blade."

Now, the whole issue that it doesn't prevent injury in

6-85

every single circumstance, is that a concern to you as a safety engineer?  Are there side effects from that?

A.    Well, there are various aspects that you can answer that question, at least in different issues.

First thing, we do know that the variability in the stopping time is a concern, okay?  We -- from very beginning we know that this not an accident-prevention device, this is an injury-mitigating device.  And I believe those statements support the fact that the degree of mitigation depends on the various factors.  And Dr. Gass is telling you that severe injury is possible with the SawStop unit, because, irrespective of whether you're using it in a bypass mode or not, it's still a severe injury is a possible outcome if the conditions are as you've seen on the previous video.

And then, of course, you have the situation with the bypass where the operator, because recognizing that the system is going to be used with wet wood, and wet wood, especially a chemically treated wet wood, confuses the signal, the brain of the system cannot recognize in the background noise of this wet wood.  It cannot recognize the finger or it is thinking about the wet wood as if it would be a person contacting that blade. So, because of that condition, a bypass mode has been designed into the system.  Because if the bypass mode would not exist and the transportable benchtop table saw is used in the environment of more frequently where the wet wood is put into

the saw blade, then the operator would experience a nuisance trips.  And every time it trips as a production model, you have an aluminum pawl that will totally destroy the blade.  So you're going to have to buy a new cartilage at $69, you're going to have to buy a saw blade, anyplace from $25 to $125, depending on the grade of the blade that you're buying.

So in order to eliminate these nuisance tripping, which would be really upsetting and economically not justifiable to the user, there is a bypass system.  But if the bypass system is used too frequently, we don't have any mitigation system in a bypass mode.  That's what that last sentence is telling you.  You are having the same saw as -- or maybe even saw that is not going to be utilized with a guard like any other saw, the injury is going to be the same.

Q.   Well, just on that point, on the bypass, doesn't the bypass have to be used every single time you're cutting?

A.   Yes.  That is a concern of mine, too.  Because if the operator recognizes that he has a wet wood, and Dr. Gass has built in a test protocol that is going to tell you that, well, should you use bypass mode or not?  So the operator goes through that process and he finds out that, yeah, my wood is too wet, there is likely to be a false tripping, so he is going to use in a bypass mode.  But now we have to think about the operator and what are the foreseeable, reasonably foreseeable consequences?  The bypass mode has to be activated, I have to

have a key, I have to insert it and turn the key and hold it, then I have to flip the switch into the "on" position, still hold it for a second or so, and then the system now, with these long process, is being told, that, yes, I want to turn on the machine in the bypass mode.  But because it is a lot -- a laborious process to do that, the operator is not likely to repeat it cut after cut after cut.  What is he going to do?  He's going to leave the machine running.  Once you put it into a bypass mode and I have a pile of wood to cut, I'm going to leave the machine running, and I'm just going to cut one after another.  When the machine is running, whether I'm there standing in front of it or not.  That is a hazard that you have to foresee.

Q.    Were there other side effects that you were concerned about, such as a false sense of security?

A.    The false sense of security is a different reasonably foreseeable behavior of the operator.

The false sense of security comes from the other spectrum of the performance, other end of the spectrum, performance spectrum of this machine.  Because the system is working most of the time when I touch is everything is working, to my expectation, to the user or the community of the users is going to say, Well, why do I need this guard, the guards are generally viewed as cumbersome, whether they are this guard or that guard, and they are not used.

So now what happens, because the expectation is that I'm going to be protected, the expectation is that I don't need the guard.  Well, what happens about that class of the hazards that we've been talking about earlier where you have a flying object?  You don't have a shield to shield you from a broken tooth, you don't have a shield to prevent a knot being propelled at your face.

Those are real consequences that happen because the people have altered their behavior based upon how the system is working.  Just like people are alternating their behavior based upon -- on some old traditional guarding where they say, I cannot work with this guard, I cannot see through that.  So they are alternating their behavior.  Equally, there is going to be alteration of behavior here because they are building their expectation based upon how the machine is performing most of the time.  And that alteration of the behavior can lead to the unintended consequences of people having a SawStop, not using the guard, but now you're going to have a more eye injuries or other injuries, and not even mentioning those other possibilities where there is no barrier now and you are more likely to touch the spinning saw blade.

Q.   Mr. Domeny, did you have -- and we're going to go back to the 2001, 2002 time frame -- particular concerns about the applicability of SawStop to a small, lightweight table saw, like the BTS 15?

A.    Yes, I had and I still do have such concerns.

Q.    Could you describe what they are?

A.    My concerns essentially resolve around the application of the system into small, lightweight transportable benchtop table saw.  Small and lightweight are the key words.

The system will react in a particular way and is the saw, if it's too light, is it going to move unexpectedly?  Because as the blade assembly is coming down, the action or reaction tells you that the whole motor assembly is going to come up.  Those forces have to balance each other.  And depending on the mass of the saw and depending on the location where you will put the braking pawl underneath the table, you're going to experience different outcomes.

So that is one concern of mine.

The other concern is that a lightweight, small, transportable bench top saw is utilizing what is known as a direct drive system.  Direct-drive system refers to the motor and motor speed transmission components between a motor and between a saw blade.  And the lightweight, small package saws rely on a direct-drive systems.  They do not utilize a belt-drive system.  And the significance is important to recognize within a direct-drive transmission and a belt-driven transmission system.

Q.    Mr. Domeny, would it be helpful for you to come up closer to the jury and demonstrate with showing with the saw itself?

A.   Definitely would be helpful, yes.

MR. APPEL:  May he --

THE COURT:  Does the court reporter need to move for this?

(Pause.)

THE COURT:  Would it be possible for you to be on the other side?

A.   Yes.

This is the drive assembly.  What you see here, this plastic part from that part to the end is the motor housing. That motor housing contains a motor known as universal motor. Universal motors are small packages of high power, okay?  They are different than induction motors or capacity motors which are usually slow and they are big in size.  Universal motors are very fast.  They rotate the motor inside between 25 -- between 20 to 30 thousand RPM, 20 to 30 thousand RPM would be an average.

But you cannot attach a blade to the spindle that is rotating at 25,000 RPM.  You need a speed transmission, like just you have a transmission in a car between the engine and the tires.  So the transmission package is located here in these assembly.  There is single-gear transmission.  The pinion of the motor is driving the gear, and the output spindle of the gear comes through right there where the saw blade is attached to the outward spindle of that gear.

And now you typically have five to six times gear reductions if you have a 24,000 RPM motor, 6-to-1 gear reduction means that the blade is going to be rotating at 4,000 RPM.

The small package of a direct-drive system is important to recognize and compared to the belt-driven system. Because if you have a belt-driven system, what you can do is in a moment of the brain sensing a contact and applying the brake pawl to the spinning saw blade, the blade assembly alone is allowed to drop.  This blade assembly has to have a couple of bearings on each sides, bearing on each side, and a pulley, and that pulley is connected through the belt to the motor that has a pulley of its own and the pulley diameters will determine the ratio of the speed reduction.

What is more important than the ratio of the speed reduction is the fact that I can let the saw blade alone drop and maintain the position of the motor.  I don't have to move the motor and I don't have to deal with all the kinetic energy that is contained in a motor.

So if I am stopping the saw blade, all what I have to do is stop the blade alone.  I don't have to invest into designing a pawl that will be stopping the whole motor. Because if one does a calculations, one can recognize very easily that the motor, like this, contains about 6 to 7 times the energy, the kinetic energy of the saw blade.

So if I were to have to stop the whole assembly, I would have to dissipate seven, eight times more energy than just stopping the saw blade. That's one consideration one has to make.

The other one is that if I have a direct-drive system and I manage somehow to stop the blade on its own, let's say I put the blade between two clutching surfaces, I will clutch the saw blade. I will not drive it. That spindle will not engage the blade through some kind of a square drive, but it's going to be a round hole, it's going to be driven by friction of the clutches.

Okay. Now I have introduced a component, a clutching component between a motor and a driven saw blade, and I can -- I don't have to worry about a transmission of the energy from the motor to the saw blade because of the clutching system. So I can stop it. I have enough energy in that pawl to absorb the energy of the saw blade.

But now what's going to happen if I do not disconnect the blade from the motor, this whole assembly, motor along with the saw blade, now it has to go below the tabletop. And the mass of this motor compared to the blade assembly is about almost 10 to 1, depending on the design and the gear housing. It means that now that consideration of angular momentum from which the force comes to drive the blade assembly below the tabletop, that force now has to work against the mass that is

10 times higher.  Therefore, the movement of the blade assembly is going to be slower because I have the same force.  When Mr. Newton told us that force equals mass times acceleration, I have now added 10 times more mass to the mass of the saw blade, so therefore, the force is the same, mass goes 10 times up meaning the acceleration goes ten times down.

So I'm going to have a of slower response and the hiding of the saw blade below tabletop as this belt-driven system where the blade assembly is separate and can be separated from the motor assembly.

May I return?

MR. APPEL:  Please.

(Pause.)

BY MR. APPEL:

Q.    I want to take -- to try to simplify this, because this is a bit complicated, and if we can simplify it for everybody here.

One problem, correct me if I'm wrong, has to do with the amount of forces generated during the braking process, correct?

A.    Correct.

Q.    Whether the saw can absorb those forces?

A.    Well, what whether I have to stop the blade alone or the blade plus a motor.  That's the question.  If I have to stop both of those rotating components, the motor and the blade, I

have to deal with substantially more energy.  That's one problem.

Q.    And did you do some testing of one of Bosch's 4000 benchtop saws, which demonstrates the problem with respect to that?

A.    Yes.

Q.    Now --

MR. APPEL:  Your Honor, may I show just a photo of the kind of saw that Mr. Domeny was testing?

THE COURT:  Yes, as a demonstrative.

MR. APPEL:  As a demonstration, yes.

We can mark this C for example.

THE COURT:  All right.  It will be marked as Exhibit C.

(Exhibit C marked for identification.)

MR. APPEL:  I have to use the Elmo for this, your Honor.

(Discussion off the record.)

A.    What you see on your screen is the front view of Bosch model 4000 table saw.  And that model, as I told you earlier is a professional grade table saw, bigger, slightly bigger than the BTS 10 and heavier, also, as the BTS 10.

Q.    The BTS --

A.    BTS 15, sorry.

Q.    And that saw sells for $179.  What does this Bosch model

6-95

4000 sell for?

A.    Well, in 2001 it was like $550.

Q.    And did you do some testing of SawStop technology on that particular benchtop saw?

A.    Not me personally, but the project that was started based upon my instigation, yes, they have done such testing.

Q.    So other Bosch engineers did the testing and you were -- you were involved with that?

A.    Correct.  Yes, I was.

Q.    And could you describe for the jury what the results of testing -- again, this is the 2002 time period?

A.    Can I shut this off?

Q.    Yes.

A.    The testing consisted of using the brick pawl and one of the cartridges that we had from the SawStop evaluation, and we had a number of brake pawls to mount that kind of a braking device on top of the table.  And engage the braking pawl, the plastic braking pawl into the saw blade.  And we were looking for the durability of the drive components that is the system as it is designed, is it capable of sustaining the forces again rated during the deceleration?

        It has to be understood, and I have to mention it that the Bosch model 4000 does have on it this sort of clutch-driving blade system.  The blade is not locked in or is not keyed to the output spindle.  It's driven only by the

friction of the two washers.  So those frictional forces, as the washers clamp the saw blade in between, they already provide some clutching action.

Understanding that, we wanted to know how long or how durable the system is.  I believe they have used -- they are tightened the blade bolt to upper limit of what the reasonable tightness would be, and after four or five braking application, the transmission system that I have shown you on the BTS 15, the gear housing inside the gear housing there is a gear that is pressed on onto the output spindle, and between the gear and the spindle there is a metal block called a key.  That key guarantees that there is not going to be any slippage between the spindle and the gear, and that key has been sheered off because of the torque generated during the braking application after the fourth or fifth cycle.

MR. APPEL:  Your Honor, I'd like to show a photograph of the damage that was done to the Bosch 4000.  I believe that's actually an agreed-upon -- no, it's not.  Okay.

So it's another demonstrative.

THE COURT:  It may be shown as a demonstrative.  It will be marked as Exhibit D.

(Exhibit D marked for identification.)

BY MR. APPEL:

Q.   So would you explain to the jury, again, what component this is on the saw that you tested and what -- what they're

looking at?

A.   May I go, your Honor, there, and I would use my pointer to point to the screen for the jury.

(Pause.)

A.   Why don't I point to that screen, since I'm speaking to the reporter.

THE COURT:  Fine.

MR. APPEL:  What you see there is the spindle -- this is the output spindle that would be inside the gear housing. On this shoulder between this point and that point, that's where the gear is pressed on.  And this item here, what you see there that is sheered off and the metal is actually smeared in this direction, that is the key that has been sheered by the torque generated during the cutting process.

That key sits in a pocket as deep as you can see on the shaft there is equally deep pocket on the inside diameter of the gear that is pressed over this, over the diameter of the shoulder.  And that key being a metal component has been sheared that in effect makes the product useless.  It's broken. Now you would have to change the gear transmission in order to fix your tool.

Q.   Mr. Domeny, before you go back, does the BTS 15 have a similar kind of component as this one?

A.   I'm absolutely sure that it has a output spindle and that it has a gear that is pressed on.

I do not know if they utilize a key or they utilize a system that is known as nodes, where the diameter of that spindle would have like a small T's like the ridges and then the gear is pressed over those ridges and that forms a secured mechanism that connects the spindle to the gear. So they either use a key or they use a node gear and a spindle.

Q.    Is it your opinion that the same result would have occurred with a BTS 15 or similar result?

A.    In my opinion the nodes do not have the load capabilities of the key. So the outcome like this would be probably happening sooner than in four cycles, maybe after the second or third cycle the breakdown would happen.

Q.    You may resume.

MR. APPEL:

Q.    Now, in addition to this problem, that is the damage to the gear drive saws because they were not able to absorb the forces and braking process, you were describing another problem with respect to adapting SawStop technology to a small lightweight saw like that?

A.    Well, I was describing the problem that if we do not separate physically the saw blade from the motor housing, than the whole assembly of the blade, gear transmission and the motor housing, that whole large mass, has to be driven down. One way to correct for that would be to invent some kind of a decoupling device, some kind of a -- let's call it a shear

blade or whatever, where the motor would stay in its place and as soon as you applied the load the gear housing would peel away and along with the blade it would drop, leaving the motor assembly in place.  So you don't have to deal with this large mass to bring it under the tabletop.

However, as of today, there has didn't nobody has invented, probably nobody will invent such a device.  There the reason for it is that it is more likely and more useful and more practical would be to go to change the design from the direct-drive system to the belt-driven system.

So probably the belt-driven configuration, which increases the size and increases the weight, but it also would be easier to achieve than the sheer plate separating the blade assembly from the motor assembly.

Q.    What you're (is what you're sailing, it is not feasible to incorporate the SawStop technology into a saw like the BTS 15?

A.    Well, it's not feasible in a sense that you no longer have a BTS 15 which is a small, lightweight benchtop tool. Remember, the key words that that product is described with and why it is used and why it is popular, it is small and lightweight.

So of course system can be redesigned, it can be added weight, it can be strengthened up and it can be changed from the gear drive to the belt drive but you no longer have a BTS 15.  You have a machine that is larger and heavier.

Q.   So that -- but something like that could incorporate SawStop technology?

A.   In my opinion a machine that is larger than heavier than the BTS 15 could incorporate a SawStop technology.

Q.   And you would say it would have to have a belt drive?

A.   That would be the most practical way to solve the problem. Of course the belt drives in addition to adding mass and volume you still have to strengthen the system. You cannot -- because one thing you have to keep remembering is that irrespective of whether you drop in just the blade alone or the blade and a motor, whatever you do, you still have to put in a braking device there. There still has to be something of an assembly under the tabletop that is going to hold the cartridge and is going to shove that piece of aluminum wedge into the saw blade. That happens very fast and the instant thing is forces, forces that are very high in magnitude but short in duration. Those forces still have to be absorbed by the structure. Because as you have seen from the inside of the BTS 15, there is no frame that you can attach this braking pawl to. You cannot attach it to the plastic shroud or a base that is covering under the tabletop the components of the saw. You have to attach it to the aluminum or a plastic or sheet metal tabletop. So those kind of a solutions, sheet metal tabletop is out. Plastic tabletop is out. You would have to use a redesigned aluminum die cast or sheet aluminum tabletops that

have reinforcing ribs and reinforcing components to strengthen it, because that is the part where the braking pawl is going to be attached. And as the blade is cutting through that pawl that is being jammed into the saw blade, action and reaction, that force has to be absorbed by that structure that holds these braking pawl. And that structure has to be attached only to the bottom of the tabletop, which means that an economic solutions like plastic tabletops or sheet metal tabletops are out and you have to add weight, you have to add size, and of course you have to add money for those components.

Q.    And do you have any opinion with respect to any of those issues about how much weight, for instance, Mr. Gass saw, the contractor's saw he has in the courtroom weighs almost 300 pounds. Can it be done for less than 300 pounds?

A.    My expectation that it could be done. I hope and I do expect it do it just under hundred pounds, probably in 90 pound category, 80, 90 pounds or something like that. Maybe even down to 75, but that depends on where else you're going to save the weight. But if you want a large enough tabletop with all of those reinforcements, it's probably going to be on the upper end.

Q.    Now, Dr. Gass has come into court and he's testified that to redesign a benchtop table it would cost less than $150. Redesign a benchtop saw that it could accommodate SawStop technology. Do you have an opinion about that?

6-102

A.    It's my understanding that that is the main cost, quite a long discussion about that, and 100 to 150 dollars is the add-on cost or the cost differential between what you have and how much more you would have to add.  And whether you are on the lower end of that range or the upper end of that range, that depend what are you starting with?  If you're starting with an inexpensive, small, lightweight benchtop tool, then probably it's going to take more in dollar -- expressed in dollars it's going to take more design for it and more expensive.  So changing the lightweight saw is probably going to be closer to $150 of additional money, while changing a professional grade benchtop tool like a Bosch 4000, that may be closer to the lower end.  So the range how much additive -- how much additional dollar you spend depends on what you're starting with.

Q.    What does that mean for the consumer at retail?

A.    Well, at retail, the figures that would be used generally in industry, and mind you that I'm not an economist on those issues, but I do know generally speaking what is the mark up between a make cost and the retail cost -- not the wholesale cost, but the retail cost is about two, two and a half times the main costs.

So if means if you're starting with a $150 and you add two to two and a half times that value, you're going to end up with additional dollars of $250, and that you have to add to

the base price -- if you speak in the case of BTS 15, then we're starting with 179 dollars is the cost as it is, and we are going to be on the upper end of that 100 to 150 range, so if you take 150 and multiply it by two or two and a half, you're going to end up between three to four hundred dollars. So it means that the end result is going to be that instead of having a $179 saw, you're going to have like $330 plus 170, just to make it even number, end result is $500. So you no longer have an economical solution for a carpenter who is focusing on a retail job or remodeling. Those kind of carpenters, taking them from $170 range to $500 range, you are out pricing them from the market.

Q.   And again, based on your experience, does that kind of price increase or increasing the cost, does that have any safety implications for consumers?

A.   Oh, definitely.

Q.   And in what respect?

A.   If I am priced out of the market, I cannot afford the $500 revision of the BTS 15, it's no longer going to be BTS 15, it's going to be something of a bigger, heavier saw. And those are the only saws that are available on the market, I'm going to go back to taking a $39 circular saw, plunging it through the plywood and using that as a table saw. I seen that in '70s happening all the time.

Q.   Now, did you see any benefit in flesh-detection in SawStop

technology?

A.    Yes.

Q.    And what have you and other table saw manufacturers done in that regard?

A.    Well, the benefit is a promise or the hope of improving the safety of the table saws.  If some of these constants can be worked out, if a systems can be designed where it doesn't take you 69 to replace the cart ridge and $100 to replace the saw blade every time that you have a false triggering, and you can do a reasonable detection of the contact, if those systems could be developed, there is a merit of utilizing it, especially on some categories of tool.  I am not trying to tell you that that system would have to be pushed on to every saw, pause there is a risk benefit analysis that you do, and there is also a cost benefit analysis you have to do.

So if somebody is using a table saw for once in a year project for minor cutting here and there, I don't know if they want to invest into that kind of an expensive proposition, because you have to be mindful that that BTS 15 as it is designed, as you follow the instruction and you use the engineering controls provided is perfectly safe.  There is nothing wrong with it.  It is not unreasonably dangerous.

If you are not using the safety devices, if you are careless, yes, accidents can happen.

Q.    Now, in particular, what kind of technology did you and

other manufacturers attempt to develop?

A.    Well, after 2001, in that time frame, almost every table saw manufacturing company has evaluated the prototype from Mr. Gass, from his company.  And it has been a subject of various PTI meetings that, yes, there is something new on the market that deserves an attention.  And when everybody was evaluating and everybody was, you know, struggling or grasping with the problems that I have spoken about earlier, an idea was floated in the board meeting of the Power Tool Institute members, well, could we -- it is a safety device, and generally in a safety device in a pass there has been a great deal of collaboration, can we collaborate and can we create a joint venture?  Can this be done collectively, where we would put the best minds to attack the problem.

So first it was given to the board members and managers of the companies to work out the details how this process would be working, and then in 2003 there was a first meeting of interested parties that was in Chicago, at a hotel near the airport.  I had some other commitments, I wasn't there, but I believe six PTI member companies have come to that meeting to participate pit remember this is not an industry approach because there were manufacturers who didn't even contemplate to come to that meeting.  So there is a company called jet, they said, no, we're going to research and we're going to do it on our own.  Makita said, no, we are not

interested in a joint venture project, we're going to research the subject on our own.

Six companies showed up, and five continued with the project after one company signing all confidentiality agreement they heard what the project is going to be all about, they walked away from it. They said, no, we don't -- we are not interested to proceed with this JV project. That was the mil power tool company.

Q. Now, how did you -- but some companies were involved and interested, correct?

A. Yes.

Q. And how did you proceed? Was there a sharing of information?

A. Well, that was the very first meeting about, because there had to be ground rules written down that, well, who is going to bring what to the party? So there was a rule said that everybody has to bring all the research and everything what they have done up to that point to evaluate the system, it has to be presented, so then we're going to kick off the project from that point seeing where we are, what is the status quo. Because up to that point I did not know what is happening at Ryobi, Mr. Peot did not know what's happening at Bosch, and on and on.

Q. So Mr. Peot had testified and showed to the jury the presentation that Ryobi did at that meeting, and I take it that

you did the same?

A.    Well, I did not because I wasn't there, but somebody from the team was doing that presentation, yes.

Q.    And from there, once the information sharing took place, what then evolved?  And the by the way, we're talking now 2003?

A.    Yes.

Q.    So what then evolved from there?

A.    From there it was agreed that a consulting company is going to be hired, is going to do the development project under the supervision of a committee that was going to oversee the weekly progress.  And it was also agreed that this project is going to be closed to very few members of the participating manufacturer.  Because there was a concern that should this information which is jointly developed and then it leaks to the particular design engineering department at a particular design engineering department may take advantage of it and go forward. So there were restrictions that only the people involved in the oversight committee and the board members had access to that information and that the information is going to be jointly developed and then at the end of the project everybody is free to use it or not.  It is going to be up to the decision of the individual company whether they want to proceed with the fruits of the labor that that JV is going to be doing.  It --

Q.    I'm sorry, go ahead.

A.    The initial goal was -- and it was really important after

the discussions that were had at that first meeting that the JV is not so of interested in duplicating a SawStop technology. We were interested in a technology that can prevent the accident using similar principles but not to rely on a contact system, where you have to get injured in the first place before the system mitigates the degree of injury.

The assignment given to the group was we want to investigate and find out what is called a proximity sensing, can I sense that a finger is too close to the saw blade and something bad is about to happen?  So the proximity sensing was the primary goal of the JV.  The goal was not to reinvent the wheel and find another SawStop.  The goal was to find an accident prevention system instead of accident mitigation system.

Q.    And was the joint venture successful in developing a proximity sensing system?

A.    The joint venture has worked on it for two, two-and-a-half years before it became apparent that a proximity sensing goal is unattainable in a time frame that we desired to have the results.

The proximity sensing is not an idea that has been thrown away.  It's an idea that is shelved and future sensing technologies or future processing methods of signal may allow us to go back to it, but at the moment we could not -- we already spent two, two and a half years researching the

proximity sensing.  So then there was already lots of time spent on it and the clock is ticking and we had to be proceeding, we had to be improving the safety of the table saws and the decision, even though it was a difficult decision, was made to shelf it, the proximity sensing and divert back to the contact sensing, to do it in a different way than what SawStop is doing.  Overall the system, our system is different than what the SawStop is using, but as far as the sensing technology, it was moved back into the contact sensing.

The other aspects of the safety response system are totally different from the SawStop.

Q.    And what are those other aspects?

A.    Well, the technology, like the SawStop, or the JV technology essentially depends on two separate but linked systems, one is the sensing, how can I sense the presence of a contacting the blade?  So that is the sensing part of it.

Then I have the hazard removal response.  Now that my computer is capable of making a decision that, yeah, I have a contact, what do I do about it?  In the case of the SawStop, they have decided to take a algorithm pawl being driven by the heavy spinning and jam it into the saw blade.  We have decided and done some calculation and experimentation that there is a faster and a more direct method and more economical method.  We have decided to use a pie row technique propulsion devices, essentially you can think about it like a blank cartridge that

would go into the pistol sort of guns and that blank cartridge is ignited, it explodes, and that explosion is driving a piston and pulling the whole assembly, the blade assembly, not the motor and the blade, but just the blade assembly, it can pull it down without damaging the saw blade. You don't have to jam anything into the saw blade. But the whole structure is designed in such a way it's like a pendulum that is pivoting at the back end and you put a propulsion device here and when a sensor tells you there is a contact, you ignite this propulsion device and you drive it below the tabletop. Because when a saw blade disappears below the tabletop even if it is rotating is no longer hazardous. So the hazard has been removed. The goal of having a safe condition has been achieved.

Q.    What are the advantages in your opinion to this kind of system as opposed to the SawStop system?

A.    The advantages are that the resetting after the firing is of more straightforward. You don't have a hidden hazard of a broken saw blade, sometimes the hazard is obvious, sometimes the blade is just so beat up that it's clear that it cannot be used. Sometimes, however, you look at it, it looks good, and you start using it, but there are cracks that would be revealed under the microscope. Of course the user doesn't have a microscope to examine it.

If he's going to use that blade, the teeth can start flying in your face, so those are the hidden hazards that can

6-111

happen as a result of jamming something into the saw blade.

Q.   Now, just to be clear --

A.   In our system that doesn't happen.

Q.   Just to be clear, what you're explaining is that with SawStop, because it has this pawl which jams into the blade in the bottom, that if you attempt -- sometimes when you attempt to reuse the blade you can't detect that there's been damage to the saw blade?

A.   Correct, yes, sir.

Q.   Now --

A.   So to complete my answer is that our advantage (there are advantages as far as not created hidden hazards, and there are advantages as far as economical and speed, how fast does it -- what does it take you to reset it?  Because in our case, when you're using this actuator instead of taking the blade out and removing this cartridge and set rating that, which can be done in probably a minute or two, but it's laborious, in our case you just pull the cartridge out, you put a new pyro propellant in, and you're done.  And the blade is there just like before, and that propellant, that cartridge that is pushing the system down out of the main costs values are $5.  If you think about it how much would it cost at two and a half times more, let's say three times more, it will be $15 to replace the propellant instead of $69, and you don't have to buy a new saw blade.

Q.   Are there also some advantages with respect to the speed

at which the system works?

A.    Yes.

Q.    And performance?

A.    Yes.

Q.    And can you describe those for the jury?

A.    The speed at which the saw blade separates from the target, from the hot dog, is faster than the sawing of the saw blade by the application of the brake pawl.  So it generally gives you -- because the blade separates from the finger faster, the time element involved in the blade cutting the finger is shorter, and as I explained earlier, that time element is shorter, the degree of penetration, the distance that the finger can travel into the rotating saw blade, this distance becomes shorter, therefore, the mitigation factor is greater.  You end up with less injury.

        MR. APPEL:  Your Honor --

        THE COURT:  Yes, we'll break for lunch here.

        You may step down for the time being, Mr. Domeny.

We'll be in recess for one hour.  We'll return at 2:00.

Jurors, we'll see you then.

        THE CLERK:  All rise for the jury.

        (Jury left the courtroom.)

        THE COURT:  Be seated, counsel.

        MR. APPEL:  Your Honor, I have one issue to raise.  --

        THE COURT:  Well, let's raise the first one first.

MR. APPEL:  Yes.

THE COURT:  Time?

MR. APPEL:  Time.  I'm coming down the homestretch.

THE COURT:  Which means?

MR. APPEL:  I would think about half an hour more, 45 minutes more at the most.

THE COURT:  Which means we won't finish the evidence today. ; is that correct?

MR. APPEL:  I think that's right.

THE COURT:  Okay.  Anything else?

MR. APPEL:  Yes, your Honor.  I would like to show one short video clip.  But this is my concern.  And it would be to demonstrate just what Mr. Domeny is talking about.  But my concern is this, that Dr. Gass is in this courtroom, and again, this is highly proprietary information.  And I don't think it would be inappropriate to just ask Dr. Gass to leave just for the showing of that clip.  Of course he's free to come back into --

THE COURT:  Mr. Carpinello.

MR. CARPINELLO:  He's one of our experts, your Honor, he needs to see that for possibility --

THE COURT:  He will not be excluded from the courtroom.  If you want to play it, he'll watch it.

MR. APPEL:  Thank you, your Honor.

THE COURT:  We're in recess until 2:00.

6-114

(The jury entered the room at 2:03 p.m.)

THE COURT:  Good afternoon, jurors.  We're ready to resume.  Mr. Domeny, please retake the witness stand.  Mr. Domeny, you're reminded once again that you remain under oath.  Please be seated.

And, Mr. Appel, you may continue with direct examination.

MR. APPEL:  Thank you, your Honor.

Q.   Mr. Domeny, I think that before the break you were describing the joint venture technology with respect to blade contact avoidance and the differences between that technology and the SawStop technology?

A.   Yes.

Q.   We're going to show a video.

MR. APPEL:  Your Honor, I believe -- we'd also like to mark this for identification.

THE COURT:  That would be -- what are we up to?  D or E?  E.  It will be Exhibit E for identification.

(Exhibit E marked for identification.)

MR. APPEL:  Could we run that.

Q.   Mr. Domeny, would you explain what the jury is seeing as we're running this?

THE WITNESS:  Can I go down so I can point with a pointer?

THE COURT:  Yes, you may do so.

THE WITNESS:  May I proceed?

THE COURT:  Yes.

A.    Before you start the video -- there are two images.  There were two cameras that were utilized to capture this.  And the cameras were synchronized.  So frame by frame, whatever is happening on the top image, is also happening synchronously in the lower image.

What you see at top is the saw blade at the maximum elevation and the hotdog being right at the tabletop level.  It's going to be approaching from right to left into the spinning saw blade.  In the moment of contact, there is going to be a determination whether there is a hotdog or not, and then the actuator that you see on the lower image here is going to be fired.

This device here is the pyrotechnic propulsion device.  It has a piston that is extending from this point, and it's pushing on the tab right at that location.  And that piston, as it extends from the cylinder, it will push this pendulum because this device is mounted as a pendulum.  And it will swing from the location as you have it in a clockwise direction.

Down here, in the upper corner, you can see the spindle to which the saw blade is mounted, so that is the center of the saw blade.  And that spindle is driven by this blade, which is spread out all over the top edge of this image.

So please proceed now.

(Video played.)

A.    So you saw the contact.  Then you saw the firing and that firing pushing that pendulum down where the saw blade now disappears below the tabletop.  You see that the blade is still running here in the same velocity as before, but it stays below the tabletop in a harmless location.

Can you please reverse the -- so now we're going back to that position.  And stop at the point of firing, please.  Go forward.  Stop.  So right there you saw the explosion.  You see the flames that shoots by the piston.  That is the firing of the propulsion charge.  And that propulsion will drive the piston, and the piston pushes on the stem of the pendulum that brings the whole assembly below the tabletop.  Thank you.

Q.    Would you please describe for the jury again the advantage of this kind of mechanism over SawStop?

A.    The advantages are in various categories.  As I have mentioned, in economic category, that the replacement cost of firing is less.  It is faster.  So the hazard, the rotating saw blade, is removed from being in contact with the saw blade in less time; and, therefore, the mitigation is better or the degree of injury is not as deep as before.  And the third category would be that you don't have any hidden hazards.  You don't have any cracked teeth that may eventually loosen up in a later use.

Q.   Mr. Domeny, does this system -- it uses a belt drive?

A.   It's not a gear-drive system.  It's a belt-drive system where the blade is separated from the mass of the motor.  So the propulsion has to drive only the blade below the tabletop, not the whole assembly of the motor plus the blade.

Q.   Let me ask you:  Do you have an opinion to a reasonable degree of engineering certainty as to whether or not SawStop technology was a feasible alternative design for that saw, the BTS 15 that was manufactured in October, 2004?

A.   I have such opinion, yes.

Q.   What is that opinion?

A.   Specially prior to 2004 time frame, it is my opinion that a SawStop was not feasible to be applied to the BTS 15 nor any other table saw in 2004 time frame.  And even as of today, it is my opinion that a SawStop technology is not feasible for a light, small, bench-top table saw because you have to redesign the product to the extent where you lose the qualities that would categorize it as a light and small.  So, of course, you can have a new product, a different product, but it's no longer going to be the BTS 15.  So applying it into the BTS 15 of that size and weight is not feasible.

Q.   Now, what about the joint venture, the joint venture technology that was developed that you've just described?  Was that a feasible alternative design in the BTS 15?

A.   Well, definitely not in 2004 because in 2004 we haven't

even progressed to the point where we had an algorithm worked out that would be detecting and firing that pyrotechnic charge in a speed -- in a time limit that we require.  And at the present time, that technology is also directly not transferable to the small and lightweight because you lose the weight, you have to add additional weight and dimensions for a pendulum that swings below the tabletop.  That adds additional mass, additional space is required.  So the size of the product would grow probably to the size of the Bosch 4000 or maybe even bigger.  It would be even heavier than a Bosch 4000?

Q.    Mr. Domeny, did you do a reconstruction of Mr. Osorio's accident?

A.    I have.

Q.    What did you do in order to perform that reconstruction?

A.    I have read his deposition.  I have viewed a reenactment, a video clip, where Mr. Osorio demonstrated what he was doing, how he was going about it, what his ultimate goal was, what he was trying to cut off.  And then he reenacted in a way that how he believes his hand got into the saw blade.

        I have reviewed some medical records in addition to the deposition and video reenactment as well.

Q.    What was your understanding as to what Mr. Osorio was trying to do at the time of the accident?

A.    May I have that piece of flooring?

Q.    Yes.

A.    Thank you.  May I proceed?

Q.    Yes, please.

A.    It's my understanding that Mr. Osorio was attempting to rip a section -- this is a tongue-and-groove hardwood flooring. This is the groove.  This side is the tongue.  He was trying to cut off about a half-inch strip from the groove side of the flooring.  And he has indicated that he didn't have a precise dimension, but he indicated, just by looking at the wood, that he was going to cut approximately the strip like this all the way from the start to the finish.

He wanted to make that cut having the blade being beveled slightly, I believe 6, 7 degrees beveling.  The reason for beveling is that the floor installers have to -- when they come to the end of the floor and now they are faced with having to put the last piece in before the wall, the spacing might be too narrow for a strip that you have.  And they have to also install the tongue and groove this way, that the tongue fits into the groove in this fashion.  They have to lay down.

So it is advantageous if the flooring would be cut slightly under the bevel but the dimension at the bottom is slightly shorter than dimension at the top.  So it allows them to install it next to the wall because the lower half of the board is shorter so it swings by the edge.  And then when the top comes in, top extends a little bit further, and it's nicely flush with the wall.  That's why the reason they typically do

6-120

the bevel cut so they can install it in that fashion.

So it was a straight cut with a beveled blade, but from front to back it was straight.  It was parallel with the edge of the board.

Q.   Did you view how he described -- he was trying to perform that cut?

A.   Yes.

Q.   What was your understanding of how he was trying to go about doing it?

A.   He was indicating that he was using the BTS 15 that did not have a guard on it, and neither was there a fence present or the miter gauge, so -- and there wasn't a sliding table on the left of the blade.  It was a solid table being utilized because that machine you can interchange on the left side, either have a fixed table or a sliding miter table.

So he put the piece of wood in line in this fashion that -- if my table would represent the tabletop of the saw, then he put the board just front of the blade, the blade being approximate my finger is.  The board would not be touching the saw blade.  The machine was turned on.  He placed his fingers -- all four fingers would be essentially perpendicular to the line of the feed.  And he was holding his left hand in a fashion as I am illustrating, holding the board down.  And with the right hand being at the back end of the board, he utilized the right hand to feed it into the saw blade.

He just started the cut and the board started to vibrate. And Mr. Osorio was illustrating it in this fashion, with up-and-down movement. He thought that it might be some irregularity or some kind of surface dust or chips on the tabletop and that caused the board to not sit solidly on the tabletop. So he stopped the machine. He cleaned the tabletop and restarted the cut, restarted the saw.

Again, the saw blade was running, and he continued in the same location as he started to cut initially. He did not progress much further than what he started with. The vibration was still present. The vibration was not eliminated by the cleaning of the tabletop. He has advanced the board. He decided that he just has to push harder, and it is unclear from the testimony whether he means the left hand or the right hand; probably both.

And as the board was vibrating at one point shortly after restarting the cut, he lost the control as he started to push harder. The next thing he remembers was that he was cut. He has illustrated it is his belief that his hand somehow went up and down on the saw blade. It is my opinion that it is much more likely that the hand just slipped forward into the saw blade.

Q.    Do you have an opinion to a reasonable degree of engineering certainty as to what caused Mr. Osorio's accident?

A.    I do have an opinion on that.

6-122

Q.    What is that?

A.    In my opinion, the root cause of the accident is utilizing the table saw without a fence.  Fence is a guiding device that provides stability.  If you have a fence here, you can secure the wood against the fence.  You are going to eliminate -- even if you are not trying to steer or wiggle the wood this way, because of the up-and-down vibration, there is going to be some bouncing around.  The wood is going to vibrate.  But if you would look at it closely, there is going to be bouncing a little bit sideways.  Whenever the wood is vibrating, you always cut a groove by the saw blade that is wider than the body of the saw blade.  That's an indication that you always have side-to-side play.

          So as he was pushing harder and it was vibrating and causing the binding condition because of the movement, that -- he had to overcome this binding, and that is when he decided to push harder.  And if the board is vibrating like that, it is easy to see that you're going to lose contact with the surface of the wood.  And your hand, as you're trying to push harder, is going to slip further into the saw blade.

          The proximity -- may I illustrate it on that one there?

Q.    I think that's a good idea.  On this saw right here?

A.    Yes.  Or actually even on the subject saw.

Q.    Sure, whatever you prefer.

6-123

A.    May I?

Q.    Yes, please.

A.    The blade, as you've seen before, it's little bit canted. It's little bit leaning to my right.  If you put a board down and I put my hand over it, you can see that there is just a fraction of the inch -- not fraction.  There is just couple of inches of separation.  By the way, Mr. Osorio testified that the blade was at almost maximum height, like three inches or so.  So it was at this elevation.  If you put your hand on the top of the board and the board is vibrating, and if you slip, you don't have much distance to go before your hand is in trouble, before it's being cut.

So the board, at the time of the accident, did not progress further than maybe the depth of the tooth.  So maybe it was that far into the cut.  And under that condition, where you have the hand in such a close proximity to the saw blade, the vibration induced by the binding condition, you don't have much time to react before your hand -- your fingers are cut. Thank you.

Q.    Mr. Domeny, before you go back to the stand --

MR. APPEL:  Your Honor.

Q.    Would you demonstrate on the exemplar saw, which has all the proper equipment, the correct way?

A.    The correct way to do this cut would be if you bevel it -- the instruction tells you that because the table saw is

6-124

beveling to the right and you don't want to trap the piece of wood between the table and the fence, when the fence is leaning towards what -- when a blade is leaning towards the fence, because then the wood would be kind of trapped in a trapezoidal configuration but it could not go up.  That is dangerous.

So the instruction manual tells you that you should put your fence to the left of the saw blade.  And now you want to cut off about half an inch from this board.  So I would set up my machine, and I'm just eyeballing it where the saw blade would be cutting exactly where the mark is.  I lock it in, and now I am guiding the wood into the saw blade in this fashion. And I have room to put my fence there.  I can grab -- illustrate it on this side.  I can grab the wood in this fashion and bring it to the fence in order to be in contact and in alignment.  And that gives me a much greater stability than doing it freehand.

Q.    Do you have an opinion, sir, as to whether the design of the BTS 15 in any way contributed to Mr. Osorio's accident?

A.    I have an opinion, and in my opinion, the design or the execution of that did not contribute to Mr. Osorio's accident.

Q.    Do you have an opinion as to the -- whether he was using proper woodworking procedure and he was -- and whether he was operating in accordance with the instruction manual?

A.    I have an opinion, and he has violated number of warnings and precautions in -- from the manual.  He should have been

using fence when you're doing the operation like that.  You should have a solid footing rather than kneeling down on the -- at the machine.  And you should lower the saw blade, not have it so high and exposed, but you should be -- just the tips of the teeth should be protruding rather than having so much exposure above the material that you're cutting.

Q.    Was it a situation where a guard could have been used?

A.    Yeah.  I illustrated that a guard can be used, yes.

Q.    If it was available to him?

A.    I believe it was.  I don't know if it was available, but the machine that we have, the guard was available for it.  I don't know if he had it right there with him at that time, but -- there was a guard.

MR. APPEL:  I have no further questions for you.

THE COURT:  Cross-examination, Mr. Carpinello?

MR. CARPINELLO:  Thank you, your Honor.

CROSS-EXAMINATION BY MR. CARPINELLO:

Q.    Mr. Domeny, good afternoon.

A.    Good afternoon.

Q.    You remember earlier today when you demonstrated the tests that your joint venture had done on the SawStop machine, and you showed how the blade had cut off the hotdog; do you recall that?

A.    I do.

Q.    What's your explanation for the fact that the exact

opposite results were achieved by the Consumer Product Safety Commission when they tested SawStop in 2001?

A.    I have many instances where the saw has worked just fine. I don't know how many test they done.  We have done probably, and altogether, maybe close to hundred evaluations.  And this thing was not -- whatever was illustrated, was not the predominate way how the outcome was.  It was an exception, but it was an exception.

Q.    So let me get your testimony -- you said most of the time that you ran it it worked fine but you found these exceptions?

A.    Most of the time it worked fine to the extent that the stopping time or the sensing time has varied between, I believe, a fraction of the millisecond, up to eight or number of milliseconds.  So there was a variance in time.  And some variances were -- there were a few instances where it was really delayed, really outside of the majority of the events.

Q.    And you have no explanation for the fact that every single time the Consumer Product Safety Commission ran the test the machine fired and there was no visible damage to the hotdog? You have no explanation for that; is that correct, sir?

A.    I don't even know if you're repeating the conditions correctly.  I have not been invited or I have -- by the CPSC, and I have not seen their results and their methodologies, so I cannot really comment on that.

Q.    You've never seen the report of the CPSC from 2001

6-127

evaluating SawStop?

A.    I have seen the report but not the test result.  That's a summary report.  It does not give you the details of how many tests they done and what was the outcome, what conditions they were.

Q.    Aren't the test results put forth in graph form right in the report?

A.    I don't remember if there are.  There are some examples but not -- I don't know if every one is being tabulated like we have it.

Q.    I assume that Bosch would have studied that because you were examining SawStop in 2001 for feasibility, weren't you?

A.    I was examining the prototype for feasibility, yes.

Q.    And you don't have an explanation, I take it, for the fact that out in the real world that the SawStop machine has never failed in any instance where there's been a report of contact?

        MR. APPEL:  Objection.

        THE COURT:  Grounds?

        MR. APPEL:  Your Honor, this gets into the same area that you have already ruled upon with respect to --

        THE COURT:  He can answer that question without going further afield.

Q.    Is that right, Mr. Domeny?  You have no explanation for the fact that every single time that people actually using the SawStop the machine worked as expected?  You have no

explanation for that?

A.    I believe you are not stating the facts.  You just know what was reported to the SawStop.  But I don't know if you have all the facts of every instance where it was working or not working is reported.  Just like there are accidents that happen with Bosch or Ryobi table saw that are not reported.  There may be incidents where the SawStop was not working right and the user does not know why and is not reporting it.  So I don't think your facts are accurate.  That's a presumption.

Q.    They're not my facts, Mr. Domeny.  They're the facts testified to by Mr. Gass.  Do you recall -- you weren't here.  Did you read the testimony of -- Mr. Gass' testimony?

    MR. APPEL:  Objection, your Honor.

    THE COURT:  Overruled.

Q.    Did you read Mr. Gass' testimony where he testified that he's tested it over a thousand times?  It worked every time.  And out in the field it worked every time there was contact between the human hand and the blade?  Do you have any explanation for that, sir?

A.    I don't.  I'm not even trying to explain it.  I have my results that I have trust in.  I see the results.  The jury has seen the results.  And I don't need to explain anything else.

Q.    Didn't you write a memo to your -- the other joint venture participants and say that you could not explain the erratic results that you had achieved with SawStop?

A.    That's correct.  We don't know why it is behaving that way.  We would be very happy if we could study the algorithm or the information that is stored in that cartridge, but Mr. Gass is not willing to give us the tools to do that.  It's impossible for me to evaluate whether his testimony -- as far as how the SawStop work, whether it's accurate or not.  There is no -- absolutely nobody in the world that can make a peer review of those results.  He's the only one who knows about it, and he can tell you whatever he wants to.

Q.    The algorithm is set forth right in the patent, isn't it?

A.    No, sir.

Q.    The software that sets forth line by line how to create the algorithm is not in the patent; is that correct, sir?  Is that your testimony?

A.    I'm talking about the information that is actually stored in that cartridge.  I don't have a readout.  We have asked for it, and we were told, no, you cannot have it.

Q.    Okay.  The videos that you showed to the jury, you just happen to show the videos of the instances where you got these inconsistent results.  You said to the joint venture, I have reviewed and double-checked the data in the attached spreadsheets.  Analyzing the SawStop data, it is clear that the data is very inconsistent, right?

A.    Exactly.  The stop --

Q.    Could it have been --

6-130

A.    May I finish?  The stopping time is inconsistent. Sometimes it stops in fraction of a second.  In the case of the prototype, it dragged on as long as eight milliseconds.  In the case of this contractor saw, we had variations up to ten milliseconds long.  So it is inconsistent.  That is exactly true.

Q.    It could have been your test data, right?  One of the things you were concerned about was whether you were using the right voltage, right?

A.    That was a theory and that was set aside.  The voltage was measured and double-checked and triple checked and it was correct.  It was a 240-volt line.

Q.    You were perplexed when you wrote this memo that you weren't sure why you were getting such varying results all over the graph, right?

A.    Exactly.  That's what I'm saying.  The results are inconsistent.  There is no consistent behavior of the SawStop. That is exactly what I was testifying all morning about, that there is a great variance in the stopping time and in the sensing time.  Stopping time was the variance early with the prototype.  Starting time is the variance that we are experiencing with the production units.

Q.    But in 2001, sir, when you tested the SawStop, before this lawsuit arose, you came to a very different conclusion, didn't you, sir?  You concluded, sir, and you told the executives of

Bosch, and I quote, that "SawStop substantially mitigates the magnitude of the accident."  That's what you told the executives of Bosch when you wanted them, back in 2001, to pursue examination of this technology in Bosch, correct?

A.   Correct.  If it works like if it was intended, in those instances it is mitigating.  That is what I told you here in the mid-range, in that slip velocity.  That's where the greatest mitigation is.  It is mitigating and it is -- for overall conditions, it is going to deliver, in overall, a safer performance than the saw without it.

Q.   In fact, it's way safer than a saw without it?  You calculated that it's three-and-a-half times safer than a saw like the BTS 15 without it?  Wasn't that your conclusion in 2001?

A.   Absolutely not.

Q.   Let's --

A.   May I finish?  I have told you that those numbers that are there are only indicators because what you do in a hazard analysis, you take the magnitude of the injury and you multiply it by a frequency of how often it happens.  In the technical report, three -- they don't use numbers.  They just say high frequency, low frequency, seldom.  They are not using a numerical expression.

I have done the same risk analysis but I have plugged in a number.  I wanted to know in numerical ways how to express

the magnitude of the injury.  But the end results, when you establish all the risk for a particular category and you get some kind of a risk number for this particular event how the accident happens, for the next event how it happens, for a third and fourth and so on.  Then you add up all the risk figures.  And you do that same thing for the two design:  for the SawStop and, in our case, it was a Bosch 4000.  You're going to come up with the numbers.  And if you look at the number and, let's say, in one instance you have 100 and other comes up with 300.

It does not mean that the SawStop is three times faster because its danger is indicated with 100 and in other case the index is 300.  All what you are concerned about is which one is higher because a scale -- it's important to recognize that a scale is not linear.  And if the scale upon which you are judging it is not linear, you cannot make a conclusion that just because you have 3-to-1 ratios in the numbers, that one is three times safer than the other one.  Absolutely not.

Q.   Let's take a look at the document you wrote in 2001, Mr. Domeny.

MR. CARPINELLO:  This is, in fact, an agreed-upon Exhibit 39, your Honor.

THE COURT:  Is it in evidence?

MR. CARPINELLO:  We move it into evidence, your Honor.

6-133

THE COURT:  And describe it, please.

MR. CARPINELLO:  It is a SawStop safety evaluation performed by the Bosch Corporation in 2001, your Honor.

THE COURT:  It will be admitted as Exhibit 39.

(Exhibit No. 39 received into evidence.)

Q.  Now, this is the cover page we're looking at, right, Mr. Domeny?

A.  I believe so, yes.

Q.  You prepared this document, correct?

A.  I prepared the document, yes.

Q.  And then the second page talks about the methodology of investigation?

A.  Yes.

Q.  And this was an evaluation of the safety merits of SawStop technology based upon empirical data collected from high-speed video of the system's performance under various conditions; is that correct, sir?

A.  That's correct.

Q.  So you did some high-speed video analysis way back in 2001 of SawStop, right?

A.  Sure.

Q.  Then you did a statistical analysis of table saw accident history files of Skil-Bosch and the CPSC, correct?

A.  Yes.

Q.  When you refer to the statistical analysis of the CPSC,

6-134

you're referring to the NEISS data, correct?

A.   No.

Q.   What are you referring to, sir?

A.   The epidemiologic report that was supplied, those 84 in-depth investigations that we had.

Q.   And those 84 in-depth investigations were the CPSC taking a fraction of the total number of reported accidents; isn't that correct, sir?

A.   No.  They were doing a follow-up review of 84 cases.

Q.   Right.  Out of 38,000 --

     MR. APPEL:  Objection, your Honor.

     THE COURT:  Sustained.

Q.   What did the CPSC report in that same report that you referred to the 84?  What did the CPSC report as their estimate based upon actual emergency room visits of the total number per year emergency room visits based upon table saw accidents?  What was that number, sir?

A.   I believe the CPSC is projecting 33,000 accidents annually.

Q.   Hospital-treated accidents, correct, sir.

A.   Actually, no.  The hospital -- there are key hospitals across the country that are linked into the NEISS electronic surveillance system.  The 33,000 accidents are projected only on 164 known accidents.  So you have only 164 accidents that actually are going into the NEISS system, and out of that the

CPSC somehow massages that number, and they come up with approximate 33,000.

Q.    That's because they took sample hospitals.  They didn't go to every hospital.  I think it was 164 hospitals, was it not, sir, that they used as data-collecting points and then extrapolated from the fact that there are thousands and thousands of hospitals, and then they came up with a national number?  Isn't that what they did, sir?

A.    To my knowledge, they had 164 reports.

Q.    How many hospitals did they use as sample hospitals --

A.    I don't know.

Q.    -- from which to collect?  You don't know, sir?

A.    No.

Q.    Now, you say that the -- let's turn to the next page, please, sir.  You concluded -- I'm sorry.  This is the -- you showed this earlier?

A.    Yes.

Q.    The slip accident in the middle is the highest frequency accident on table saws, correct?

A.    Yes.  That's predominantly how the accidents are happening.

Q.    That's exactly what you described happened to Mr. Osorio; it was a slip accident, correct?

A.    That's correct.

Q.    So his accident was certainly foreseeable; was it not,

sir?

A.   It was foreseeable, yes.

Q.   Okay.  By the way, you spent about 45 minutes and you drew that diagram -- and I've got to tell you, you lost me, sir.  But you drew that diagram with the saw going upside down and then right side up and this vector and that vector to show a kickback.  This was not a kickback, was it, sir?

A.   In all likelihood it wasn't a kickback.  Mr. Osorio talks about as push-back.  In my reconstruction, it is unlikely that you had a kickback when the blade is only a fraction of an inch into the wood.

Q.   You said right in your report it wasn't a kickback, didn't you, sir?  And you testified it wasn't a kickback?

A.   I just told you that in all likelihood, in my opinion, it wasn't a kickback even if Mr. Osorio talks about push-back.

Q.   All those vectors and all those arrows and all that stuff you talked about about what happens in a kickback did not happen in this case, is that correct?  Is that correct, sir?

A.   If there was no kickback, they are not going to be applied.

Q.   Now, I want to go to this chart you were talking about.

MR. CARPINELLO:  Skip two pages, could you please, Doug, to the relative safety chart.

I can't read that, and I assume the jurors can't read it.  I happen to have a copy here.  Could we go to the bottom

6-137

line, Doug, to where it says, "Total relevant anticipated danger." Before you do that -- I'm sorry. Before you do that --

Q. Mr. Domeny, you've got four columns here, correct? You've got four columns?

A. Yes, sir.

Q. Okay. And the first column on the left is the accident category description, right?

A. Yes.

Q. And you've got -- the first line says, "Accidents while feeding the wood in the blade." You say that's 10 percent of the time, right?

A. Yes, sir.

Q. "Accidents when reaching or slipping into the blade" -- that's Mr. Osorio's case -- 49 percent, correct, sir?

A. Sure, yes.

Q. And then kickbacks, of which we learned a whole lot about this morning, was 41 percent, right?

A. That's correct.

Q. And then what's in the next column, sir? You've applied -- the first column is a saw equipped with SawStop with the guard off the saw, correct?

A. That's correct.

Q. And you applied certain values to the level of hazard or risk, is that correct?

A.    Yes.   That is the magnitude of the injury in that column.

Q.    And you added them up, and you got a -- what you call a total relative anticipated danger of 76,830, correct?

A.    First, you had --

Q.    Just confirm that that's the number, sir, please.

A.    No, because you misspoke.   You don't just add it up. First you have to multiply the magnitude of the severity with the anticipated frequency.   Then you get a danger index for that category.   And what you add up is the danger indexes, not those numbers merely, the magnitude.

Q.    Okay.   Let's -- you've taken -- those numbers in parentheses, what are those, sir?

A.    The number in parentheses are the actual magnitude assigned to that category.

Q.    Magnitude of what, sir?

A.    Magnitude of the injury.

Q.    Okay.   So looking in the third column, in the slip injury, which is Mr. Osorio's, the magnitude is -- you have 270 there, correct, sir?

A.    Yes.

Q.    What does that represent?

A.    If you read down at the bottom, it should explain it to you.

Q.    Well, I'm kind of slow.   Can you explain it to me, please, and the jury?

A.    May I just read it?  Severity of the injury is expressed as the linear progression into the blade with the blade -- while the blade is rotating or for a maximum of 200 milliseconds.  So it expresses the linear progression.  It expresses that the distance that I was telling you that how much injury, how far the finger gets into it.  I was not expressing it in terms of whether I'm going to have an amputation or not.  I was expressing how deep you're going to cut into.  That was the measure to use to express the injury.

And that is another reason why these things cannot be compared as saying one instance you have the total anticipated danger is 7,000 and the other one is 28,000.  You just cannot divide those numbers because all what you are discussing here is dividing some indexes that are not transferable to the actual injury to the person.  They just represent millimeters of penetration into a hotdog.

Q.    You say the injury severity rating is the number in parentheses?  That's what you say right at the top of the graph?  The injury severity rating is expressed in the parentheses, correct?

A.    That's correct.

Q.    The injury severity rating for a slip injury such as Mr. Osorio's you calculated at 270, correct?

A.    That's correct.

Q.    Without SawStop, you calculated it as 3,000, is that

correct?

A.    That's correct.

Q.    Okay.  And then you multiply that number?  How do you get the 13,230 in that middle box, sir?

A.    By taking the 270 and multiplying it by frequency.  It happens in 49 percent of the time.

Q.    Okay.  So that number -- that product in the middle column --

MR. CARPINELLO:  May I approach the screen, your Honor?

THE COURT:  Yes.

Q.    -- in the middle column is 13,230 with the SawStop saw, as you say in 2001, correct?

A.    Yes.

Q.    And the number without the SawStop stop is 147,000; is that correct, sir?

A.    That is correct.

Q.    And then you take those numbers, and you add the three together, in all three rows, for all of the different types of injuries, and you get a total of 76,830, correct?

A.    That's correct.

Q.    And without SawStop, you get a 282,000 without SawStop?  That's your --

A.    That is --

Q.    Excuse me, sir.  I hadn't finished the question.  That's

6-141

your total relative anticipated danger, correct?

A.    That is correct.  That is an index number.

Q.    Thank you.

A.    That is not representing what kind of injury you have.  It is an index relative, index for comparison.

Q.    And you thought that was relevant to the issue of whether SawStop should be adopted?  Otherwise, you wouldn't have provided this graph to the chief executives of Bosch, would you?  You provided this to demonstrate to them that this is a whole lot safer than without, correct?  That's why you showed it to them?

A.    I showed it to them that it delivers, in a summary page, a safer product if it's used in the same way and if it's working.  I didn't say "whole lot safer" because you cannot use those numbers in the way you are using in this courtroom.  All what you can conclude, that a SawStop, under the identical conditions, it's going to be safer.

However, this chart does not represent the change in the behavior because this chart shows that the real -- the actual table saw, like a Bosch 4000, is going to be used without the guard a hundred percent of the time.  And it doesn't show the other danger is that SawStop unit is going to have the byproduct of using those unanticipated hazards that you're going to run into.  It is showing that it's going to be safer only under the identical condition without making

allowances for changes in behavior of the user, those other hazards that I have cautioned you earlier about.

Q.    Right.  You testified, sir, that a proper hazard analysis has to deal with all foreseeable uses of the saw, didn't you, sir?

A.    Absolutely.

Q.    And one of the foreseeable uses is that somebody is going to use the saw without the guard, correct?

A.    Correct.

Q.    And somebody is going to use the saw without the fence, correct?

A.    That's correct.

Q.    And you were telling the Bosch people that we can make this saw a whole lot safer for what is happening in the field by taking the next step and putting SawStop on the saw?  That's what you were telling them, right?

A.    No, sir.  I never used the words "whole lot safer."

Q.    You didn't use "whole lot."  You used the number -- you said compare 76,830 to 282,000.  Now, you drew those numbers there for a reason, right?  They were not meaningless numbers, were they?

A.    They are not meaningless number, but they cannot be interpreted as you are saying, where you ratio it, and you're trying to divide one into the other one and come to the conclusion that it is three times or four times safer.  I'm

6-143

explaining it to you a number of times that that is not true. This is -- only thing what you can say, that in this instance one side prevails over the other one, but you cannot say how much and by how many times.

Q.   Why did you put the number down, then?  To me -- I'm not a -- I don't have a degree in physics, but 282,000 is a whole lot larger than 76,800.  And you were making a point by putting those numbers there.  Those numbers are not meaningless, are they?  You're not going to walk away from those numbers as you sit here today?  You put them down there to make a point to the Bosch executives; i.e., we should be doing this?

A.   I was telling them that a SawStop can be delivering an overall safer performance.  I never told them that it's going to be three times or four times safer because that is absolute nonsense.  That is the misuse of that data.

All what you can -- if you are following the TR3 report, you wouldn't even have numbers.  All what you would have is, well, it's riskier or less risky.  I didn't want to go away in some kind of a format like that because I had a more refined method to do the risk analysis.  I have more accurate data as to the frequency.  I have used the data from the measurement, the total relative -- the severity of injuries expressed as actual millimeters of cutting.  But just because you use a number as millimeters of cutting, that doesn't mean that the operator is going to be three times safer because you

6-144

cannot correlate that to the human -- to the damage to the

human hand.  You don't have a direct one-to-one correlation.

You cannot use it in that way.

Q.    Let's use --

A.    I told you that in the deposition.

Q.    You did, sir.  Let's use the words that you used.

        MR. CARPINELLO:  Can we turn to the next page.

Q.    You say, "The SawStop technology is not an accident

avoidance system, but it will substantially mitigate" -- let's

put the grammar aside a minute.  "It will substantially

mitigate the magnitude of the accident."  That's what you told

the Bosch executives in 2001, correct?

A.    It will mitigate, and in slip velocities, it may be

substantial, and other velocities may not be.

Q.    And you had the authority to create a project to explore

this further, called the Guardian Project, didn't you, sir?

A.    Yes.  And I did.

Q.    And your -- and you put -- the person in charge was a guy

by the name of Tom Siwek, right?

A.    I don't know if I -- I recommended him for that position,

but he was put in charge by the management.

Q.    And Tom Siwek made the strong recommendation --

        MR. APPEL:  Objection, your Honor.

        MR. CARPINELLO:  That's a question, Judge.

        THE COURT:  Well, ask a question.

Q.    Tom Siwek made the recommendation to you and to management, did he not, that the Guardian Project should continue because he believed and he expressed the view to you that Bosch could do it?  Bosch could create on its own a flesh-detection system that would dramatically reduce the number of accidents, didn't he?

MR. APPEL:  Objection.

THE COURT:  Sustained.

Q.    Did Mr. Siwek give you advice and suggest that the Guardian Project should continue?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

MR. CARPINELLO:  May I not ask a leading question, Judge?  It's cross-examination.

Q.    Did Mr. Siwek advise you that the Guardian Project should continue?

MR. APPEL:  Objection.

THE COURT:  Sustained.

Q.    Did there come a time when Bosch was deciding whether to continue the Guardian Project or to abort it, sir?

A.    Yes.

Q.    Didn't Mr. Siwek at that time recommend that the Guardian Project should continue?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

6-146

Q.    Was the project aborted, sir?

A.    No, it was not aborted.  It has been given to the JV group, and it has continued essentially along the line as Bosch develops the major technologies or the direction how to approach this issue and how to devise a safer table saw.  They came from the Bosch.  The pyrotechnic device was invented and patented by Bosch.  The capaciflector (ph), the original proximity sensor that we wanted the JV to work on, that came from the Bosch saw.

I look at the JV evolution as a continuation of that project.  We have carried it to a certain point, and if there would not be a JV, we probably would go further.  But because there was a JV, there was a promise of combining the best minds in the whole industry to put to this issue.  I said, fine, okay.  Let's do that.

So the JV -- to me, it's not like whatever the Guardian Project discovered, it was there and thrown into the basket.  Absolutely not.  It lives on in the JV world.  The Guardian results live on in the JV project.

Q.    And when that decision was made to -- whether to continue the guardian or not, you had a conversation with Mr. Siwek, correct?

A.    I don't know.  I had -- Mr. Siwek was in my department.  I had, daily, probably dozens conversations with him.

Q.    And did he not --

MR. CARPINELLO:  Your Honor, may I have a brief sidebar?

THE COURT:  Yes.

(SIDEBAR CONFERENCE AS FOLLOWS:

MR. CARPINELLO:  I'm -- I don't understand the nature of the objection, but the fact that Mr. Siwek made this statement is relevant.  It's not hearsay.  It's not being introduced for the truth of the statement.  It's being introduced for the contact that Mr. Siwek, as head of the project --

THE COURT:  Head of the project at Bosch?

MR. CARPINELLO:  At Bosch.

THE COURT:  In 2001?

MR. CARPINELLO:  2001.  Actually, from 2001 to 2003. -- made a recommendation, which was rejected by Mr. Domeny and the management.  And that goes to -- Mr. Domeny's here as an expert.  He testified for about four-and-a-half hours about the inadequacies of SawStop and the great things the JV did.  And it goes to his credibility because he made the decision, even though advised by Mr. Siwek, not to do it.  Bosch, on its own, for reasons that I think we've demonstrated and we're going to demonstrate here, that Bosch decided not to pursue it even though they had the capability because they were motivated by a desire to work in collusion with other manufacturers to make sure the pace -- that everybody worked in lockstep.  That's

what Mr. Peot testified to on Friday.

MR. APPEL:  Your Honor, first of all, what he just said doesn't make it not hearsay.  There's nothing which he cited which takes it out of the realm of hearsay.  Just because it's a fact does not mean it's not hearsay.  It's a statement, out-of-court statement, by somebody.

MR. CARPINELLO:  It's not being introduced for the truth.  It doesn't --

THE COURT:  Wait.  You're talking to me and you're talking to me.

MR. APPEL:  I am, your Honor.  It's not introduced for the purpose of notice.  What notice?  So it's not relevant.

THE COURT:  I don't get why it's not being introduced for the truth of it.  What does the state of mind of Mr. Domeny matter here?

MR. CARPINELLO:  Because Mr. Domeny was one of the people who made the decision that even though Bosch could do it on its own that it was not in their interest to do it on its own because they did not want to step out in front of the other manufacturers.  That's why the whole joint venture was not dictated by the development and technology.  It was dictated by the fact that they all got together and said, as Mr. Peot acknowledged last week, we can't have one manufacturer stepping ahead of the other.  That's why Mr. Domeny made the decision.

THE COURT:  You can certainly inquire of Mr. Domeny as

to why he made certain decisions, but what somebody in his --
at Bosch said to him at some stage does not seem to me to be
admissible and over the objection that it's hearsay.

MR. CARPINELLO:  I don't know how else to say it,
Judge.  Siwek is expressing his opinion.

THE COURT:  He's an executive in Bosch, right?

MR. CARPINELLO:  Yes.  And it's not being introduced
for the -- it's not like Siwek is saying these are the test
results we got.  I didn't ask him that.  That would be hearsay.
He's saying, I'm telling you, Peter Domeny, you should do this.
It's the fact that Peter Domeny heard this and chose to act
otherwise, that the fact that Siwek made the statement is the
historical fact I want to establish, not the truth of the
statement.  This is an event that occurred.  He made a
decision, we're not going to go ahead, against the advice of
Siwek, and that's a historical fact that I've got to establish.

MR. APPEL:  Your Honor, again, he still hasn't
established why it's not hearsay.  There's no -- it's not
notice.  It's not for the state of mind.

THE COURT:  Jurors, please.

MR. APPEL:  However, your Honor, this is really going
far afield.  We're talking about Ryobi in this case.  We're not
talking about decisions about Bosch.  We're talking about an
engineer who works under Mr. Domeny who had an opinion.  It has
nothing really to do with the facts of this case.

6-150

MR. CARPINELLO:  It has everything to do because our theory of the case is that Ryobi did what it did because David Peot and Peter Domeny and two other guys got together in a room and said, We've got to do this together, boys, or we're going to get screwed if we do it individually.  And the standard is its effect on the listener; that is, Peter Domeny got this advice and did the exact opposite of what his guy recommended.

THE COURT:  Well, I'm going to allow you to inquire of Mr. Domeny as to what he did, and you can ask him what his understanding was, but I'm not going to allow the testimony of what some executive in his company told him.  So the objection is sustained.

.  .  .  END OF SIDEBAR CONFERENCE.)

Q.   Mr. Domeny, you remember earlier today --

THE COURT:  Wait, wait, please.

(Discussion held off the record.)

THE COURT:  You may proceed.

MR. CARPINELLO:  Thank you, your Honor.

Q.   Mr. Domeny, you remember, I'm sure, earlier today --

MR. CARPINELLO:  May I approach the saw, your Honor?

THE COURT:  Yes.

Q.   -- when you picked up the saw -- and I'm not going to be as adept as you are.  You picked up the saw and you demonstrated that it was a direct-drive saw, correct?

A.   I remember that, yes.

Q.   And then you put on the screen -- you put up -- looked like -- what did you call it that was sheared from the SawStop test?  What do you call that thing that was sheared on the test?

A.   The key?

Q.   The key?

A.   Yes.

Q.   You explained to the jury how, because of the power of the brake, it -- it was the Bosch 4000 because it -- the force of the brake caused that shear?

A.   Well, I told the jury that it was the energy from the motor in the form of a torque that has caused that shearing.

Q.   But you didn't -- you didn't show the jury the whole -- you didn't show the jury the report that photograph came from, I noticed, did you, sir?

A.   No.

Q.   You just took a picture out of the report, right?

A.   I don't know.

Q.   You don't know where that picture came from, sir?

A.   I know it comes from the Guardian Project.  I know it comes from a particular stage when this testing has been done.  I know that there is an interim report, after the third accident, where there was still no harms (ph).  So after the three firings of the brake mechanism, there was a report written that everything is still working fine, but when it was

continued on to the fourth or the fifth finding, that's when the problem happened.

Q.   I'm talking about the final report, sir, not the third -- after the -- I'm talking about after all the tests.  You're familiar with that report, aren't you?

A.   I haven't seen it for a long time.

Q.   Maybe we should refresh your recollection.

MR. CARPINELLO:  This is just a demonstrative, Judge. I'm not introducing this.

Could you put No. 18 on, Doug.

Q.   Now, this is a report that you got in 2002, right, sir?

A.   I don't know.  I cannot read this.

Q.   Let's go to the -- I think it's the seventh page, sir. No, it's not.  Go to the sixth page -- the seventh page, the page after that.

I've got to tell you, my copy is not as good as yours, sir.  But isn't that the thing you just showed the jury, that sheared key there?

A.   I believe that's the one that was shown.

Q.   Now -- but you didn't show the jury the conclusions that Mr. Pierga reached after doing those tests, did you?

A.   This is the only thing that was shown.  It's the only thing that's relevant.

Q.   Let's go back to the first page.  If you look at the second paragraph, doesn't Mr. Pierga conclude that, "Overall,

the mechanical integrity of the saw was good following the test. The blade elevation and bevel system still functioned properly and blade alignment truism were maintained. The weakest components of the tool, the main bearing and gear key, were damaged while absorbing the large amount of kinetic energy of the blade and motor. Damage to these parts can be avoided with a mechanical motor disconnect or clutch mechanism of robust design." That was Mr. Pierga's conclusion; was it not, sir?

A. Yes. And that was my testimony here, that you can provide a clutch or you can do a disconnect, which I called the shear blade. That is exactly what I testified to.

Q. Yeah. So you went on, I think I counted 15, 20 minutes, about all the problems of applying SawStop to a direct-drive saw. But the bottom line is, sir, that that is not a problem if you design a clutch or you go to a belt-driven saw; isn't that correct, sir?

A. That is correct. You can redesign it. You can make it more robust. You can accommodate for those forces. There is no new technology needed to be invented. All I was telling you is you cannot put it directly into the product like BTS 15. You have to redesign it, make it substantially sturdier, larger, heavier.

Q. So your testimony is, if you take the BTS 15 exactly as it came off the assembly line and you slap on a SawStop device,

6-154

the saw is going to break?

A.    It will definitely break.

Q.    Of course.  It wasn't designed for it, was it, sir?

A.    That's what I was telling you.  You have to redesign it, which takes away the key ingredients of the existing BTS 15 being a light, small bench-top.  By redesigning it, you adding additional weight.  Yes, you have to make it stronger.  But by doing it, you add weight and you add size.  That was the message all along that I was telling this morning.

Q.    Sir, didn't you testify in a deposition that it was feasible to have a flesh-detection technology on a saw that was 60 to 90 pounds, sir?

A.    I don't know if I said "60."  Today I said "70 to 90," I believe.

Q.    I think you said "60 to 90."  Do you want me to refresh your recollection, sir?

A.    Fine, if I said "60" in the deposition.

Q.    You wouldn't be surprised if you said "60," would you, sir?

A.    No.  I was giving you an estimate.

Q.    How much does that saw weigh, sir?

A.    Fifty-some pounds.

Q.    Fifty-eight pounds, correct?  Fifty-eight pounds?

A.    Didn't seem that heavy when I was lifting it.  I don't think I'm getting stronger.

Q.   You weren't here, but we've had testimony, sir, that it was 58 pounds.

How much does the Bosch 4000 weigh?

A.   Over 60, close to 70, 60-some.

Q.   With the stand, correct, sir?

A.   No, without.

Q.   Without the stand?

A.   I believe so.

Q.   And how about the 4100?

MR. CARPINELLO:   Excuse me, your Honor.

A.   Slightly more.

Q.   Which one of these is the Bosch 4000 and which one is the 4100, sir?

A.   The one that you're holding is 4100.

Q.   This is the newer saw, correct?

A.   Yes.

Q.   And this is the 4000 that was in existence in 2004 when Mr. Osorio's saw was manufactured, correct?

A.   Yeah.  That is a 4000, yes.

Q.   And that's considered a transportable saw, isn't it, sir?

A.   Yes.  It is a professional grade transportable bench-top table saw.

Q.   Right.  And the 4100, I think you testified, is essentially the same except it has a new guarding system on top, correct?

A.    Yes.

Q.    Same size?

A.    No.  There are slight changes in the footprint, but, in general speaking, yes, same size.

Q.    Now, isn't it true that Bosch has created for itself a prototype based upon the 4100, which has flesh-detection technology?  Isn't that true, sir?

A.    No, I don't know about Bosch creating any prototypes.

Q.    You don't know that, sir?

A.    I know JV has created a prototype.

Q.    And you don't know that --

      MR. APPEL:  Objection, your Honor.

      THE COURT:  Let him finish the question.

Q.    You don't know that Bosch has taken the JV prototype and has already begun designing a flesh-detection saw based on the footprint of the 4100?  You don't know that?

      MR. APPEL:  Objection, your Honor.

      THE COURT:  Overruled.

Q.    You don't know that?

A.    Well, I have retired in 2008, and I'm not there every day. I don't know what they doing.  That would be my expectation, that whatever was accomplished in the JV technology, that it is going to be utilized.  So it's my true belief, and I really hope that they going to design that.  But I don't know what stage they are in or how far they got.

Q.    Mr. Domeny, you've been an expert now in several cases, correct?

A.    Yes.

Q.    Several table saw cases?

A.    Yes.

Q.    And several of those cases were against Bosch, correct?

A.    Yes.

Q.    You read the transcripts of those cases to prepare your expert report, did you not?

A.    What transcripts you referring?

Q.    The transcripts of the Bosch employees.

A.    I have read Mr. Tom Siwek's report.

Q.    And he's testified, did he not, that they were --

        MR. APPEL:  Objection, your Honor.

        THE COURT:  Yeah, not how he testified.  Sustained.

Q.    But you don't know, as you sit here, that Bosch has created a prototype, identified as a flesh-detection prototype based upon the 4100 which you just identified as a bench-top transportable saw?  You don't know that?

A.    No, I don't know what stage they are in.  As I told you, I'm really hoping that they are going to be progressing with the JV technology, and it is very natural to take the Bosch 4000 or 4100 as a workhorse and on which to build and use that as a basis for the further evolution.  So I wouldn't be surprised they are using 4000 or 4100.  But I am no longer

there.  I don't know, especially when you talking about in past tense, that they have done this.  I don't know that.

Q.    Don't you think that would have been an important issue to check before you walked into this courtroom as an expert, to tell this jury that you didn't think SawStop was feasible to put on a transportable bench-top saw?  Isn't that a fact you would want to find out?

A.    I have found out those facts, and I am telling you there is a difference between 4000 and the BTS 15.  And I'm telling you that the aim of the JV technology was to incorporate it into that size roughly and additional weight, as we talked about, 60 to 90 or 70 to 90 pounds weight.  So there's going to be a weight increase.  There is probably going to be some size increase, especially the height.  But that is not that, and I'm telling you that -- and my opinions were here focusing on the BTS 15.

Q.    So it's your testimony that if we had to put SawStop or we wanted to put SawStop on a bench-top saw, it would have to look more like that one on the cart than that one over there, right?

A.    Yes.  Not from the aesthetics point of view, not from the industrial shape and things like that.  I'm talking size and weight.

Q.    And you testified, did you not, sir, that there was no mechanical barrier to putting a SawStop technology or any -- certainly not the JV flesh-detection technology -- on a

belt-driven saw which could be transportable and transported from site to site?

A.    That's correct.  The saw of that size, slightly bigger, can incorporate a belt-drive system.

Q.    Incidentally, your testimony is all based upon the fact that this is a job-site saw, correct?

A.    It's a transportable lightweight saw.  Yes, it is used on job sites.  It's also used in a garage of the homeowner.

Q.    But you read Mr. Hill's deposition, right, because you said right in your report you read Mr. Hill's deposition?

A.    I did read Mr. Hill's deposition.

Q.    And Mr. Hill testified in his deposition that it wasn't designed as a job-site saw.  In fact, it was designed to be a shop saw, wasn't it, sir?  You don't remember that?

A.    Not those details.  I mean, for me, those classifications are, there are -- what's the difference between the definition of job site and shop?  There are no definitions in the dictionary.  There are no definition by CPSC.  So everybody is using these terms somewhat -- there is a grading of overlap, sir.

Q.    Those are the terms you used, sir, did you not?  Mr. Appel asked you to divide the saws into categories, and that was very important because you wanted to show the jury, did you not, that the fact that SawStop was on a contractor saw and a cabinet saw but wasn't on a bench-top transportable saw was

6-160

somehow an important fact --

A.    Yes.

Q.    -- right?

A.    Correct.  Our last discussion was shop site versus job site.  Well, the shop versus job site.  That's what I was talking about.  I -- in my view how these products are categorized, you have cabinet.  You have contractor.  You have job site.  You have small, transportable bench-top products, "bench-top" meaning, without the leg, set -- just put it on the bench like you have it here.

Q.    And you talked about cost, sir.  You threw around a lot of numbers about how much it would cost to put flesh-detection technology on a saw.  You have no idea, do you, sir?  You've done no studies of any kind on cost, isn't that true?

A.    That's correct.  I have not done studies.

Q.    So all the numbers you threw out, you just -- it's a guess, correct?

A.    Oh, absolutely not.

Q.    What studies have you done, sir?  What costing have you done to determine how much it would cost to add SawStop or any other kind of flesh-detection technology onto a saw?  What studies have you done, sir?

A.    I don't have to do the study.  I just took the information from the man who developed the SawStop, and it is his testimony that it would add $150 additional cost to the product.  And

6-161

that is the main cost, and I know -- now I know from my experience what is the relationship between the main cost and the wholesale cost, and those are the numbers that I gave you.

Q.    But the joint venture has come up with its own estimate? Hasn't the joint venture estimated that the cost of putting flesh-detection technology on a transportable, bench-top, belt-driven saw is $55; has it not, sir?

A.    Absolutely, because it's totally different design.  I have testified to the jury that we are not using a $69 cartridge. We are using, at most, $15 pyrotechnic projection.  You are not using a -- you're not damaging the blade.  Altogether it's different -- it's altogether different system.  So you cannot compare the SawStop cost to the JV cost.

Q.    That idea for that different system, Bosch came up with that in 2001, didn't they?

A.    No.  In 2002, when the Guardian Project started.

Q.    Okay.  So you've known, and the industry has known, since 2002 that they could do what you showed on that screen there, which is use a pyrotechnic device and drop that blade down and demonstrate that in 99 percent of the cases, there would be no more than a scratch on somebody's hand either in a slip or a kickback, right?

A.    I have lost you.  I don't know if you're talking about the cost that we knew, or you're talking about the performance? Because the cost in 2002, we been using actuators that were

6-162

$110 apiece.  We had to contract a company called Scott and SBI to specially develop these actuators for us in a mass-produced way.  That's how we brought the cost down.  In 2002, the actuator alone was $110.

Q.    When did you or anybody else first contact Scott to get a number?

A.    I would say 2005.  It would be after the Phase 3 testing because the Phase 3 testing was still utilizing those blank cartridges.  Like, they go into the spout that are actually in guns when you're shooting the nail into the concrete.  And we concluded that we cannot use those small cartridges, those blank bullets, because they are not reliable.  We have to have a specially designed actuator that has an electrically-ignited fuse.  We can just cannot rely on hitting the back end, like the bullet and ignite that, because that's how it was originally contemplated for the lowest possible cost.  Then we had to go from 25 cents blank bullet to the $5 specially designed actuator.

Q.    Was Scott around in 2002?

A.    Scott was probably around in 2002, but --

Q.    That's all I need to know, sir.

A.    In 2002, we were not even talking about Scott.

Q.    Right.  But you knew that you were going -- your people had developed an actuator system which was the basis for the JV project in 2002?  Your people came up with the idea of using a

pyrotechnic to push down on a lever, to push down the blade, to bring the blade down, and that the pyrotechnic would bring the blade down faster.  And your people came up with that idea in 2002 as part of the aborted Guardian Project, did they not?

A.    Well, we came up with it in 2002, 2003, and the project was not aborted.  And to the very first part of your question, did we know about Scott in 2002, yes, we knew about them, but they were not selling this kind of cartridges.  Scott is a company who is sending rockets up into the space.  When they release the vehicle from the payload, it's done by actuator. That's what their business is in.

Q.    Their business has been around since long before 2005?

A.    Right.  And they are designing --

Q.    Thank you.

A.    -- propulsion units for the military technology.

Q.    Now, are you a licensed engineer, sir?

A.    No, I'm not, sir.

Q.    Have you ever been a licensed engineer?

A.    No.

Q.    Do you have a -- are you a member of any engineering societies, sir?

A.    American Society Safety Engineers, American Society for Testing Materials, ASTM.

Q.    Do you have a certification in safety engineering?

A.    No, I don't.

Q.    Now, I think we've established, sir, that you've been an expert -- well, let me ask you:  You've been an expert in a large number of cases, correct, sir?

A.    All of them dealing with power tools, whether it's a grinder drill, router, jigsaw, whatever you have, whatever company made.  And if there was an unfortunate accident with them, it was my job to find out why that accident happened, and if there was a court proceeding, then I would be what you call an expert witness.

Q.    How many table saw cases have you testified in either a deposition or a trial, sir, table saw cases?

A.    I don't know.

Q.    Well, give us -- give the jury an idea, please, an order of magnitude.

A.    It's really going to be an order of magnitude.  A dozen or something, in that neighborhood.

Q.    A dozen?

A.    Maybe.  I don't know.  Testified in a courtroom, that was your question?

Q.    You testified and submitted reports in ten cases in the last two months, haven't you?

A.    And I haven't testified in a courtroom in neither one of them.  This is the first time.

Q.    Okay.  How many table saw cases have you been retained as an expert by the manufacturer of the table saw to either give

advice, testify at deposition or trial?

A.    Well, obviously, all Bosch cases that we had.

Q.    How many, sir, please?

A.    Well, at the moment, I think we have only one outstanding.

Q.    Sir, I mean during the course of your professional career, sir.  I didn't ask right now.

A.    Could you please tell me, are you talking about testifying in courtroom or just being involved in investigation?

Q.    How many cases were you retained, sir, to give advice, either in the form of a report, to testify at a deposition or a trial on behalf of a table saw manufacturer, sir?

A.    Okay.  All the cases for Bosch, I have not been retained because I was working for them.  My being retained is only after I have retired, and I'm no longer a regular employee of the Bosch.  So being retained as far as the Bosch is concerned, there are four cases, if I count correctly.

      Other manufacturers, I think I have three cases -- I'm sorry, six cases for Ryobi.  I have two cases, two table saw cases, for Hitachi, and one case for a Fox -- for a Sharp-Fox table saw.

Q.    Before we get to the current cases, sir, I'm sorry I used the word "retained."  How many cases, while you were employed at Bosch, were you employed to give advice or give a deposition or trial on behalf of Bosch with regard to table saw accidents?

A.    On behalf of Bosch and Skil -- I presume you want both --

probably a few dozen.  I don't know exactly how many table saw cases we have.

Q.   And how many cases did you find that the saw was defective?

A.   In table saw cases, none.  In other --

Q.   I'm talking about just table saw.

A.   I'm sorry.  I take it back.  I have found on at least two occasions that a Skil table saw was defective, and I have initiated a recall through Consumer Product Safety Commission. So there are at least two instances where a recall was initiated because of my conclusion that there is a defect in the product.

Q.   Now, you're currently retained by Ryobi in eight cases; is that not correct, sir?

A.   I don't have accurate count.  It could be eight.  I thought it was six but it could be eight.

Q.   You're retained in the Scerensko case; are you not, sir?

A.   Yes, I am.  Scerensko Petrenko, Maloney --

Q.   Excuse me.  Let's take them one at a time.  Scerensko is pending in Florida, sir?

A.   Yes.

Q.   Petrenko is pending in California?

A.   Yes.

Q.   The Beers case, sir, was that a --

A.   That doesn't ring a bell.

Q.    That was a Bosch case?

A.    What, DeBeers?

Q.    Beers, Beers.

A.    Doesn't ring a bell at all, neither Bosch or Ryobi.

Q.    The Bidford (ph) case, sir, a Ryobi case pending here?

A.    Correct.

Q.    The Bernier case?

A.    Bernier does ring a bell, yes.

Q.    That's pending here, also?

A.    I don't know where it's pending.

Q.    The White case, sir, against Ryobi?

A.    Yes, White is here.  That's five.

Q.    And the Maloney case?

A.    That's six.

Q.    How much are you paid an hour, sir?

A.    $200 per hour and that's irrespective if I'm in a courtroom or back in my office at home working on the case.

Q.    Now, I think you testified, sir, that you've never actually tested the BTS 15 in any way, is that correct?

A.    If you mean taking it through the rigors of some kind of a UL certification or doing some burnout test or any other test, you are correct.  I have not done that.

Q.    I mean any test, sir, any test.

A.    Not testing, not in a formal way, no.

Q.    And you acknowledge, sir, that the -- if the BTS 15 at

issue in this case was equipped with SawStop, that it would have substantially mitigated Mr. Osorio's injury; didn't you say that, sir?

A.   I think you are mixing two parts of my testimony.  I told you, if it would be equipped with SawStop, it no longer would be BTS 15.

Q.   Well, because it would have something that BTS 15 doesn't have, right?

A.   And it would be substantially larger and heavier.  It would not be a small, lightweight bench-top table saw.

Q.   Again, sir, you testified, did you not, that it could -- that flesh-detection technology could be put on a saw, and the saw could still weigh 60 to 90 pounds?  Didn't you testify to that, sir?

A.   Yes, I have.

Q.   Okay.  So I'm not talking about weight now, sir.  I'm talking about whether the saw that had SawStop equipped on it, you testified would substantially mitigate Mr. Osorio's injuries; did you not testify to that, sir?

A.   A saw that would have a SawStop-like technology would mitigate and depend on whether we believe Mr. Osorio, or if the hand went in straight, it could mitigate it or even substantially mitigate it.

Q.   Substantially mitigate it, sir, correct?

A.   Yes, if they went in in the fashion as I'm illustrating.

If they went in parallel, on top of it, as Mr. Osorio was demonstrating, then it would not be substantial.

Q.    Based upon -- you testified based upon your understanding of how the accident occurred, which I think you just testified to the jury.  Did you not say, sir, that the degree of mitigation would be fairly good because the injury would be only a few millimeters deep?  That was your testimony, correct?

A.    Right.  And that's why I'm saying that I believe the accident happened in this way, and I told you, if it happened in that way, it would be substantial.

        THE COURT:  Let me see counsel at sidebar.

(SIDEBAR CONFERENCE AS FOLLOWS:

        THE COURT:  Approximately how much longer on cross?

        MR. CARPINELLO:  At least an hour.

        THE COURT:  Okay.  Then I am going to adjourn for the day.  We're going to go into the morning.  You'll complete your cross-examination.  There will be some redirect?

        MR. APPEL:  I would think not very long, your Honor.  Depends on how much more is made, but I really would keep it very short.

        THE COURT:  So approximately an hour and a half.  Would the defendant then rest?

        MR. APPEL:  Yes, your Honor.

        THE COURT:  And the plaintiff will have a rebuttal case, or not?

6-170

MR. CARPINELLO:  We have a short rebuttal case, your Honor.

THE COURT:  A short -- I'm always curious about what the definition of "short" is.

MR. CARPINELLO:  Well, we haven't decided, but we anticipate live testimony of about 15 minutes.  And we're going to ask the Court to allow -- since Mr. Domeny criticized the NEISS data, we'd like to put in a few of the video clips that establish that the -- that the reliance -- that Underwriters Laboratories relied on the NEISS data you struck conditioned upon whether the defendants attacked the data.  And Mr. Domeny did, in his direct, attack the NEISS data.  He said that there was problems with it, that he sent out Caroleene Paul, that he didn't -- with regard to the effect, that he didn't view them as being accurate because they didn't ask the questions right.  Very short videotape that UL relied on the NEISS data that he criticized, possibly about four minutes of transcripts.

MR. APPEL:  Your Honor, on that score, actually, you made a ruling that he was not to talk about the numbers because there had been no criticism of those numbers.  And Mr. --

MR. CARPINELLO:  You brought it up first.

THE COURT:  We're not talking to each other.

MR. CARPINELLO:  I'm sorry, Judge.

THE COURT:  We're going to learn that, right?  You're talking to me only.

6-171

MR. APPEL:  Judge, there was no criticism by Mr. Domeny of those numbers.  And he, in a leading question, brought out 38,000, which is highly prejudicial and actually might be -- in my understanding, was run counter to your ruling on that.  You know --

THE COURT:  What's the response to his four-minute rebuttal?

MR. APPEL:  Your Honor, why does he have to have the last word?  Mr. Domeny has been deposed six times in this case, six times.  He has done a very thorough expert report.  Nothing new came out at trial here which would require a rebuttal.

THE COURT:  All right.  We'll talk about that after I dismiss the jury.

What I'm going to tell the jury is we're going to have testimony tomorrow which will last roughly two hours, and then we're going to adjourn for the day because we're going to have other matters.  I have afternoon business tomorrow that I need to conduct.

Right now we're going to schedule this charge conference for 12, but it's not going to go beyond 1:00.  Hopefully, we won't need that long.  I'm going to have closings and charge on Wednesday.

.  .  .  END OF SIDEBAR CONFERENCE.)

THE COURT:  You may step down for the time being, Mr. Domeny.  Thank you.

We're going to recess for the day, jurors.  The good news is that the case is still going to get to you on Wednesday.  The bad news is that we're going to have a session tomorrow, but the testimony will be completed tomorrow morning.  I'm not exactly sure when, but it will be before noon.  And then we will recess for the day because counsel and the Court have matters to conduct outside of your hearing.  And then we will prepare for closing arguments and charge, which will occur on Wednesday morning.  And the case will be submitted to you sometime late on Wednesday morning, around noon or maybe a little after noon.

But it is now important, as we are getting close to the end of this case, that you abide by my instructions and avoid conversations with others.  It is extremely important for you to acknowledge and to abide by that instruction.  The time for your deliberations is approaching, but it isn't here yet.

You haven't heard all of the evidence.  You haven't heard closing arguments, and you haven't heard my instructions on the law.  Only then will it be appropriate for you to discuss this matter with one another.  I'll see you back here tomorrow at 9 a.m.  Please leave your notebooks in the jury room.

(The jury left the room at 3:35 p.m.)

THE COURT:  All right.  Be seated, counsel.  Just slightly further to add to comments at sidebar, what exactly is

6-173

it that you intend to offer in your rebuttal case, Mr. Carpinello?

MR. CARPINELLO:  We wish to respond to the criticisms Mr. Domeny made of the CPSC/NEISS data.  Your Honor's ruling was that that -- that the excerpts that we had designated, which demonstrate the Underwriters Laboratories, of which you've heard a lot of testimony, relies on that data, was deemed not relevant unless the defendants had criticized the data, which Mr. Domeny did.

The reason it came in, Judge, was because Mr. Appel asked a question which -- by which he intended to elicit this number of 84 sample cases that they looked at, I believe trying to create the impression to the jury that the number was 84 as opposed to the actual number which the NEISS data found, which was 30 to 40,000 per year.

Mr. Domeny then proceeded to criticize, both in direct and cross, the methodology by which that data is collected.  He mentioned how he told Caroleene Paul that the way she did her numbers was not the right way, and he showed her how to do it right.  I think that brings up -- I'm entitled to show to the jury that the very data that he criticized is routinely relied upon, not only in general but in -- with regard to table saws, by the Underwriters Laboratories.  I think -- we have a variety of clips which are all very, very short.

THE COURT:  These are video clips?

MR. CARPINELLO: These are video depositions, Judge. These are the depositions of the Underwriters Laboratories' employees. We presented it to your Honor in a motion. And your Honor said that -- you ruled that it was not relevant unless the defendants had criticized the numbers, the methodology of the NEISS data. That happened today, and so we wish to put in those videotaped depositions of the NEISS data. And we have --

THE COURT: I'm not sure I still have those transcripts, but if I don't, I want to see them.

MR. CARPINELLO: We'll get them to you tonight, Judge.

We do have a short rebuttal witness, probably 15 minutes.

THE COURT: What will he be testifying about?

MR. CARPINELLO: Probably Mr. Gass rebutting certain specific statements that Mr. Domeny made on the stand.

THE COURT: Mr. Appel?

MR. APPEL: Your Honor, first of all, with respect to the NEISS data, Mr. Carpinello -- again, it was my understanding that those numbers would not be brought up at this trial as long as there was no dispute, as long as we weren't trying to attack the reliability, yet twice, Mr. Carpinello got -- blurted out those numbers to the jury, once with Mr. Hill improperly, 33 or 38,000. Mr. Hill had not said anything about that. And now again with Mr. Domeny, giving the

very highly prejudicial impression to the jury that there's like umpteen million -- well, at least 38,000 a year table saw accidents.

And so I don't see any -- it's already out to the jury. And to have to keep on going on about that, I see no -- I see no use. And, as a matter of fact, Mr. Domeny even admitted and described what they were just now on the stand. Why we need a continuing rebuttal testimony about that is -- I don't know.

With respect to Doctor Gass' testimony, he has been an expert in this case for years. As I mentioned to you, Mr. Domeny has been deposed six times, five times as an employee of Bosch and once as an expert in this case. He has issued a thorough expert report. Nothing that he said on the stand today was not already known to the plaintiffs, and there's no need for rebuttal. By giving rebuttal, then we just drag things on because I think then we open up the door to having this back-and-forth additional testimony.

This is just Mr. Carpinello always wanting to have the last word, and I don't think he has a right to rebuttal. I think there's no reason for it in this case.

THE COURT: All right.

MR. CARPINELLO: May I briefly, Judge?

THE COURT: Thirty seconds.

MR. CARPINELLO: Mr. Gass did not see the transcripts

because they were designated "confidential to," and they say right on them Mr. Gass can't see them.  He was not allowed to see any of the joint venture material.  That's why Mr. Appel, as you recall, wanted him out of the courtroom.  This is the first time Mr. Gass has seen any of this stuff.  All the transcripts in every case have been "confidential to." Virtually every document has been marked "confidential to," which means we can't show it to Mr. Gass.

On the NEISS data, he wants it both ways.  He elicited testimony from Mr. Hill that says there's an accident once in every million saws.  He elicited from Mr. Domeny today this number of 84, which was clearly a canard because he knew that was a very small subset of the total, that NEISS took a very small sample to look at, and Mr. Domeny keeps throwing out the 84.  Obviously, the jury needs to hear the whole story.

THE COURT:  I'll take the matter under advisement. We're in recess until tomorrow at 9.  The charge conference will be at noon tomorrow.

(Whereupon, at 3:40 p.m. the trial recessed.)

C E R T I F I C A T E

We certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of our skills and ability.

/s/Cheryl Dahlstrom                    03/01/2010

Cheryl Dahlstrom, RMR, CRR             Dated

Official Court Reporter

/s/Debra M. Joyce                      03/01/2010

Debra M. Joyce, RMR, CRR              Dated

Official Court Reporter