7-1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CARLOS OSORIO,                          )
                    Plaintiff,          )
                                        )
                                        )
vs.                                     ) CA No. 06-10725-NMG
                                        )
                                        )
ONE WORLD TECHNOLOGIES, INC.,           )
et al,                                  )
                    Defendants.         )



BEFORE:   THE HONORABLE NATHANIEL M. GORTON



JURY TRIAL DAY 7




John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, MA 02210
Tuesday, March 2, 2010
9:15 a.m.




Cheryl Dahlstrom, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, MA 02210
Mechanical Steno - Transcript by Computer

APPEARANCES:

     BOIES, SCHILLER & FLEXNER LLP
     By:  George F. Carpinello, Esq., and
          Teresa A. Monroe, Esq.
     10 North Pearl Street
     Albany, New York 12207
     - and -
     SULLIVAN & SULLIVAN LLP
     By:  Richard J. Sullivan, Esq.
     40 Washington Street
     Wellesley, Massachusetts 02481
     On behalf of the Plaintiff.

     SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
     By:  Michael S. Appel, Esq., and
          William F. Benson, Esq.
     101 Merrimac Street
     Boston, Massachusetts 02114-4737
     On behalf of the Defendants.

<u>I N D E X</u>

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PETER DOMENY (Cont'd) | | | | |
| by Mr. Carpinello | | 6 | | 78 |
| by Mr. Appel | | | 71 | |

P R O C E E D I N G S

THE COURT:  Good morning, counsel.

I wanted to see you before we call the jury, because there are a few matters that I need to resolve.

First, just for your own planning, with respect to the proposed rebuttal case of the plaintiff, I am going to allow the plaintiff to recall Mr. Gass for a brief rebuttal, keeping in mind that the rebuttal testimony will be permitted only regarding the facts raised in defendants' case that were new to or unforeseen by Dr. Gass or plaintiff more generally.

So I will allow him to testify for 15 minutes or so on rebuttal, but I am not going to allow further testimony with respect to the NEISS data, because, consistent with my earlier order, I do not believe plaintiff's experts' credibility have been attacked by any criticism of the NEISS data.  So I am not going to allow that to be entered in the rebuttal case.

The rebuttal case, therefore, will consist of short testimony of Dr. Gass and, of course, cross-examination.

With respect to another issue, I want counsel to be thinking about this before the 12:00 charge conference.  The plaintiff notified the Court that it was going to file an opposition to the defendants' motion for directed verdict with respect to Home Depot, but no such opposition has been received.  If -- first of all, does the plaintiff oppose with respect to the negligence count?

MR. CARPINELLO:  We do, your Honor, and it was electronically filed, I believe, last night.

THE COURT:  Well, you know, we're not on duty 24 hours a day.

MR. CARPINELLO:  I understand.  Should we hand up a copy?

THE COURT:  No, it's not going to do me any good now, I have to preside over trial, but I will hear that argument either at some break or during the charge conference.

Questions for the defendant in that regard.  Your motion cites two important propositions of law:  First, that even where a seller has knowledge of a dangerous condition, its only duty is to inform the customer of that condition; and second, a retailer owes no duty to inspect or test products manufactured by others for defects.  In support of those propositions, however, you cite a state court appellate brief, not a decision, an appellate brief, and several treatises.

You will in the intervening time cite to the Court Massachusetts statutory or case law standing for those propositions if there is any.

And with respect -- the second question for the defendant is, is the duty owed by a retailer or a seller different where plaintiff alleges a design defect case as opposed to a manufacturing defect?  And if so, how?

I would like those -- that issue addressed by the time

we have our charge conference.

With that, I'm ready to call the jury for further testimony.

(Jury entered the courtroom.)

THE COURT:  Good morning being jurors.

THE JURY:  Good morning.

THE COURT:  We're ready to resume.

Mr. Domeny will please retake the witness stand.

Good morning, Mr. Domeny.

THE WITNESS:  Good morning.

THE COURT:  You're reminded that you remain under oath.  Please be seated.

THE WITNESS:  Yes.

THE COURT:  And, Mr. Carpinello, you may continue with cross-examination.

MR. CARPINELLO:  Thank you, your Honor.

CONTINUED CROSS-EXAMINATION

BY MR. CARPINELLO:

Q.   Good morning, Mr. Domeny.

A.   Good morning.

Q.   Mr. Domeny, you testified in 2001, did you not, that you came to the conclusion that SawStop, under most circumstances, would significantly reduce the extent of injury?  Is that a fact?

A.   I don't understand the question.  Did I testify in 2001 or

did I testify that in 2001 I had that opinion?

Q.    Good point.

In 2001 you came to the conclusion --

A.    Yes.

Q.    In 2001, having seen only the prototype, you came to the conclusion that, SawStop in most circumstances, would significantly reduce the extent of the injury?

A.    That's correct, yes.

Q.    Even in a kickback situation?

A.    Even in a kickback situation.

Q.    Although this is not a kickback, this is slip, correct?

A.    That's correct.

Q.    And the velocity of approach is slower in a slip than in a kickback, correct?

A.    Generally, yes.

Q.    And weren't you quoted in an article, sir, as stating that SawStop is probably one of the most --

MR. APPEL:  Objection, your Honor.  If it can be shown, the article, we don't know --

THE COURT:  Show him the article.

MR. CARPINELLO:  Put that on the screen.

MR. APPEL:  No, not on the screen.

THE COURT:  Show him the article and see if it refreshes his memory as to what he said.

MR. APPEL:  Your Honor, may I also see a copy of it?

THE COURT: Yes. Do you have a copy for counsel?

MR. CARPINELLO: Sure.

May I ask if he recalls the statement first, your Honor?

THE COURT: Yes.

BY MR. CARPINELLO:

Q. Mr. Domeny, do you recall making the statement in that article that SawStop was, quote, probably one of the most major developments in the area of product safety applicable to table saws -- for table saws?

A. No, sir.

Q. Could you turn to page 88 of the article, sir, on the left-hand column?

A. Okay.

Q. The paragraph begins, "That's what Gass figured he had in summer of 2000."

MR. APPEL: Your Honor, before he gets to start talking about this article, could Mr. Domeny even take a look at it, read it?

THE COURT: Yes, let him familiarize himself with the article.

MR. CARPINELLO: Okay.

A. Where am I allegedly quoted here?

THE COURT: There's no question before you, Mr. Domeny.

MR. CARPINELLO:  May I point to where he's quoted?

THE COURT:  Yes, you may.

(Pause.)

A.    Okay.  Thank you.

(Pause.)

Q.    Do you recall that you made that statement, sir?

A.    No, sir.  I'm still reading it.

(Pause.)

A.    I don't even remember being interviewed.  I don't know how they got it, where they got it from.

Q.    Was that not your belief, sir, in 2005?

A.    In 2005 --

Q.    That SawStop --

A.    In 2005, just like in 2001, it was my belief and my opinion that on the very circumstances the SawStop can improve the safety of table saws.

Q.    And you believed that it was one of the most major developments in the area of product safety applicable for table saws?

A.    It was definitely different, as I testified yesterday, it was a new approach to the product safety, so I guess you could characterize it as a major development.

Q.    In product safety for table saws, a major development in product safety for table saws.  Do you agree with that statement, sir?

A.   I wouldn't use those words, but in general it is a development to improve the safety of the table saws.

Q.   And Ryobi was introduced to that major development in product safety in the year 2000; isn't that correct, sir?

A.   That is my understanding from reading the documents, yes.

Q.   And to this day Ryobi has not applied SawStop technology to any of its saws; is that correct?

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.   Well, certainly as of the time that it manufactured that saw it had not applied it to any of its saws, correct?

A.   That is my knowledge, yes.

Q.   Okay.

Now, yesterday, sir, you testified that Mr. Gass made a presentation in Cleveland -- do you recall that meeting in Cleveland, at the Sheraton airport in Cleveland?

A.   I do.

Q.   In November of 2000, do you recall that?

A.   Yes, I testified --

Q.   And you were there, right?

A.   Yes, I was there.

Q.   And who was there from Ryobi?

A.   I don't think Mr. Peot was there.  I don't have a specific recollection that Mr. Wayne Hill was there, but I believe the

records indicate that he was there.

Q.    Okay.  And you testified yesterday, if I may, "So my concern was that, Well, what is the mitigation and approach velocities and under the various blade configurations and under various other situations, what is the actual mitigation going to be?  Because I knew that accidents do not happen in a manner as it was illustrated where the hot dog is fed into the saw blade.  That happens only ten percent of the time.  Then Dr. Gass illustrated an approach where he moved the hot dog faster but not fast enough to replicate the approach velocities during the reaching or during the slipping."

Do you recall that testimony?

A.    I believe yesterday I said that, yes.

Q.    But that's not what you said in 2000, is it, sir?

A.    I don't remember what I said in 2000.

Q.    You sent an e-mail to the management of Bosch in 2000, and you described the demonstration differently then, did you not, sir?

A.    Sir, I don't know what time period you're talking about.  Is it before this November meeting or after or what?

Q.    I'm talking about immediately after the meeting, sir, when your recollection was fresh.  When you came back to the Bosch headquarters and you did an e-mail to management and you described what you had just seen.

A.    Okay.

Q.    Do you recall that e-mail?

A.    No.  But please show it to me.

(Pause.)

Q.    Can I direct your attention to the fourth paragraph where you describe what actually happened at the demonstration?

(Pause.)

A.    Yes, sir.

MR. CARPINELLO:  May I show it as a demonstrative, your Honor?

MR. APPEL:  Your Honor, I don't see what the purpose of a demonstrative is.

MR. CARPINELLO:  To demonstrate what he said, your Honor.

A.    I can read --

MR. APPEL:  There's been no impeachment --

MR. CARPINELLO:  Well, I am impeaching him, because he testified --

THE COURT:  Wait.  You can read what he said to him and ask him if that's what he said.

MR. CARPINELLO:  All right.

BY MR. CARPINELLO:

Q.    First you say, sir, "The demonstrations were impressive" with an exclamation point, correct?

A.    Yes, that's correct.

Q.    Then you said, "First, Steve Gass performed an ordinary

7-13

ripping operation (no guards) while holding a hot dog directly in the line of the blade.  As the blade touched the skin of the hot dog, the blade immediately stopped and disappeared below the table.  Examining the hot dog barely a visible mark was found.

A.    Mm-hmm.

Q.    Right?

A.    Yes.

Q.    And then you say, "The demonstration was repeated, this time simulating a much faster approach velocity as if the operator slipped and fell forward to the blade."  Right?

A.    That's correct.

Q.    The result was two millimeters long and less than a half a millimeter -- less than a half millimeter deep cut."  That's what you testified then?

A.    That's what I wrote then based upon observation.

As I testified yesterday, that in 2001, after this meeting, I had a chance to actually test it and evaluate it and that was the time I also had a chance to measure what are the slip velocities and that is the time where I have found that approach velocity that he has demonstrated, while it was faster than ordinary feeding, was not at all at the upper range or middle range of the slip velocities that are typically happening.

So it was faster, and at that time my knowledge was

not what the range of the slip velocities, as I have learned later through the research, slip velocities are much greater than what was demonstrated then.

Q.    And you read Mr. Whelchel's deposition in preparation for your expert report, correct?

A.    Yes.

Q.    And you read, did you not, that Mr. Whelchel testified --

MR. APPEL:  Objection, your Honor.

THE COURT:  Sustained.

MR. CARPINELLO:  Your Honor, I believe he stated it was the basis he read in preparation for his expert opinion.

THE COURT:  Ask another question, Mr. Carpinello.

BY MR. CARPINELLO:

Q.    Did you consider in preparing your report that Mr. Whelchel expressed a view that if the hand approaches from the front of the blade, that there's substantial mitigation of injury?

MR. APPEL:  Objection.

THE COURT:  Overruled.  He can answer that.

A.    I have considered not Mr. Whelchel's statement, I have considered for my report my own experience and the results of the testing that I have done.

Q.    And you agree that -- with his conclusion that SawStop is very effective in mitigating injury when the hand approaches from the front of the blade.  That was your conclusion, is it

not?

A.    Not exactly in those terms.  As I have expressed yesterday, the degree of mitigation will depend on approach velocity and a time that the finger is in contact with the rotating hazardous blade.  That is the measure of mitigation. Everything else is just descriptive words.

Q.    Okay.

A.    The true measure is in time and velocity.

Q.    Let's talk about the Guardian Project, sir.

A.    Okay.

Q.    Now, the Guardian Project was a project initiated by you, was it not?

A.    Yes, it was.

Q.    For --

A.    I'm sorry, it was -- I'm the one who championed it for -- in front of the management.  I cannot initiate the project.  I do not have authority to assign resources of the company.  But I was pleading with the management to start this project and to fund it, and they have done so.

Q.    All right.  And the purpose of the project was to explore the inclusion of flesh-detection technology into Bosch table saws, correct?

A.    In general speaking.  The purpose was not to repeat what Mr. Gass has done, but to explore all other possibilities.

Q.    Now, even before you began the Guardian Project, you knew

about the possibility of using pyrotechnics as opposed to a spring, correct?

A.   Even before -- well, we talked about it before the project, so we've been brainstorming, so maybe in that sense. But not in any project or any, like, hard engineering work sense I did not.

Q.   Didn't Stephen Gass discuss with you and other representatives from Bosch the concept of using pyrotechnics as opposed to a spring for moving the blade out of the way?

A.   Absolutely not.

Q.   You don't recall that?

A.   Absolutely not.  That is outright not true.  Because that -- pyrotechnic propulsion is a patented design by Bosch, and Mr. Gass had nothing do with that.

Q.   Didn't he disclose it in his patent, sir?  Didn't the very first patent he filed disclose that alternative method of dropping the blade by pyrotechnics, sir?

A.   No, sir.  That language came in as a continuation of the patent application.  That is what is so upsetting about this process, is it that Mr. Gass keeps his patent application open and he keeps updating and changing the language based upon the PTI --

Q.   Do you recall, sir --

A.   May I finish?

Q.   No, sir, you've answered my question.

THE COURT:  Wait, wait.  He will be able to finish.

A.    The patent applications are being updated based upon what Mr. Gass learns from other sources, and that is not the original language.

Q.    Well -- and Bosch has also filed patents on flesh-detection technology, correct?

A.    Bosch has filed patents on flesh-detection technology if you mean sensing or the pyrotechnics -- which one do you mean?  Well, we filed patents in both.

Q.    You filed both, right?

A.    That's right.

Q.    Okay.  And do you recall Dr. Gass discussed with Bosch back in 2000 the idea of dropping the blade rather than braking and dropping the blade?  Do you recall that discussion?

A.    I did not even have a discussion with Mr. Gass in year 2000.

Q.    You did in Cleveland, didn't you?

A.    Oh, in that Cleveland meeting.  I thought -- yes.  No, we did not discuss pyrotechnic.

Q.    I didn't ask that, sir.  I asked that before.

I asked:  Didn't you also discuss the concept of simply dropping the blade as opposed to stopping and dropping?  Wasn't that also a topic of discussion, sir?

A.    No, sir, the topic of --

Q.    You don't recall that?

A.   No.  The topic of discussion was what he demonstrated, then he turned the machine upside down, we looked at the components of it.  He let me take a look at one of the cartridges.  He explained the spring, the fuse, how it's burned.  It was all about braking.  Nothing about other methods other than jamming a piece of plastic at that time into the spinning saw blade.

Q.   Well, certainly Bosch had the idea of simply dropping very early on, correct?

A.   Well, very early on -- they had the idea of dropping it by 2002, where this initial discussions that we had were actually executed in engineering project, and then we filed the patent for that.

Q.   Okay.  And wasn't one of the reasons that the Guardian Project was initiated was because Bosch expected Dr. Gass to introduce SawStop technology in a transportable saw in the near future?

A.   No, sir.

Q.   Well, sir, let me show you a document that might refresh your recollection in that regard.

     Do you recognize that document, sir?

A.   Yes.

Q.   That's the Guardian Project predevelopment concept, correct?

A.   That's correct.

Q.    That was a memo that was written in April of 2002, correct?

A.    In 2002, yes.

Q.    Yes.  And does -- and if you could turn to the first page, sir --

A.    The cover or the one behind?

Q.    After the cover, sir.

A.    Okay.

Q.    Where it says, "reason for development"?

A.    Yes.

Q.    And it says, "The necessity to develop such a system is twofold:  One, a contractor-type table saw manufactured by a competitor is expected to enter the marketplace within the next six months with an active safety system which reacts to human tissue contact with the blade."

A.    Yes.

Q.    "On contact, the blade can stop within one one-thousandth of a second, minimizing injury to the user.  We expect that this competitive technology will migrate to transportable saws (which are competitive to the Bosch 4000) a few months thereafter."

        Does that refresh your recollect, sir?

A.    Well, that is a different question.  We expect the migration in future into the transportable -- Bosch transportable table saws, like a Bosch 4000.  But the original

concept was not aimed at that.

Q.   Well, that's the first reason given for doing the project. That's the justification that your group gave to management, global management -- didn't global management approve this?

A.   First of all --

Q.   Sir, did global management --

A.   I haven't finished the previous answer yet.

The project was aimed to finding a technology.  The project was not aimed to design a prototype of a particle table saw.  The project was to find out alternative ways and the ways that would prevent injury rather than mitigate injury.  That was the goal of the project.

Once the concept is proven, where it can be applied, that you can find out only by what you're going to develop. Because maybe you develop something that is big and you cannot fit it in a transportable saw.  Maybe you can develop something that is small and you can fit it even into a smaller table saw. Those possibilities are open.

So at the time this concept was written, there was no -- there was no constraint that really has to be applied.

Q.   All right.

A.   Obviously our intent was to do it and try to do it for a transportable table saws, because we do not manufacture cabinet saws.  So our goal was towards the saw of that size, like the Bosch 4000.

Q.    Because, and I quote, "This competitive technology will migrate to transportable saws which are competitive to the Bosch 4000 a few months thereafter."  That's what it says, doesn't it, sir?  Yes or no, please, sir.

A.    Yes.

Q.    Is that what it says?

A.    Yes, that's what it says.

Q.    Thank you.

        MR. CARPINELLO:  Your Honor, I ask that he answer --

        THE COURT:  That's fine.  You've answered the question.

BY MR. CARPINELLO:

Q.    Now, he also provides a second reason, does he not, sir?  Doesn't he also say, sir --

A.    Who is "he"?  You mean the writer?

Q.    The writer says --

A.    Okay.

Q.    -- "This will not only raise the bar of performance in the transportable saw category, it will create a new and significant liability concern for our corporation because of this enhanced safety performance."

        It says that, doesn't it, sir?

A.    Yes, sir, it does.

Q.    So he says two concerns:  "One, we expect a competitor to produce a transportable saw competitive with ours; and two,

because this technology is coming out, it raises product liability concerns for our company."  Correct?

A.    Yes, both --

Q.    Yes, or no?

A.    Yes, both concerns were present.

Q.    Thank you.

And by the end of 2002 and early 2003, your group, the Guardian Group, had concluded that a system based upon a retracting blade in a pyrotechnic device was feasible and would be effective, correct?

A.    It was feasible and it would be effective, yes.

Q.    And they concluded that at the end of 2002, correct?

A.    I don't know it was by the conclusion of the project, which my recollection says 2003.

Q.    Well, certainly by early 2003 at the latest they had come to that conclusion, correct?

A.    I don't know the timing.  We came to that conclusion at the time when we concluded the Guardian Project, whatever time that was; and I believe it was in spring of 2003.

Q.    Well, let me show you a document, sir.

Do you recognize that document, sir?

A.    It's a test report.  I don't think this is the final report about the project.

Okay.  I've seen this document sometime in the past.

Q.    And it's a summary based upon test reports done on

7-23

December 31 and -- December 31, 2002 and February 10, 2003, correct?

A.    Correct.

Q.    And the very first sentence says, does it not, "The results obtained in this test indicate use of external energy source is likely to provide consistent performance suitable to avoid severe injury in case of kickback."  Which, of course, you testified is the most severe, fastest approach to the blade, correct?

A.    Yes.

Q.    Okay.

And it also says, on the first page again, sir, "Introduction of SawStop system demonstrated that it is possible to reduce severity of table saw injuries" --

A.    Where are you reading from?

Q.    Very first page, where it says, "background"?

A.    Okay.

Q.    Second sentence.

A.    Okay, got it.

Q.    Maybe I should read the first.  "The Bosch Guardian Project has been initiated to explore possible table saw injury avoidance systems.  Introduction of SawStop system demonstrated that it is possible to reduce severity of table saw injuries through detection of human tissue upon contact with the blade, removing the blade out of the contact path.  The design

approach of the Guardian Project is to exceed the performance

of SawStop and provide greater protection against severe

kickback conditions.  It is believed that if the design

prevents/reduces injury in kickback conditions, then all other

injuries will also be reduced or eliminated."

Do you see that?

A.    I see it.

Q.    And then can you go to the conclusion, sir?

A.    All right.

Q.    And in the middle of that paragraph, does he not say, "It

is the writer's opinion that the use of a faster acting

actuator with higher load capacity will result in the

performance necessary to satisfy these system requirements."

Is that correct, sir?

A.    That's correct.

Q.    Okay.  Now, what was Ryobi doing at this point in time to

develop flesh-detection technology?

A.    At that time I had no idea what they were doing.

Q.    You were retained by Ryobi to be their expert in this

case, were you not?

A.    I'm sorry, I said at that time when this was happening I

didn't know what they were doing.  I know it now that I have

learned --

Q.    No, no, I mean now, your knowledge now as to what Ryobi

was doing at this point in time.

A.   To my knowledge, the documents that I have received, they were evaluating the stresses in use by the SawStop by the application of the SawStop technology, measuring the stresses and forces resulting from those stresses on the structural components of the saw.

Q.   Didn't they do that in October of 2000, sir, when they were testing the prototype?  Isn't that what Mr. Peot testified to?

A.   I believe that's the time they did it, yes.

Q.   And I want to know what were they doing after they shipped off the prototype in October of 2000, after testing it for two weeks -- actually -- well, we won't characterize what they were doing for two weeks, but they had the saw for two weeks.  Do you remember Mr. Peot testified to that?

A.   I don't remember exactly, but they had it for some period of the time, that's what I remember.

Q.   Well, you weren't here when he said that they had it for two weeks.  Did you read the transcript?

A.   Fine, two weeks.

Q.   You have no reason to disagree with me on that, do you?

A.   No.

Q.   They shipped the prototype off in October of 2000, right?

A.   If that's what you say, that's what the records show.

Q.   Now I want to know what they are doing in 2002 and 2003 to develop --

A.    Sir --

Q.    Excuse me, let me finish the question.  -- to develop flesh-detection technology, what are they doing?

A.    Your question is when they shipped in October I don't know when they shipped it.  And what they were doing, based on the documents I have received, they were measuring stresses and strains in a structural component to calculate the forces on a structure and whether those components can withstand those forces.  That's what I know from the documents that I have read.

Q.    And what you know from those documents is they did those stresses, they measured those stresses in the first two weeks they had the saw, did they not, sir?

A.    As I told you, I don't know how long they had it.  If Mr. Peot said two weeks, it can be done, those measurements can be done in two weeks.

Q.    Okay.  Whenever they shipped the saw, whether it was October 12 or it was October 19 or it was October 25, whatever the day they shipped it, I want to know what did they do after they shipped the prototype out?

      You've looked at the records, you said in your report you examined all the relevant records.  I want to know what were they doing when you were doing these tests?  What were they doing?

A.    I can hear you, sir.  What they were doing is they have

prepared, Mr. Peot, I believe, form a team to evaluate the feasibility and to continue with the project but they did not get a funding, a go-ahead for that project.

Q.   So they were doing nothing; isn't that correct?

A.   I don't think they were -- well, the fact that they ended up not doing any more work because the project wasn't approved.

Q.   Right.  They were doing nothing because management would not approve Mr. Peot's request to do the kind of testing that you were doing at Bosch; isn't that correct, sir?

A.   It appears that the project was not approved.

Q.   Right.  Mr. Dils, Mr. Bugos, Mr. Whiffen, none of them would give the money to Mr. Peot that he had asked for to do this kind of testing; isn't that correct, sir?

A.   I believe I answered it two three times that it appears that there was no follow-up work done.

Q.   Now, going back to the Guardian Project redevelopment concept that you were just looking at, sir --

A.   Okay.

Q.   -- and going to the second page, the first page of text when we read about the two reasons, we talked about the two reasons, that same paragraph --

A.   Yes.

Q.   -- your group came to the conclusion that the expectation would be that amputations would be virtually eliminated by the successful development of this technology.  Wasn't that the

group's conclusion?

A.   Yes, and you have to remember that we were working on accident-prevention system, not on a contact and mitigation system.

     And as this document, what we have read from before, it tells you that if you utilizing the accident-prevention design principles and if you're using the proximity sensing and the pyrotechnic propulsion, then even the kickback, saw kickbacks, can be eliminated.  Maybe in the high-kickback velocities the injury can be mitigated, but that means on any slower approaches, if you are using the proximity sensor, the accidents would be eliminated.

Q.   And you testified --

A.   These are proximity sensor.

Q.   You testified yesterday that in -- that the joint venture came to the conclusion that proximity sensing was not feasible and that they shelved it.  That was your testimony, correct?

A.   That's correct.  This was a concept evaluation.  The actual execution of that concept into the workable prototype, the D2M which, are very capable engineers from near the Stanford University in California in Silicon Valley, they were not able to execute that.  So that is the reason why it was shelved after two years of funding and trying that approach.

Q.   And that decision to shelve the proximity sensing was made in July of 2004; isn't that correct?

A.    That was the time where I think we said that we no longer have the exclusive approach with the proximity sensing.  For a time there was a parallel project between proximity sensing and a contact sensing was also started at that point.  But the proximity sensing, to my recollection, was going on for some period of the time before it was totally shelved and no more activity was devoted to that.

Q.    Didn't you testify, sir, that in July of 2000 the joint venture decided to switch from proximity sensing to shelve proximity sensing and to devote their energies to developing a prototype based upon contact sensing just as Mr. Gass' technology is based on contact --

THE COURT:    Mr. Carpinello, you said July of 2000.  Did you mean '04?

MR. CARPINELLO:    Thank you, your Honor, 2004.  Thank you, I'm sorry.

A.    It's my recollection in 2004 we stopped it, we also opened the contact sensing technology.  It is my belief that in July of 2004 that wasn't the last effort on proximity sensing.  There were parallel projects going on for -- I don't know if it was a full year, but for a number of months thereafter.

Q.    Let me read your testimony, sir, because that equivocation that you just gave was not -- I don't believe you gave that in your previous testimony.

Let me refresh your recollection, sir.

MR. APPEL:  Your Honor --

THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.    Do you recall when you testified in -- the testimony you gave in June 6, 2008 at your deposition, sir?

A.    June -- yes.  I was in Chicago, downtown, I believe.

Q.    Let me show you your testimony, sir.

MR. APPEL:  Can we have a page?

MR. CARPINELLO:  Mm-hmm.

BY MR. CARPINELLO:

Q.    Sir, do you see -- if I may look over your shoulder, sir --

THE COURT:  Page and line?

MR. CARPINELLO:  Actually, I'll go -- the page is 102, line 10.

BY MR. CARPINELLO:

Q.    Do you see where I say, "So you recall that that was the decision in July of 2000?  That's consistent with your recollection?

Answer -- let me read the prior sentence for the --

A.    What page you are on?

Q.    Page 102, line 10.

"Does that refresh your recollection as to when the joint venture decided to proceed with a contact rather than proximity testing system?

"A.   It's consistent with what I said earlier, that before phase three, that's what I told you.

"Q.   All right.  That is -- okay.  So you recall that that was the decision in July of 2004?  That's consistent with your recollection?

"A.   That decision was made prior to 2004.

"Q.   It was prior to July 2004?

"A.   Right.  In close proximity but prior to that meeting."

Do you recall that testimony, sir?

A.   I can read it there, but I don't know what was supposed to refresh my memory.  Was there a document?  Because if that's a memory test, maybe my memory was failed.

There are documents that tell you exactly when the project of the proximity sensing was totally shelved, when the contact sensing technology was initiated.

My memory as I sit here today is that the -- there were two projects, proximity and contact sensing running parallel for some time.  And if that parallel running of those two projects ended in July of 2004, so be it, so I don't have a total recollection --

Q.   Well, the date is significant, sir.

You'll agree with me that -- you have no reason -- as you sit here you have no reason to disagree with me that it was July of 2004 or prior to that when the joint venture decided to

develop a prototype based on contact sensing, correct?

A.    I believe that's what I said, that the contact sensing --
may I finish -- the contact sensing, I believe it started in
July of -- or whatever, in 2004.  And that proximity shelving
was -- proximity sensing was shelved for some time thereafter.
My memory says early 2005.

So, for a time, there were parallel projects.  The
contact sensing technology has started to be evaluated in 2004.
That's what I recall.

Q.    And --

MR. APPEL:  Your Honor, and Mr. Carpinello has only
read portions of the deposition.  The other portions of the
deposition clarify --

THE COURT:  You'll be able to go over that on
redirect.

BY MR. CARPINELLO:

Q.    But you had a meeting with the Consumer Product Safety
Commission in October of 2005 at which you told the CPSC that
they should reject the idea of adopting a rule for
flesh-detection technology because philosophically it was a bad
idea to base any safety device that required contact with the
blade.  Didn't you tell the Consumer Product Safety Commission
that in 2005?

A.    First of all, I did not have a meeting with CPSC.  The
Power Tool Institute had a meeting with CPSC; a number of

people were represented there.  It's not my meeting, okay?

Q.   Are you disavowing what was said at that meeting, sir?

A.   No, all what I'm doing is I'm correcting your characterization of the meeting.  It wasn't my meeting.

Q.   And you -- you --

A.   At that meeting --

THE COURT:  Let him answer the question.

MR. CARPINELLO:  I think he answered my question, your Honor.  He's trying -- if Mr. Appel wants to --

THE COURT:  Let him answer the question.

A.   At that meeting there was an opinion expressed that the Power Tool Institute prefers to have a technology that would avoid the injuries rather than mitigate them.

Q.   Well, it said more than that, didn't it, sir?  Didn't it say more than that?

A.   I think that characterizes that portion of the discussion or meeting where we talked about mitigation versus avoidance.  I think that was your question, and I was focusing my answer to that portion of your question.

Q.   Didn't the Power Tool Institute in a report which you approved tell the CPSC that they should -- that one of the reasons --

MR. APPEL:  Objection, your Honor.

THE COURT:  Let him finish the question.

BY MR. CARPINELLO:

Q.   -- tell the CPSC that they should reject a rule requiring flesh-detection technology because the existing technology required a contact with the blade which PTI was philosophically opposed to?  Isn't that what they told the CPSC?

MR. APPEL:  Objection, your Honor.  It's hearsay.  He hasn't even had a look -- a chance to look at the document.

MR. CARPINELLO:  Let's look at the document.

THE COURT:  Show him the document, Mr. Carpinello.

MR. CARPINELLO:  Can we produce it as a demonstrative on the screen?

THE COURT:  Show him the document.

(Pause.)

BY MR. CARPINELLO:

Q.   You've seen that before, haven't you, Mr. Domeny?

A.   I'm sure I have.  I haven't seen it probably since the time it was used.

Q.   And it was distributed to the committee, your committee, before it was brought to the CPSC; isn't that true, Mr. Domeny?

A.   What do you mean by my committee?  I don't understand.

Q.   The joint --

A.   I don't have a committee.

Q.   It was seen.  I'll ask the question.

A.   Okay.

Q.   Wasn't it seen by the joint venture committee, of which you were a member?

A.   I don't think there is a joint venture committee.

Q.   The flesh-detection technology committee which was developing the technology that you testified about for four hours yesterday.  You forgot that committee?

A.   That is not a committee.  That is a joint venture to -- of which there is -- Bosch is a member of and I'm one of the oversight members.  But it's not a joint venture committee.  So you misleading me with the terms and discreet words that you're using.

Q.   Okay.  The joint venture representatives of the manufacturers who were members of the committee got an advance copy of this and approved it before it was shown to the CPSC; isn't that true, sir?

A.   The joint venture group has received this document.

Q.   So you saw it before it went to the CPSC?

A.   May I?

Q.   That was a yes or no question, sir.

A.   No, that is not true.  Because --

     MR. CARPINELLO:  Your Honor, I ask --

     THE COURT:  Let him answer.

A.   -- there are other people who has also received it, not just JV.

Q.   There were a lot of other people that received it.

A.   In addition to the JV, that's what I'm trying to tell you, because you are characterizing this document as a JV document.

Q.    No, I --

A.    It is not a JV document.

Q.    I never said, sir, it was a JV document.  I asked you a simple question.  I said, was this document presented to the manufacturer representatives of the joint venture for them to review before it was submitted to the CPSC?  And I think you answered yes to that question.  And I --

A.    Yes.

Q.    And my next question is:  Wasn't it also shown to members of other committees of PTI, including your committee, which is known as the product liability committee, of which you were chair?  Was it also shown to that committee?

A.    I don't know.  All that I know it was shown to additional manufacturers, additional members of the Power Tool Institute.

Q.    Okay.

        MR. CARPINELLO:  May I put this one slide on the -- I'd like to ask him some questions -- as a demonstrative, your Honor?

        THE COURT:  Not of the document.  That's not a demonstrative.

        Show him the document.

BY MR. CARPINELLO:

Q.    Well, didn't the PTI in a document approved by you say that one of the reasons why SawStop should not be approved --

A.    Which page you are on?

Q.    I'm on the very -- I'm on the second page.

A.    Okay, sir.

Q.    Top screen.

A.    Yes, sir.

Q.    That philosophically it was not a good idea because, quote, must come in contact with the blade to make the device work.  That was one of the three key reasons that PTI said you shouldn't adopt this.  And this wasn't the first time that they had given that message to the Product Safety Commission, was it?

A.    That's correct.  That's not the first time that we have said -- that the PTI has said that it is better to have an accident avoidance than accident mitigation.

Q.    But you didn't -- but PTI didn't tell the Consumer Product Safety Commission that over a year before this presentation was made PTI itself had decided that contact sensing was, in fact, the best way to develop a flesh-detection technology.  You didn't tell them that, did you?  You didn't tell the CPSC that, did you?

A.    Could you repeat that question?

Q.    Nowhere in this presentation is there any disclosure to the Consumer Product Safety Commission that, in fact, PTI itself is relying on a contact sensing system while they're telling the CPSC you shouldn't do this because contact sensing is a very bad idea?  Was that clear?

A.    Yes, your question was clear.  The PTI --

Q.    And the question was, sir:  Did you disclose that to --

THE COURT:  Wait, wait, let him answer the question.

A.    PTI was telling the CPSC that philosophically we prefer a proximity and accident avoidance system instead of a mitigation and a contact system.  PTI did not tell CPSC that at this time, October of 2001, the proximity sensing --

Q.    2005?

A.    2005, sorry.  -- in October of 2005 the proximity sensing has been shelved.  It was our full intention to restart it and, as I testified yesterday, if the technology comes around in future and if there is additional funding, we will restart that part of the project.

Q.    And it's never been restarted, has it?

A.    As of now, not.

Q.    Okay.  And it's your view -- it's your view now, certainly, that if you can mitigate injury, if you can substantially mitigate injury, even if you must have contact to do so, that is a desirable safety goal.  That's your view as you sit here today, correct?

A.    Well, it is a -- it is a system that will improve the safety of the table saw.  I don't think I ever said, and I think I said the opposite, that that technology is not mandatory to make the product like a table saw reasonably safe.  I never said that.  I think I said the opposite, that you are

perfectly reasonably safe if you are using the table saw

without that technology.  That is my opinion.

Q.   That wasn't my question, sir.  My question was:  You

agree, do you not, sir, that it is desirable to develop a

safety system which substantially mitigates injury, even if the

system is based upon the necessity of there being contact

between the finger and the blade?  Do you agree with that, sir?

A.   I agree with the fact that it is desirable to develop any

kind of technology that will improve the safety of the table

saw.  Whether it is mandatory and absolutely necessary, that's

a different question.

Q.   Now, isn't it true, sir, that your report on this case is

silent as to whether use of the guard would have made any

difference in causing Mr. Osorio's accident?

A.   I -- the guard was not used, so I was not addressing that

issue.  And based upon from what I know about the description

of the accident, mechanically it would not prevent the

accident, because the hand was right there in front of the saw

blade.

Q.   May I approach --

A.   In the front -- so mechanically it would not prevent the

injury.

Q.   Just so we're clear, the absence of the guard was not a

causative factor in this case?

A.   It's probably 90, 95 percent probability true.  This is

7-40

the aspect that one has to consider, that if you don't have a guard, then putting your hand in front of the saw blade may not seem to be -- you don't have any warning element.  What I'm trying to say, if you have a guard there and if you -- may I illustrate, your Honor?

THE COURT:  Yes.

MR. CARPINELLO:  This is not responsive to my question, your Honor, and I -- I asked him whether -- and I'll --

THE COURT:  I'm going to let him answer.

A.    The issue is whether the guard would prevent the accident.

I have testified that mechanically it would not because your hand goes in.  But as a warning device it may allow the user that, say, I am putting my hand -- and I know he was doing it with his left hand, but I'm just going to illustrate so you can see better.

If I put my hand here and this is the way he had, all four fingers on the tabletop, as a warning device to the user, hey, I'm putting my hand under the guard, maybe there is something wrong with it.  Because if I am doing it here, that warning aspect of the guard is not present, because I don't see the guard in the proximity of my hand, how I'm sticking my hand under the guard.  Mechanically, maybe not, but in a warning sense it may alert you that you are doing something wrong.

MR. CARPINELLO:  May I approach, your Honor?

7-41

THE COURT:  Yes.

MR. CARPINELLO:  Mr. Domeny, I'd like you to just do the demonstration you just did on the SawStop saw, sir.

If I may, your Honor, wheel this over to the jury. And I do this with trepidation.

MR. APPEL:  May I know what that word means?

MR. CARPINELLO:  It means I have no idea what the hell I'm doing.

BY MR. CARPINELLO:

Q.   Could you illustrate that approach, please, to the jury on this saw, sir?

A.   Yes, sir.

And I'm going do it like Mr. Osorio did.  He put his hand right on the front of the table saw and with his fingers on top of it.

So the warning aspect, my hand is not under the guard, I would have to move my hand here to be under the guard. That's the difference.

Q.   Well, isn't also the difference, sir, that there is -- how many inches from the beginning of the guard to the edge here on this saw.  Do you know?

A.   Well, we can measure it.  It appears to be --

Q.   Here you go.

A.   -- about five inches.  Five inches, yes.

Q.   And on the SawStop saw, sir?  The beginning of the guard?

A.    The beginning, nine.

Q.    And that's significant, is it not?

A.    Well, of course.  That is a small, lightweight table saw. That is the aspect of it, that you can pick it up and you can carry it.  This not one of those saws; so, of course, the dimensions are different.

Q.    And it's your testimony you couldn't make a lightweight, transportable saw that had a larger approach distance?

A.    You lose the -- you can make anything you want because it doesn't require the technology.  But the fact is that you lose the attributes of small, lightweight.  Because if this one sticks out an additional four inches, now this is -- if you are transporting it, you have to pick it up.  The dimension is you're pushing it against your tummy, you are holding it far away, it becomes more difficult to handle.  It is ergonomically not desirable to have such a size.

Q.    Now, Mr. Domeny, I'd like you to illustrate -- and I didn't quite get this yesterday -- using the exemplar saw how he was making a bevel cut, correct?

A.    Yes.  Well, slight bevel, it was only six, seven degrees bevel.

Q.    Bevel to the right?

A.    Bevel to the right.

Q.    Which meant the fence would have to go where?

A.    The fence would have to go to the left.

Q.    Can you illustrate again for the jury how he should have held his hands?

        (Pause.)

Q.    I'm not sure the jury can see that.

A.    Where is that piece of wood?

        Well, I can put it on the ground and actually go down on my knees even if you want.

        THE COURT:  We're getting far afield from --

BY MR. CARPINELLO:

Q.    I want him to demonstrate the actual accident, your Honor, how he should have -- how Mr. Osorio should have held the wood, but I'm trying to do it in a way that many the jury can see it?

        THE COURT:  Why don't you let him say how he feels he should have done it.

        MR. CARPINELLO:  I'd actually like him to do --

A.    Can I do it on this -- this is the saw as it was bevelled so we can --

Q.    Please proceed.

A.    Okay.  And I will turn it around such that the jury can -- and your Honor can see.

        THE COURT:  Hold on a second.

        Is the court reporter able to take the testimony from there?

        COURT REPORTER:  Yes.

        THE COURT:  All right.

7-44

(Pause.)

A.    Okay.  This is -- if he would be using the fence and if would desire to feed the wood with the right hand and control the board against the fence with the left hand, he could have done it this way.

Q.    With the four fingers facing the blade as you're illustrating there, sir?

A.    It's not my recommended procedure, but if he were desire to do it with the fence, not having the guard and potentially doing it the same way, this is not my recommendation.

What he should have done is to do it in this fashion. You should never have your fingers on the top of the wood where slipping forward your hand goes immediately in the saw blade. You should never do that.

What he should have done is keep your hand away from the line of the cut and I can -- with these fingers and the thumb, you can see, I can hold and I can apply the pressure and hold the wood against the fence and against the table.

So I put my hand here on the edge so it's not going to slip forward, my palm is here on the edge, my thumb and index finger is pressing it against the fence, and I am feeding it in this fashion.

Q.    And if the wood starts chattering, sir, how would you hold the wood down?

A.    If the wood started chartering, I would investigate why

the chattering is there.  If the chattering persisted, I wouldn't proceed.

Q.    Okay.  Can you return to the stand?

        (Pause.)

Q.    Now, you testified yesterday that in 1998 there was a meeting with the Consumer Product Safety Commission at which the Consumer Product Safety Commission disclosed certain accident data with regard to table saws, correct?

A.    Yes.

Q.    And is it your testimony that you became aware of the frequency of accidents and the frequency of non-guard use at that 1998 meeting?

A.    The 1998 meeting was to communicate about the frequency -- that the CPSC is not satisfied with the high frequency of table saw injuries.  I don't recall any numbers that would quantify those guard usages or other patterns, no.

Q.    Did you have any occasion, sir, during the -- well, let me rephrase it.

        You've been involved with power saws since, I think you testified, the 1970s, correct?

A.    As of 1972 for sure when I left the solid state department of Skil I've been involved with the saws.

Q.    Did you have any occasion, sir, during any of those years to actually check the data that was actually being collected by the Consumer Product Safety Commission?

A.    No, sir -- well, we haven't started making table saws until second half of '80s, so I wouldn't have interest in doing and checking on table saws.

Q.    Let's start from the second half of the 1980s.  Did you have any occasion to collect the data that was being collected by the Consumer Product Safety Commission on an annual basis?

A.    No, sir, I did not.

Q.    And you testified that there was a meeting at research -- well, there was a meeting in 1999.  Do you recall that, sir?

A.    Well, again, that was meeting at CPSC.  CPSC and UL have met at the CPSC facility.  That wasn't a PTI meeting or anything like that, or a UL meeting.

Q.    And you remember there was a meeting in 1999?

A.    That's the one I was talking about, 1999.

Q.    And at that meeting, representatives of PTI stated that they would do nothing other than --

          MR. APPEL:  Objection, your Honor.

          MR. CARPINELLO:  He testified about this yesterday, your Honor.

          THE COURT:  What's the ground for the objection?

          MR. APPEL:  I think, your Honor, what other -- what other people said, it's hearsay.

          THE COURT:  Sustained.

          MR. CARPINELLO:  Your Honor, he testified about this meeting yesterday.  He expressed to have knowledge about the

meeting.  He testified --

THE COURT:  You can ask him about his testimony yesterday about that meeting.

MR. CARPINELLO:  All right.

BY MR. CARPINELLO:

Q.   You testified, yesterday, did you not that there was a meeting in 1999 and that one of the things that the Power Tool Institute was going to do was to make a safety video?  Do you recall that?

A.   I do.

Q.   But, in fact, sir, that was the only thing that the Power Tool Institute was willing to do in 1999; isn't that true?

A.   I don't think you can characterize it as the only thing. We have also -- because the UL at the same time has requested the data from CPSC, so we were waiting on what data the UL is going to get and are they going to distribute that data to us. So there were other things happening, but in the actual hard working and doing designing or doing that video, video was the product of our work.

Q.   Wasn't it PTI's position, sir, of which you were a member, a representative, that the PTI would do nothing with regard to table saw safety other than to make a video?

A.   A video is the only thing that we done, but I don't think we said that we're not going to do nothing.  I -- I don't remember ever seeing or definitely I never had that

understanding.

(Pause.)

Q.   Does this refresh your recollection, sir, of the position that PTI took with regard to what it would do or not do?

(Pause.)

A.   This appears to be a log of meeting between CPSC and the UL.

Q.   And is it not a fact, sir, that PTI told UL that they believed that their guards were the best available guards and they would do nothing to change them, except to create a video, sir?

A.   I'm trying to find where it says we are not going to do nothing.

Q.   Well, look at the second page, sir.

A.   Yes.

Q.   Where it says, does it not, "PTI believes the current spreader guard is the best possible guard for most through-cuts.  Education is the only way to effect the injury hazard pattern seen.  Education, not redesigning the guard, needed to convince the operators to use the blade guard."

And that was PTI's position, sir, was it not, that education was the only way to reduce table saw accidents, not to redesign the guard?

A.   I was unable to follow you, but, yes, PTI has told the CPSC that we are going to focus on the education.  I believe I

testified to that yesterday, where we said in order to change the mindset of the operator to use the guard, to give it a chance, you need to start educational program.

Q.   And they say that's the only way, that's their words, the only way to effect the injury hazard pattern seen?

A.   That's the only way to do that for those guarding systems. If you want to redesign and change the philosophy of the guarding, that is something that was brought up later, but we needed the participation of the UL and a change in the standard.

But with that guarding system, as it is, you need to educate the users how to use it.

Q.   Well, you talk about UL changing the standards.  Sir, you changed the standard, didn't you, sir?

A.   No.

Q.   You and the other manufacturers changed the standard?

A.   Absolutely not.  It was changed by the STP membership. And STP membership is an equal participation of industry members, academia, and interested parties.  So the UL by its ANSI rules cannot have a committee, like STP committee, that would be dominated by any one of the groups.  It has to be an even distribution.  I am the one who was writing the proposals, if that's what you mean.  To that I plead guilty, yes.

Q.   Equal distribution, sir.  Isn't it a fact that the vast majority of members of the committee were, in fact,

manufacturers' representatives?  The overwhelming majority, something like 10 out of 13, were representatives of manufacturers, sir?

A.   Well, sir, you are mixing apples and oranges.

Q.   Is that a fact, sir, or is that not a fact?

A.   No, it is not, sir, if you let me finish.  STP members are the one and only one who can approve the standard.  The committee, the ad hoc committee, that was working on it was comprised of the 13 people.  But STP membership is like 50, 40 to 50 people large, and I'm talking about that STP committee, because ad hoc committee that was working on cannot approve the standard.  They can just make proposal.

The eventual approval of the standard is done by this 40 to 50 body STP membership that has to be equally divided.

Q.   Well, in fact, though, sir, the STP itself had a majority of manufacturers' representatives, did it not, sir?

A.   No, sir.

Q.   Who were the manufacturers' representatives on the STP?

A.   I know I am.  I know Mr. Peot was at the time.  I don't know who is the man now for -- representing Ryobi, whether he still is or is not.  Black & Decker is represented, Makita is represented and -- I cannot name them all.

Q.   And you wrote this new standard, didn't you?

A.   No, sir.  I wrote the draft that was commented on by many people.  In fact, Mr. Gass had pages and pages of comments that

the UL has received, and I'm not the only one who wrote it.
All the comments, whether they come from industry or Mr. Gass
or anybody else, they had to be taken into account and the UL
had to respond to it and there was a common resolution decision
by the UL.

Q.   Didn't you -- when an issue arose as to the approval of a
particular Bosch design, didn't you remind the staff of the UL
that you had written the standard yourself?  So basically,
Don't tell me what the standard says, I wrote it?  Or words to
that effect?

A.   I know the standard very well, if that's what you're
trying to convey to the jury, I know it absolutely very well.

Q.   Not that you know it, you wrote it.

A.   Not all of it.  I wrote the draft, and there were comments
and changes to the draft made.  There were changes made to the
draft based upon the comments received from various people,
including Mr. Gass and including Ms. Caroleene Paul from CPSC.
She made comments.  So there were many comments made and the
draft was changed.

Q.   Now -- and you and Stan Rodriguez wrote the draft that was
approved by the STP.  Stan Rodriguez wrote the draft that was
approved; is that correct?

A.   Stan Rodriguez and myself walked away from that ad hoc
meeting in -- from the RTP park in October of 2001.  We are the
ones who volunteered.  Mr. Gass was there, he could have

volunteered also to write it.  He did not.

Q.   Now, the meeting was actually in November of 2001, correct?

A.   Okay, all right.  I am not too good with dates.  November.

Q.   Okay.  So there's a meeting with CPSC in 1999, at which PTI says, Education is the only way to reduce table saw accidents.  And then in -- we wait two years, and in November of 2001, finally there's a meeting and all of a sudden everybody at the meeting decides we've got to change the design of this guard.  We've got to introduce European riving knives, we've got to change the guard so it has articulating sides.  We've got to make all these steps, correct?  And all that was discussed, all of those ideas were thrown out and discussed in November of 2001, correct?

A.   That is correct, but you are implying that there was nothing happening between 1999 and 2001.  While in that time period we have received or the UL has received the information from the CPSC.  That information has been analyzed, it has been digested, and out of those kinds of information, this enhancement of the knowledge that we have, out of that came these proposal.

Q.   It took you two -- it took you two years, sir, to analyze the data from the CPSC?  It took you two years?

A.   No, but we are not the one who called the meeting.  UL calls the meeting, and they are the ones who called it two

years after the 1999 meeting with CPSC.  It was not our prerogative to call it.

Q.   But it was prerogative, sir, to look at your guard and make some -- and start asking the question that, given the number of accidents that we are seeing and given the fact that 80 percent of professional users don't use guards, maybe we should do something.  That was something that Ryobi and Bosch could have done, couldn't they?

A.   Yes, and I'm sure that Bosch and I'm sure also Ryobi, they were doing their best to improve the safety of the table saws.

Q.   Like what?

A.   Like -- you have to keep in mind it has to be within the constraint of the UL standards.  You cannot change the guard from that design to something that would not comply with the UL standard.  So this is the constraint of having a total protection, a good guard that would be totally shielding the saw blade and having to comply with the language of the UL that says a complete guard shall consist of the hood guard, a spreader, and a kickback pawl.  Within those constraints, you -- there is not a freedom to drastically change the design.

Q.   Isn't it a fact that Ryobi or Bosch could have gone to UL at any time and asked for a significant interpretation in saying we'd like to improve our guard and would you give us approval within the confines of the existing standard?  Isn't that a fact?

A.   You can ask for significant interpretation if there is a minor deviation, or if you are in a time period of where a draft is written and you expect a new standard to be released or a draft is finalized.

To go through a major redesign, I believe Mr. Stimitz has told you that a changes like you are talking about would require a STP evaluation and a consensus among all STP members, and that did not start until 2001.  And STP consensus had to be worked on up to late 2004.

I have told you that there were still many STP members in 2004 that were not convinced that a change in a guarding system is required.

Q.   And you mentioned Mr. Stimitz' testimony.

Didn't Mr. Stimitz -- he's an engineer at UL, correct?

A.   Well, he's more than engineer at UL.  He's the primary designate engineer at UL.  That means he is the top guy for interpreting standards relating to the table saws.

Q.   And didn't Mr. Stimitz testify that what you and Mr. Rodriguez and Mr. Keller from Delta and what all you people did in November of 2001, there was absolutely no reason why you couldn't have done it in 1992, 1995, 1998, 1999, any time that you wanted to go to UL and say this guard is not working, we should change the standard, you could have done it and you didn't do it.  Isn't that what he testified to?

A.   I believe what he testified to was a technological

feasibility does this change require a new technology?  So from technological point of view, there was no prohibition to do that in 1992 or any one of those years you have mentioned.

However, in order to do the change, one needs to have a reason to do the change.  And the reasoning is -- was not there because in 1992 definitely Bosch, and I also believe definitely Ryobi, did not have information about that 80 percent of the professional carpenters are not using the guards.

Q.   Well, that's because they didn't go out and find out, isn't it?  Well, they couldn't -- they didn't have the information because they didn't go out and ask; isn't that true?

A.   Well, you --

Q.   You did a -- sir, isn't it true that Bosch did a survey --

A.   Can I answer the question?

Q.   Isn't it true, sir, that Ryobi never did a survey to go out and find out in 1992 how many people are using guards?

THE WITNESS:  Your Honor, can I answer the first question?

THE COURT:  Yes.

A.   Ryobi nor Bosch did not have any reason to go out in 1992, because their data, Ryobi's data and our data, did not indicate that there is any need for changing.  Accidents are happening with tools, accidents are happening with drills, people drill a

piece of lumber and they drill through their hands.  Accidents are happening with other products.  I could give you many examples.

So having few table saw accidents is not a reason to start investigating that, oh, there is something wrong, we have to sound alarm bells.

Q.    But you would have had an alarm bell if you bothered to check with the CPSC and find out the actual numbers, right?  Which you didn't do and Ryobi didn't do; isn't that correct?

A.    I don't know what kind of information CPSC had in 1992.

Q.    Because you didn't ask?

A.    In 1992 we just started to make the first production model, model 3400, in a scale.  I told you that in late '80s we made a small table saw for a couple of years, then we abandoned it; we were out of the table saw market.

In 1992 we just started talking about, Well, should we go into the table saw business again?  And that was the time when we talked to the manufacturing time of.

So why would I be doing this in 1992?

Q.    What about Ryobi, why didn't they do it in '95 or '97 or '98 or '99?

A.    It is my understanding that Ryobi also had very few table saws in those days.  They had a BTS 3000, they had a model 3000 --

Q.    When was that put on the market, sir?

A.    I believe Mr. Peot worked on the development in late '80s, 1989.

Q.    So they had a table saw on the market in --

A.    They had a table saw, but they did not have, to my knowledge, any information that, oh, my God, there are people cutting their fingers off right and left and we have to do something.

Q.    Because they didn't ask?  Is it your testimony -- is it your testimony that the Consumer Product Safety Commission was not collecting data on the number of people who had finger amputations in the 1980s and the 1990s?  Is that your testimony?

A.    No, sir.  I never --

Q.    In fact, they were, were they not?

A.    May I finish?  I don't know in what time period they started doing these statistics and how frequently they were issuing reports.  I do not know about that from '80s and early '90s.

Q.    Were you here, sir -- you were not here, sir, but did you read the transcript of Mr. Peot where he gave an explanation of some of the reasons why the joint venture was created?  Do you recall that testimony?

A.    You mean here in the courtroom?

Q.    Yes.  Did you read his testimony?

A.    I have read portion -- I mean --

Q.   Did you read the part where he said one of the reasons was to avoid paying a royalty fee to Dr. Gass?

A.   No, I don't remember that.

Q.   Let me refresh your recollection.

"Q.   Now, wasn't the discussion at the meeting, sir, how we as industry members develop something like SawStop but not have to pay a royalty fee to Dr. Gass?  Isn't that what that is a reference to, sir?

"A.   I'm sure that was discussed, but, you know, that wasn't the only thing."

And further on:  "Q.   The joint venture was created to find an alternative technology so that industry did not have to use Mr. Gass' technology, correct?

"A.   That's probably one of the reasons, correct.

"Q.   Okay.  And if they came up with a technology, that didn't use Dr. Gass' technology they wouldn't have to pay him a royalty fee, correct?

"A.   That would be a correct statement.

"Q.   All right.  And you said it was surprising to you that all these people would -- all these industry members would get together and suggest this?

"A.   Correct.

"Q.   That was completely unprecedented, wasn't it?

"A.   Yes, it was."

You didn't read that testimony?

A.    Portions of it I have read.  I did not recall about --

Q.    Did you read his testimony where he said one of the reasons they got the JV together was to make sure that all the manufacturers worked in lockstep so that nobody got ahead of the others and introduced the technology, therefore -- thereby creating product liability problems for everybody else?  Do you recall that testimony?

A.    No, I don't think you read it, nothing about lockstep or anything --

Q.    Let me read that --

THE COURT:  Let me see counsel at sidebar.

(At sidebar on the record.)

THE COURT:  Counsel, this cross that was to take an hour has now been an hour -- over an hour and a quarter.  We are running up against a hard end of this case.

How much longer are you going to be --

MR. CARPINELLO:  Fifteen or 20 minutes, your Honor.

THE COURT:  Well, then you're not going to have a rebuttal case.  You choose.  Because this case is going to be completed -- the testimony is going to be completed before noon.  We're going to have the break -- we're going to have a break, and the case is going to be completed by noon.  You either get more time with this guy or a rebuttal case, you don't get both.  That's it -- no.

MR. CARPINELLO:  Do I --

THE COURT:  Let's go.

(End of discussion at sidebar.)

(Discussion off the record.)

BY MR. CARPINELLO:

Q.   Let me refresh your recollection about Mr. Peot's testimony.

"Now, isn't it true, sir, that the manufacturers got together and decided that they would take this unprecedented step specifically because they were concerned that if one manufacturer adopted SawStop and the other manufacturers didn't, that they would be subject to potential liability for not adopting something that was shown to be feasible because one manufacturer put it out on the market?  Wasn't that their concern?

"A.   That was one of their concerns, yes."

Do you recall that testimony?

A.   Yes, that was one of the concerns.  It was not the only concern or that there were no other concerns.

Q.   All right.  Now, it's a fact, is it not, that there was discussion in October 2001, right before that November meeting with UL, about SawStop and the fact that Stephen Gass had gotten an award from the Consumer Product Safety Commission?  Do you recall that?

A.   Which meeting are you referring to?

Q.   Meeting of the Power Tool Institute in Savannah, Georgia

in October of 2001.

A.    Okay.  In Savannah, Georgia was the board meeting, which is the meeting of the heads of the corporations.  At that meeting, SawStop issues and any other issues affecting the industry has been discussed, yes.

Q.    And there was a discussion in 2001 about creating a joint venture as I examined Mr. Peot about, right?  There was a discussion about creating a joint venture, getting the manufacturers together to look at flesh-detection technology?

A.    I don't recall that to be 2001.  My memory says that that discussion has been held in 2002 and that it was executed in 2003.  Maybe the discussion started earlier, I don't know.

Q.    Well, let me show you some minutes from 2002, sir.

      You're chair of the Product Liability Coordinators Committee, correct?

A.    That's correct.

Q.    And the meetings are -- minutes are prepared of the meetings?

A.    No, minutes are prepared after the meeting.

Q.    Of the meeting.

A.    Of the meeting, yes.

Q.    And Susan Young does those, correct?

A.    Susan Young does those based upon the notes from what she has and also notes from the members of the committee.  Mostly myself.

Q.   And you approved -- you reviewed them and the committee also reviews them and approves the minutes, correct?

A.   The committee reviews the minutes and approves them on the next meeting.  So we have a meeting, Susan sends out the document after the meeting, and then on the next meeting -- the meetings are happening every six months -- on the next meeting there is a vote to approve that or change it.  So it -- I believe it has been approved.

Q.   And you recall that there was a meeting in Philadelphia in September of 2002 of your product liability committee?

A.   Frankly, no, I don't remember, but --

Q.   Let me fresh --

A.   We had a meeting in Philadelphia, yes.  I don't remember what year it was.

Q.   Let me refresh your recollection.

A.   Okay.

Q.   Does that refresh your recollection there was a meeting in September of 2002 of your committee?

A.   Yes, it says Philadelphia and September 2002.

Q.   And there was a discussion at that meeting, sir, was there not, about the fact that Stephen Gass had illustrated -- had demonstrated a SawStop saw at the woodworkers' convention and that it was anticipated that he was about to come out with a contractor's saw?  Do you see that on page -- these are unnumbered, but on the fourth page in?

A.    The paragraph calling "Items of Interest" title, "Items of Interest" and then subparagraph saw.

Q.    "SawStop"?

A.    "SawStop," yes.

Q.    Do you see that?

A.    Yes, I see that paragraph, yes.

Q.    And the action decision that was made at that meeting was to -- for engineering to clarify the stance on the joint research project because liability exposure has intensified based on the product introduction at IWF, which is international woodworkers?

A.    Yeah, there were concerns, liability concerns, about any product; and, of course, we discuss liability.  Coordinators meeting we're discussing liability concerns relevant to grinders, relevant to miter saw, drills, portable circular saws.  So this was in reference to SawStop and table saws.

Q.    But this is in specific reference to the joint venture and the fact that the stance needed to be clarified as to this joint venture because liability exposure has increased -- I'm sorry -- intensified -- is that increased -- mine is increased based upon the product introduction at IWF.  Correct?

A.    I'm agreeing with you.  We had discussions about the SawStop.

Q.    Right.

A.    And I believe it was the engineering committee or the --

it wasn't the executives who -- they have to approve of the JV.
There was a discussion that can some of this project be done in
a joint format?  So I think that's why there is a reference
here to the JV.  But at that point, nothing was approved.

Q.   Now, the discussion is begun with the statement, "SawStop,
the now semi-annual discussion, was revisited with vigor.
Members discussed the IWF show in Atlanta where the latest
offering of the technology was something in a large stationary
saw, table saw."  Do you see that?

A.   I read it with you, yes.

Q.   Okay.

A.   What's the question?

Q.   Do you see that?

A.   I said yes.

Q.   Now, I'm going to show you, sir, another copy of those
minutes.  Just compare them -- just turn the front page, if you
would, sir.

A.   Okay.

Q.   Those are also minutes of the September 2002 meeting,
aren't they?

A.   Yes, they appear to be, yes.

Q.   And it lists the same people and it has the same start
time, right?

A.   Okay.

Q.   Now, I want you to turn to the same page, sir, with the

same heading, "Items of Interest" and "SawStop."  Do you see that, sir?

A.   I do.

Q.   And I want you to read the action line at the bottom of that paragraph, sir, in those minutes.

A.   "Action - engineering to clarify stance on a joint research project."

Q.   And --

A.   "Engineering" means the engineering committee.

Q.   Right.  And the words, "because liability exposure has increased based on the product's introduction at IWF" --

A.   Where are you?

Q.   I'm on the first version of the minutes, sir.

A.   I don't believe there is first version or second version. What are you -- this is document that something has been redacted by lawyers.

Q.   Well, not redacted, sir.  Does it say "redacted"?  It doesn't say "redacted," does it?

A.   I am saying this is a document that has a bunch of paragraphs redacted.

Q.   Right.  That's marked "redacted" with the lawyer's redacted material?

A.   And where are you reading from now?

Q.   Right here, sir.  Those words, "because liability exposure has increased based on the product's introduction at IWF" do

not appear in those minutes, do they?

A.    They don't.

Q.    Do you have an explanation for that?

A.    The only explanation that I can have is that this is probably the draft that has to be approved by Mr. Art Herald, who is the attorney for the PTI, and he is usually the one who is redacting or changing the paragraphs.

Q.    He's the one that sanitized the minutes, taking statements out about concern about product liability; is that correct?

A.    I'm speculating, I don't know.

Q.    Did you know that he had changed the minutes, sir, when you reviewed them and then they came out?

A.    No, I did not know.  I did not even know that there was, you know -- the version that probably I seen and the version that we've been approving is the final version.  So whichever one of these is the time, that's the one that would be approved.

Q.    That's the one that was sanitized by Mr. Herald, where those words were taken out?

A.    I don't know if sanitizing is appropriate, but -- and I don't know which one is the final one.  I don't know, you can say which is the final one.

Q.    Okay.  Well, the one where the words are taken out has a tag line at the end, doesn't it?  Look at the very last page.  Look at the very -- do you have the very last page?

A.    Of which document?

Q.    The one that's -- the second one I gave you, sir, the clearer one.

A.    Okay.  Yes, sir.

Q.    It says, "These minutes were reviewed by legal counsel prior to distribution."  Doesn't it?

A.    On the very last -- yes.

Q.    And those don't appear on the earlier version, do they?

A.    I don't know because that page is all redacted so I don't know what was appearing on that page.

Q.    Let's talk about wet wood for just a minute, sir.

One of the concerns that Bosch had with regard to the SawStop flesh-detection technology that was that it could false trip when cutting wet wood, correct?

A.    That's correct.

Q.    Okay.  And that would not be an issue with regard to the wood that a flooring contractor would be exposed to, like Mr. Osorio, would it?

A.    That's correct.

Q.    And you testified that there is a bypass, correct, sir?  That if the user is -- knows that he or she is using wet wood, that there's a bypass?

A.    Yes, sir.

Q.    And how long does it take, sir, for the user to press the button and turn the key to invoke the bypass?

7-68

A.    I believe two to three seconds.  I know -- I don't remember exactly the language, but the instruction tell you you have to turn the key, hold it, then you have to pull the switch while holding the key and you have to hold it some time thereafter.  So a few seconds.

Q.    And isn't it a fact, sir, that PTI recommends that users not cut wet wood on a table saw at all?

A.    That's correct.

Q.    Now, sir, yesterday you testified that if SawStop had been on the subject saw, Mr. Osorio's injuries would have been -- I think you testified only a few millimeters deep.  Do you recall that, sir?

A.    Most likely -- I don't recall exactly the words, but that -- that is my opinion, that it would be few millimeters deep.

Q.    Okay.  I want you to show to the jury, sir, if you could -- may I have permission, your Honor?

THE COURT:  Yes.

BY MR. CARPINELLO:

Q.    Would you please -- using this ruler, would you please show to the jury how deep two millimeters is?  Would you please show that to the jury?

THE COURT:  You want him to approach the jury?  He doesn't need to do that.  Two millimeters can be shown to the jury.

BY MR. CARPINELLO:

Q.   Using this ruler, sir, can you show the jury where two millimeters is?

A.   You know where two millimeters.

Q.   Well, I know, but maybe they don't, sir.  Would you please show the jury where two millimeters is?

A.   It's the second mark.

Q.   This is the scale?

A.   The upper scale.

Q.   And it's the second mark on this ruler?

A.   The second mark is the second millimeter, yes.

MR. CARPINELLO:  May I show it to the jury.

THE COURT:  No, my deputy can show it to the jury?

MR. CARPINELLO:  Thank you.

BY MR. CARPINELLO:

Q.   If it says "Wescott," you have to turn it upside down, right?  You have to get that scale.

A.   I believe most people can distinguish between millimeters and inches.

MR. CARPINELLO:  And it's the second mark.

THE COURT:  You can leave the ruler to pass around.

(Pause.)

THE COURT:  You can continue.

BY MR. CARPINELLO:

Q.   Do you know the extent of the injuries Mr. Osorio actually

suffered, sir?

A.   Yes, I believe he had amputation of a couple of fingers and lacerations of other two.

        MR. CARPINELLO:  Could you show the demonstrative, please?

Q.   That's a picture of the actual injury, isn't it, Mr. Domeny?

A.   No, I believe the injury that you see mostly on the hand, that's a result of the surgery, not the result of the laceration.

Q.   Well, we don't have a picture from the scene, sir, but that's a picture of the extent of his injuries after his second operation, isn't it?

A.   The extent of the -- it's the cut that was created by the laceration, to my knowledge the injury is to the palm side of the fingers, which is, unfortunately, covered because these fingers are like that.  So we don't see the injury from the saw blade.

        MR. CARPINELLO:  No further questions, your Honor.

        THE COURT:  Redirect examination.

        MR. APPEL:  Your Honor, would this be a good time to take the morning break?

        THE COURT:  No, we'll go forward.

        MR. APPEL:  Okay.

                         REDIRECT EXAMINATION

BY MR. APPEL:

Q.    Mr. Domeny, yesterday you were questioned about a document, it was a hazard analysis?

A.    Yes, sir.

Q.    And you were questioned about a whole bunch of numbers, relative numbers that you used?

A.    I remember that, yes.

Q.    And would you explain to the jury, again, what those numbers represented?

A.    Those numbers are what we call an index, index that is used for comparative purposes, to compare relative safety or relative danger of one design compared to the other design. And the numbers are being generated based upon an expression of injury, which in this case, was the depth of the cut expressed in millimeters.

So that is something that we have measured from particular tests and the frequency of that occurrence of how that injury happens under those conditions.

Frequency of the accident comes from our data and from the CPSC data. And when you take the frequency multiplied by the magnitude of the injury, you come up with a risk or a relative danger.

You sum up all the dangers for all particular ways how the accidents happen and you come up with an index of risk or index of relative danger. And when you compare that index

number of one design to the other design, you can conclude which design prevails.

But in no way these numbers are in linear fashion where one can say that the injury or the product overall is X number of times safer or less safe just by comparing the numbers. Because we don't know that a two-millimeter injury on this side of the thumb results in the same disability as a two-millimeter injury on the wrist or someplace else.

You cannot talk about these numbers as a measure of safety and how much harm they're going to do to the operator.

Q.   And let me --

MR. APPEL:   Could you put that document up and --

Q.   And did you actually say that in a document, although Mr. Carpinello didn't show that on the second line?

A.   Yes, it's above the table, the paragraph number 2. It's explicitly stating that this table does not express the injury severity in any absolute terms such as probable PPM, which stands for parts per million, or any other means.

So what I am trying to communicate here, especially to -- when I was showing this to the executive in Bosch organization, that not to use these numbers in any manner similar as what Mr. Carpinello was trying to do.

Q.   Now, after you did this hazard analysis, did you make a recommendation to your company to investigate this technology further?

A.    Yes, I have.

Q.    And why did you do that?

A.    Because I was interested throughout my life in improving the safety of various table saws.  And, as I have testified here, not just table saws, power tools.  This technology, when it was introduced, has captured my attention.  I mean, it definitely, it was a new way of addressing the safety issues with table saws, and I wanted to see whether there is a better way of utilizing similar technology to eliminate accident rather than mitigated.

My primary concern was in asking for the Guardian Project can we have something like a SawStop but looking at it differently, can we have this kind of a technology using the sensor and avoid the accident instead of getting cut and mitigate the magnitude of the injury?  That was my goal when I have asked for the Guardian Project to be approved.

Q.    And did that same philosophy carry forward when you and others, including Ryobi and Mr. Peot, entered into the joint venture?

A.    Well, that philosophy came about only after the project has started, the JV project has started.  If you remember, the first meeting was in Chicago area where six member companies have came forward and they have presented to each other what they have developed.  At that point, we did not know whether somebody else may have invented or followed a better path that

7-74

would be even better and more attractive than the path that Bosch was following. So we did not know what is coming up.

So when the JV was created, there was no preconceived idea that guardian way is going to be what's going to be followed.

And even after that initial meeting, at which point there was agreement that we're going to give all these information to the company called D2M, they have evaluated the approaches of each individual companies, then they have evaluated the technologies at large, is there anything else that these companies may have overlooked? And only after that technology assessment they came to the conclusion that let's utilize a proximity sensor and let's utilize a pyrotechnic drop response mechanism.

Q.    Now, is it fair to say that the work of the joint venture, at least in the beginning, was geared towards trying to develop that proximity sensor?

A.    Absolutely.

Q.    And I think, as you've testified, at some point in time it was found that that was not a feasible way to proceed?

A.    That was -- I don't know if feasible -- feasibility might still be there, but it's technologically was not -- nobody found a solution to it, to that.

Q.    And the joint venture -- the joint venture continued in trying to develop a kind of flesh-detection technology?

A.    Right, for part of the year there was a parallel project between the proximity sensing and the contact sensing, and then all the efforts were geared towards pursuing the contact sensing.

Q.    Now, I think you testified yesterday concerning a saw that could be developed using this kind of technology that might be in the range of 60 to 90 pounds?

A.    I have testified to that, yes.

Q.    And would you explain what you mean there?

A.    Well, one has to keep in mind when these projections are made that what is the basis of it?  And we starting out with an understanding that the JV wanted to develop a technology that could be placed into the midsize transportable table saw.

The very first prototype that the D2M was capable of building weighs 113 pounds.  Remember that 113 pounds does not include the fence and does not include the miter gauge, because they haven't even been built into the prototype.  So when you add those devices on, because that's how the total weight is evaluated, the probable weight is around 120 pounds.

So now starting that we already know that a prototype was developed at 120 pounds, now we are looking that, well, I'm sure that each company can utilize a space -- I'm sorry, not so much space, but a weight-saving technique to reduce the weight. So that's why I was predicting or testifying here that it is anticipated that maybe within a certain range a lighter model,

a lighter table saw, a benchtop table saw can be achieved.

So 90 pounds is probably a fair estimate. Coming down from 120 to 60, that is a stretch, that is like the outermost possibilities that we would reduce the weight down to the half of what our prototype is.

So these are estimates that have to be viewed in that context, that where you starting, you're starting with is 20 and bring it down to 90 is very likely; coming down to 60 is a stretch goal.

Q. And is it fair to say that even this -- this is not -- has this ever been executed in any saw?

A. Absolutely not. As I told you that this is a concept prototype and now to engineer a workable table saw that would have the miter -- that would have a miter gauge slot, that would have a means to attach the fence, because you need the railings to which you put the fence and all that add-on stuff, no, it has not been executed as a workable, producible table saw.

Q. And was that technology at all feasible in 2004?

A. What do you mean, "that technology"?

Q. The technology you're describing.

A. The technology of the JV was absolutely not feasible to be introduced into any working prototype. Absolutely not.

Q. Is there -- and do you know of any technology, including SawStop, that was executable in a benchtop, a gear-driven

benchtop table saw in 2004?

A.   No, and that -- in my opinion, I believe I said it yesterday, that the SawStop, based upon what we knew from our testing in 2001, 2002 time frame, no, absolutely was not introducible for a small, lightweight or for matter of fact for any table saw that is transportable.

Q.   And even today, if such -- if the joint venture could develop and manufacture -- or if individual members could actually take the joint venture concept and manufacture a saw that was in this range of 60 to 90 pounds, is it your opinion that every table saw should have that technology and should conform to that?

A.   I believe I testified yesterday that it is my opinion that the technology like this is not necessary to assure a reasonably safe operating table saw.  There are various products that have a various degrees of safety.  And I don't think anybody expects to have always the top-notch safety performance in every product.  That is physically and economically not achievable.  Because there is always somebody is going to come up with a new widget and does it mean that the whole industry has to change and adapt to this new widget?

Technology like the JV and the SawStop improved the safety, yes.  But the product like the BTS 15 is reasonably safe and it is not built for production and high volume and, you know, fast operations.  It is a small, lightweight table

saw; and if you operate it with all the guarding systems and in accordance with the instruction, it's perfectly safe to do that.  There are probably millions of cuts made on a product like that without accident.

MR. APPEL:  I have no further questions for you.

THE COURT:  Any recross?

MR. CARPINELLO:  Short, your Honor.

THE COURT:  Yes.

RECROSS-EXAMINATION

BY MR. CARPINELLO:

Q.  Isn't it a fact, Mr. Domeny, you testified that the JV was working to develop a saw that was -- used flesh-detection technology that was in the range of 40 to 60 pounds?

A.  I don't remember 40.

Q.  May I draw your attention to your deposition, sir, on December 17, of last year, sir?

A.  Okay.

Q.  Page 195, line 15.

"Q.  Okay.  What is the basis for your conclusion that it would not work in a 40- to 60-pound saw, or have you drawn any conclusion as to whether it would work in a 40- to 60-pound saw?

"A.  No.  My conclusion is that I think it would work. I mean, because, after all, the JV is striving towards achieving that kind of a system that would work in a 40- to

60-pound category.  So I am not at all negative that a SawStop can be executed in a 60-pound category, maybe 60- to 90-pound category, but I think it can be executed in sizes that is much smaller than a 300-pound contractor's saw.  I would expect that to be the case, but it is still unproven.  Just because that is my expectation, that doesn't mean everything is done, you know, it still has to be proven."

Does that refresh your recollection that you said the JV was striving to introduce its flesh-detection technology in a 40 to 60-pound saw, sir?

A.   I don't know if it refreshes my memory.  "Striving" I think is the key word here.  It is not probably realistic. That was maybe something we would strive for, but you don't know if you can achieve.

Q.   Well, after ten years, sir, and all these companies and all these Stanford professors, you still don't know, sir, whether flesh-detection technology is feasible in a 40-pound saw or a 60-pound saw or even a 90-pound saw; is that your testimony to this jury, sir?

A.   No, sir.  My testimony was and in that deposition that a SawStop technology, that's what I referred, to between 60 to 90 pounds.  As far as the sensing technology and the JV technology, that's the one that was reference between 40 to 60, that is something that you may strive for and may achieve depending on how somebody develops it, but I think

realistically it's probably in the same ballpark as the SawStop is.

Q.   How much does the Bosch 4000 cost, sir?

A.   The Bosch 4000, I don't know, currently it's not sold, but back in those days it was like $550.

Q.   And what was the minimum life guarantee?

A.   Well, there is no guarantee for the life.

Q.   What was the --

A.   It had been designed for 400 hours of running time.

Q.   It was designed for 400 hours running time.  And you said it was approximately $500 to $550?

A.   $550, $549 is what --

Q.   So the BTS 15, which retailed for $179 and had a minimum life expectancy of 40 hours, was not such a great bargain, was it?

A.   I believe the documents that I seen, the life expectancy is 80 hours.

Q.   Well, the minimum requirement is 40, is it not?  Was it not, 40, that they had -- that if the machine met 40 hours, it was authorized for sale, correct?

A.   I don't know exactly -- the documents that I have seen required 80 hours of performance.  I believe 40 hours is what the test lab at Ryobi's testing it for, but I don't know if that is the bottom minimum.

Q.   Well, take 80.  It's still no great bargain, is it,

compared to the, for example, your own Bosch 4000.  $179 saw that's expected to last 80 hours, sir?

A.    It is 80 hours of cutting time.

Q.    As compared to --

A.    May I just finish?  I just want to put it into the perspective.  Eighty hours of cutting time, sometimes 3,600 seconds, you can multiply it out, and then an average cutting speed as you're feeding the board would be like six inches per second.  I think I went through that calculation.  If you calculate it out that how many seconds of the running time you have and what kind of a -- how many feet of lumber you can cut, it's tremendous.  I think it comes up to 325 two-by-four eight-feet long -- you could cut 325 eight-foot long boards in that time.  Which homeowner is going to do that?

      So it is a tremendous bargain for any homeowner or any type of the contractor who has occasional need for a table saw.

      That product was never designed for industrial use for a high-volume production.

Q.    But it's not a great bargain --

A.    For people who you want to have it in your home for occasional cutting, it's a marvelous bargain and you never, ever as a homeowner going to reach that kind of cuts.

Q.    Let's talk about cost benefits here.  Let's talk about cost benefit.

      You testified just now that you said, "I've always

been interested in power tool safety."  Do you remember that?

A.    I do.

Q.    But isn't it a fact, sir, that all the manufacturers that are involved in this joint venture made a decision that it would be a whole lot cheaper to pay out product liability claims rather than to put a flesh-detection technology on their saw as quickly as possible?

A.    I don't know where you're getting it from.  No.

Q.    Okay.  You said, sir, that Mr. Appel asked you -- he put the chart on the machine again, and you testified that it wasn't an absolute scale, that it was a relative scale, right?

A.    It's for relative comparison of two designs.

Q.    Right.

A.    You can never use it in absolute terms.  It means you cannot have a duty analysis for a single product, because you don't have anything to compare it to.  You need to develop this index for two competitive models, then you see which one balances out on a positive side.

       If you do that analysis in a singular model for a singular design, you don't have anything to compare it because those numbers are not absolute.

Q.    And you were comparing a saw with SawStop and a saw without SawStop, correct?

A.    A saw --

Q.    Correct, sir?  Yes or no, answer, sir.  Is that what you

7-83

were doing?

A.    Yes, is with the following qualification:  Without a guard.  It means we have assumed that a hundred percent of table saws is not going to have a guard, which they do.

Q.    And I've got it written down here, sir, you said, sir, the purpose of that PowerPoint was -- you said, "I recommended that the company investigate the technology further."

A.    Yes, which they did.

Q.    They did, right?

A.    Yes.

Q.    The Bosch management said, Yes, we will investigate the technology further, correct?

A.    Yes.

Q.    And the Ryobi management said, No.  Didn't they?

A.    They have not given a go-ahead to the project because they had reservations whether that product could meet the certifications or whatever -- whatever they had in mind, I don't know.  The management of the Ryobi, they did not go forward.

Q.    We have no idea what they had in mind because Mr. Dils and Mr. Whiffen and Mr. Bugos didn't give an answer when they were examined on that video screen as to why they said no.  None of them said I don't think we ever made a decision, didn't they?

        MR. APPEL:  Objection, your Honor.

        THE COURT:  Sustained.

BY MR. CARPINELLO:

Q.   In any event, we don't know the answer, do we, Mr. Domeny?

A.   I don't know the reasoning why there was not a go-ahead to that project.

MR. CARPINELLO:  Thank you, sir.

THE COURT:  All right.  We'll take the morning recess here, jurors.  We'll be in recess for 15 minutes.

THE CLERK:  All rise for the jury.

(Jury left the courtroom.)

THE COURT:  Be seated, counsel.  You may step down, Mr. Domeny.

Any further evidence that -- what's the defendants' position?

(Discussion off the record.)

MR. APPEL:  Excuse me for one second, your Honor.

THE COURT:  Yes.

(Discussion off the record.)

MR. APPEL:  I think the defendant is going to rest, your Honor.

THE COURT:  All right.

And then does the plaintiff choose to put on --

MR. CARPINELLO:  No, your Honor.

THE COURT:  So we're not going to have a rebuttal; is that right?

MR. CARPINELLO:  That's correct, your Honor.

THE COURT:  All right.  Then we will have a recess, but then I will let the jury go after they come back.

MR. APPEL:  Your Honor, at this time I would just like to renew my motions.

THE COURT:  Well, okay, we'll do that after we dismiss the jury, but you have to rest in front of the jury, then we'll resume.

THE CLERK:  All rise.

(Recess taken.)

(The jury entered the room at 11:35 a.m.)

THE COURT:  Good morning again, jurors.

Mr. Appel?

MR. APPEL:  The defendant rests, your Honor.

THE COURT:  The defendant rests.  Thank you.

Mr. Carpinello, does the plaintiff have any rebuttal case to offer?

MR. CARPINELLO:  No rebuttal, your Honor.

THE COURT:  Jurors, that means the evidence is complete, and now what we need to do, as I think I mentioned to you yesterday, is have meetings outside of your hearing to get prepared for closing arguments and my charge to you on the law.

So I am going to dismiss you for the day and ask you to come back tomorrow morning, at which time you will hear closing arguments of both sides and then my charge to you on the law, and after that the case will be submitted to you for

your consideration.  I don't know exactly when that will be, but I estimate it will be about noon tomorrow that the case will be submitted to you for your deliberation.

Now that all the evidence is complete, take my last instructions about not talking and multiply it by about five, and that's what I want you to do.  It would be entirely inappropriate for you to talk to somebody after you've heard all of the evidence but you haven't heard closing arguments, and you haven't heard my instructions on the law.  And what somebody says about an opinion about some other case would be entirely improper for you to consider.  So I please -- I ask you fervently not to do that, to come back refreshed and ready to go back to work.  And we'll see you all at 9 a.m. tomorrow morning.  Please leave your notebooks in the jury room.

(The jury was excused at 11:38 a.m.)

THE COURT:  Be seated, counsel.  Mr. Appel wanted to be recognized.

MR. APPEL:  I did, your Honor.  Thank you.  I do want to renew the motions with respect to directed verdict. Actually, not directed but a JN -- just a --

THE COURT:  Judgment as a matter of law?

MR. APPEL:  Yes, as a matter of law.  Thank you, your Honor.  I hope it isn't a JNOV.  Both with respect to the main case against the manufacturers and with respect to Home Depot.

THE COURT:  Do you wish to address further with

specifics toward the Home Depot motion?

MR. APPEL:  Your Honor, if I may, you asked for the additional cases, and if I could -- I have to just consult with one of my associates -- or, actually, my partner, I think, went back to do a little bit of research on that.  And if I could, if I could address that at a little bit later time?

THE COURT:  We're going to have a charge conference in about half an hour.  I have afternoon business that I need to attend to, but I am going to have this charge conference as soon after 12 as possible.  Right now I think it will be about 10 past 12.  We'll address it at that stage unless you wish to further argue it orally in any manner.

MR. APPEL:  Your Honor, if I may, because your Honor specifically asked for those cases.

THE COURT:  Mr. Carpinello, anything for your side?

MR. CARPINELLO:  Your Honor, are you asking for oral argument now?

THE COURT:  If the defendant is going to reserve his oral argument, you can obviously reserve your response.  If you want to give me something in advance, that's okay, too.

MR. CARPINELLO:  I will reserve then and respond to his argument when I hear it.  But I would also like to submit our brief in response to the motion, which was electronically filed last night.

THE COURT:  We have received it now, but I haven't had

a chance to read it yet, so you don't need to give me another copy.

Anything else, then?  Then what we're going to do is recess for half an hour.  Let's call it 10 past 12 we'll reconvene for the charge conference.

Anything else that I need to know about before that? If not, I'll see you at 10 past 12.

(Recess taken at 11:40 a.m.)

(The Court entered the room at 12:10 p.m.)

THE COURT:  Good afternoon, counsel.  We're here on our charge conference, but I do want to hear first brief oral argument from the defendant with respect to its motion for a judgment as a matter of law and particularly with respect to the Home Depot negligence count.

I take it, Mr. Appel, that the motion does not relate to the breach of warranty count against Home Depot, is that correct?

MR. APPEL:  That's correct, your Honor.

THE COURT:  So then with respect to the negligence claim against Home Depot, who is going to address --

MR. APPEL:  Mr. Agudelo, who does have an appearance in the case.

THE COURT:  Mr. Agudelo, yes.

MR. APPEL:  Yes, your Honor.  You had asked before we started today about certain cites in the brief.  I can get to

that.  But the first point is there's absolutely no evidence that the subject saw was sold by Home Depot in this case.  The only evidence at all really involving Home Depot was the receipt that they put into evidence.  The receipt shows that a table saw was sold on some day by Home Depot.  There's never been anyone to link the sale from that receipt to this subject saw.  So the first argument is is that there's absolutely no showing that the subject saw was sold by Home Depot.

THE COURT:  I just asked Mr. Appel if the motion related to the claim for breach of warranty.  If Home Depot didn't sell the saw, why are they liable or why could they be liable under a breach of warranty theory?

MR. AGUDELO:  Your Honor, there's actually two separate motions for judgment as a matter of law.  I think Mr. Appel was thinking you're only addressing the one that related to the negligence aspect.  But there is the one that was filed separately by Home Depot that says:  1), there's no evidence of the sale; and 2), even if you find some evidence of the sale, there's no evidence of negligence.

THE COURT:  Go ahead.  I'll hear briefly on that argument, but I want the other one as well.

MR. APPEL:  I'm sorry, your Honor.  With respect to that, that's true.  If there's no evidence of sale, there's no liability on Home Depot with respect to negligence or breach of warranty.

THE COURT:  Go ahead, Mr. Agudelo.

MR. AGUDELO:  Your Honor, the law in Massachusetts is clear that when you're trying to hold a seller responsible for negligence, the only circumstances you can do this under -- and this is shown by the plaintiff's own proposed jury instruction -- is if the seller has knowledge that there is some particular dangerous condition of a product and it believes that the purchaser is not aware of it, then it has a duty of notice to that purchaser that there's some defect.

THE COURT:  What case law do you cite as opposed to a brief?

MR. AGUDELO:  Your Honor, the Farley vs. Edward case, 271 Mass. 230, 171 Northeast 639.

THE COURT:  Which is what year?

MR. AGUDELO:  In 1930.  That case sets forth -- it says, "It is settled that a person who sells an article which he knows is inherently dangerous to human life, limb or health, to another person who has no knowledge of its true character and fails to give notice thereof to the purchaser is liable."  And this is part of the standard jury instruction in the Massachusetts cases and, as I said, is what the plaintiffs have proposed as well.

THE COURT:  All right.  Thank you.  Mr. Carpinello, in response to that argument?

MR. CARPINELLO:  Very briefly, your Honor.  First of

7-91

all, with regard to whether the saw was sold by Home Depot, we have a concession on the record by Mr. Appel in court to the effect that Home Depot was the retailer of the product, in court, at the beginning of the week, and I cite it in my brief. It's the February 4th transcript at 24:7-8.

THE COURT:  He said what?

MR. CARPINELLO:  Home Depot was the retailer of this product.  Given that, I don't think there's a factual issue to be tried.

Also, in their interrogatory answers, they said, "Defendant does not know the exact date when the subject saw arrived at Home Depot USA."  I think the implication to that is that the saw arrived at Home Depot USA.

THE COURT:  What about the negligence count?

MR. CARPINELLO:  The standard, at least as of today, maybe not in 1938, is that a retailer is required to exercise reasonable care, not to provide a product which it knew or had reason to know was dangerous for its intended use.

Home Depot had notice that the saws -- of the SawStop technology for table saws -- and Mr. Light testified to that -- in 2000, and continued to sell the saws despite his notice of what we claim was a defect.  That's obviously for the jury to decide.  And his response was, I let it go -- I told my manufacturers about it and relied upon them to deal with it. Well, they're certainly entitled to do that, but the duty is on

them.

They were on notice, and they chose to not do anything about it despite the fact that they were on notice. That's enough for it to go to the jury, for the jury to conclude that they had notice of the defect and sold it with notice of the defect and chose to rely upon the expertise of their manufacturers, which, of course, they're entitled to do, but that doesn't absolve them of legal liability.

THE COURT: Mr. Agudelo, final word.

MR. AGUDELO: Your Honor, if anything, all it shows is that they had notice that there was a technology out there called SawStop. It doesn't show that they had notice of any defect of the saws they were selling.

And, secondly, your Honor, when you're looking at design defect cases, the law says you look at it as of the time the product leaves the manufacturer's hand. You don't look at it as to -- you know, what did the retailer then do about the design defect?

The evidence in this case is Home Depot had absolutely no role in the design of the case. That's the evidence. So there's no basis. Even if they can say, okay, there is some duty out there, there's no basis to find that there was any breach by Home Depot.

THE COURT: The Court has heard enough, and the Court is going to allow the defendants' motion for directed verdict

with respect to the negligence count only, not with respect to the breach of warranty count, because the Court, although the evidence is sparse, believes that a jury could find that Home Depot sold this particular saw.

So the fact that it sold or that there's evidence that it sold the saw means that the breach of warranty count will go to the jury, but I do not believe the law in Massachusetts, either in 1930 or today, is such that the Home Depot had a duty or a liability to forewarn any potential user about the lack of SawStop on its particular saws.

So we're going to now proceed to the charge conference portion of this proceeding, and my deputy will pass out a form -- a verdict form that I have drafted. And before the end of these proceedings, I will take questions and/or comments about it. You will notice that it does not include, in the negligence counts, claims against Home Depot, but it does include Home Depot with respect to the warranty counts.

What I'm going to do now is to go over the proposed questions of the parties for instructions to the jury. We'll start with the plaintiff's requested jury instructions. We'll then go to their supplemental jury instructions, after which I will call on comments from both plaintiff's counsel and defendants' counsel as to my proposed rulings on their requests. Then we'll do the same thing for the defendants' requests and supplemental requests. It's just a single

request.

When I say in these proceedings that I am intending to give the "substance" of an instruction, it means just that. It does not mean that I will give it verbatim or that I will give it in several different ways. Sometimes -- I understand why counsel does that. They give me alternatives. And what it means is that I'm going to give at least one alternative but not necessarily all of them.

Therefore, starting through the proposed requests, Instruction -- it starts with -- I guess it does start with No. 1, burden of proof. I will give the substance of that, of course. Request No. 2, negligence, yes, I will give the substance of that one; and of the elements of negligence, which is No. 3, the substance.

With respect to duty, manufacturer, Instruction No. 4 on Page 4, I will give the substance of that request with the exception of the last sentence, which says, "A product contains a manufacturing defect when the product departs from its intended design." I'm not going to say that. We're not talking here about manufacturing defects. So that part of the instruction I will not give.

Going on to No. 5, I will give the substance of that instruction. And going on to No. 6, I will give the substance of the duty, design and enhanced injuries request. I will give the substance of the next one, No. 7; and of No. 8, with --

actually, on No. 8, I will give the substance of the first two sentences and the last sentence but not of the third and fourth; that is, "A defendant cannot relieve itself from liability by proving the" -- I believe that's "careless practices of others.  There are some precautions which are so imperative that even their universal disregard will not excuse their omission."  I do not say that, but I say the substance of the other three sentences of that request.

Then with respect to state of art, No. 9, I give the substance of that.  With respect to No. 10, causation, I do give the substance of most of it, but I'm not going to give the substance of the second paragraph, which I believe is repetitive of the first.  Nor do I give the fourth paragraph, which is, "But if you find that defendants' negligence could reasonably have contributed to the result, then you are to find for the plaintiff."  I did not say that, nor will I instruct on that.  And then where it says "contributing factor" in the fifth paragraph, I use "substantial" instead of "contributing."

Going on over to the top of the next page, the same instruction, I do not say that first sentence, "A result is foreseeable if it is not highly extraordinary."  I don't say that.  I give the substance of the remaining -- the remainder of that request.

Turning over to foreseeability, No. 11, I give the substance of that; and on causation, enhanced injuries, I give

the substance of the first paragraph; but the second paragraph, I talk about sort of tangentially but not when I'm speaking about causation, so it doesn't come there with respect to the adoption of SawStop technology.  So I give the substance of the request, the first paragraph, however.

Then of comparative negligence, I give the substance of that request except for the last sentence, which says, "Any negligence of the plaintiff does not reduce its recovery under the implied warranty theory except as I shall specifically instruct you later."  No, I don't give that there.  I talk about implied warranty at a later point, not with respect to comparative negligence.

Then with respect to the next one, breach of warranty, I give the substance of that one.  And the substance of the elements, No. 15, with the exception of the last sentence of the third paragraph that says, "There is no question that One World and Ryobi manufactured the saw and that it was sold by Home Depot."  That is, in fact, true, but I don't say it there or anyplace else, I guess, the substance of it.

Then turning over to design defect, I give the substance of No. 16 requested by the plaintiff.  And with respect to inadequate guarding, No. 17, I give the substance of that except for the last sentence, which says, "A manufacturer can be found liable for breach of implied warranty if it was reasonably foreseeable that the guard or other safety device

would be removed."  I don't say that.

I give the substance of the foreseeable use instruction, No. 18; and the substance of the defect causation, No. 19, with the exception that, in the third paragraph, where the plaintiff suggests that I say, "The defect was the legal cause of the plaintiff's injury if it contributed to bringing about or enhancing plaintiff's injuries."  I say it, "The defect was the legal cause of the plaintiff's injury if it was a substantial factor in bringing about or enhancing plaintiff's injuries."

And then, further, I don't define "substantial" as -- in the next paragraph, you say, "Substantial, as used here, has the same meaning as I gave it previously when I charged you on negligence theory."  Maybe that's true, but, of course, the plaintiff has asked me to use "contributed," not "substantial."  So I'm not clear what that was requesting.  But I don't give it there in any event.

Going on to No. 20, damages, I do give the substance of that request, but I don't -- except for the last couple of sentences in that second paragraph, starting, "It is sufficient if the extent of the damages is shown by just and reasonable inference even if the result is approximate."  I don't say that.  My general damages instructions don't say that.

"The wrongdoing is not entitled to complain that the damages for which it is responsible cannot be measured with

mathematical precision." I say roughly that. "Parties should not profit by and speculate on the value of injuries caused by their wrongs." No, I don't say that. But, otherwise, I do say -- give the substance of the damage request.

Going over to the next page, pain and suffering, I say it a little bit down there -- the fourth paragraph of the pain and suffering section. I don't say you "should" take into account. I say you "may" take into account past, present and probable future mental suffering. But other than that, the substance.

Then over onto the next page, medical expenses, yes, I do give the substance of the rest of that damages request.

And that completes the plaintiff's requested instructions, first time around. And then the plaintiff's requests for supplemental instructions, No. 1, the comparative negligence, I do give the substance of Request No. 1, but I don't give the substance of No. 2. It is duplicative. And I don't use the term "social acceptability of the design." So I don't give the substance of No. 2.

Number 3, I will say, as requested in the original requests, that passing reference to future pain and suffering, so on, but I don't say it this way. So I would say I give the substance of the way you asked for it the first time around but not the way that you asked for it the second time around.

Nor am I going to give an absent witness instruction.

I don't believe it's warranted.  With respect to unreasonable use defense, I will give the substance of that one.

Going over to the next page, however, I don't give the substance of the paragraph about two-thirds of the way down the page.  It starts, "In order to avail itself of this defense, a defendant must demonstrate that the plaintiff subjectively knew that the product was defective and dangerous and that despite that subjective belief the plaintiff's use of the product was objectively unreasonable and that the plaintiff's conduct was the cause of the injury."  I don't say that.  That does not come from the model instruction, and it does seem to me to simply repeat what we've said up higher on that page, in Paragraphs A, B and C, so I don't repeat it.

Then with respect to negligence of a retailer, because I have just directed Home Depot out of the case with respect to negligence, I'm not going to give that one.

I will give the substance of Supplemental Request 7, breach of warranty, including with respect to the retailer, because Home Depot is still in the case for breach of warranty.

And then, finally, expert witness, I will give the substance of that one.

That completes my responses to the requests of the plaintiff.  Any comments, Mr. Carpinello?

MR. CARPINELLO:  Just a couple, your Honor.  First, we do think it's important that there be a definition of

"substantial cause."

THE COURT:  Where are you referring now?  Which requested instruction?

MR. CARPINELLO:  Well, I think it --

THE COURT:  Because the -- where I pointed out, it was -- you said, "as previously charged," and in the previous one you had referred to "contributed" and not "substantial."

MR. CARPINELLO:  Right, right.  And that was, obviously, an error, but -- you said you're going to modify 10.

THE COURT:  Where are we now?  What page?

MR. CARPINELLO:  10, Page 10.

THE COURT:  You mean Instruction 10 on Page 11?

MR. CARPINELLO:  My Instruction 10 begins on Page 10 of my -- of what --

THE COURT:  Mine doesn't.  Your Instruction No. 9 is on Page 10.  Your Instruction No. 10 is on Page 11.  You mean causation, basic definition?

MR. CARPINELLO:  Yes, your Honor.

THE COURT:  The one I have is Page 11.  But go ahead.

MR. CARPINELLO:  I think this did get modified.  Well, it's on Page 10.  In any event, I think we're on the same one. I have it on Page 10, your Honor.

THE COURT:  Okay.

MR. CARPINELLO:  I did -- because we have the case law there that we cited -- cite "contributing."  I understand your

Honor is going to change it to "substantial."

THE COURT:  Yes.

MR. CARPINELLO:  I think, if you are going to change it to "substantial," we'd request the definition of the word "substantial."

THE COURT:  Where do you define that?

MR. CARPINELLO:  I don't.

THE COURT:  You want me to define it?

MR. CARPINELLO:  We'll provide it.  We didn't provide it because we wanted to use "contributing," but we will provide "substantial" based upon the case law.  And the model instructions has the definition of the word "substantial."

THE COURT:  It seems to me that "substantial" is a pretty common term that people understand.  If you want to give me something that you propose, I'll look at it.  I'm not inclined to give it, but I'll look at it.  So the definition of "substantial."

MR. CARPINELLO:  Two issues with regard to unreasonable use, your Honor.

THE COURT:  Give me a page, please.

MR. CARPINELLO:  The supplemental instruction.

THE COURT:  What's the subject matter?

MR. CARPINELLO:  It's the unreasonable use charge, your Honor.

THE COURT:  That's 5 on Page 2?  Maybe over on Page 3

is where I was concentrating.

MR. CARPINELLO:  Starting on Page 2, over to Page 3, your Honor.

THE COURT:  Yes.

MR. CARPINELLO:  The first issue is that we do believe it is important to emphasize that the knowledge is subjective. That is what the case law says.  Even the cases that Mr. Appel cites make it very clear that what the jury has to find is that it's the subjective knowledge of the plaintiff, not any kind of objective standard like knew or had reason to know.  That's why we used the language "subjectively knew," which comes directly out of the Cigna case, your Honor.

We do think that either there or where the A, B and C's are listed above, that is very important that the charge read that he subjectively -- that this person knew of the product's defect and danger.

THE COURT:  All right.  I'll further consider that.

MR. CARPINELLO:  And the other point with regard to the misuse defense is we do not believe that there is evidence in the record to substantiate the misuse defense.  And, again, I'll even reference the case that Mr. Appel cited, the Gillette case.

THE COURT:  Wait a minute.  You say --

MR. CARPINELLO:  In his papers --

THE COURT:  You say there's no evidence, but are you

referring to a request of yours that I'm not going to give or are you arguing a different point of law?

MR. CARPINELLO:  Let me back up, your Honor.  Mr. Appel submitted an unreasonable use defense.

THE COURT:  When we get to Mr. Appel's requests, then I will hear from you.

MR. CARPINELLO:  Well, I'm explaining why we put the unreasonable use defense charge in here, your Honor.  It was in response to Mr. Appel's.  We do not believe --

THE COURT:  And you're going to get it except for the one paragraph, right?  You understand that?  I said I'm going to give the substance of that request except for that one paragraph that I quoted.

MR. CARPINELLO:  Yes.  But we do not believe -- we listed it here.  We listed what we -- what we thought was an unreasonable use defense charge in response to Mr. Appel's unreasonable use defense charge.  We do not believe there is sufficient evidence in the record to give such a charge because there is insufficient evidence that this plaintiff subjectively knew that his use of the saw was an unreasonable use.  There is no such evidence in the record.

Again, referring to the Gillette case, in that case, the defendant argued that there should be a subjective -- I'm sorry.  The defendant argued there should be an unreasonable use charge, and the Court said there is just a modicum of

evidence in the record because there was evidence that the plaintiff there testified that he was aware that he should have used the guard.

There is no such evidence in this case, that Mr. Osorio was on notice as to what defendant considers to be the proper use of the saw.  There's no evidence in the record that he had such subjective knowledge.  He didn't read the manual. He was not given the manual.  He was not given instruction.

There is no evidence in the record that he knew that the way he was operating the saw was improper.  In fact, he testified to exactly the opposite, that he understood that the way he was operating the saw was the proper way to operate the saw.  That evidence is uncontradicted in the record.  So there is no basis for -- under the Gillette case and the cases we have cited, a basis for an unreasonable use defense.

THE COURT:  Anything else?

MR. CARPINELLO:  That's it, your Honor.

THE COURT:  All right.  Going to the defendant, then, with respect to my rulings on the plaintiff's requests.

MR. APPEL:  Just a couple, your Honor.  Number -- Jury Instruction No. 9 on state of the art.

THE COURT:  Wait just a second.  Number 9 on page what?

MR. APPEL:  Well, on my copy, it is on Page 9, your Honor.  It's Jury Instruction No. 9.

THE COURT:  Okay.  For some reason mine is paginated differently.  I have it on 10.  But it's state of the art anyway, right?

MR. APPEL:  Yes.  The first sentence, I think, does accurately reflect Massachusetts law under the Wiska case.  But the second sentence --

THE COURT:  Second sentence in the first paragraph?

MR. APPEL:  Yes, yes, your Honor, where it says, "State of the art also refers to the safest technology developed in a given time."  There is no Massachusetts case or First Circuit case that I'm aware of that uses that law.  And it just serves to confuse the jury because you've just instructed that a saw has to be reasonably safe.

What this refers to is that -- in the restatement there are various definitions of what the state of the art is, and in various jurisdictions there's a different interpretation.  So I think -- again, there is no law in this circuit, nor in Massachusetts, which actually stands for this proposition, on the second sentence.  Again, I just think it's confusing, your Honor.  The rest of it I have no problem with.

THE COURT:  I will look at it again.

MR. APPEL:  The second issue that I have is Instruction No. 13, and the only problem I have there is just the first sentence.

THE COURT:  Let me catch up to you.

MR. APPEL:  Yes.  I'm sorry, your Honor.

THE COURT:  The comparative negligence?

MR. APPEL:  Yes.  The sentence that the plaintiff is presumed to be in the evidence -- in the exercise of due care at the time of his injury.  And I think that kind of an instruction just could mislead the jury that they're supposed to think that he -- even as he approaches and even as he's doing this accident -- or cutting -- doing his cutting process that what he's doing is somehow a presumptive notion of due care.  So I would object to that.  The rest of it, I don't have any problem.

THE COURT:  All right.

MR. APPEL:  The only other issue I had was with the medical expenses.

THE COURT:  Give me a page, please.

MR. APPEL:  That was on, mine, 23.  It was part of the damages instruction.  It says, "Medical expenses."  The third paragraph says something about, "You may also" --

THE COURT:  This is Instruction No. 20, right?

MR. APPEL:  I'm sorry.  Yes, it is.  It's Instruction No. 20, and I believe it's the last page of that.

THE COURT:  You mean "beyond pain and suffering"?

MR. APPEL:  Yes, your Honor.

THE COURT:  Medical expenses?

MR. APPEL:  Yes.

THE COURT:  Page 26 on mine.

MR. APPEL:  It's 23 on mine, your Honor, so -- if you see that heading where it says, "Medical expenses" --

THE COURT:  Yes.

MR. APPEL:  -- the third paragraph down says, "You may also consider and allow the plaintiff a fair reasonable sum for damages that reasonably are to be expected in the future as a result of the accident."  And there's no evidence with respect to any medical expenses in the future, and that's -- that was my issue with that.

That's restated again, you know, in the next paragraph when he says, "Calculating total damages."  This notion of -- on the second line, talks about future medical expenses.  This is the kind of thing when you have the doctor come into court who will say that this plaintiff is going to need this particular surgery, and this surgery will cost X amount of dollars.  That's when this kind of instruction should come in, and there was none of that.

THE COURT:  We had been looking into that, and there is some case law that says -- not with respect to this particular question, but even where expectancy -- life expectancy tables have not been submitted, a court may allow an instruction for expected future medical expenses.

I will look at this particularly -- this particular subparagraph again to see whether that fits into the law that

7-108

I'm aware of with respect to the allowance of an instruction by a court notwithstanding the fact that no -- there was no evidence about life expectancy, as to whether or not the jury can consider future damages.

The law in Massachusetts says that it's up to the court -- it's within my discretion, and I have agreed with the plaintiffs that I would include that one sentence -- I can't remember -- yeah.  I think it's at the top of this same page, that says, "If you find that the plaintiff will suffer for the rest of his life, you may have the right to consider how long he will probably live."  That's -- I've said I will allow the substance of that, not necessarily the exact words.

MR. APPEL:  I have no objection to that, sir.  Your Honor, the issue is, of course, he may have pain and suffering and so forth.  It was just with respect to the medical expenses.

THE COURT:  As opposed to pain and suffering?

MR. APPEL:  Yes.

THE COURT:  I will look at that again.

MR. APPEL:  Yes, your Honor.  Thank you.

THE COURT:  All right.  Then we'll turn to the --

MR. CARPINELLO:  May I have --

THE COURT:  Yes, you may.

MR. CARPINELLO:  With regard to the state-of-the-art language, your Honor, I think comes right out of both the Wiska

and the Haglund case.

THE COURT:  You've got to give me a page number.

MR. CARPINELLO:  It's Jury Instruction 9, my Page 9, probably your Page 10.

THE COURT:  Yes.

MR. CARPINELLO:  And Mr. Appel objected to the second sentence.

THE COURT:  Yes, he did.

MR. CARPINELLO:  Which, of course is in the model civil jury instructions.  And based upon the -- I think the language in the Wiska case and the Haglund case both use that language.  We just checked it on the computer.  I don't have the cases in front of me, but I believe both those cases support the use of that language.

THE COURT:  Wiska and --

MR. CARPINELLO:  And Haglund case.

THE COURT:  Is that cited below?  I don't see it.  You cited Wiska.  But where did you cite Haglund?

MR. CARPINELLO:  I didn't.  I just pulled it up on the computer, Judge.

THE COURT:  I'll look at it.

MR. CARPINELLO:  It's 446 Massachusetts.  I have the jump cite, but I don't have the --

It's not in Haglund, apparently.

THE COURT:  I'm sorry?

MR. CARPINELLO:  It's not in Haglund, I'm told.  It's in Wiska, your Honor.  That was already cited, and that's 7 Mass. Appellate Court 813, 19 --

THE COURT:  I've got the cite.

MR. CARPINELLO:  On the medical, I don't believe there's any case law --

THE COURT:  Medical was on 26, my 26, I think.

MR. CARPINELLO:  It's on my Page 23, under Jury Instruction 20, medical expenses.

THE COURT:  Yup.

MR. CARPINELLO:  Mr. Appel objected to future.

THE COURT:  Yes.

MR. CARPINELLO:  He did not cite any case law, and I don't believe there is any case law for the proposition that you have to have a doctor come in and testify as to future medical procedures before you can give that charge.  I don't believe that's the law in this state, and I know of no case that says it.

And there was testimony that he was advised that -- and he's anticipating possible future surgery.  In fact, he testified that there may be an amputation of the small finger and the ring finger.  And I believe that's sufficient evidence for that issue to go to the jury.

THE COURT:  All right.  Turning, then, to the defendants' requests, I will give the substance of negligence,

No. 1; the substance of the elements, No. 2; duty of manufacture, No. 3, yes; duty of design, which is still within the negligence; duty of manufacture, on Page 4, yes, the substance; and then duty design, the substance of that, yes; and then the duty of foreseeable user, yes; the substance of evidence of safety standards, yes, I will give the substance of that.

I'm not going to give the duty of retailer because that matter is no longer in the case, so No. F -- Subsection F on Page 9, I will not give.

I will give the substance of the causation request on Pages 10 and 11.  That's paragraph G.  I will give the substance of comparative negligence on Page 12; breach of warranty on Page 13; elements on Page 14, yes; and defect on Page 15, yes.

Design defects, I will give the substance of that one. That's on Pages 16 and 17; foreseeable use, yes, that's Page 18; defect and causation, substance, yes; Page 20, going over -- of course, I'm not going to include any reference to the retailer.  Well, no, I am going to include retailer when we're talking about breach of warranty.  I am going to include that, yes.

And then with respect to causation on Page 21, I give the rough substance of that, but I don't make specific reference to SawStop.  I intend to charge generically.  Once in

7-112

a while I may make a reference to the evidence, but usually I don't. And so I will give the substance of that but without specific reference to the evidence.

Then I will give the substance of reasonable use defense, F. We've talked about that before, but I am going to give the rough substance of that one. I will reconsider it, however, in light of the plaintiff's objections.

Going over to 23, knowledge of product defect for unreasonable use defense, yes. Again, I may not refer to the fence and the guard, but I will give the substance of that request. Also, the damages request of the defendants', I will give the substance of it on Pages 24 and 25, including the pain and suffering on 26 and 27; and the medical expenses on 28.

So pretty much I will give the substance of the defendants' original requests. However, I am not going to give the substance of the supplemental request because I don't say that you may consider how much of their work is devoted to litigation as opposed to doing research or design or manufacturing products or other work in the field.

I do give a general, thorough instruction on expert witnesses and including the fact that they can believe all, some or none of an expert's testimony and so forth. I think you know the general detailed instruction that I give, but I don't give these words, nor am I going to give the substance of it.

7-113

So with that, we'll go first to the defendants, Mr. Appel.

MR. APPEL:  Your Honor, actually, you've -- there are very few things that you said you weren't going to do with my instructions, so I don't have any problems.

I just want to address an unreasonable use defense. Mr. Carpinello referred to a case called Gillette, which I'm completely unfamiliar with what he's talking about.  But there is a case called Gillespie.  And the Gillespie --

THE COURT:  Do you cite it?

MR. APPEL:  Yes.  It's cited there.  That's a First Circuit case.

THE COURT:  Would you give me the page again.

MR. APPEL:  It's on Page 23, your Honor, of mine.

THE COURT:  That's knowledge of product defect for unreasonable use defense?

MR. APPEL:  Yes, yes, your Honor.  All that's required for that, and that case clarifies that, is that the plaintiff has to understand that this is the kind of product that normally comes with a safety device, with a guard or a fence. That's all that's required.  He doesn't have to know -- there was evidence that he knew about both of those things.  He just said they were never used.

But even if he didn't know, with respect to this particular product, if he knew that, ordinarily, those kinds of

products are equipped with those kinds of devices, that's enough to at least get a prima facie showing of subjective knowledge. And I believe that's what that case stands for. So I believe it is appropriate to use the unreasonable use defense, your Honor.

THE COURT: All right. Thank you. Any response, Mr. Carpinello?

MR. CARPINELLO: Yes, your Honor. It is Gillespie, and I believe that Mr. Appel's reading is a bit too narrow. I won't parse it right now, your Honor, but I believe that the court specifically held that he had to know not only that it came with a guard but that he should be using the guard for a safe defense. He has to know not only that it comes with it but that removing it -- that using it without the device is dangerous.

And that's -- the Gillespie case cites that at Page 32 of the brief. So he has to have subjective knowledge not only that he comes with it, but that if he uses it without it, that that use is dangerous. And there's absolutely no evidence to that effect.

One other just clarification, your Honor. You said you would charge most of the unreasonable use defense that we have and the one that they have. I think it's important --

THE COURT: I didn't say "most." I said the substance of each.

MR. CARPINELLO: Substance. And there was a sentence that you took out of ours. I just wish to -- I think it's important, Judge, that if the unreasonable use defense is given that there be specific language that says you have to find that his unreasonable use was the cause of the accident. And I don't -- although one of the elements listed and Mr. Appel says that you have to find he was injured as a result. I don't think that's clear English for finding, and the case law is very clear on this, that you have to find that not only did he use it in an unreasonable manner, but his accidents are derived from that very use, that the proximate cause -- this is what the Cigna case says -- that the proximate cause of the injury was the plaintiff's own unreasonable use of the product.

And I think that needs to be clear. That was part of the sentence that you had stricken from ours. And I think Mr. Appel's charge, with all due respect, doesn't make that clear.

THE COURT: All right.

MR. APPEL: Actually, your Honor, it specifically says already in that charge that --

THE COURT: Which one?

MR. APPEL: In the -- both my instruction and the instruction that Mr. Carpinello submitted actually already make that clear. It says, "This is a defense" -- I'm sorry. Let me get to -- looking at mine, on Page 22, your Honor.

THE COURT: Okay.

7-116

MR. APPEL:  And I'm reading now from five lines down. "This is a defense and will bar recovery by the plaintiff for any breach of warranty if and only if" --

THE COURT:  Okay.  Do that again.

MR. APPEL:  "This is a defense and will bar recovery by the plaintiff for any breach of warranty if and only if you find that the plaintiff:  a), knew of the product's defect and its danger; b), nevertheless proceeded to use the product voluntarily and unreasonably; and c), was injured as a result. That's the -- that's precisely the causation language, and it's the same language that he submitted in his instruction.

THE COURT:  All right.  Thank you.  All right.

Anything else, Mr. Carpinello?

MR. CARPINELLO:  As I --

THE COURT:  All right.  We'll turn, then, to the verdict form.  You may not have had a chance to look at it, but I'll give you a few minutes, if you need it, to look at the verdict form and give me any comments that you believe are appropriate.

Are you ready, Mr. Appel?

MR. APPEL:  This is fine, your Honor.  I'm content with this jury form.

THE COURT:  Mr. Carpinello?

MR. CARPINELLO:  May I have a moment, Judge?

THE COURT:  Yes, you may.

MR. CARPINELLO:  Two requests, your Honor.  First, we would request that the breach of warranty go first because if the jury answers that in the affirmative, all the additional questions on negligence are unnecessary, and it dramatically simplifies the form.

THE COURT:  Why is that?

MR. CARPINELLO:  Because there's no reduction unless -- I mean, if they find unreasonable use, there's an absolute affirmative defense.  If there's a verdict for implied warranty, there's no reason to go into the issue of comparative negligence or anything like that.  So it would dramatically simplify the form.

THE COURT:  Mr. Appel?

MR. APPEL:  It's actually -- the simplicity for the jury is actually the opposite, your Honor, and reduces jury confusion if you give the negligence question first because, as a matter of law in this jurisdiction, if a jury finds that there's negligence, there's a breach of warranty.  So this actually reduces the possibility of juror confusion by having the negligence count go first.

MR. CARPINELLO:  But that's not what the form says, of course.

THE COURT:  Well, if that's right, Mr. Appel, then if they have found negligence at the end of that first section, why do they proceed to consider the breach of warranty before

they go to damages?

MR. APPEL:  Because -- well, for a number of reasons, your Honor.

THE COURT:  One, I suppose, is we have a different party involved.

MR. APPEL:  Yes.

THE COURT:  Home Depot.  But why wouldn't it be appropriate, then, if they have decided that there is negligence, whether there's contributory negligence or not, but presuming that they find negligence and not more than 50 percent contributory negligence, why do they consider the breach of warranty with respect to Ryobi and One World?

MR. APPEL:  Because it is possible, your Honor, if they don't -- I'm saying if they don't find any negligence, they can find breach of warranty in the absence of finding negligence.  It just can't be the other way around.

THE COURT:  So there should be an instruction at the end of the negligence section that if they have found negligence, they don't need to consider warranty with respect to Ryobi and One World, but they'll still have to consider it with respect to -- well, I think what we can do is we can simply have an agreement of counsel so that we don't confuse the jury, that if there is a finding of negligence with respect to Ryobi and One World that is not overcome by a 50 percent or more contributory negligence, that there will be entered a

finding of breach of warranty as to those two defendants. And we'll let the jury decide whether or not there's a breach of warranty with respect to Home Depot.

MR. APPEL: I think that's the accurate statement of the law.

THE COURT: Anything wrong with that, Mr. Carpinello?

MR. CARPINELLO: Just wondering if there's going to be some confusion as to damages.

THE COURT: If they find negligence, the way the instructions read, they will get to negligence -- I mean, they will get to damages regardless of what they do on breach of warranty. That's the way the instructions read, I believe.

MR. CARPINELLO: Could I allow Mr. Sullivan to address this issue?

THE COURT: Sure. Mr. Sullivan.

MR. SULLIVAN: The confusion is, if they go with negligence first and they address the percentages, the confusion is, does the jury reduce the verdict, the true value of the case by what -- if they're confused by the percentages.

THE COURT: If you'll notice -- please notice on the damages section, at the very end, "Note: In answering this question, do not reduce your award by the percentage of negligence, if any, for which you may find Mr. Osorio responsible in Question 1e. I made that part of the instruction on damages.

MR. SULLIVAN:  No question, your Honor.  That is the standard here in Massachusetts.  But it still doesn't effect the issue, that it is still confusing to the jury that because -- Mr. Appel, I'm sure, would agree -- because the breach of warranty merchantability is strict liability.  Whatever the amount is, the amount is.  There's no need for calculation for percentages of fault.  So that's where the confusion is, and that's why we suggest the breach of warranty should precede the negligence count.

THE COURT:  Mr. Appel?

MR. APPEL:  I don't see the risk of juror confusion here, your Honor, and I think this is a completely standard form, which I've seen in this form countless times.

THE COURT:  In fact, I do agree with Mr. Appel, that this does seem to be the standard form for doing this.  I'm not suggesting that yours is wrong, but it does seem to me that the model format for verdict forms in negligence/breach of warranty cases is the format that I've given.  Am I wrong, Mr. Sullivan?

MR. SULLIVAN:  Again, your Honor, I think it's at the Court's discretion, and it's this very issue that always confuses both lawyers and jurors, I believe.

MR. CARPINELLO:  One other --

THE COURT:  Mr. Carpinello.

MR. CARPINELLO:  The one other issue is, on Question 2e on Page 3.

7-121

THE COURT:  2e on Page 3, yes.

MR. CARPINELLO:  I think the law is that the jury has to find that Mr. Osorio's misuse is "the" cause -- is the proximate cause of the accident, not that it's "a" cause.  It's not -- the misuse defense, which, of course, is a complete bar to any recovery -- it's a very strict standard.  It's a complete bar to any recovery.  The jury has to find that the cause of his injury was, in fact, his misuse and not the defect of the product.  It was his unreasonable use of the product, knowing of the defect, that caused "the" injury, not "a" cause.  And I looked.  I don't think there's a single case in Massachusetts that says "a" cause.  It's "the" proximate cause.  That's what the case law says.  And I think "a" should be "the" cause.

THE COURT:  You mean 2e?

MR. CARPINELLO:  The "a" in 2e.

THE COURT:  Mr. Appel?

MR. APPEL:  Well, I don't have really a problem with that, your Honor.  This whole instruction is essentially a causation instruction so that if the jury finds that -- actually, if the jury finds just the first part of it, that he proceeded voluntarily and unreasonably to use the saw, in effect, that's -- it's saying there's no causation with respect to any defect.

But to make it simple, I'm okay with this language.

If he wants to say "the" cause, I don't have a problem.

THE COURT:  Fair enough.  All right, counsel.  I will take all of these matters --

MR. APPEL:  Your Honor, if I may, I have one other issue to raise.

THE COURT:  Okay.  About the verdict form?

MR. APPEL:  Not about the verdict form.  This goes to something that actually happened in the opening statement, which was very troubling to me and which I didn't raise at the time because I don't like to raise things in the middle of the plaintiff's opening statement.

But before he was -- Mr. Carpinello was allowed to show some documents that were shown to the jury, you asked him if there would be evidence of it.  In particular, I'm referring to a sales chart that he displayed to the jury in which he -- in which he displayed the total global sales of Ryobi for all of its table saws and had a number of something like 450 million or 550 million.

He then went on to make what is clearly in this jurisdiction an improper argument.  It was an argument.  And it was improper at any time, whether it's opening or closing.  He said, "Send a message to Hong Kong."  That is at no time a proper thing to say to a jury in a civil case for compensation.  It is not about sending a message to the jury and especially based on evidence that was never even entered in this court.

So -- and many judges, including Judge Woodlock recently, has castigated lawyers for making that kind -- it's bad practice and it's improper.  It shouldn't be made to a jury.  The issue in a case like this is compensation to Mr. Osorio, not sending a message to a corporation.  And it's even worst because, again, there was not even any evidence submitted in this whole trial with respect to the sales of Ryobi.

THE COURT:  Mr. Carpinello?

MR. CARPINELLO:  I wasn't allowed to put it in, your Honor.  He objected every time I tried to put in evidence about sales.  I expected to put it in, but as I say -- we can go through the record and find all the objections that were sustained when --

THE COURT:  I'm not going to go back and give a special instruction to the jury, but the comment about "sending a message" is, I believe, well-taken.

MR. CARPINELLO:  May I speak to that, your Honor?

THE COURT:  Yes.

MR. CARPINELLO:  This case, with all due respect, is not just about the amount of compensation to Mr. Osorio.  Our case is about a corporate decision that was made at the highest levels of the Ryobi organization not to install a safety device.  And I think it's appropriate argument to the jury that the reason we're here is because of that corporate decision and that there's tremendous evidence in this case that Ryobi's

7-124

management was, shall we say, at best, oblivious to the issue that was presented to them and which they chose to ignore.

That was the message I was conveying to the jury, that it's about time that a jury told Ryobi about the improper management decision that they made. I don't believe that's an improper suggestion to the jury, that they send a message to this defendant that they made an absolutely wrong decision when they decided to expose thousands of people to a defective table saw. And I would be interested in knowing case law that says that.

THE COURT: Mr. Appel, if you have case law in that regard, submit it to my office before 4:00 this afternoon.

MR. APPEL: I have the two cases right here.

THE COURT: If you wish to respond, it will be by 5:00 this afternoon.

MR. CARPINELLO: One other item, your Honor. If we may submit a very short, four-page brief on the reason why there's insufficient evidence in the record on the unreasonable use defense, the issue we just argued. I'd like to submit a very short memorandum to your Honor on that issue.

THE COURT: You can submit it. If you can submit it by -- right now, right?

MR. CARPINELLO: Yes. I'm going to hand it to the clerk if I may do that.

THE COURT: You can submit it. And Mr. Appel may

respond to it by 4:00 this afternoon.

MR. APPEL:  Thank you.

THE COURT:  All right.  Tomorrow, then, logistics, the closing arguments will not exceed one hour.  The defendant will go first.  If you want to use a lectern, of course, you can do that, or you can stand in the well.  I do not want counsel approaching the jury box closer than ten feet.  I know we all know what ten feet is.  We know what two millimeters is, so we know what ten feet is.

I really suggest that both sides avoid any sort of histrionics.  I expect that you are entitled to be emotional, but this is a court of law.  I don't want to have to chastise anybody for speaking too loudly or even shouting.  I don't think that that is appropriate at a closing or any other time.  So be mindful of the restrictions that closing arguments are to have.

And after the defendant goes first, the plaintiff will go second.  We will then have a break.  Where that comes -- I have a commitment to another matter that has been on my docket for a considerable length of time, that it is suggested is going to be 11:15.  I don't know whether it's going to fit in to these closings.  I'm not going to interrupt your closings, of course, but I may have to take a roughly half-hour break between the time of your closing arguments and the time of the commencement of my charge to the jury.  So just be mindful of

that.

We'll start at roughly 9:00 tomorrow morning.  That means the arguments should be over by roughly a little bit after 11.  Then the charge will start a little bit after 11:30.

Yes, Mr. Carpinello.

MR. CARPINELLO:  Quick question, your Honor.  When will we get the final set of instructions?  Will we get --

THE COURT:  You're not going to get a copy of my instructions before I give them, but I will react to you on the matters that are at issue before closing arguments.  I'll give you those at 9:00 tomorrow morning.

Anything else?  If not, we're adjourned.

(Whereupon, at 1:12 p.m. the trial recessed.)

C E R T I F I C A T E

We certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of our skills and ability.

/s/Debra M. Joyce                03/02/2010

Debra M. Joyce, RMR, CRR         Dated

Official Court Reporter

/s/Cheryl Dahlstrom              03/02/2010

Cheryl Dahlstrom, RMR, CRR       Dated

Official Court Reporter