8-1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CARLOS OSORIO,                          )
                    Plaintiff,          )
                                        )
                                        )
vs.                                     )  CA No. 06-10725-NMG
                                        )
                                        )
ONE WORLD TECHNOLOGIES, INC.,           )
et al,                                  )
                    Defendants.         )


BEFORE:  THE HONORABLE NATHANIEL M. GORTON


DAY EIGHT OF JURY TRIAL




John Joseph Moakley United States Courthouse
Courtroom No. 4
One Courthouse Way
Boston, MA 02210
Wednesday, March 3, 2010
9:26 a.m.




Cheryl Dahlstrom, RMR, CRR
Debra M. Joyce, RMR, CRR
Official Court Reporters
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 3209
Boston, MA 02210
Mechanical Steno - Transcript by Computer

APPEARANCES:

    BOIES, SCHILLER & FLEXNER LLP
    By:  George F. Carpinello, Esq., and
        Teresa A. Monroe, Esq.
    10 North Pearl Street
    Albany, New York 12207
    - and -
    SULLIVAN & SULLIVAN LLP
    By:  Richard J. Sullivan, Esq.
    40 Washington Street
    Wellesley, Massachusetts 02481
    On behalf of the Plaintiff.

    SUGARMAN, ROGERS, BARSHAK & COHEN, P.C.
    By:  Michael S. Appel, Esq., and
        William F. Benson, Esq.
    101 Merrimac Street
    Boston, Massachusetts 02114-4737
    On behalf of the Defendants.

I N D E X

Closing Argument:                                              Page

  by Mr. Appel                                                 7

  by Mr. Carpinello                                           34

Charge to the Jury                                            63


E X H I B I T S

| No. | Description | In Evd. |
| --- | --- | --- |
| 57 | Life expectancy table | 6 |

8-4

P R O C E E D I N G S

THE COURT:  Good morning, counsel.  Before we call the jury, I wanted to alert you on my decisions on several of these matters that were brought to my attention at the charge conference.  First, with respect to the breach of warranty claim, the Court will charge on the affirmative defense of unreasonable use pursuant to the ruling in the Gillespie case, and the plaintiff may, of course, convey his arguments about the evidence on that issue to the jury during closing argument.

The Court will not add to its charge on that issue the language requested by the plaintiff in his supplemental request pertaining to the subjective and objective knowledge because the charge, in the Court's judgment, as it is, fully and adequately accounts for the propositions set forth in that request.

Third, the Court will define "substantial" minimally as indicated yesterday.  And the Court will not include in its charge the language requested by the plaintiff concerning the state of the art because it does not read the Wiska case cited by the plaintiff to stand for anything more than the proposition stated in the other parts of that requested instruction.

Next, with respect to the instruction on comparative negligence, the Court will include the presumption of the plaintiff's exercise of due care because the Massachusetts

statute, Chapter 231, Section 85, seems to require it.

Next, the Court will charge, as requested by the plaintiff, on future medical expenses because the plaintiff presented at least some evidence about the possibility of future medical expenses.

On a different issue, in light of the plaintiff's counsel's assertion that he has no intention of using the term "sending a message" and so forth in his closing argument, the Court need not further restrict any statements to be made by counsel.  But both counsel are reminded that introducing purely emotional elements into jury deliberations is impermissible and should, therefore, argue accordingly.

Finally, the Court would entertain and would like to make it clear at this stage that under Massachusetts law, if the jury finds that the defendants Ryobi and One World were negligent, then it must also answer yes to Question 2b with respect to the breach-of-warranty count.  And if the jury returns a verdict inconsistent in that respect, the Court will correct it.

Do counsel agree with that?

MR. APPEL:  Yes, your Honor.

MR. CARPINELLO:  Yes, your Honor.

THE COURT:  All right.  Fine.  We're ready to call the jury.

MR. CARPINELLO:  Your Honor, just a minor -- first,

just note our exception to the record to certain of the rulings. And, also, by consent, your Honor, the parties have agreed that a life expectancy chart may be introduced as an exhibit. That's by consent. It was inadvertent that it wasn't admitted because the parties had consented all along.

THE COURT: All right. What is the number on the --

MR. SULLIVAN: Exhibit 57, your Honor.

THE COURT: 57. You can make that offer just before we have closing arguments. We'll do it right now when we call the jury. So it will be No. 57. That is the life expectancy table.

MR. SULLIVAN: That's correct, your Honor.

(The jury entered the room at 9:30 a.m.)

THE COURT: Good morning, jurors. We are starting a little later than anticipated because we had some matters that we had to resolve outside of your hearing. And one minor item needs to be taken care of. One of the exhibits that was supposed to have been marked was not, so I'm going to allow the plaintiffs now to offer that.

MR. SULLIVAN: Thank you, your Honor. The plaintiff would offer Exhibit No. 57, a life expectancy table, your Honor.

THE COURT: That will be admitted into evidence, life expectancy table, Exhibit 57.

(Exhibit No. 57 received into evidence.)

With that, jurors, we are ready for closing arguments. By tradition, in civil cases, the defendant argues first, to be followed by the plaintiff. So we will hear first from the defendants' counsel. Mr. Appel may make closing argument for the defendants.

MR. APPEL:  Thank you, your Honor.

Good morning, members of the jury.

THE JURY:  Good morning.

MR. APPEL:  You've had to absorb a lot of information over these last few days, a lot of witnesses, a lot of documents, a lot of stuff. And I thank you very much. You've been paying close attention, and personally, and on behalf of Ryobi, we very much appreciate that.

Now, when all is said and done in this case, it's a case about what Mr. Osorio was doing at the time of his accident. He was using a product that can cause you a lot of injury if you don't use it carefully. It's a table saw. And he was not being careful.

You've got to use all the safety features. You've got to use the fence, the blade guard. You've got to take proper care. You've got to set your body up in the right position, have the blade raised to the proper height. You can't have your hands in line with the blade. You've got to use common sense, and particularly in this case, where he wasn't using a blade guard, you have to even be more careful.

So -- and as we've heard, the fence is the essential feature here.  This is the key feature.  And failure to use the fence by Mr. Osorio was probably the major reason why he had his accident.  The fence enables you to support the wood as you're trying to make the cut.  Mr. Osorio knew about the fence.  He had used it before.  He knew how to use it.  It was available to him.  But he didn't use it.  And as a matter of fact, his testimony was that on prior occasions he himself had tried to move the wood, make some cuts without using the fence, and there was some vibration.  And it had even caused kind of like a small kickback on other occasions.  And he was afraid when that happened.  He knew that was dangerous.  He had actually even seen others have that same kind of experience.  So he knew that it was a dangerous operation to be cutting without using the fence.

And on the day of this accident, that's what he was doing and he ran into trouble.  If you recall, twice he first started to make the cut.  There was some binding.  He couldn't get -- binding and vibration.  He couldn't move the wood into the blade.  He stopped.  He cleaned it off and he did it again.  And he pushed his hand harder, and his hand went into the blade.

Now, that's very unfortunate.  But fortunately for him, it happened here in the Boston area, and he was able to get some of the best medical care in the world.  He winds up at

Mass. General.  He gets a top surgeon who was able to save his fingers and, fortunately, within a couple of years, got back to work and is now working full-time.

So we can feel empathy for Mr. Osorio, for sure, but he's coming into court, and he's asking you for compensation, and he was completely careless.  He did everything wrong that you can do with this saw.  And not only that, now he's not even being honest with you because he tried to tell you that when he was making this cut that he was cutting it at an angle, that there was a small amount here, and then there was a larger amount that he was trying to cut off this piece of wood.

And why did he say that?  Why did he testify to that in court?  Because then Mr. Holt can come into court and tell you that when somebody is trying to cut this kind of a -- what we call a taper, it makes it harder to use the fence.  That was going to be his excuse.  The problem is it wasn't true.  I took Mr. Osorio's deposition.  He was under oath.  I took it two years ago.  I videotaped that deposition so that I was able to see it and review it again.  Mr. Holt was able to review that deposition.  Mr. Domeny was able to review that deposition.

And what he said back in 2008 was that he was making a straight cut, taking the same amount off the wood all the way through the board, nothing about a taper like this.  He was cutting it at a -- what we call a slight bevel, but it was completely straight.

And if you recall, Mr. Osorio admitted that he changed his testimony on that matter, and I asked Mr. Holt about that at his deposition. Remember, he had reviewed the videotape. And I asked Mr. Holt at his deposition about what he felt the -- or what he saw that the plaintiff was doing. And when I asked him in the deposition, he agreed that it was not a taper. It was a straight rip cut on the bevel. But, in court, of course, Mr. Holt changed it -- his testimony as well.

So there's really no excuse for not being careful, and I suggest to you that it is wrong to come here asking for compensation when you're being careless and you're not even telling the truth. And, instead, what Mr. Osorio is doing is he's blaming everybody else. He blames his employer. He blames Home Depot, and he blames Ryobi for his accident.

If you recall, when I asked him at his deposition about -- excuse me, not his deposition but right here in court, when I asked him about what he was doing and why he was -- why he had the blade raised too high or why he was kneeling, he basically said, well, I'm poorly trained. My employer never told me that that was the wrong way to do the cut. Never told me that it was improper to have the blade raised so high. Never told me that it was improper to have my hands right in front of the blade. He never supplied the blade guard to me. Didn't tell -- he told me that it was dangerous to not use the fence, but he didn't prevent me from doing it. I was just

doing my job.

Well, yes, the employer does have a responsibility. When this saw came from Home Depot, it looked like this. It had everything on it, including a manual that explains how to set the saw up. Gives you all kinds of extensive warnings about using the saw with a blade guard, using the saw with the fence. It was in pristine condition.

So the employer should supply all of that in good shape to the employee, including the manual. And, obviously, that didn't happen. But it is -- it's still up to Mr. Osorio, and anybody working with a tool like this, to use common sense. And he had been working with it for a year, and he knew about the fence. By the way, the warnings are in Spanish right on the saw itself.

So Mr. Osorio not only blames the employer, he blames Home Depot as well. And he's sued Home Depot in this case. And Home Depot sells thousands of products, and they rely on a company like Ryobi to design it. Why would they be at fault? It's another example of the overreaching that's going on here by the plaintiff and his lawyers. He blames Ryobi, of course, most of all, for what happened here.

So let's look at this product. Let's look at the saw. This BTS 15, it complied with all industry standards. Nothing wrong with this saw. It had -- as I say, it had a blade guard. It had a fence. It complied, as I say, with ANSI UL 987.

8-12

Actually, even had some additional features like this sliding miter gauge, a good, useful saw that you can buy for $180.

Now, we heard a lot of discussion and some evidence about the blade guard and whether operators use them or not and Ryobi's knowledge as to the extent to which operators use those guards. And, in particular, you heard Mr. Carpinello criticizing Ryobi because they didn't do any surveys to find out about guard usage. You know, they should have known that people were not using the guards.

There was testimony even that Mr. Dave Peot, the director of engineering, was unsatisfied with this kind of a guarding system, and at home he had rigged up his own guarding system in his workshop, a guard system that hangs from the ceiling. By the way, I'm sure you're not confused about this, but that kind of guarding system could never be adapted to this saw.

But the point is that it's important to understand why this guarding system was on this particular product, and that has to do with -- and you heard a lot about that in this case -- engineering principles. The first principle of safety engineering is that, if you can't design out the risk in a product -- and you can't design out the risk. It's got a spinning blade. You can't eliminate that. You don't have a product.

The next thing you have to do is guard it. That's

8-13

what this guard was for.  And the UL 987, the relevant safety standard, which does encompass good safety engineering principles, it mandated that the manufacturers provide a guard like this that completely covers the blade.  The emphasis was on maximum blade coverage, but you don't want -- the notion was that you don't want the operator to have any possibility of getting his hand close to the blade.  So that was the dominant philosophy.  And it also required this splitter because that gives kickback protection as well as the anti-kickback pawls.  And the other thing was that you had to have a tool to remove that because they didn't want to make it too easily removable. They wanted people to keep those guards on.

And everybody, everybody, pretty much agreed with this kind of guarding system and this kind of philosophy.  Even Mr. Holt never, ever criticized this design of the splitter-mounted guard.  And if you recall, he came into court telling you that UL 9 -- criticizing and denigrating UL 987 and saying it doesn't embody good safety design engineering principles.  You remember I had that report that he did in a prior case in which he said exactly the opposite?  So that is why this guarding system was on it.  That was the consensus.

But, yes, there was some understanding that this guarding philosophy had to change.  Again, Mr. Peot had his own guard.  This was already germinating in the minds of Mr. Peot and others.  And Mr. Domeny was also looking at alternative

guard systems.  And there was some idea that maybe this did have to change.

And they -- by the way -- and they didn't do a survey. This is -- again, why didn't they do a survey?  Because a survey about guard usage is really not that useful.  What's useful is accident information.  You need to understand why the accidents happen.  And when you understand why accidents happen and why and how operators are getting their hands into the blade, then you can make design changes.  And you heard Mr. Hill describe that Ryobi didn't make any changes because it didn't have any significant data of its own that there was a real problem with their guards.  They had a very low accident rate.

Now, in 1999, the data did start to come in.  The Consumer Product Safety Commission had compiled statistics, statistics which were extrapolated from a limited amount of actual injuries.  And in 1999, 2000 time frame, that data was analyzed.  And when the data was analyzed -- I think you remember Mr. Domeny describing those epidemiological reports, and there was additional data enabling Ryobi, Bosch, all the table saw manufacturers and Underwriters Laboratories -- that accident data enabled them to understand and get a better sense of what was going on.  And what they found out from that data was that people who had accidents were not using the guard, a high percentage of those people.

8-15

So the CPSC, the Consumer Product Safety Commission, asked UL, Underwriters Laboratories, and the industry, to address that problem.  Is there something that you can do?  Is there some way we can change the guarding configuration?  Look at table saw safety and address this problem of users not using the guards?  And they did.  Ryobi responded.  All the manufacturers responded.  UL responded.

And what was required was a major change in the guarding philosophy.  In other words, again, we had to move away from this kind of guard which people weren't using.  So, instead, you had to look at user behavior.  Users weren't using the guards, so you had to look at their behavior.  And it meant that you had to have a different outlook or different perspective on what guarding would be.

So the initial response, by the way, was to create a video.  The idea was, well, let's send out a video.  Let's put it out as many different places as we possibly can so that consumers who buy these products can get access to that information and learn how to -- learn the risks more and be encouraged to use the guarding system, this guarding system.

But that wasn't the major focus.  The major focus by 2001, for sure, was a shift and a change in the standards, UL 987.  There was a major effort that was begun, and Mr. Peot was integral to that effort.  Mr. Domeny was integral to that effort.  And the idea was to come up with a guarding system

8-16

that was user friendly.  You didn't see what that guard looks like, but the notion there is that they wanted to make a guard that would encourage people to actually use it, to keep it on the saw as much as possible.  And they even made it more easily removable.  So instead of maximum guarding, you got a little less guarding, but you made it easier for people to use the guard that was there.

So contrary to what the plaintiff is suggesting here, Ryobi did respond when it got the information, the hard data, and they made significant efforts.  And Mr. Peot and his ideas were a major contributor to the -- not only the changing of the standards, but, as you may recall, there was the evidence about the joint venture and the guarding designs.  There were two joint ventures.  One had to do with guarding, and the other had to do with flesh detection.  And in that guarding joint venture, they came up with designs of these new user-friendly guards that were going to be consistent with new standards that would allow them to actually be used.

But for the purposes of this case, ladies and gentlemen, this, this was the guard that was required, and this is a reasonably safe saw.  Mr. Gass and Mr. Holt take potshots at it.  The guard was flimsy.  Mr. Holt, you know, lays the fence down in this purposefully crooked way.  He even takes the absurd, I would suggest to you, position that a saw like this is defective because it's too small.  There's not enough room

over here.  So all -- he went so far to say all small saws are defective.  They shouldn't be on the market.  And, of course, he's comparing them to that saw.  Well, that saw, of course, it cost ten times as much, almost, as this saw.  So it has a little bit slightly larger table and so forth.  It has robust -- more robust components.  But in no respect is this one defective.

And as the Court will instruct you, the manufacturer has a duty to provide a reasonably safe saw, not a perfect saw, not a risk-free product.  A reasonable product.  And the BTS 15, this saw, not only did it meet the standards, it had a very good safety record, as you heard from Mr. Hill, no recalls on this product and only one, one other accident that they had notice of before Mr. Osorio's accident.  And that was out of 120,000 saws sold.  So there was no reason to think that this was a dangerous -- unreasonably dangerous product or a defective product.

Now, what are they saying in this case?  What is the plaintiff saying?  That this is defective because it didn't have SawStop.  Their burden of proof is to show you that it was defective and that there was a reasonable alternative, a better alternative available, which was feasible, which was feasible.  And they say that, of course, that feasible alternative was SawStop.  But there's no evidence -- there's no evidence that SawStop was a feasible alternative design for this product back

8-18

in 2004.

I would ask you, ladies and gentlemen, to please remember this. We're talking about 2004 here. That is the time period when this saw was designed and then sold. It was manufactured, left the hands of the manufacturer after it was manufactured, in October of 2004. We're not talking about feasibility as of today, 2010. You've got to go back to 2004. That's when the -- the accident happened in 2005, and before the accident happened, the saw was already on the market.

So, obviously, obviously, SawStop, the concept of SawStop is feasible. He's -- Doctor Gass has a product on the market. He put out a huge industrial cabinet saw in the fall of -- summer, fall, of 2004. So he proved that it could be done. And by 2008 he had that product. And we congratulate Doctor Gass. That was a brilliant idea, and he has made a major contribution to table saw safety. And nobody disputes that.

But, again, the issue is whether it was feasible for this saw or any lightweight bench-top saw that you could pick up, like one person could pick up and put in the back of their truck and carry it around to a job site and millions -- certainly, in this case, over 100,000 owners could buy it in a Home Depot, take it back, do a project in their backyard or whatever else they needed to do with it. There's actually -- there really is no evidence even today that SawStop can be put

into a saw like that.  At the time this saw was designed and sold, SawStop was completely unproven technology.  It was brand-new, unproven.

Now, back in 2000 -- and you recall this evidence -- Ryobi engineers had seen a prototype.  And by the way, the prototype of the SawStop technology that Doctor Gass showed to Ryobi was on a contractor saw.  And they -- Ryobi engineers were impressed with that technology and they did some testing.  Remember this thing called strain gauge testing?  They fired a couple of brake cartridges, and they had some very good analytical engineers working on this testing.  And they made the calculations.

And they pretty much quickly were able to determine that the very enormous forces that are generated when the SawStop brake pawl is activated were too great for a small, lightweight saw like this to withstand, and they could clearly make that judgment based on calculations alone.  They were concerned about the damage that it would cause to the gears of a saw like this.  And they were also concerned about whether the structure itself was robust enough to prevent the saw from flipping over.

So the judgment was that it was not going to be able to be put on a saw like that, and they proceeded with negotiating with Doctor Gass but only for a larger saw.  Remember, that's what the idea was.  The notion was that if you

could get this product on any kind of a saw it would be a large contractor saw, and Ryobi sold those kinds of large contractor saws. They sold a Craftsman saw that was quite a bit heavier and quite a bit more expensive.

And even Doctor Gass admitted that what Ryobi was trying to do, what his understanding of what their contract was, was that they were going to go forward with a contractor saw, not to put SawStop technology on a saw like this. And that was the testimony not only of Mr. Peot. It was also the testimony, if you recall, of the Ryobi executives that you saw on videotape: Mr. Whiffen and Mr. Dils.

And that whole contract, that whole contract that was actually never finally finalized between Ryobi and Doctor Gass, was with respect to a contractor saw. And those time periods about feasibility, one nine months and then cost feasibility within twelve months, that was all under the assumption that we're working towards putting it on a contractor saw.

Do you also recall that long list of questions that we went through when Mr. Peot was testifying, that feasibility study? Again, these were all the questions that Ryobi had, a very long list of serious concerns about whether or not SawStop could actually be put on even a big saw. That's what the state of the knowledge was as of 2002.

And Mr. Peot had testified that even if they had gone forward with this, there would have been a lot of work that had

to be done, a lot of it.  All those questions would have to be answered because nobody had ever done anything like this before on a saw.  And if you recall, he testified that it would take almost three years to get something like this to market, three years, that is, for a big saw like that.  And, of course, that sounds like a pretty reasonable estimate when you think that it took almost five years for Mr. Gass to get his contractor saw to market.

Now, as you know, Ryobi didn't do any further work on SawStop because they never signed a contract.  So they didn't do any further testing.  They never went through all that feasibility because there was never a project.  There was no budget.  But, interestingly, as it turns out, they were absolutely right.  Their analytical engineers were right about the feasibility of putting this SawStop technology on a small saw.

You heard Mr. Domeny, I believe it was on Monday, explain to you that -- remember, Mr. Gass had also come to his company, Bosch, and he did do some testing on one of Bosch's saws.  And that saw, the Bosch saw, was a professional grade, a heavier duty bench-top, a professional-grade saw.  Three times the price of this, sold for over $550, with much more robust components.

And when they did the testing of SawStop on that saw, they found that it did severe damage to the gears.  You

remember that photo that he showed you of that gear component? That was the damage to that Bosch bench-top saw. So all of Ryobi's analytical concerns were actually verified in actual testing by another company. The Ryobi engineers were spot on.

But there were also other concerns that you've heard about SawStop technology, particularly back in this time period. There were concerns about whether it could work -- it could perform, whether it was fast enough to actually prevent a serious injury.

Remember -- you heard a lot about kickback. Why was there so much about kickback even though it didn't happen in this case? There was a lot about kickback because kickback does frequently happen. Before you manufacture and sell a saw, mass produce it to tens and maybe hundreds of thousands of people, you want to make sure that it performs properly under all different conditions including very severe conditions. That's why you test for kickback.

And that testing -- again, Mr. Domeny did a lot of that testing, and he was well-qualified to do it because he had been studying kickbacks since the 1970s. Some of his kickback studies were part of academic studies. And his testing showed that SawStop performed inconsistently. It didn't always work, particularly at high velocities. Again, this is a good concept, but it's not perfection.

But a manufacturer who's going to put out saws to the

general public, you have to be concerned about all of that. And, particularly, you've got to be concerned about that kind of thing because what happens when you put out a product like SawStop and somebody thinks, well, if I have SawStop on this, I'm never going to get hurt. I don't even need to use a guard. So people start using a product like that, thinking that it's full-proof but it isn't full-proof. Even Doctor Gass warns about this in his manual, that you can get a severe injury using SawStop.

So you don't want to lull operators into what we call a false sense of security. You might remember what happened at trial when I asked Mr. Holt about false sense of security. When I asked him whether that was a legitimate concern, what did he say? Baloney. Baloney, he said. So I showed him the report that he had done several years earlier on another product in which he said exactly the opposite. It was important. In that other report, he says it's important for a safety engineer to take into account whether or not there's a false sense of security.

So this whole concern, by the way, about, you know, the performance of a system like that, that illustrates why Ryobi and others took a different approach. This illustrates why they went into this joint venture. Remember, the joint venture for flesh detection that Ryobi and others were involved in, they were focused on what's called proximity sensing. They

wanted to figure out if there was a system that, as you're feeding, it could detect the presence of the human flesh even before it got to the blade so the blade would stop even before the hand made contact with the blade. That is more in line with the principles of accident prevention. That's what they wanted to do. And that's when they hired that very high-tech consultant firm out in Silicon Valley to see if they could figure out a way to do that.

But there were other concerns. There were other concerns about SawStop's reliability, including whether or not SawStop -- the electronics could work in very hot environments, whether it would get damaged when you throw it into the back of a truck, whether it would work in the freezing cold in Minnesota, whether it works when you're using pressure-treated wood. And we know it doesn't -- you can't always use it when you're using pressure-treated wood. The technology can't always recognize the difference between human flesh and a piece of wet or pressure-treated wood. That is a legitimate concern. I'm not saying that these things may have not been worked out. As of today, it's still not a perfect system. But, certainly, these were legitimate concerns.

But the main concern -- again, I want to go back to the main concern because that's really the crucial thing in terms of this saw, the BTS 15. And Mr. Domeny explained this in detail. You can't convert -- you can't adapt SawStop

technology to a small gear-drive saw like this.  That's what makes these saws light and useful.  The fact that they're driven by this universal motor and that there isn't a belt, that's what enables them to be so handy.  And you can't do that.  Nobody has been able to figure out how to adapt that kind of technology into this kind of lightweight, gear-driven saw.

Mr. Domeny, if you recall, he showed you the bottom of the saw and he explained that the shear forces, the enormous forces of the dropping of the -- separating the blade from the motor, that's inevitably going to cause damage to these kinds of saws.  And the reaction forces in the whole dropping require that there be a much stronger and heavier duty structure to accommodate those reaction forces.  That's why it can't be done.

And those problems, those problems, members of the jury, have never been solved.  Doctor Gass has been working on this for ten years.  What happened here?  He did a couple of tests back in 2000 on a small saw, and I think he described that the saw jumped up in the air.  Nothing since that time. He did no other work.  He essentially abandoned the idea of putting his technology on a small bench-top saw, and he never did any testing since that time.

He never -- he didn't come into court with any prototypes.  He didn't come into court with any drawings even

or specifications.  No development work.  No development work has been done in ten years.  Why?  Because it can't be done. And don't you think that even just for the purposes of this litigation, which he obviously has such a great interest in, that if it could be done he would come up with something?  He would show you a prototype.  He would show you some drawings. He would try to convince you.  But you didn't see any of that because there isn't any of that.  It doesn't exist.  The lightest product that he's been able to put it in is, again, that contractor saw, which weighs 300 pounds and costs $1,600.

Mr. Carpinello, I'm sure, will say, Ryobi is so huge, you know, don't they have the resources to figure this out? Well, no, because it just -- it can't be done.  It's an engineering problem that has not realistically been able to be accomplished.  It's not been executed in a direct-drive saw.

And what Ryobi did was go into a joint venture to come up with an alternative to this SawStop technology in which the blade drops through this pyrotechnic actuator so that there isn't a brake, and they felt that this was a better system and that this system had more potential to actually adapt to different kinds of saws.  But even today, even today, that technology has yet not been able to be adapted into a small saw.

Mr. Domeny, I think, explained to you that it would have to be -- that even this new technology, the joint venture

technology is going to be belt-driven, and it's going to have to be in sort of a larger and heavier configuration. He talked about the 60- to 90-pound range. It may hope to do that, but there's no evidence at all -- this wasn't even remotely possible in 2004. It's something that might happen in the future, but it's something that could not be adapted to the BTS 15 or a lightweight saw in 2004.

Now, this brings me to the issue of cost in this case. And as the judge will instruct you, when you're evaluating the feasibility of an alternative design -- in this case the alternative design is SawStop -- there's various factors that you need to take into account. One is the mechanical feasibility, which we just talked about. Another factor is the financial cost of adding that design to the product. And another factor is the adverse consequences to the consumer if that kind of design is added to the product. Boy, are there adverse consequences to the consumer to add SawStop to a small saw like that.

So at this point I've just got to say something here which is completely obvious. There's been a big elephant in this room, and he's literally been in the room. He's still here. And that's Doctor Gass. He has an enormous interest in all of this because he's trying to make it so that everybody has to put their technology -- put his technology into their saws. He has an enormous agenda here.

And the way this goes, the way the argument goes for the plaintiff -- and you'll hear this from Mr. Carpinello, I'm sure -- there's some kind of conspiracy going on.  This is a conspiracy argument, that Ryobi and the industry were worried about SawStop and Doctor Gass.  And everything that they did, the table saw guarding, the revision of the standards, the technical guarding, joint venture, all of that was in reaction to SawStop, and all of that is to prevent SawStop from becoming, you know, a usable and workable alternative.  And he will claim that SawStop -- that Ryobi stopped negotiating with Doctor Gass because they'd figured out they could avoid paying him royalties by joining with other manufacturers into a joint venture.

I would suggest to you, ladies and gentlemen, you have not seen any evidence of a conspiracy because there was no conspiracy.  But there is -- there is a tiny germ of truth in all of this.  Ryobi was worried about Doctor Gass, and all the manufacturers worried about Doctor Gass.  Why?  They were concerned about his motivations because what were -- what was he doing?  In 2001, he went to the Consumer Product Safety Commission.  At the end of 2001, he went to Underwriters Laboratories asking that they make his technology, his proprietary technology, required for all table saws.  In 2003, he petitioned the Consumer Product Safety Commission, asking for a federal regulation that made his technology mandatory for

every single saw.  And Ryobi was concerned about that.

And they were also concerned about product liability. Now, is that surprising to you or to anybody?  Of course, they were concerned about product liability.  What happens?  You have people like Mr. Osorio, who are completely careless, and they come into court, and they say that it's the fault of the product.  And then they hire somebody like Mr. Holt, who essentially will say whatever you pay him to say.  He's received $400,000 in compensation in these cases.  So, yeah, product liability, that's a concern.

Now, there wasn't -- Ryobi -- yeah, Ryobi broke off the contract.  They got -- obviously, got distracted by another issue which you heard about from Mr. Whiffen and Mr. Dils on videotape.  And you even recall Doctor Gass remembers that there was this whole concern about Ryobi's acquisition of another company.

But, yes, Ryobi decided not to go forward with Doctor Gass, and they chose a different path.  They chose a different path, and they chose to go with the joint venture.  Really, this goes right to the heart of the issue.  Remember, SawStop technology was not feasible for this kind of a product, and that's the vast majority of the products, and it was certainly the majority of what Ryobi was selling.

So, yes, if this becomes -- if SawStop becomes mandatory, then you can't even -- you wouldn't be able to sell

a small saw.  You wouldn't be able to make it because it can't be done.  So, yes, it's bad.  That's bad for Ryobi.  It hurts their bottom line.  They can't sell saws.  But you know what? It's bad for consumers, too.  That has very adverse consequences on the consumer because there's a tremendous demand.  That's why these saws are the most popular kind of saws on the market.  Huge percentage of them.  As you've heard over and over in this case, they're popular with contractors, popular with do-it-yourselfers.  You or I could go into a Home Depot and buy a product like this and do the job we need to do, and we can do it without breaking the bank.  We can do it for low cost.

But if SawStop is required, these saws are eliminated. You can't do that.  You heard the testimony.  It's going to cost double, triple.  You probably can't get a saw on the market for under $500 and that's optimistic, so it's basically eliminating all of this from the market.  And so it eliminates the saw.  Whatever saws are available, the prices are dramatically driven up.

And it also -- that also has another consequence, and that is, it has a safety consequence, that when people can't afford to buy a perfectly usable saw like this, that complies with all the standards and it's reasonably safe if you use it properly, then they resort to very unsafe methods.

And that's why Mr. Domeny explained to you -- he was

8-31

the product safety guy for Skilsaws, the saws that everybody in the world is always using.  There used to be a lot of accidents on Skilsaws because people would flip them over and use them as table saws.  And you saw those photos of that kind of crazy rigged-up device where somebody had a string to the bottom of their Skilsaw and was flipping it over and trying to use it as a table saw.  Mr. Holt says that's okay.  If they can't afford a bench-top saw, just go back to using your circular saw.  But that's what happens when you go back to using a circular saw.  Is that right to tell us that we can't use -- we can't buy a bench-top saw unless we're willing to pay $500 or more?  No, I don't think so.

Now, Doctor Gass likened SawStop technology to a seat belt or an air bag.  That's what he says this is.  But that's not what it is.  That's not what it is.  SawStop cannot be compared to a seat belt or an air bag because -- think about it.  You can add a seat belt or an air bag to an automobile, and it doesn't affect the utility of the vehicle.  You can still drive it.  And you can -- the manufacturer can add something like that, a seat belt or an air bag, to the vehicle without substantially affecting the price of the vehicle itself.  It's a relatively small percentage of the total cost of a vehicle.

But trying to add SawStop to a small table saw like the BTS 15, that eliminates the product entirely.  It can't

even be done.  You have to redesign a completely new, heavier, bulkier, more expensive saw.

So, yes, SawStop technology is feasible for larger, heavier saws.  And if you want that kind of a product and you can afford it, excellent.  You should be able to go out and buy it.  It has a completely reasonable niche in the market.  But it doesn't mean -- it doesn't mean that a saw like the BTS 15 is defective, and it doesn't mean a saw like that should be removed from the market.

You know, it's good to have choice because we need to go out and buy a product that meets our own needs and is consistent with our own pocketbooks, what we can afford.  And the BTS 15, reasonably safe, met all the standards.  And, again, if you use it safely, you're not going to get injured.

In the end, members of the jury, just like everything, every situation in life, everybody has got to take responsibility for their own actions.  And, yes, a corporation also has to take responsibility for its actions.  Ryobi has an obligation to be a good corporate citizen, has to abide by all kinds of government regulations.  It has to abide by its reporting duties under the Consumer Product Safety Act.  If there's a substantial product safety hazard, you have to report that.  It abided by that.  There was no product safety hazard with respect to the BTS 15.  It abided by its obligations because there were none.

It has to put out a product that meets all the industry standards. You can't just throw out a product that's mass produced without getting that kind of regulatory approval. It did. This product was certified by Underwriters Laboratories and was -- and it went into the marketplace as such. And you will also hear from the judge that -- he's going to instruct you that Ryobi has a duty, just like every manufacturer, to make a reasonably safe product. Ryobi did that.

But with respect to responsibility, Mr. Osorio also has responsibility. He's got the responsibility to use care and common sense when he's using the product. And, instead, he ignores the warnings. He didn't use the fence. Of course, the blade guard was not on. He essentially did everything wrong that you could do wrong when you're trying to cut with a product like this. And then to make matters worse, he comes to you and he doesn't tell the truth.

So after Mr. Carpinello argues and the judge instructs you with respect to the law, you're going to get a form with some questions on it. And the first question is going to ask whether or not Ryobi negligently designed the BTS 15. And I would ask that you answer that question no. And there's another question that's going to ask you whether or not Ryobi breached its warranty of merchantability and put out a defectively designed product. And I'd ask you to answer that

8-34

question no as well.  Thank you.

THE COURT:  All right.  For the plaintiffs, Mr. Carpinello.

MR. CARPINELLO:  Thank you, your Honor.  Ladies and gentlemen, thank you for taking nine days out of your life to hear this case.  It's been a long time.  I apologize for having shouted a few times during my examination.  We appreciate your patience.  Mr. Osorio, who's been waiting here in the case, appreciates your patience.  And now the decision is yours.

I'd like to take you back to my opening statement, ladies and gentlemen.  In my opening statement, I told you that the defendants in this case were going to blame Mr. Osorio. And that's what you heard for almost an hour from Mr. Appel, that it was Mr. Osorio's fault.

I also told you that you were going to learn that the technology that Ryobi was introduced to in the year 2000 would have substantially mitigated Mr. Ryobi -- Mr. Osorio's injuries to the extent that what was a horrific accident across five fingers and the almost complete amputation of his pinky and which resulted in a hand permanently affixed like this (indicating), would have been, if they had used the technology, a minor cut.

And you heard Mr. Domeny testify, not once, not twice, but three times, that if Ryobi had used this technology, the cut would have been two millimeters.  Can you imagine the

frustration that somebody like Mr. Osorio feels having learned that fact? That there was a technology that was introduced to Ryobi in the year 2000, ten years ago, that if applied to this saw would have led to a cut no deeper than a superficial cut on a kitchen knife? Can you imagine the frustration that he feels?

And what was the reason it wasn't adopted? Well, you didn't have to wait long to hear that because as soon as I sat down from my opening statement, Mr. Appel got up and he told you that the evidence would show that the defendants did not adopt flesh-detection technology, and I quote, "because they were too busy doing other things." "They were too busy doing other things." There were "very pressing issues for Ryobi executives, very pressing," he said. And then he said, and I'm quoting, "SawStop took a back seat."

And then he said, "Ryobi lost interest." Lost interest? Are you kidding me? Lost interest? I'm sorry. I shouldn't shout. Lost interest? In a device that would take an accident from a laceration of five fingers and a finger dangling from your hand to an injury that's two millimeters? Lost interest? But that is a very accurate description of exactly what happened.

You heard Mr. Whiffen. You heard Mr. Dils. You heard Mr. Bugos on this little box here. Remember they were on the videotape? Because they never showed up in this courtroom.

8-36

You've been here for nine days.  You've been listening to this.  Did you ever see Mr. Dils come through that door?  Did you ever see Mr. Whiffen come through that door?  Did you ever see Mr. Bugos come through that door and explain to you their actions?  Did they ever come in and say to you why they didn't do this?  You didn't.

But you did hear them on the box.  And you heard Mr. Dils say, I was too busy.  I was moving jobs from one continent to the other.  I was shuffling companies.  And I wasn't -- this wasn't really on my radar because -- if I had given him $20 million, I'd be concerned about it.  If I had given him $10 million, that would be something I would be concerned about.  I didn't give him any money, so why would I be concerned about it?  Maybe because you're concerned with the safety of the people who use your saws?  Maybe that would be a reason to be concerned.

You heard Mr. Bugos testify that he sent a letter to Stephen Gass in April of 2001, April of 2001, almost nine years ago, in which he said to Doctor Gass, "Ryobi's working on its next generation of saws so we'd better get this deal wrapped up quickly if you want to do the deal."  Well, we're ten years later and they still haven't done anything.

Of course, they did finally execute a contract.  They signed -- Mr. Dils signed a contract, sent it to Doctor Gass on January 18, 2002.  And then what happened?  Nothing.  Nothing.

You heard Mr. Peot testify that he had set up this committee.  Remember I put on the screen that -- the agenda, the inaugural meeting of the committee that never did anything?  January of 2002.  He had Phil Minalga -- we'll hear more about him in a minute -- all these other people and said this is what we're going to do.  We're going to study this.  We're going to test that.  We're going to check the feasibility of this.  You heard Mr. Peot testify that he did nothing.  And you heard him say, I think three times, I didn't do it because they would not give me the funding.

You heard Mr. Domeny testify about the things that Bosch did -- and we'll hear more about that in a minute -- the things that Bosch did to check feasibility.  And by the way, they checked very early on whether it could go into a direct-drive saw, and they concluded that it could.  But we'll hear more about that in a minute.

But you heard what Bosch did.  And I asked Mr. Domeny, What did Ryobi do?  And we got the exact same answer.  Nothing.  And what was the reason?  Mr. Domeny, what was the reason?  You heard Mr. Peot.  He said he could not get the funding.  Now, I'm not blaming Mr. Peot.  I'm blaming Mr. Dils.  I'm blaming Mr. Whiffen.  I'm blaming Mr. Bugos.

Now, you heard testimony that in 1998 the Consumer Product Safety Commission went to Ryobi and Bosch and PTI and said, Are you aware of how many people are getting injured on

table saws?  And amazingly, ladies and gentlemen, they were not.  You heard me ask Mr. Domeny, Did you check the Consumer Product Safety Commission's statistics in 1985?  No.  Did you check them in 1986?  No.  Did you check them in 1987?  No.  Did you check them in 1988?  No.

And the answer is no all the way up to 1998 when the CPSC comes to the industry and said, Have you seen these statistics?  And what was the answer?  You heard -- you remember I asked Mr. Peot and I asked Mr. Domeny.  What are you going to do about this?  And what was the answer?  We're going to do nothing.

I told you that in the opening.  Remember I said to you in the opening, the CPSC went to the industry and said, What are you going to do?, and they said nothing.  And they admitted it.  There were the minutes there.  I showed Mr. Domeny the minutes.  They said, We're going to do nothing because we have the best guards in the world.  But we're going to make a video.  And by the way, contrary to what Mr. Appel just said, the plan wasn't to distribute the video to everybody possible.  The plan was to distribute it to shop classes and to woodworking seminars.

Of course, Mr. Domeny and Mr. Peot didn't need to be told, as Mr. Domeny now testifies, that there were approximately 33,000 hospital-treated injuries on table saws a year.  And you heard Mr. Holt testify, uncontradicted, that 80

to 90 percent of the people didn't use this guard.  And you heard from everybody the reasons why people were not using this guard.

Now, this is really scary.  Mr. Hill, the safety director of Ryobi, gets on the stand, and I asked him, Did you ever do a survey on guard usage?  Mr. Appel said that's a meaningless statistic.  I don't think so.  Because you remember we talked about hazard analysis, and one of the key parts of hazard analysis is, if you provide a safeguard that's supposed to prevent injury, you'd better check to see if the safeguard is being used.  I think going out and doing maybe just a little survey, maybe checking, like, how about 15 people and take a random survey and find out.  But Mr. Hill never did that.  And he said, I had no indication that there was a need to look.  Are you kidding me?  I had no indication that there was a need to look.

Now, you heard testimony that -- Mr. Appel just said it again this morning.  Every person who mentioned it has said it the exact same way.  There's a studied way they're supposed to say this, and they all say it.  Mr. Peot said it the same way.  Mr. Domeny said it the same way.  Mr. Appel just said it the same way.  The CPSC brought us statistics, so we decided the first thing we would do was a video, but the second thing we would do was we were going to change the guard.  It didn't happen that way, and you know it didn't happen that way because

you've now heard the evidence.

They said we're going to do nothing, and they didn't do anything until they got together in the fall of 2001. And you remember that meeting in Savannah. We've talked about it before. In October of 2001 they all got together. That was the meeting at which they talked about the fact that Stephen Gass had come along, and he had gotten the Chairman's Award from the Consumer Product Safety Commission, and we'd better do something about SawStop.

Why should we do something about SawStop? Remember the minutes that I showed Mr. Domeny? The sanitized minutes? The unsanitized version said, Our product liability concerns are intensifying. So in October of 2001, when they figure we've got to do something about SawStop, then they decide to completely scrap this thing and develop a whole new guard. Then they decide to do it, as if they didn't know. As if they didn't know years ago. Talk about callous.

So they form a joint venture. And Mr. Appel told you that I'm going to talk about a conspiracy. I don't have to talk about a conspiracy. Mr. Peot talked about the conspiracy. Mr. Peot admitted on the stand, because he had to, because I had the documents -- he admitted on the stand that one of the reasons they formed a joint venture was because they were afraid that if one manufacturer adopted SawStop and put out saws that when you touch the blade you'd get no more than a

two-millimeter nick, the rest of them were going to be in big product liability trouble.

Now, I have -- it's natural and reasonable to be concerned about product liability. It's good to be concerned about product liability. That's one of the reasons we have tort laws, is because it gives an incentive to people like Ryobi to do the right thing. Even if they didn't have the incentive, the fact that they may be sued if they don't do the right thing, that's a good thing. You should be concerned about product liability. The problem is, is when you decide that because of product liability concerns we're not going to fix the saw. We're all going to get together and decide not to fix the saw. That's the problem and that's what they did.

You heard Mr. Peot and you heard Mr. Domeny talk about how all the manufacturers didn't have the resources to develop this thing? Mr. Gass came to them with the whole package in 2000. He came to them with the package in 2000 and says, Guys, what do you want to do? Oh, we've got to study this. We've got to hire some Stanford professors. We've got to spend ten years, ten years, studying this thing. Ten years.

Do you believe that? That a company the size of Ryobi, a company the size of Bosch, a company the size of Makita, a company the size of Black & Decker, a company the size of Delta, Hitachi, that they had to spend ten years to figure out how to apply Mr. Gass' technology? Well, it's not

me.  It's Mr. Peot.  He told you why they did it.  And the second reason they did it -- and he told you this -- was because they didn't want to pay Doctor Gass a royalty.

Now, they -- you heard it again this morning.  Doctor Gass, he's got these patents.  He wants to make money.  They filed patents.  Ryobi filed patents.  Bosch filed patents.  What's wrong with that?  It's not the filing of the patent that's wrong.  It's the deciding I'm not going to fix my saw, make it safer, because I don't want to pay 3 percent royalty on my saws.  That was the deal.  Ryobi, if they put that on the saw, they were going to have to pay a 3 percent royalty, which was going to go up over time as SawStop became -- or some flesh-detection technology became more effective in the field.

You take a look at that contract, ladies and gentlemen, Exhibit 4.  When you go into that jury room, you look at that contract, and you look at that royalty.  3 percent.  On a saw like this, that's about $5.50.  They didn't want to pay $5.50?  And instead they wanted to say, okay, we'll just sell the saw without it, and people like Mr. Osorio, well, they don't read the directions.  They don't read these directions down here.  They don't read this down here.  These warnings?  They didn't read this.  So, therefore, it's all his fault.

And I wasn't the -- when people engage in a conspiracy, they don't usually lay out the whole thing in

writing.  You have to infer it from the facts, from their actions.  And that's why you see a document which we have, which said, Don't leave a paper trail.  Why would you tell somebody not to leave a paper trail?  If they were concerned about safety -- if they got together to develop a new technology, why would they tell the participants not to leave a paper trail?  That's incomprehensible.  It's ironic, though, that the one paper that they didn't destroy says, Don't leave a paper trail.  I think that was pretty ironic.

The fact is that they were going to do nothing about this guard, and they told CPSC they weren't going to do it, until Doctor Gass came along and they were faced with the possibility of liability actions and the possibility of a rule coming in that would require them to do it.  So then they all got together, and they decided we're going to make all these changes, and then we're going to go to the Consumer Product Safety Commission and tell them they shouldn't adopt SawStop because we've made all these changes.

And they did go to the Consumer Product Safety Commission.  And you heard about this yesterday.  They had the audacity to go to the Consumer Product Safety Commission and say to the Commission, You should not mandate a rule for SawStop because it's a bad idea to have a safety rule that requires you to actually touch the blade before the blade will retract.  That's bad safety.

But they didn't tell the CPSC that over a year before, they had decided that that was the only way to do this.  After dithering around with this proximity sensing for I don't know how long, they came to the conclusion, in 2004, that contact sensing was the right way to go, which, by the day, Doctor Gass told them in 2000.  If people are willing to knowingly deceive the Consumer Product Safety Commission like that, do you think that they're unwilling to deceive you?

By the way, it is truly ironic, I think, that Ryobi has -- maybe it's not ironic.  Ryobi chose as its star expert witness the architect of the industry strategy, the chairman of the Power Tool Institute's liability committee, Doctor -- Mr. Domeny.  That's their expert witness, whose own company, as you know from the questions, has been sued for not doing the exact same thing that Ryobi didn't do.

Certainly, he's not a disinterested person.  Mr. Appel criticizes Mr. Holt because he comes in -- he's a mechanical engineer, and he comes in and testifies in cases like this. But what about Mr. Domeny who has every interest to try to convince you that this is -- that flesh detection is a bad idea because his own company is being sued as we sit here?

Now, ladies and gentlemen, the test -- the judge is going to charge you on the legal standard.  The test is not whether the defendants had gotten around by 2004 to incorporating this technology but whether it was mechanically

feasible to do so.  That's the question.  Was it mechanically feasible, when this product left the defendants' hands, to use SawStop technology or any other kind of flesh-detection technology?

Of course, they could have used the technology.  For one thing, Doctor Gass already had a saw on the market in 2004. We know that.  That's undisputed testimony.  Doctor Gass first delivered the saw to customers in May of 2004, May of 2004, ladies and gentlemen.

And you heard Mr. Peot testify that Ryobi knew about capacitance technology, which is the basis of Doctor Gass' technology, in the 1970s, 1970s.  And you heard him testify on direct -- I didn't bring this out.  You heard him testify on direct that Mr. Minalga was an expert on capacitance technology, Mr. Minalga being one of the members on his team. I showed you that agenda -- that committee that never did anything?  And Mr. Minalga was listed there.  He was on the team because of his expert knowledge in capacitance technology. They'd known in the '70s about the underlying concept of you can have a technology where it will detect a contact.

So let's look at the time line, and I'm going to show you, ladies and gentlemen, a time line of the events that you've heard in the testimony in this case.  And October, 2004, is the critical date.  That's the date that this saw left the hands of Ryobi.  Stephen Gass testified -- Stephen Gass

testified that after two years of trying to get manufacturers to adopt his technology, he realized that he was going to have to go out and build his own saw. He was going to have to find a manufacturer. He was going to have to find mechanical expertise and build his own saw. And he testified that he did that in July of 2002. And he had a saw on the market, shipped to customers, by May of 2004.

So Doctor Gass, who's working out of his barn, with a couple employees, and a few investors, is able to put the saw on the market in less than two years, less than two years. And he actually delivers it in May of 2004, five months before this saw left the hands of Ryobi.

And you also heard testimony that on January 18, 2002, January 18, 2002, Ryobi signed the contract. And, again, I'd like you to look at the contract because the contract makes a commitment that they will have a saw on the market, not a prototype, a saw delivered to customers, in 24 months, or January, 2004. So if Ryobi had any sense of urgency about this, when they signed the contract and they started right away, if that committee -- remember the agenda --

THE COURT: Mr. Carpinello.

MR. CARPINELLO: I'm sorry, your Honor.

That agenda was dated January, 2002. And you heard Mr. Peot say that the committee did nothing because it got no funding. If the committee had gotten the funding and Ryobi

8-47

said they would do it in 24 month, I asked Mr. Bugos, was that a realistic time fame?  And Mr. Bugos said, I wouldn't have put it in the contract if it wasn't realistic.

And on that same agenda, again, that January, 2002, agenda, Mr. Peot said, Here's our time frame.  We will have a product on the market in 24 months, the exact same time frame on that agenda.  And if they had done that, they would have had a product on the market in January of 2004.

But the reality is, ladies and gentlemen, that they were on notice of the technology and they knew about it and they had the prototype to test in October of 2000.  Again, if they had any sense of urgency -- they took 13 months to negotiate a contract with Stephen Gass.  If they had any sense of urgency, and if they had started right away, given the same 24-month time frame, they would have had a product on the market in October of 2002, two years before the product left the market.

Now, let's go back even more, ladies and gentlemen, because, in 1998 -- you heard the testimony that in 1998 Ryobi was on notice from the Consumer Product Safety Commission about the inordinate number of accidents.  And if they had started Phil Minalga and their capacitance people on doing what Doctor Gass did in a couple of months in his barn, if they had done the same thing, they could have had a flesh-detection technology product on the market in 2000, four years, four

years, ladies and gentlemen, before this product left their hands.

Was it mechanically feasible?  There's no question it was mechanically feasible.  These dates are not disputed.  You heard no testimony in the case disputing a single date that's on that screen.

Now, Mr. Appel told you that Ryobi never intended to put the product in a small saw.  They intended to put it in large saws like the Craftsman saws.  We never intended to put it in a small saw.  Ladies and gentlemen, whether you believe that or not, whether you believe it or not, it's irrelevant.  It's totally irrelevant.  The question is not what Ryobi intended to do, what Ryobi wanted to do, what their plan was.  The question is whether it was mechanically feasible.  That's the only question.

And by the way, if -- they say that was their intent, is there a single Craftsman saw on the market?  Did you hear any testimony about any Craftsman saw on the market having flesh-detection technology?  There isn't.  The testimony was there isn't any saw on the market, other than Stephen Gass', with flesh-detection technology.  So how believable was that that that was what they were going to do?

Now, the manufacturers raised all kinds of concerns.  They had all kinds of concerns with SawStop:  wet wood, you know, false trips, false sense of security.  I love that one.

As Bob Holt said, if that were a reason not to adopt the technology, you wouldn't have seat belts or air bags because people -- it's going to encourage people to drive recklessly because they have a false sense of security.  God forbid, we give them a harness and an air bag if they get in an accident.

But they had all these concerns about whether it would work at all, they say.  And then, the unexpected happened.  Doctor Gass actually produced his own saw.  So then they thought, oh, my God.  Well, the argument that it's not going to work -- and he started selling them.  And he's been selling them for how many years?  Since May of 2004.  He's been selling them.

So they were down to one argument, and that was, oh, but he didn't put it in a small saw.  He didn't put it in a small transportable job site saw and that's the final argument.  That's the last line of defense.  You can't put it in -- you can't put it in this saw.  Don't believe it because the evidence is to the contrary.

First of all, as Mr. Domeny acknowledged, Bosch did testing in 2002 on a direct-drive saw.  And on direct testimony -- I love this.  I really -- he had -- on the screen he had that spindle, I think he called it, and he talked about how they did the test.  They put the brake on the Bosch 4000, which is their transportable saw.  It's a direct-drive saw.  And he said, We put the brake on the blade and we got damage to

the saw.  And he put the part on the screen and he said, you know, You see that shear there, ladies and gentlemen?  You know, that shear shows the damage.

But he didn't say anything about the report that the photograph came out of, which was kind of an amazing omission, because the report that he took the photograph out of said that it was feasible to develop flesh-detection technology like SawStop in a direct-drive saw.  That was the conclusion in the report.  But he didn't mention that.

Mr. Domeny also testified that you could put it in a 60- to 90-pound saw.  This is 58 pounds.  He admitted on the stand, under cross-examination, that he had previously testified that it can be used on a 60- to 90-pound saw.  So the argument that it's not feasible in a small saw was rejected by the defendants' own expert.  And then he acknowledged a fact that he didn't mention on direct, that the joint venture is developing flesh-detection technology for a 40- to 60-pound saw.

And this issue about direct-drive, ladies and gentlemen, it's a canard, it's a smokescreen, because, as you -- you heard testimony about the fact that there are small saws, lighter and cheaper than this saw, which are belt-driven.  And so all this argument about how it's going to cause problems with a direct-drive saw, which, by the way, is false, is irrelevant because you can use it on a belt-driven saw, and

that's what the joint venture is doing.  They are using a lightweight, belt-driven saw.

Now, it is amazing what Mr. Domeny can testify about and still leave facts out.  He testified for four hours on direct, but he left out all kinds of facts.  He showed you the sheared pin.  He didn't tell you that the report that photo came out of said we can overcome this and he laid out how to overcome it.

He said, after the meeting with the CPSC, we went and started to design a new guard, but he didn't tell you that the manufacturers did nothing after that meeting until Stephen Gass came out with SawStop technology, and that was two years later when they started to redesign the guard.

He told you about hazard analysis.  He said, First you have to design the product and design it out, and if you can't do that you have to safeguard.  And then the next step is warning.  He left out the most critical step of the analysis, and that is, when you get to the safeguard step, when you get to the step that you put a safeguard on the product, that you're not done.  You have to determine whether the safeguard is doing its job because if it makes it difficult to use or the safeguard itself is difficult to use or there's anything about the design that encourages users not to use the guard, then you have to do something else.  He completely left that out of his testimony.  And that's the most critical part because we know

that people were not using the guard for all the reasons that people don't use the guards.

And he also left out -- and this is critical because he kept talking about a transportable job site saw -- that this is not a transportable job site saw. This is a shop saw. Mr. Hill acknowledged under cross-examination that he had previously testified that this was put out to be put in the shop. It was not put out to be carried around. That's why, ladies and gentlemen, it has the stand that it does.

Saws that are designed to be carried around have wheels, ladies and gentlemen. They have wheels. And how long has Ryobi known about wheels? Oh, I think we've known about wheels, I don't know, what? 10,000 years maybe? This is not a transportable saw. So the whole idea that you can't put it in a saw like the BTS 15, because you can't carry it from job to job, that's also a canard.

And Mr. Domeny told you -- and this was cute, I've got to say. He got on the stand. He talks about the CPSC data and he uses the number 84. He said 84 injuries. I looked at the 84 injuries in their study. And what he was referring to -- you didn't know it because you didn't know what he knew at the time. He was referring to specific case studies when the CPSC went out and actually interviewed people injured.

But he didn't tell you what he later acknowledged under cross-examination, because I knew it, was that it wasn't

84. It was approximately 33,000 injuries treated in hospitals a year. Why didn't he mention that number in his direct?

And then -- and this was the ultimate -- he shows you two videotapes of tests that he did where he shows the blade slicing the hotdog. And what was the purpose of that other than to try to convince you that SawStop doesn't work? So I get up and I say to him, Mr. Domeny, how do you explain the fact that the Consumer Product Safety Commission had exactly the opposite result? I can't explain that. Or that Doctor Gass has had -- done this thousands of times and never had a failure? Or that it's working in the field and it's been working in the field for six years?

And then he admits, "I have many instances where the saws work just fine. I don't know how many tests they done, referring to PTI. They have done probably altogether maybe close to a hundred evaluations and this thing was not -- whatever was illustrated was not the predominant way how the outcome was. It was an exception, but it was an exception."

So he chose, out of all the tests that they did -- what he acknowledged was the exception, and then he acknowledged that he had sent an email to the other people at the PTI saying, I can't explain this aberrational result that we got. And out of all the videos that they had created, which show the SawStop working, which show it stopping in milliseconds, of all those videos, what did he choose to show

8-54

you?  What he acknowledged was an unexplained exception from the tests.

Let's talk just a second about the standard.  You've heard that from Mr. Appel.  You heard it from Mr. Domeny.  You heard it from Mr. Peot.  This saw complies with the standards.  Who writes the standards, ladies and gentlemen?  Who writes the standards?  The industry writes the standards.  Mr. Domeny wrote the standard.  You heard Mr. Domeny testify, did you not, oh, I -- I wrote the draft.  I wrote the draft, the draft that was adopted by a committee dominated by manufacturers.

As Doctor Gass testified, having Underwriters Laboratories determine whether this is the safest reasonable design is like the fox watching the henhouse.  It's the manufacturers adopting a standard so they can come into court and say don't hold us liable for not adopting a technology we've known about for ten years because we complied with the standard.

Now, I told you in the beginning of my opening that they would blame Mr. Osorio, and they have.  At the time he was 25 years old.  He had no experience in construction.  He had never seen the blade guard on this saw.  He was never told to use it.  He never saw the manual, which, by the way, take a look at it because nowhere does it tell you where to put your hand in the kind of cut that Mr. Osorio was doing.  And we'll get to that in a minute.  But he never saw it anyway.  No one

8-55

ever told him that he shouldn't use this saw on the floor.  He testified that when he was making a straight cut he did use the fence.

And now, here, ladies and gentlemen, I've got to say, I just -- to say that Mr. Osorio lied to you is really, in my opinion, beyond the pale because what Mr. Appel did was he took the deposition testimony of Mr. Osorio, which, as you know, was translated.  The question was translated into Spanish.  The interpreter then asked Mr. Osorio.  Mr. Osorio answered in Spanish.  And the interpreter then gave it back in English.  And Mr. Appel jumped all over the fact that Mr. Osorio said that he was doing a straight cut.

But what Mr. Appel never asked was -- he never asked and it's in the record that he never asked -- were you doing a taper cut, which, incidentally, ladies and gentlemen, is a straight cut.  A taper cut is a straight line, as Mr. Osorio showed you, going from one end to the other, which takes more off of the top than at the bottom.  That's why he wasn't using the fence because the fence makes a parallel straight cut, not a tapered cut.

And despite all the translators and despite all the translation, Mr. Osorio did get out, even though Mr. Appel never asked the question, of the kind of cut he was doing.  And he said what he was doing was "a little bit of the edge and a little more."  "A little bit of the edge and a little more."

But if Mr. Appel had ever asked the question, he would have gotten the same answer that he got in the courtroom, which was that he was doing a tapered cut.

Now, Mr. Appel, as Mr. Domeny, made much of the fact that Mr. Osorio -- incidentally, ladies and gentlemen -- may I, your Honor, illustrate?

THE COURT:  Yes.

MR. CARPINELLO:  The guard that Mr. Domeny put on the saw yesterday that's still here, this is not the guard to this saw.  This is the guard to the new saw.  And the reason Mr. Domeny -- he's very clever.  The reason Mr. Domeny did not use this -- I'm sorry, fence, not guard.  The reason Mr. Domeny did not use this fence is because it doesn't work.  You saw Mr. Appel illustrate how it jumps up when you put it on the machine.

So Mr. Domeny, when he did his demonstration, carefully took this guard and put it on to do his demonstration.  And Mr. Domeny -- I said to Mr. Domeny, Well, Mr. Domeny, you're critical of the fact that Mr. Osorio put his hands on the wood.  How would you do it?  And he said, I would cup my hand -- cup my hand over the fence.  And you may remember this.  I said, So you have your four fingers in front of the blade, also.  He said, Oh, the better way to do it is this way where you move the fence -- he had the fence over here.  He said, The better way to do it is this way.  And then

the wood fell on the floor. I don't know if you remember that. What he first did, his first reaction when I asked him to illustrate it was, he did this. He put his hands right in front of the blade, which is the way everybody does it.

The problem with this saw, ladies and gentlemen, is the blade is only five inches from the edge. And Mr. Domeny admitted that if you have -- even if you have the guard down, as soon as you put the wood here, if you're making this kind of cut, your hand can slip right under that guard. And even if he had the guard on -- Mr. Domeny admitted this. Mr. Appel talked about the failure to use the guard, I think, two or three times in his opening. Mr. Domeny admitted expressly that the failure to have the guard on the saw was not a cause of this accident. He was very clear on that. Yet, Mr. Appel, just like in his opening, criticized Mr. Osorio for not using the guard, a guard which the industry recognizes is so bad that they completely redesigned it.

So he didn't use the guard, which Mr. Domeny said is not a cause of the accident. And he didn't use the fence because he said he was making a taper cut. And, incidentally, ladies and gentlemen, about this fence, you heard -- this is important because it's a matter of elementary physics. You remember Mr. Domeny did that 45-minute lecture, and he drew the blade, and he had all these vectors and everything.

THE COURT: Mr. Carpinello.

MR. CARPINELLO: I'm sorry, your Honor. He had all these vectors. And the point he was making -- I'm not sure of the point he was making. But one point that came out is that in the front of the blade where the cut was occurring here, the blade is going downward. It is pushing down on the wood. And Mr. Holt testified, the reason you use a fence, the reason you use a fence is to prevent kickback because in the back of the blade, the blade is going up. And Mr. Domeny illustrated this with arrows.

So if the wood is coming -- if you're cutting and the wood is approaching the back of the blade, you have a risk, if the wood is at all crooked, the blade will bind against that wood and kick that wood back. And Mr. Domeny talked about kickback and how the wood will go back.

The fence -- as Mr. Holt testified, the fence is designed to keep the wood straight so that it doesn't go crooked and bind against the back of the blade. Where did this accident occur? In the front of the blade. Mr. Osorio testified that he had barely made the cut. He was less than an inch -- less than half an inch into that wood when his hand slipped into the blade. So this whole notion that the fence was the cause of the accident is made up. The fence is there to prevent kickback, in the back of the blade.

So the absence of the fence wasn't a causative factor. But even if it were, the law is that the manufacturer, who

knows a whole lot more about this than Mr. Osorio, who's been making these saws, putting these saws on the market, knows a whole lot more about saw safety than Mr. Osorio, they're obligated by law to design for foreseeable use and foreseeable misuse.  They are required to design the saw to avoid serious injury when it's used in a way that they can foresee it's going to be used.

They knew people did not use the fence.  Mr. Domeny admitted it.  I asked him expressly on the stand.  "Was use of this saw without a fence foreseeable?"  "ANSWER:  Yes."

"Was use of the saw without a guard foreseeable? "ANSWER:  Yes."

These were all foreseeable uses.  They have an obligation under the law to design the saw so it is not dangerous when it's used in that manner.  That's the law.  So even if you bought everything that Mr. Appel said and everything that Mr. Domeny said about this fence or this guard, they had a duty to make it safe even if they didn't use these devices because they knew people did not use them.  They knew what was going on in the field.  They knew what floorers were doing.

So what's the result of all of this, ladies and gentlemen?  What was the result of Ryobi's conscious, considered, deliberate decision over all these years not to make a safe saw?  The result was a near amputation of Mr.

Osorio's pinky.  It was a cut through the second finger.

May I have the photographs.  You know -- you saw what Mr. Osorio saw when he woke up from his surgery.  Days later, it looked like this.  You recall that there was a cut across all five fingers.  You recall that they had to take a tendon out of his wrist to try to fix the tendons in his hand.  You recall that they actually drilled -- they drilled through his fingernails to put buttons in to try to hold his fingers to try to save the tendons.  You know that despite all those efforts these tendons atrophied, and he's left with a hand that's like this permanently and that he's been advised that he should consider, because of the pain, because of the discomfort, because of the disfiguration, that he should consider complete amputation of those fingers.  And you know, because he testified, that although he can move the other three fingers, he has pain and numbness in the other three fingers.  He's going to have that, ladies and gentlemen, for the rest of his life.

He went through five surgeries.  He went through 94 visits to physical therapists.  It took him two years to recover.  Yes, he went back to work, and that's a credit to him.  Despite the fact that he's got pain, numbness, restricted use, he went back to work.  He's not a malingerer.  He had $384,000 in medical expenses.  And, yes, he is asking for compensation from Ryobi and the people who control it:  Mr.

Bugos, Mr. Whiffen and their former executive, Mr. Dils.

And why did he have to go through that?  Why did he have -- why does he have to endure 47, his life expectancy -- he's 30 years old.  Life expectancy table, which you'll see, says his normal life expectancy is another 47 years, 47 years of enduring this, ladies and gentlemen, instead of a two-millimeter cut.

Now, as between Mr. Osorio, who you may think should have been safer -- as between Mr. Osorio and Ryobi, who made a conscious, deliberate, callous, considered decision not to adopt this technology, not to do anything in 2000, not to do anything in 2002, not to give Mr. Peot a dime to do the study, and then to join a joint venture because they were concerned about product liability and they didn't want to pay Stephen Gass $5.50 on a royalty on this thing -- as between them and Mr. Osorio, who do you think should bear the loss?

Let me come back to my opening.  I told you in my opening, ladies and gentlemen, that it's necessary to end this type of corporate decision-making.  And it is up to you to determine who should bear this loss for the next 47 years.

Perhaps the best way to end, to summarize -- and I'm glad -- I'm sure you're glad I am -- is to use the words of Mr. Hill when he said from the stand, "I've learned so much during the course of this trial."  Indeed, he has.  Hopefully, we've all learned quite a bit from this trial.  But it's a stunning

admission from Ryobi's safety director that he has learned so much from this trial.  Why didn't he learn it in 2000?  Why didn't he learn it in 1998?  Why didn't he learn it in 2002?  Why didn't he learn it in 2004?  But he's finally learned it, presumably.

Let's hope, ladies and gentlemen, that there doesn't have to be another injured worker who has to say in testimony on that stand, as Mr. Osorio did, "I feel awful.  I feel like a failure.  I feel that I can no longer bring an improvement to my life through my studies.  I just can't do it."

Please tell him he's not a failure.  Please tell him the failure was not his, that it was the failure of those who made a very conscious decision many, many, many years ago not to spend the time and the money to make a saw like this safe.  Thank you.

THE COURT:  All right, jurors.  We're now going to take a recess before I give you my instructions on the law.  And because I have another commitment, this is going to be a little bit longer break than we normally have.  I'm going to need about one-half hour.  We will be in recess.  Let's say 25 minutes, till 20 of 12.  It may go beyond that, but we'll be in recess until then.

(The jury left the room at 11:17 a.m.)

THE COURT:  All right, counsel.  We will be in recess for at least 25 minutes.  I'd like you to be ready to come back

8-63

at 20 of, but it may not be until quarter of.

(Recess taken.)

(After recess, start at 11:43)

THE COURT:  Good morning, again, jurors.

THE JURY:  Good morning.

THE COURT:  You have now heard the evidence and the closing arguments in this case.  It is now my duty to instruct you on the law that you must follow and apply.  In any jury trial there is, in effect, two judges.  I am one of the judges, and you collectively are the other.  It is my duty to preside over the trial and to determine what testimony and evidence is relevant under the law for your consideration.  It is also my duty at the end of the case to instruct you on the law applicable to this case.  You, as jurors, are judges of the facts.  But in determining what actually happened in this case, that is, in reaching your decision on the facts, it is your sworn duty to follow the law as I am about to define it for you, and when you finish -- or when I'm finished, you will commence your discussions with one another, which we call jury deliberations.

Now, to help you understand and remember these instructions on the law, I will divide them into three parts. First, general instructions, intended to guide you throughout your deliberation; second, instructions about the claims and about the questions that you will be asked to answer as stated

on the verdict form and about the law that you must apply in considering those questions; and third, some additional general instructions about the procedures that you are to follow during your deliberation.

Now, these instructions are somewhat complicated and I ask you to pay very careful attention. I need to read them to you because I cannot commit to memory all of the law of which I have to instruct you, but I will submit to you a written copy of these instructions when you go to the jury room. I want to caution you right away, however, not to dwell on any one particular portion of it, if you decide to review it at all, because you must consider these instructions as a whole and not just one individual particular instruction. So I ask you to do the best you can to stay with me.

Now, all of my instructions are about the law you must apply. I do not mean any of these instructions to be understood by you as comment by me on the facts or on the evidence in this case. It is your function to determine the facts. Although the law allows a trial judge in this court to comment on the evidence, I deliberately do not do so and, instead, leave the fact-finding entirely in your hands. You are the sole and exclusive judges of the facts.

Fortunately, you do not need to resolve every dispute of fact raised by the evidence. In order to know which fact disputes are important, you need to know what rules of law to

apply.  I've explained some of those rules to you during the course of the trial, and I'll explain others to you now.  The lawyers were allowed to comment during their arguments on some of these rules of law, but if what they have said about the law differs in any way from my instructions, you must be guided only by the instructions on the law as I state them.

You must follow all of the rules as I explain them to you.  A single sentence or statement might not refer to an exception or a qualification that I state elsewhere in these instructions, so you must consider them altogether as a unit.

And even if you disagree with one or more of these rules of law or don't understand the reasons for them, you are bound to follow them nevertheless.  This is a fundamental part of our system of government by law rather than by the individual views of the judge or the jurors who have the responsibility for deciding a case.  If I make a mistake in instructing you on the law, fair and even-handed application of the law to this and other cases is nevertheless assured, because any mistake I make on the law can be appealed.

In contrast, your decision on disputed facts is final.  That is, your findings on material disputed facts are not subject to appeal.  You are the final and exclusive judges of the facts.  In your fact-finding, of course, you are not to be swayed by bias, prejudice, sympathy, or antagonism.  It is your function to find facts fairly and impartially on the basis of

the evidence.

And the evidence in this case consists of all exhibits received into evidence, all facts that may have been admitted or stipulated to, and all of the sworn testimony of the witnesses. A stipulation means simply that the parties accept the truth of a particular proposition or fact. Since there is no disagreement, there is no need for evidence apart from the stipulation. Chalks, charts, and demonstrative exhibits that were used to illustrate or explain a witness' testimony are not evidence. Statements and arguments of counsel are not evidence in the case. Any evidence ordered stricken by the Court must be disregarded, and anything you have seen or heard outside of this courtroom is not evidence and you must disregard it entirely. Your verdict must be based solely on the evidence presented in this courtroom and in accordance with these instructions.

Now, also from the facts proved you may draw reasonable inferences about additional facts. An inference is a deduction or a conclusion. An inference is an additional finding that your experience, reason, and common sense lead you to draw from facts that you find are proved by the evidence.

Two more phrases often used in discussions about evidence received at a trial are "direct evidence" and "circumstantial evidence."

Testimony of a witness showing firsthand observation

8-67

of a fact by that witness is direct evidence.  For example, the testimony of an eyewitness just about what he or she saw is direct evidence.  If the witness is permitted to go beyond what he or she saw and is permitted to state a conclusion or an inference or an opinion, that part of the answer is not direct evidence, instead, it's a kind of circumstantial evidence.

Circumstantial evidence is proof of some facts, including events and circumstances, on the basis of which the jury may infer the existence or nonexistence of additional facts.

For example, let's suppose you've been in this courtroom for a couple of hours and unable to look outside.  A man comes into the back of the courtroom wearing a wet raincoat and carrying a dripping umbrella.  You may draw the inference from those circumstances that it is raining outside.  That is what we call circumstantial evidence.  As opposed to direct evidence, which would be the testimony of that man in the wet raincoat taking the witness stand and telling you that it is raining outside.

Now, direct and circumstantial evidence have equal standing in the law.  That is, with respect to what weight shall be given to the evidence before you, the law makes no distinction between direct and circumstantial evidence.  No greater degree of certainty is required of circumstantial evidence than of direct evidence.  You are to consider all of

8-68

the evidence in the case and give each item of evidence the weight you believe it deserves.

Now, any inference that you draw from facts proved must be a reasonable one and not merely conjecture or guesswork. You might decide that you do not have a sufficient basis to decide what inference to draw. It is for you, as judges of the facts, to decide whether the evidence before you is or is not sufficient for you to draw an inference. Ultimately, in drawing inferences you should use your common sense.

If any reference by the Court or by the lawyers to matters of evidence is different from the way you remember the evidence, let your collective memory control.

At times during the trial you heard lawyers object to questions asked of the other lawyer and to answers by witnesses. It is a proper function for lawyers to object. In objecting, a lawyer is requesting that I make a decision on a question of law. Do not draw from such objections or from my rulings on them any inferences about facts. The objections and my rulings related only to legal questions that I had to determine. They should not influence your thinking about facts. When I sustained an objection to a question, the witness was not allowed to answer. Do not attempt to guess what the answer might have been; and if you heard an answer to the question before my ruling, you are to disregard it. In

your deliberations, do not consider or talk about any question to which I sustained an objection or any answer or other statement that I excluded or struck or told you not to consider.

Also, during the course of the trial I may have made comments to the lawyers or spoken to a witness concerning the manner of his testifying.  Do not assume from anything that I may have said that I have any opinion concerning any of the issues in this case.  Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings about the facts.

Now, at the beginning of the trial I instructed you about taking notes.  I remind you that notes taken by any juror are not evidence in a case and must not take precedence over your independent recollection of the evidence received in the case.  Notes are only an aid to recollection and are not entitled to any greater weight than the actual recollection or impression of each juror as to what the evidence actually is.

Now, an important part of your job as jurors will be deciding whether and to what extent you believe what each witness had to say and how important that testimony was.  You are the sole judges of the credibility of each witness.  In deciding whether to believe a witness or how much weight to give to that witness' testimony, you may consider anything that reasonably helps you to assess the testimony.  The following

8-70

are the kinds of questions that you may want to consider in evaluating a witness' credibility:  Did the person seem honest?  Did he have some reason not to tell the truth?  Did the witness have an interest in the outcome of the case?  Did he gain any personal advantage by testifying in the case?  Did the witness seem to have a good memory?  Did the witness' testimony differ from his earlier testimony or from the testimony of other witnesses?  Was the witness' testimony different on cross-examination than it was on direct examination?  What was the witness' manner while testifying?  These are some, but, of course, not all of the kinds of things that may help you decide how much weight to give to what each witness had to say.

You may also consider any demonstrated bias, prejudice, hostility of a witness in deciding what weight to give to the testimony of that witness.

The mere number of witnesses or exhibits or the length of the testimony has no bearing on what weight you are to give to the evidence or on whether you find that the burden of proof has been met.  Weight does not mean amount of evidence.  Weight means your judgment about the credibility and importance of the evidence.

You may consider inconsistencies or differences as you weigh the evidence, but you do not need to discredit testimony merely because an inconsistency or difference exists.  Two or more witnesses may see or hear things differently.  Innocent

8-71

misrecollection, like failure of recollection, is a common experience.  In weighing the effect of any inconsistency or difference, consider whether it concerns a matter of importance or an unimportant detail and whether it results from innocent error or intentional falsehood.

On the other hand, you're not required to accept testimony merely because it is uncontradicted.  You may decide because of a witness' bearing or demeanor or because of inherent improbability or for whatever reason that testimony is not worthy of belief.  You may accept all of a witness' testimony or you may reject all of it or you may accept part and reject another part.

Now, during the trial, some testimony was presented to you by the playing of deposition videotapes and the reading of deposition transcripts.  A deposition is simply a procedure where the attorneys for one side may question a witness or an opposing party under oath in the presence of a court reporter prior to trial.  This is part of pretrial discovery, and each side is entitled to take depositions.  This sworn testimony is entitled to the same consideration you would give it had the witness personally appeared here in court.

During the trial you heard testimony from individuals having specialized skill or knowledge.  Such a witness is sometimes referred to as an expert witness.  The mere fact that a witness is allowed to testify as one having specialized

knowledge or experience does not, however, indicate that you must believe that testimony. Nor should you substitute the expert's testimony for your own reasonable judgment and common sense. The credibility of each witness is for you to determine.

The law allows a person having specialized knowledge or experience to state an opinion in court about matters in that person's particular field. The fact that a witness expressed an opinion does not mean you must accept the opinion. It is for you to decide whether the opinions expressed were mere speculations or guesses, which you should disregard, or were instead based on sound, reasoned judgment and facts.

If you find that part or all of the opinion testimony was based on stated or unstated assumptions and you further find that those assumptions are contrary to what you find the evidence before you to be, then you will disregard any part of the opinion testimony that was based on assumptions contrary to your factual findings.

Also, your decision whether or not to rely upon opinion testimony of an expert will depend on your judgment about whether the expert's training and experience is sufficient for him to give the opinion that you heard.

It is up to you, bearing all of these considerations in mind, to decide whether you believe and choose to rely on the testimony of a witness having specialized knowledge or

8-73

experience.  You may accept all of it, part of it, or none of it as you find appropriate.

Because this is a civil case, the plaintiff has the burden of proving every disputed element of his claims by a preponderance of the evidence.  If you conclude that the plaintiff has failed to establish a claim by a preponderance of the evidence, you must decide against the plaintiff on that particular claim.

To establish something by a preponderance of the evidence means to prove that it is more likely true than not true.  It means that such evidence, when considered and compared with the evidence opposed to it, has more convincing force and produces in your mind the belief that what is sought to be proved is more likely true than not true.  As I said at the beginning of the trial, to put it differently, if you were to put the plaintiff's and the defendants' evidence on opposite sides of the scale, the plaintiff would have to make the scales tip somewhat to his side with respect to that claim.  In determining whether any fact, any issue has been proved by a preponderance of the evidence, you may consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received into evidence, regardless of who may have introduced them.  The burden of proof has not been carried if, after considering all of the evidence, you find you must speculate, guess, or imagine that one or more of the necessary

facts is true.

Although on the claims in this case the burden is on the plaintiff to prove his contentions on that issue by a preponderance of the evidence, this rule does not, of course, require proof to an absolute certainty, nor is proof beyond a reasonable doubt or by clear and convincing evidence required. As to all of the issues in this case, the standard for defining the burden of proof is the preponderance of the evidence standard.

In many cases there is an element of sympathy which surrounds the trial. People involved in the case may be deserving of sympathy in everyday life. However, the courtroom is not a place for sympathy. When you decide this case, you must do so on the basis of the facts as you find them, disregarding sympathy and emotion. You must consider the evidence in a calm, dispassionate, analytical manner in accordance with the burden of proof I've just described and the specific instructions I will give you momentarily. You also may not consider the relative financial status of the parties, but should reach a verdict based solely upon the evidence presented during the trial and my instructions on the law.

The fact that the defendants in this case are corporations does not mean that they are entitled to any lesser consideration by you than if they were individuals. All litigants, corporations as well as individuals, are entitled to

your fair and unbiased consideration.

In the remainder of these instructions, I will refer to the plaintiff, Carlos Osorio, as the plaintiff or Mr. Osorio; and I'll refer to the defendant Ryobi Technologies Incorporated as Ryobi, and the defendant One World Technologies, Inc. as One World, and the defendant Home Depot U.S.A., Inc. as Home Depot. And I may refer to the defendants collectively simply as the defendants.

Now, in this case I will submit specific questions to you in a verdict form. First, I will summarize the claim and explain how to apply the law to that particular claim. In a moment, my deputy clerk will distribute copies of the verdict form that you will have with you in the jury room, and I will explain and refer to from time to time these -- this particular form during the remainder of these instructions.

The plaintiff in this case has brought claims against the defendant for negligence and breach of warranty.

And now I'd like Mr. Nicewicz to pass out the forms.

(Pause.)

THE COURT: When you get them, you'll notice that there's three pages, and there are a lot of questions, so what we're going to do is I'm going to read one question and then ask you to put the form down, we'll talk about that question, then we'll go back and forth, but I don't want you reading the form while I'm instructing you on that particular question.

As you'll notice, it is entitled "Verdict Form," and the first section is with reference to negligence, and the first question, 1a, reads as follows:  "Were the defendants Ryobi Technologies, Inc. ("Ryobi") and/or One World Technologies ("One World") negligent in designing the Ryobi BTS 15 table saw used by the plaintiff, Carlos Osorio (Mr. Osorio), on the date of his accident?"  And there's a place for you to answer that question yes or no.

And I ask you now to put the form down, we're going to talk about negligence.

The plaintiff, Mr. Osorio, has brought a negligence action against the defendants Ryobi and One World alleging that they were negligent in failing to incorporate the SawStop or similar flesh-detection technology into the Ryobi BTS 15 table saw, which would have prevented or at least mitigated his injuries.

Negligence generally is the failure to exercise that degree of care which a reasonable person would exercise in the circumstances.  Negligence in its ordinary sense is the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance, and forethought which in the discharge of the duty then resting on him a person of ordinary caution and prudence ought to exercise under the particular circumstances.

In this case you are asked to consider whether the

defendants Ryobi and One World exercised that degree of care which an ordinary, reasonably prudent manufacturer would have exercised in like circumstances.

In order to prevail on a claim of negligence, the plaintiff must prove by a preponderance of the evidence that, first, those defendants owed a duty to the plaintiff; second, those defendants breached that duty; third, the plaintiff has suffered injury or damage; and fourth, the subject defendants' breach of their duty was a cause of the plaintiff's injury or damage.

A manufacture of a product which the manufacturer knows or should know is dangerous by nature or is in a dangerous condition or is likely to become dangerous owes a duty to exercise reasonable care to prevent injury to those persons who foreseeably will come into contact with and consequently may be endangered by that product.  The manufacturer's duty is one of reasonable care, not perfection. The defendants are held to that standard of care which the ordinary, reasonably prudent manufacturer would have exercised in like circumstances.

A manufacturer of a product has a duty to the foreseeable users of the product to design its product with reasonable care in order to eliminate dangers that are avoidable and to eliminate unreasonable dangers.  The manufacturer must anticipate the environment in which the

product will be used and design against reasonably foreseeable risks attending the product's use in that setting.  A product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product unreasonably safe.  Unreasonably dangerous that ought to be.

The manufacturer's duty is to design a product that is reasonably safe.  It has no obligation to develop safety devices to protect against dangers that are only remotely possible or highly speculative.  No designer is required to make a product that is risk-free or risk-proof, but a manufacturer must anticipate the environment in which its product will be used as discussed earlier.  In evaluating whether this product was designed with reasonable care, you must weigh several factors.  These factors include:  The gravity of the danger posed by the challenged design, the likelihood that an accident would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

In considering whether there was negligence in the design of this product, that is, the BTS 15 table saw, you should also consider all of the other relevant factors,

including:  Whether the product performed as intended; whether those hazards, which could reasonably be eliminated, had been eliminated; and whether there were adequate warnings or instructions to avoid those hazards that remained; and whether they were obvious.  A manufacturer may still be liable for negligent design if the plaintiff has shown an available design modification that would reduce the risk of injury without undue cost or interference with the performance of the product, even if the product performed as intended and was accompanied by adequate warnings and instructions regardless of whether the danger was obvious.

With respect to duty and breach, several additional instructions are relevant here.  First, a defective design, which causes, enhances, or worsens the plaintiff's injury renders the manufacturer liable if the risk is reasonably foreseeable.

Second, the manufacturer's duty of reasonable care extends to the purchaser of the product and also extends to all others whose use of the product was foreseeable.

Third, the fact that the defendants' table saw may have complied with the usual custom or standard in trade does not establish that the defendants' exercised due care or that the saw was fit.  You may consider, however, such trade customs or standards, but they are not conclusive or controlling.  The essential question is whether the defendants acted with

reasonable care under all of the circumstances, and whether their product was reasonably fit for its foreseeable purposes.

Finally, the state of the art is the level of pertinent scientific and technical knowledge existing at the time of the design, manufacture, or sale of the product.  In negligence actions, evidence that the manufacturer has conformed to business customs, industry customs, or state-of-the-art design concepts is relevant.  This evidence, however, is not determinative of the fact of whether or not the defendants exercised due care.  You must still consider, in light of the facts and circumstances which you find, whether the defendant exercised due care.

Now I'm going to go back to the verdict form, and back on the first page, after that first question, which you were asked to answer yes or no, there is an instruction; that is, a note.  It says:  If you answer subpart (a) "Yes," then answer subpart (b).  If you answer subpart a "No," then you'll proceed to question 2, which is over on page 2.

But for the moment, let's assume that you have answered that first question "Yes."  Then the second question, 1b, says:  "Was the defective design of the Ryobi BTS 15 table saw used by Mr. Osorio on the date of the accident a cause of the accident?"  And a place for you to answer that question yes or no.

And I'll ask you to put the form down.  We're going to

talk about causation.

Now to the meaning of causation.  If you decide that the defendants were negligent, you must then consider whether the defendants' negligent conduct caused the plaintiff's injuries.  Even if you find that the defendants were negligent, the defendants are not liable to the plaintiff unless their negligence caused or increased the plaintiff's harm.  To meet his burden, the plaintiff need only show that there was a greater likelihood or probability that the harm complained of was due to causes for which the defendants were responsible than from any other cause.

The defendants' conduct was the legal cause of the plaintiff's injury if it was a substantial factor in bringing it about and without which the harm would not have occurred.  In other words, if the harm would have occurred anyway, the defendants are not liable.

It does not matter whether other concurrent causes contributed to plaintiff's injuries as long as you find that the defendants' conduct was a substantial factor.  Substantial is used here in its ordinary sense which requires no further elaboration.

Furthermore, to establish causation, the plaintiff must show that the general kind of harm was reasonably foreseeable to the manufacturer in the defendants' position at the time of the defendants' alleged negligence.  The plaintiff

does not have to establish that the defendants foresaw or should have foreseen the exact manner in which the harm occurred, but the plaintiff must show that his injury was a natural and probable consequence of the defendants' negligence.

The manufacturer is liable for those injuries that are a -- that are a reasonably foreseeable consequence of its negligence.  When we say that something is foreseeable, we mean that it is a probable and predictable consequence of the defendants' negligent acts or omissions.  Thus, if the manufacturer knew or should have realized that its conduct might cause harm to a potential user of its product in substantially the manner in which it occurred, the injury is regarded as the legal consequence of the manufacturer's negligence.

Liability for negligent design is not limited to situations in which the design defect was the causative factor of the accident.  Rather, liability will also attach where the design defect enhances or worsens the injuries of a person -- that a person sustains in an otherwise foreseeable accident.

I'm going to go back to the form.  And again, we're still on page 1.  After paragraph 1b you'll see a note that says the following:  If you answer subpart (b) "Yes," answer subpart (c).  If you answer subpart B "No," proceed to question 2, which starts on page 2.  But assuming for the moment that you've answered question 1b "Yes," you turn to question 1c, and

that says:  "Was Mr. Osorio negligent in connection with his use of the Ryobi BTS 15 table saw on the date of the accident?" And there's a place for the answer to that question, yes or no.

And then going on, that note at the bottom of page 1 says, If you answer subpart (c) "Yes," answer subpart (d).  If you answer subpart (c) "No," proceed to question 2.

So we'll turn over to page 2.  We'll assume for the moment that you answered 1c "Yes."

And 1d says, "Was Mr. Osorio's negligence a cause of the accident?"  And a place for you to answer that question yes or no.

And following 1d there's an instruction:  If you answer subpart (d) "Yes," answer subpart (e).  If you answer subpart (d) "No," proceed to question 2.

And then, finally 1e, and again -- I'm assuming you've answered 1d for the moment "Yes," -- 1e says, "What percentage of negligence is attributable to each party?"  And there's a place for you to fill in the blanks as to Mr. Osorio and as to One World and/or Ryobi.  And those numbers must total 100 percent.  So the numbers that you fill in there have to add up to 100.

Now we'll put the form down and we'll talk about those particular questions.

As to a defense to this action, the defendants claim that Mr. Osorio was negligent and that his negligence caused

his injuries.  I have already told you the standards for both negligence and causation.  Mr. Osorio is presumed to have been in the exercise of due care, and the defendants have the burden of proving that he was negligent.

If you find that the plaintiff's injury was caused both by the defendants' negligence and by the plaintiff's negligence, then under the law of comparative negligence you are to compare the plaintiff's negligence and the defendants' negligence.  The plaintiff's recovery will not be barred by his contributory negligence unless his negligence is greater than the amount of negligence attributable to the defendants; that is, if plaintiff's negligence is 51 percent or greater.  The plaintiff's negligence, if equal to or less than the total amount attributable to the defendants, only serves to diminish his recovery by the proportion of negligence attributable to him.

If you find that the plaintiff was negligent, the combined total of the plaintiff's negligence and the defendants' negligence must equal 100 percent.

Now I'm going to go back to the form again, we're now on page 2, and the section entitled "Breach of Warranty."

And that first question reads as follows:  2a.  Did the defendant Home Depot, U.S.A., Inc. ("Home Depot") breach the implied warrant of merchantability by selling a product, that is, the Ryobi BTS 15 table saw, that was defectively

designed?  And a place for you to answer that question, yes or no.

And then 2b says, Did the defendants Ryobi and/or One World breach the implied warranty of merchantability by selling a product, that is, the Ryobi BTS 15 table saw, that was defectively designed?  And then a place to answer yes or no.

Put that down.  We're going to talk about breach of warranty.

Mr. Osorio also seeks to recover against Ryobi, One World, and Home Depot under the theory of breach of warranty. When any goods or products are sold, the law of Massachusetts implies a warranty or a promise by the manufacturer that the products are fit for the ordinary purposes for which they are used.  An implied warranty is a promise which arises by operation of law; that is, it does not depend on whether the manufacturer made any actual statements or representations about the product.  The manufacturer warrants that its product is fit for its ordinary purposes, which include both those uses which the manufacturer intended and those uses and misuses which are reasonably foreseeable.  If a product is in a defective condition and, thus, unreasonably dangerous, then it is not fit for the product's ordinary purposes, and the merchant has breached its warranty.

In order to prevail on the claim that the defendant breached their implied warranty of merchantability, the

8-86

plaintiff has the burden of proving by a preponderance of the evidence the following four elements:  First, the defendant then under consideration manufactured and/or sold the product in question.

Second, at the time of his injury the plaintiff was a person whom the manufacturer might reasonably have expected to use, consume, or be affected by the product in a manner that the defendant intended or reasonably could have foreseen.

Third, a defective condition rendering the product unreasonably dangerous existed at the time the product left the hand of the defendant so that the product was not reasonably suitable for the ordinary uses for which products of that kind and description were sold.

And finally, fourth, the defective condition which existed at the time of the sale of the product was a cause of plaintiff's injury.

In general, a defendant can be found liable for breach of warranty only if a defective condition rendering the product unreasonably dangerous was present at the time the defendant parted with possession of the product.

With respect to the second element, the plaintiff must prove that at the time of his injury he was using the product in a manner that the manufacturer intended or reasonably could have foreseen.  In other words, the plaintiff must prove that he was using the product in a way that was probable and

predictable to the defendant when it manufactured or sold the product.  The requirement that the plaintiff's use of the product was reasonably foreseeable means that the manufacturer is not obliged to design against bizarre, improbable or unpredictable accidents.  However, the manufacturer is obliged to take into account both the use of the product as intended and the foreseeable ways in which the product may be misused. Stated differently, the manufacturer is obliged to anticipate the environment in which the product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting.

With respect to the third element, a design defect is a condition that makes the product unreasonably dangerous as a result of the product's design.  To determine whether there was a design defect, you should consider whether the product had any propensity resulting from the manufacturer's conscious design choices that rendered the product unreasonably dangerous to its foreseeable users, and, therefore, unfit for its ordinary foreseeable uses.

A product is defective in design when the foreseeable risk of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product unreasonably dangerous.

A manufacturer warrants that his products are fit for

the ordinary purposes for which such products are used, including both those uses which the manufacturer intended and those which are reasonably foreseeable.  The design must take into account the environment in which the product will be used and provide against the reasonably foreseeable risks attending the product's use in that setting.

Your consideration of this question must focus on the characteristics of the product at the time it left the defendants' hands.  In determining whether the product's design was reasonably safe, as I said before, you should consider, among other factors, the gravity of the danger posed by the design, the likelihood that an accident would occur, whether the risks posed by the product could have been reduced by use of a reasonable alternative design, the financial cost of an improved design, any adverse consequences to the product and to the consumer that would result from an alternative design, and whether the proposed modification would cause undue interference with the performance of the product.  As an additional factor, you may also consider whether the product met the consumer's reasonable expectations as to its safety.

When designing safety devices for a machine, a manufacturer is held to anticipate the uses of that machine, not only must guards provide some degree of protection for workers, they must not so impede the use of the machine that they invite the removal of the guard.

Now we're going to go back to the form again.  And we're now in the -- toward the bottom of page 2.  And you will see after 2b there is an instruction, a rather long instruction, and it says:  If you answer either subpart (a) or subpart (b) "Yes," answer subpart (c).  If you answer both subpart (a) and subpart (b) "No," and you answered either question 1a or 1b "No," your deliberations are complete.  If you answer both subpart (a) and subpart (b) "No," but you answered question 1b "Yes," then proceed to question 3, which has to do with damages.

Now, that's a long instruction, but I think, as you read it carefully, you'll be able to understand it when you look at the form.

Let's assume for the moment that you have answered either (a) or (b) "Yes" and then we go on to subpart (c).  And that says:  "Was the defective design of the Ryobi BTS 15 table saw used by Mr. Osorio on the date of the accident a cause of the accident?"  And a place for you to answer that question yes or no.

Please put the form down, and we're going to talk about that one particular subpart of the question.

I turn now to the fourth element in the proof of breach of warranty.  In this action, the plaintiff also has the burden of proving by a preponderance of the evidence that the product defect -- that the product's defect or unreasonably

dangerous condition, which was present at the time the product left the possession of the defendant, caused the plaintiff's injury.

If you decide that the product was defective, you must then consider whether the defect caused or enhanced the plaintiff's injuries.  Even if you find that the product was defective, the defendants are not liable to the plaintiff unless the defect caused the plaintiff's harm.  To meet its burden, the plaintiff need only show that there is a greater likelihood or probability that the harm complained of was due to causes for which the defendants were responsible than from any other cause.

The defect was the legal cause of the plaintiff's injury if it was a substantial factor in bringing it about and without which the harm would not have occurred.  In other words, if the harm would have occurred anyway, the defendants are not liable.

It does not matter whether other concurrent causes contributed to plaintiff's injuries as long as you find that the product's defect was a substantial factor.

Furthermore, to establish causation, the plaintiff must show that the general kind of loss which plaintiff sustained was reasonably foreseeable to a manufacturer or retailer in the defendants' position at the time the defendants manufactured the product or the retailer sold it.  The

plaintiff does not have to establish that the defendants foresaw or should have foreseen the exact manner in which the loss occurred, but the plaintiff must show that his loss was a natural and probable consequence of the defect in the product for which the defendants were responsible.

Back to the form again. And we're now we're on the very bottom of page 2 at the instruction after 2c, which says, If you answer subpart (c) "Yes," answer subpart (d).

And then, turning over to the last page at the top, the instruction continues: If you answer subpart (c) "No," and you answered either question 1a or 1b "No," your deliberations are complete. If you answered subpart (c) "No," but you answered question 1b "Yes," proceed to question 3; that is, the damages section.

Now, reading -- again, assuming the answer to the previous question was "Yes," 2d says: "Did Mr. Osorio, with full knowledge of the product's defect and danger, nonetheless voluntarily and unreasonably use the Ryobi BTS 15 table saw on the date of the accident?" And a place to answer that question yes or no.

And then a note after 2d says, If you answer subpart (d) "Yes," answer subpart (e). If you answer subpart (d) "No," proceed to question 3.

Assuming for the moment that you've answered 2d "Yes," 2e says: "Was Mr. Osorio's misuse of the Ryobi BTS 15 table

saw the cause of the accident?  And a place for you to answer that question yes or no.

Please put the form down.  We'll talk about those two subpart questions.

In the answer to the plaintiff's claim that the defendants breached their warranty of merchantability with regard to their product, the defendants have presented an affirmative defense that the plaintiffs knowingly, voluntarily, and unreasonably used a product he knew to be defective and dangerous and as a result was injured.  The defendants have the burden of proof on this issue.  This is a defense and will bar recovery by the plaintiff for any breach of warranty if, and only if, you find that the defendants have proved by a preponderance of the evidence that the plaintiff, first, knew of the product's defect and its danger; second, nevertheless proceeded to use the product voluntarily and unreasonably; and third, was injured as a result.

In other words, prior to the accident, the plaintiff must have had knowledge of the product's defect and the danger present and must have proceeded to use the product with appreciation of this known danger.  If you find that the defendants have proven each of those elements, then the plaintiff cannot recover under the legal theory of breach of warranty.

When the alleged unreasonable use is the failure to

8-93

use a safety device, the defendants must prove that the plaintiff at least perceived that the safety device is standard equipment or was regarded as necessary to safe operation so that removing it or using the equipment without the device was dangerous.

Now, I turn to damages. I have completed my instructions on the substantive claims and will now instruct you on the law of damages as the law -- as that law applies to this case. The mere fact that I instruct you on the law of damages does not mean that I believe damages are due or not due in this case. That is for you to decide. You are to consider damages only if you first find that some or all of the defendants are liable to the plaintiff.

Now, for the last time we're going to pick up the form and read about damages.

Question 3, the bottom of page 3, says, "What amount of money, if any, do you award to Mr. Osorio to compensate him fully, fairly, and reasonably for his injuries?" And then a place for you to write that number in both in words and in numbers, like you do on a personal check.

And then there's a note after that that says, "In answering this question, do not reduce your award by the percentage of negligence, if any, for which you may find Mr. Osorio responsible in question 1e." In other words, these are the damages that you find are proved regardless of how you

come out on the contributory negligence question.

Now, if you put the form down one last time, we'll talk about damages.

If you find that the defendants are liable, then you must determine the extent to which they are liable.  The burden is on the plaintiff asserting the claim, that is, Mr. Osorio, to prove damages by a preponderance of the evidence.  You may award only that amount of damages that will reasonably compensate Mr. Osorio for his loss.  Damages are to be awarded to the plaintiff as a fair and reasonable compensation for the legal wrong done to him by the defendants.

You are not permitted to award speculative damages. Any award of damages must be based on the evidence and on a finding by you that the plaintiff claiming damages has convinced you by a preponderance of the evidence that he has been damaged as claimed.  There is no special formula to assess plaintiff's damages.  Any mathematical certainty is not a prerequisite for recovery.  The determination of damages is left to your judgment and estimate as triers of the facts.

If you award damages, you are not to include any amount for interest.  You may not include any amount for court costs or attorneys' fees.  In addition, you may not award punitive damages or any damages to punish the defendants.

In determining the amount of damages which the plaintiff is entitled to recover you should take into

consideration two areas which I will now outline.

Pain and suffering damages.  First, this is called pain and suffering damages.  Pain and suffering are of two kinds, physical pain and suffering and mental pain and suffering.

For physical pain and suffering you are to consider the areas of the body in which you find the plaintiff physically was injured.  You are to take into account the past pain and suffering endured by the plaintiff since the date of his injuries, the present pain and suffering caused by the injuries, and any future pain and suffering which were proved with a reasonable medical probability.

Mental pain and suffering includes any and all nervous shock, anxiety, embarrassment, or mental anguish resulting from the injury.

Also, you may take into account past, present, and probable future mental suffering.

Taking into consideration the nature of the injury, you are to determine what would be a fair and reasonable figure to compensate the plaintiff.  You may consider the extent to which the plaintiff's injuries have caused him a loss of pleasures which he otherwise probably would have had in the form of work or play or family life or whatever.  The plaintiff is entitled to full compensation for any reduction in the enjoyment of life which you conclude has resulted or probably

will result from this accident.

You should also consider and allow a fair, reasonable sum for any permanent condition caused or resulting to the plaintiff as a result of the defendants' wrong.  This should include any permanent marks or permanent loss of bodily function.  You must determine what amount will fairly and reasonably compensate for that loss.

To arrive at a monetary figure for the plaintiff's pain and suffering, you must use your own common sense, background, and experience in determining what would be a fair and reasonable figure to compensate for past, present, and future suffering such as you find has been proved by the evidence.

If you find that the plaintiff will suffer for the rest of his life, you may -- you have the right to consider how long he will probably live.

The second area of damages which you are to consider is medical, hospital, and nursing expenses incurred by the plaintiff on account of his injuries.

The plaintiff is entitled to be compensated for those expenses which were reasonable in amount and which were reasonably necessary.  Therefore, you must determine whether the expense was reasonably related to the treatment and care of the plaintiff and whether the charge itself was reasonable.

You may also consider and allow the plaintiff a fair,

reasonable sum for damages that reasonably are to be expected in the future as a result of the accident.

The plaintiff is entitled to recover for whatever expenses he proves are reasonably required to diagnose and treat any condition brought on by the accident or the resulting injuries. The plaintiff is entitled to recover for the reasonable costs of cure, alleviation or suffering or limitation and control of disability related to the incident.

Once you have calculated each of these areas of damages, you should add them up to arrive at a total award. You must not award duplicative or overlapping damages or award damages more than once for the same loss. The plaintiff is entitled to be made whole again but not to recover more or less than his loss.

And now part three of these instructions, which I'm sure you'll be glad to know is by far the shortest sections of these instructions.

When you go to the jury room to begin considering the evidence in this case, your forewoman, Ms. Sullivan, will assure that every juror is present during all of your deliberations and that all of the jurors, the forewoman included, will have equal and full opportunity to participate in the deliberations. Once you are in the jury room, if you need to communicate with me, the forewoman will send a written, signed, and dated message to me. If you do send a written

message to me, I will discuss it with the lawyers for both sides before responding to you.  So please continue your deliberations to the extent you are able during the time it takes me to respond to any question.  Do not stop your deliberations and wait -- to wait for a response, and do not tell me how you stand either numerically or otherwise on any issue before you until after you have reached a verdict.

On matters touching simply on arrangements for your meals, schedule, and convenience, you are free to communicate with the marshal orally rather than in writing.  You are not to communicate with anyone other than me about the case, however, and then only in writing.

I have read to you what is called the verdict form.  A verdict form is simply the written notice of the decision that you will reach.  You will each have original and copies of this form in the jury room, and when you have reached a verdict, you will have your forewoman fill in, date, and sign the original to state the verdict upon which you agree.  You will then report in writing to the marshal that you have reached a verdict, after which you will be invited to return with your verdict to the courtroom.  Your verdict must be unanimous; that is, you must be unanimous as to the answer to each of the questions you answer.

It is my practice, absent special circumstance, to allow the jury to recess before dinner and to begin

deliberations again in the morning of the next regular court day, in this case, that would be tomorrow.

It is not quite time for you to start deliberating.  I will have a sidebar conference with counsel.  You can be at ease for a few moments, and then I'll return with a final brief instruction to give to you before you retire to deliberate.

And I will see counsel at sidebar.

(At sidebar on the record.)

THE COURT:  Mr. Carpinello.

MR. CARPINELLO:  We have some exceptions to the charge, your Honor.

THE COURT:  Yes.

MR. CARPINELLO:  Your charge was limited when you defined the nature of the negligence was the failure to include SawStop or similar flesh-detection technology.

It is our contention, and we put in evidence through Mr. Holt, that the saw was poorly designed in that it did not have a proper distance between the beginning of the edge of the saw and the blade, that it had a poorly designed guard, and a poorly designed fence.

THE COURT:  Where did you say that in your particular request for instructions, Mr. Carpinello?

MR. CARPINELLO:  The request -- our request for instructions did not list the facts of the case.

THE COURT:  Well, I don't charge on the facts of the

case. I charge on the law. Where in your requests did you request me to say what you've just asked me to say now?

MR. CARPINELLO: We didn't specifically.

THE COURT: Okay. Go ahead.

MR. CARPINELLO: Our requested charge number 15 asked that with regard to defect that whether the defect -- defective condition caused or increased the extent of his injuries. The words "increased the extent of his injuries" were omitted, and we think that's particularly relevant here because the claim is that SawStop would have substantially reduced or mitigated the injuries from a severe injury to a minor cut.

And in the same regard, number 19, the word "caused" or "enhanced" plaintiff's harm. The word "enhanced" was omitted.

If I may have a moment.

(Discussion off the record.)

MR. CARPINELLO: We did ask -- we submitted -- on the first point, your Honor, we submitted a general negligence charge because we did not intend to or think it was appropriate to in the charge describe the facts or describe how the saw was negligent. And when you gave the charge, that limited and defined the nature of the negligence, I think that narrowed the scope of the negligence below or within what was actually introduced at trial. There was testimony at trial of various other defects.

We gave a general negligence charge, which we thought was appropriate, which didn't reference any of the particular ways in which the machine was defective. And we thought that was --

THE COURT: Then the jury can determine if, in fact, it agrees with you, whether those were negligent or not.

MR. CARPINELLO: Except your charge limited it. You defined the negligence specifically as the plaintiff claims that the saw was negligent because it failed to contain SawStop or any flesh-detection technology. And when you add that, when you put that limiting charge on, you are telling the jury that they're not to consider anything else. That's the natural presumption of that statement.

Our charge did not say SawStop or flesh-detection technology. Ours was a general charge of negligence and left to the jury to consider in what ways the product was defective.

THE COURT: Okay. Anything else?

(Discussion off the record.)

MR. CARPINELLO: One other item, your Honor. Without having it in front of me, I wasn't sure I heard it correctly, but on the misuse defense, you mentioned removal of the safety device. I thought in the second half of the sentence you made reference to removal of the guard. And --

THE COURT: What part of the charge is this?

MR. CARPINELLO: That is the misuse defense in the

implied warranty.

MS. MONROE:  The unreasonable use.

MR. CARPINELLO:  The unreasonable use defense.  I thought I had heard when you started talking about whether it was unreasonable for the plaintiff to remove a safety device, I thought you used the term "removal of the guard."  And I think that would be inappropriate, first, because you're specifically referencing one safety device and not others; and secondly, because there's no evidence in the record that the guard was the cause of the fact of the accident.  Indeed, defendants' expert testified to the contrary.

THE COURT:  Okay.  Any response to plaintiff's requests?

MR. APPEL:  Well, first, your Honor, this issue of these other so-called defects.  I believe there is absolutely no evidence that any of these other so-called defects were causally related to this accident.  So, you know, yes, there were references that -- I don't even know if there was sufficient testimony that the fence or any other components were unreasonably dangerous, but there was certainly no testimony that any of those other defects were causally related to this accident.

The only testimony was that product -- actually stated it was SawStop or other flesh detection, and that is the reason this is a defective product.  So I think your charge was

sufficient.

THE COURT:  Any other comments on the other objections?

MR. APPEL:  I don't -- I have no copy of the -- of your charge on the unreasonable use, but I didn't hear what Mr. Carpinello heard.  It says what it says.

THE COURT:  Okay.

MR. APPEL:  The only other -- well, I have no other comments on what the plaintiff --

MR. CARPINELLO:  May I have a brief response, your Honor, to his --

THE COURT:  Yes.

MR. CARPINELLO:  Mr. Holt testified, and the record would reflect that he testified, that the saw -- the distance between the edge of the saw and the blade was, in fact, a causative factor to the accident because there was insufficient room for Mr. Osorio or any operator to hold his hand without placing his hand immediately in front of the guard.

He also testified that the guard and the fence were inadequately designed, and that was a causative factor in the sense that that's what led to their non-use.

You don't have to show that the fence is dangerously defective.  The product is defective because the safety device fails of its purpose because it was inadequately designed.  And Mr. Holt specifically testified in detail about the inadequate

design of the fence, the fact that the fence was broken, the fact that the fence was not properly constructed, and the inadequate design of the guard.

THE COURT:  Okay.  Anything else?  Do the defendants have anything regarding the fence?

MR. APPEL:  I have only one thing, your Honor, and this is actually -- I apologize for not bringing this up yesterday.  But when we were at the pretrial (sic.), we talked about you instructing the jury they were not to consider any lost wages.

You did not mention lost wages in the elements of damage, but my only concern is that some jurors might take it upon themselves to document the fact that he lost a couple of years of work, they might, you know, throw that in.

THE COURT:  So what would you have me do?

MR. APPEL:  Just that there is no claim of any loss of earning capacity and they're not to -- or future loss of earning capacity, and they're not to take that into account.  A very simple --

MR. CARPINELLO:  We have no objection.

THE COURT:  Well, okay.  I am not going to go back over that.  I believe I -- I've instructed them on damages.

Thank you, counsel.  I will consider what you've said, and if I'm going to make a change, I'll let you know, otherwise we're going to go.

MR. CARPINELLO:  Thank you, your Honor.

MR. APPEL:  Thank you.

(Discussion off the record.)

(End of discussion at sidebar.)

THE COURT:  All right.  Members of the jury, it is time for the case to be submitted to you.  You may commence your deliberations.  All of you who are the jury must be together at all times while you are deliberating.  When you need a recess for any purpose, your forewoman, Ms. Sullivan, may declare a recess.  Do not discuss the case during a recess in your deliberations.  All of your discussion about the case should occur only when you are together and your forewoman has indicated that deliberations may proceed.  This should be your procedure so that everyone on the jury will have an equal opportunity to participate and to hear what other members of the jury have to say.

You may go to the jury room and commence jury deliberations.

THE CLERK:  All rise for the jury.

(Jury left the courtroom.)

THE COURT:  Be seated counsel.

I need counsel to remain with the deputy clerk to assemble all of the exhibits in numerical order so if and when the jury wants to review them, they will have them readily available.  So you need to stay here for that.

And then I need you also to be available within ten minutes' notice if we have a question from the jury. So if you're going to be anywhere, you need to let Mr. Nicewicz know where you are and be able to be back in ten minutes.

We will provide lunch for the jurors, I think, momentarily. So if you're going to get some lunch, probably sooner rather than later would be better. But, in any event, I need you to have you available.

Is there anything else that needs to come to my attention before we recess?

MR. APPEL: No, your Honor.

MR. CARPINELLO: No.

THE COURT: Then we are in recess until further notice.

(Recess taken at 12:52 p.m.)

(The jury entered the room at 5:13 p.m.)

THE COURT: Good afternoon, jurors. You have asked for permission to go home for the day, and that permission will be granted. You've had a long day and worked hard, and, therefore, I want you to go home and be rested when you come back and continue with your deliberations.

However, I need to give you my sermon again, and this time it has to be -- you have to do another multiplier because it is absolutely crucial, now that you are in deliberations, that you not talk to anybody else about those deliberations.

That would be entirely improper.  You are to decide this case based upon the evidence that comes into this courtroom and based upon your collective opinions that you've been expressing this afternoon.  And, therefore, it would be inappropriate for you to do any independent research, to talk to anybody about this case and so forth.

So please honor my instructions.  I will ask you tomorrow morning whether you have been able to do that.  And I really sincerely hope I get a unanimous showing of hands.

So have a pleasant evening.  Don't worry about this case.  We'll see you back here tomorrow morning.  I will see you at 9 a.m. before you start your deliberations just to reassure you that we're here if you need us and so forth.  So have a pleasant evening.  I'll see you tomorrow morning at 9 a.m.  Again, please leave your notebooks in the jury room.

(The jury was excused.)

THE COURT:  All right.  Anything that needs to come to my attention outside the hearing of the jury?  Then we will reassemble at 9 a.m. tomorrow morning.  It's my procedure to say hello to the jury in the morning and tell them that I'm here and available for any questions and then send them out to deliberate.  So I will be here at roughly 9 a.m. to start this process.  So we're in recess for the evening.  See you tomorrow morning at 9 a.m.

(Whereupon, at 12:15 p.m. the trial recessed.)

C E R T I F I C A T E

We certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of our skills and ability.

/s/Cheryl Dahlstrom                03/03/2010

Cheryl Dahlstrom, RMR, CRR         Dated

Official Court Reporter

/s/Debra M. Joyce                  03/03/2010

Debra M. Joyce, RMR, CRR           Dated

Official Court Reporter